James E. Cecchi
Caroline F. Bartlett
Donald A Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
Gerald H. Silk *(pro hac vice forthcoming)*
Avi Josefson *(pro hac vice forthcoming)*
Michael D. Blatchley *(pro hac vice forthcoming)*
Abe Alexander *(pro hac vice forthcoming)*
Jake Nachmani *(pro hac vice forthcoming)*
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AIRCONDITIONING AND REFRIGERATION INDUSTRY HEALTH AND WELFARE TRUST FUND, AND FIRE AND POLICE HEALTH CARE FUND, SAN ANTONIO, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>VALEANT PHARMACEUTICALS INTERNATIONAL, INC., AND PHILIDOR RX SERVICES,<br><br>                    Defendants. | Civil Case No. _____<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 2

II.     JURISDICTION AND VENUE ............................................................... 6

III.    THE PARTIES....................................................................................... 7

        A.      Plaintiffs .................................................................................7

        B.      Defendants .............................................................................7

IV.     FACTUAL BACKGROUND .................................................................. 8

        A.      Third Party Payors And Pharmacy Benefit Managers ............................8

        B.      How Drug Prices Are Set.........................................................9

        C.      Valeant's Growth By Acquisition Strategy ..............................10

        D.      Valeant's Secret Network Of Captive Pharmacies ..................13

        E.      Defendants Use Their Secret Nationwide Network Of Captive Pharmacies To Insulate Valeant's Branded Drugs From Generic Competition And Exponentially Inflate Drug Prices..................................................20

        F.      Valeant's And Philidor's Misrepresentations To The Class ..............25

        G.      Defendants Reaped Hundreds Of Millions Of Dollars In Ill-Gotten Profits .........33

        H.      Defendants' Fraud Is Finally Revealed................................35

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES ............... 40

        A.      Defendants' Misrepresentations To Third Party Payors .....................40

        B.      Defendants' Misrepresentations To Patients And Physicians .............42

        C.      Defendants' Misrepresentations To State Regulators ...........................42

VI.     CAUSATION AND INJURY TO THE CLASS ............................. 44

VII.    CLASS ACTION ALLEGATIONS ....................................... 47

VIII.   CLAIMS FOR RELIEF ......................................................... 50

IX.     PRAYER FOR RELIEF ........................................................ 55

X.      JURY TRIAL DEMAND ..................................................... 57

1.      Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust") and Fire and Police Health Care Fund, San Antonio ("San Antonio" and together with ACR Trust, "Plaintiffs"), by their undersigned attorneys, bring this action for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 on behalf of themselves and all other similarly situated third party payors ("TPPs") who paid claims, or incurred costs, in connection with prescriptions for Valeant Pharmaceuticals International, Inc. ("Valeant") branded drug products and were injured thereby (the "Class") from January 2, 2013 through November 9, 2015, inclusive (the "Class Period").

2.      Plaintiffs allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel. This investigation included, among other things, a review and analysis of: (i) public reports and news articles; (ii) public filings by Valeant or its affiliates with state and federal regulators, including the California and Texas Boards of Pharmacy; (iii) contracts between pharmacy benefit managers and Valeant-affiliated pharmacies; (iv) research reports by securities and financial analysts; (v) litigation materials from the case *R&O Pharmacy, LLC v. Valeant Pharmaceuticals North America LLC*, 15-cv-07846, filed in the United States District Court for the Central District of California; (vi) former Philidor Rx Services employees interviewed by Plaintiffs' counsel; and (vii) other publicly available material and data identified herein. Plaintiffs' counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within Defendants' custody or control. Plaintiffs contend that further substantial evidentiary

support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.        PRELIMINARY STATEMENT

3.        This case arises from a fraudulent scheme perpetrated by Valeant and its top executives to use a secret network of captive pharmacies to shield the Company's drugs from competition, fraudulently inflate the prices of its products, and artificially boost sales. Valeant created a secret pharmacy network (the "Valeant Enterprise") as a platform through which Defendants implemented a host of fraudulent practices to improperly inflate the reimbursements for Valeant drugs paid for by TPPs, including Plaintiffs and the Class. The fraud Defendants perpetrated through the Valeant Enterprise was so vast in execution and so devastating to its victims that media and commentators have dubbed it the "Pharmaceutical Enron."

4.        Valeant's business model consisted of acquiring drugs from other pharmaceutical companies and massively increasing prices, rather than researching and developing new drugs . For instance, after acquiring the dermatology drug Noritate 1%, Valeant increased the price *212%*. Similarly, Valeant increased the price of Tagretin gel, another dermatology drug, by *250%* over the course of the Class Period.

5.        Far cheaper generic equivalents are available for most of Valeant's drugs. Absent the scheme Defendants implemented through the Valeant Enterprise, Valeant's bloated drug prices would have been unsustainable in the face of competition from these cheaper generic alternatives. The secret pharmacy network at the heart of the Valeant Enterprise was created specifically to circumvent the "problem" of generic competition.

6.        Defendants built their secret network of captive pharmacies around Philidor Rx Services, LLC ("Philidor"), a Pennsylvania mail order pharmacy. Valeant then created a host of

2

shell companies owned through Philidor, which Philidor used to acquire interests in additional retail pharmacies all over the United States.

7.    Defendants channeled prescriptions for Valeant's branded drugs  through Philidor.  Philidor employees, as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of fraudulent practices to prevent the substitution of cheaper generic equivalents for Valeant branded drugs.  These fraudulent practices included:

- Valeant employees worked at those pharmacies secretly controlled by Valeant using aliases to conceal their identity as Valeant employees;

- Defendants instructed employees to change codes on prescriptions to ensure that the prescription would be filled with a Valeant drug, rather than a generic equivalent;

- Defendants used false pharmacy identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursements;

- Defendants submitted numerous prescription renewals for reimbursement, falsely representing to TPPs and PBM agents that patients had requested renewals of their prescriptions when no such request had been made;

- Defendants waived patient co-pays to remove patients' incentive to seek out cheaper drugs, and then misrepresented the "actual charges" for Valeant drugs by failing to account for the co-pay waivers;

- Defendants used pharmacies within the Valeant Enterprise to enable Philidor to indirectly operate in states where it had been denied a license; and

- Defendants made misrepresentations directly to patients in order to boost Valeant's drug sales.

8.    Many of these fraudulent practices are catalogued in manuals Defendants distributed to employees, assuring those employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*."  Those "back door" approaches" were fraudulent, and included: (1) changing prescription codes on claims, *i.e.*,

3

*deliberately altering the prescribing doctor's instructions as set forth in the prescription*, to require that the prescription be filled with Valeant's brand-name drugs; (2) making claims for refills that were never requested by patients – a scheme that former Philidor employees have confirmed was jointly developed by top Valeant and Philidor executives; (3) misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs – *a fraudulent practice that Andrew Davenport, Philidor's CEO, acknowledged in a July 19, 2015 email he knew was ongoing*; and (4) submitting claims that inflated the price charged by failing to take into account serial waivers of patient co-pays.

9.      The success of Defendants' scheme hinged on its secrecy: had TPPs or PBMs known the truth about Defendants' captive pharmacy network, they would have denied claims submitted by pharmacies in the Valeant Enterprise.   To prevent discovery, Defendants deliberately misrepresented to state regulators the ownership and control of the captive pharmacies that constituted the Valeant Enterprise precisely to ensure that Valeant could charge supra-competitive prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased.   To maintain the secrecy of the Valeant Enterprise, Defendants also issued a host of false and misleading statements to a number of constituencies, including TPPs, PBMs, and state regulators designed to conceal Valeant's relationship with its captive pharmacies and its improper use of the secret pharmacy network to inflate drug prices and sales.   All of those misrepresentations – to the Class and others – were made to enable Defendants to engage in the misconduct described herein that caused harm to the Class.

10.     Through their fraudulent scheme, Valeant reaped hundreds of millions of dollars in ill-gotten profits at the expense of the Class, the members of which paid inflated prices for Valeant drugs, and paid for Valeant drugs that should never have been dispensed.   Indeed, in

2015 alone, Valeant secretly channeled nearly $500 million worth of its drugs through its central pharmacy hub, Philidor.

11.     The fallout from the unmasking of Valeant's secret pharmacy network in late October 2015 has been telling.  Shortly after Valeant's relationship with Philidor was revealed, the three largest pharmacy benefit managers in the U.S. – CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx –announced that they were dropping Philidor from their networks.  They also disclosed that audits revealed that Philidor had failed to comply with the terms of their agreements.  In October 2015, Valeant announced that it had terminated its relationship with Philidor.  Valeant also received a subpoena issued as part of a criminal investigation into possible violations of federal health care laws.  After news about the secret pharmacy network reached investors – and the Company failed to provide reasonable explanations for the existence and secrecy of that network – Valeant lost over $100 billion of its market capitalization.  In March 2016, Pearson, Valeant's CEO during the Class Period, was forced to resign as a result of numerous government investigations as well as investor and public scrutiny into Valeant's misconduct.

12.     Today, Valeant and the Valeant Enterprise are the focus of investigations by Congress, the U.S. Department of Justice, and the SEC.  In testimony before the U.S. Senate Special Committee on Aging on April 27, 2016, Pearson conceded that Valeant's price-inflation practices were improper, admitting that Valeant was "too aggressive – and I as its leader, was too aggressive – in pursuing price increases on certain drugs."  Through this action, Plaintiffs seek to recover the damages caused by Valeant's misconduct and the "aggressive" price increases that were facilitated through the fraud and violations of law set forth herein.

## II.      JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d)(2).  Valeant sold at least $500 million worth of its drugs through its captive pharmacy network during the Class Period, and the amount in controversy exceeds $5 million.  Moreover, the Class is composed of hundreds of TPPs, such as welfare benefit funds and insurers, located throughout the United States, less than one third of whom are citizens of New Jersey.

14.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, with respect to Counts I and II because those Counts arise under the laws of the United States, and 28 U.S.C. 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO), 18 U.S.C. § 1962.

15.      This Court has personal jurisdiction over the Defendants because they have sufficient minimum contacts with New Jersey, as each Defendant either resides in New Jersey or communicated with, and coordinated its activities, with Defendant Valeant, which has its U.S. headquarters in New Jersey.

16.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because Defendant Valeant is headquartered and resides in this District and conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.  Defendant Philidor conducted business in this District during the Class Period.

17.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails and interstate telephone communications.

### III.   THE PARTIES

#### A.   Plaintiffs

18.     Plaintiff Airconditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust") is a health and welfare benefit fund with its principal place of business at 3500 W. Orangewood Avenue, Orange, California 92868.   ACR Trust is a multi-employer welfare benefit plan, within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(1), (2) and 1003(a), which provides health benefits to eligible participants and their beneficiaries.   Membership comes from various union members, who are involved in the air conditioning and refrigeration industries.   Throughout the Class Period, ACR Trust paid or reimbursed eligible ACR Trust participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged herein.

19.     Plaintiff Fire and Police Health Care Fund, San Antonio ("San Antonio") is a public healthcare fund located at 11603 W. Coker Loop, Suite 130, San Antonio, Texas 78216, which provides health benefits to over 12,000 eligible participants and beneficiaries.   Throughout the Class Period, San Antonio paid or reimbursed eligible San Antonio participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged herein.

#### B.   Defendants

20.     Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") is a Canadian corporation, incorporated in British Columbia, Canada, and has its United States headquarters located at 400 Somerset Corporate Blvd., Bridgewater, New Jersey.   Valeant is a multinational, pharmaceutical and medical device company that markets a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter products, and medical devices, directly or

7

indirectly, in over 100 countries. Valeant is one of the largest pharmaceutical companies in the United States.

21.     Defendant Philidor Rx Services, LLC ("Philidor") is a specialty, mail-order pharmacy that, during the Class Period, dispensed primarily Valeant products. Philidor is a Delaware corporation, with its corporate headquarters located at 330 South Warminster Road, Hatboro, Pennsylvania.

## IV.     FACTUAL BACKGROUND

### A.     Third Party Payors And Pharmacy Benefit Managers

22.     A third party payor ("TPP") is any organization, public or private, that pays or insures health or medical expenses on behalf of customers, members, beneficiaries or their family members. TPPs can include commercial insurance companies, self-insured employers, and multi-employer Taft-Hartley health or welfare funds.

23.     Insureds and beneficiaries of a TPP generally pay a premium or premium contribution (for employer-sponsored plans) for coverage, or have a premium paid on their behalf by an employer. When an insured fills a prescription under a TPP plan, a TPP generally pays the majority of the insured's prescription drug costs. The remainder of the cost is generally covered by the insured in the form of a co-pay and/or deductible payment.

24.     Pharmacy benefit managers ("PBMs") serve as middlemen between drug manufacturers and/or pharmacies and the TPPs that pay for drug prescriptions. PBMs act as agents for TPPs. PBMs enter into contracts with TPPs to provide programs designed to help maximize drug effectiveness and contain drug expenditures by influencing the behaviors of prescribing physicians, pharmacists and members. Accordingly, on behalf of TPPs, PBMs provide numerous services, including developing a pharmacy network, formulary design, negotiating drug rebates, drug utilization review, processing and analyzing prescription claims.

8

25.     In a typical situation where a benefit plan participant seeks to fill a drug prescription, the role of the PBM is illustrated as follows: the insured patient visits a network pharmacy; the pharmacy checks with the PBM to confirm patient eligibility, coverage and copayment information; the patient pays the co-payment (and any deductible) and purchases the drug; the PBM then reimburses the pharmacy for the remainder of the negotiated drug price including the ingredient cost and a dispensing fee less the co-payment; the PBM then bills the TPP for the payments it made on behalf of the TPP pursuant to the terms of the contractual agreement between the TPP and the PBM.

26.     Recognizing that TPPs generally pay the bulk of an insured's prescription costs, Defendants exploited TPPs by using their secret network of captive pharmacies to shield Valeant's drugs from competition, fraudulently raise the prices of its products, and artificially boost sales, improperly inflating the reimbursements for Valeant drugs paid for by TPPs.  For the same reason, Valeant and its secret pharmacy network provided a platform through which Defendants implemented a host of fraudulent practices to improperly inflate the reimbursements for Valeant drugs paid for by TPPs.

### B.     How Drug Prices Are Set

27.     The common pricing benchmark for virtually all retail drug reimbursement transactions is the "Average Wholesale Price" ("AWP").  AWP represents the manufacturer's published catalog or list price for a drug product.  Commercial publishers of drug pricing data, such as Red Book and First DataBank, have published AWP data since the 1970s.  AWP is used to determine drug prices and third-party reimbursement throughout the healthcare industry.

28.     The AWP may be determined by several different methods.   The drug manufacturer may report the AWP to the individual publisher of drug pricing data. The AWP may also be calculated by the publisher based upon a mark-up specified by the manufacturer that

is applied to the wholesale acquisition cost ("WAC") or direct price ("DP").  The WAC is the manufacturer's list price of the drug when sold to the wholesaler, while the DP is the manufacturer's list price when sold to non-wholesalers.

29.     Pharmaceutical manufacturers typically sell their on-patent brand drugs to wholesalers at the manufacturer's list prices, usually WAC, net of prompt-pay discounts.  AWP is generally based on the standard formula of WAC + 20% or 25% or, far less frequently, the manufacturer's suggested wholesale price ("SWP") – *i.e.*, the price the drug maker would set – if an SWP is provided.

30.     Accordingly, a pharmaceutical manufacturer's ability to set a benchmark data point, such as WAC, by increasing the price of its drugs sold to certain parties, automatically increases the drug's published AWP, which in turn raises the price of that drug when sold to all parties.  Through Defendants' fraudulent scheme, Valeant was able to charge inflated prices for Valeant-branded drugs by eliminating generic competition through illegal and improper means, including by blatantly breaching contractual and state law requirements mandating generic substitution through the Valeant Enterprise.  In doing so, Valeant was able to sustain an artificially inflated benchmark price for its branded drugs that otherwise would have been much lower, thus causing Valeant's branded drugs to be sold at artificially high prices both within and outside of the Valeant Enterprise, causing injury to the Class.

### C.     Valeant's Growth By Acquisition Strategy

31.     Prior to and during the Class Period, Valeant's business model was focused on achieving revenue growth by acquiring drugs and drug companies and then dramatically raising prices of the acquired drugs.  Indeed, since 2010, Valeant has acquired companies with a total value of at least $36 billion. Valeant is the sixth-largest acquirer, globally, by deal size.  Notably, since 2008, when Michael J. Pearson became CEO of Valeant, Valeant has acquired at least 100

companies.  For this reason, analysts and pharmaceutical industry observers referred to Valeant as a "serial acquirer."

32.     Valeant's acquisitions gave the Company access to a diverse portfolio of drugs. For example, in September of 2010, Valeant engaged in a reverse merger with Biovail Corp., Canada's largest pharmaceutical company, for $3.3 billion, with Michael J. Pearson becoming CEO of the combined company.   The merger gave Valeant access to a portfolio of dermatological drugs, drugs treating disorders of the central nervous system, and the anti-depression drug Wellbutrin.  In 2012, Valeant purchased Medicis Pharmaceutical Corp. for $2.6 billion, providing Valeant with access to drugs for the treatment of acne, as well as other aesthetic skin care products.  Also in 2012, Valeant acquired Natur Produckt International of Russia for $180 million, giving Valeant control of a portfolio of a cough and cold treatments.  In 2013, Valeant bought eye-care giant Bausch & Lomb from private equity firm Warburg Pincus for $8.6 billion, giving Valeant access to Bausch & Lomb's specialized opthamology and contact lens portfolio.  In April 2014, Valeant completed its $11 billion purchase of Salix Pharmaceuticals, a maker of drugs treating gastrointestinal disorders.

33.     Valeant's growth by acquisition strategy appeared successful.  Year after year, the Company reported consistent and steep growth, reporting $7.71 billion of revenue for the first three quarters of 2015, and revenues of $8.25 billion for 2014, $5.76 billion for 2013, and $3.48 billion for 2012.  As of July 2015, Valeant was valued at over $90 billion, making it the largest public company incorporated in Canada and the largest pharmaceutical company headquartered in the United States.

34.     During the Class Period, Valeant attributed the success of its strategy to its aggressive cost-cutting strategies, its "outstanding sales teams, implementation of innovative

marketing approaches, great leadership, [and] a portfolio of great products." Similarly, in a February 22, 2015 Valeant press release, Michael J. Pearson attributed Valeant's explosive growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services." These misrepresentations concealed from the Class – as well as regulators – the true driver of the Company's growth.

35.     In truth, a key driver of Valeant's growth was its fraudulent use of a secret network of captive pharmacies. Valeant's use of that secret pharmacy network enabled Valeant to exponentially increase the prices of its branded drugs, despite the fact that cheaper, generic substitutes existed for many of these drugs. In an effort to conceal its scheme, Valeant consistently downplayed the extent to which pricing increases contributed to the Company's growth. For instance, on an April 29, 2015 earnings call with investors, CEO Michael J. Pearson was asked how much price contributed to growth in the quarter. Pearson falsely responded that "In terms of price volume, actually, volume was greater than price in terms of our growth." On February 4, 2016, after the conclusion of the Class Period, Valeant issued a press release **admitting** that this statement was false and that, in truth, Valeant's growth was a result of its increasing the prices of its drugs. (*The Wall Street Journal*, February 2, 2015, *Valeant's Sales Growth: Driven by Price Increases or Volume Growth*).

36.     Likewise, in a further effort to obscure Valeant's reliance on the price increases facilitated by its captive network of pharmacies, Valeant changed the way it reported its financial results, refusing to break out the revenue numbers for major acquisitions and making it impossible for the public to track whether acquired drugs were experiencing any organic growth.

12

In 2013, the year in which Valeant created Philidor, the drugmaker cut the number of operating segments reported in half, going from four to two. Because various segments were driven by just a few main products, the public could previously track how those products were performing. But with just two operating segments, it became impossible for the public to obtain that same information.



**Figure 1. Valeant's changes to its financial reporting at the time it created Philidor**

**D.      Valeant's Secret Network Of Captive Pharmacies**

37.      In order to insulate its brand name drugs from generic competition and boost sales, Valeant embarked on a scheme to funnel sales of its branded drugs through a nationwide network of captive pharmacies. Through this secret network, Valeant insulated its products from generic competition throughout the Class Period by, among other things, flouting statutory or contractual mandates requiring substitution of generic equivalents for Valeant branded drugs and submitting false claims information to TPPs and PBMs. This fraudulent scheme enabled Valeant to massively increase the price of its drugs and inflate the number of claims paid on prescriptions for those drugs. As a result, the Class overpaid for Valeant's expensive branded drugs, were prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed.

38.     At the center of this network of captive pharmacies was Philidor.  On January 2, 2013, Defendants incorporated Philidor, a purportedly independent specialty mail order pharmacy.  During the Class Period, Philidor was licensed in 45 states and the District of Columbia.

39.     During the Class Period, Philidor falsely held itself out to be a "specialty pharmacy."  True specialty pharmacies focus on self-administered specialty drugs covered under a patient's pharmacy insurance benefit.  Such specialty drugs are almost always highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses such as cancer, rheumatoid arthritis, multiple sclerosis and HIV.  Often, such drugs come in the form of self-administered injections or require constant refrigeration.  Philidor, on the other hand, was principally devoted to dispensing Valeant's undifferentiated traditional drugs — principally its dermatological products — most of which had low-cost generic substitutes. Indeed, as Philidor has itself admitted, Valeant was Philidor's "only client." (Business Insider, October 22, 2015, *A Company involved with Valeant has shed light on a critical accusation in that brutal short-selling note*).

40.     Valeant employees worked with Philidor's founders to set up the pharmacy in 2013. One month before Philidor was even incorporated, Valeant hired manager Gary Tanner to act as the drug company's special "liaison" with Philidor and help ramp up the pharmacy's operations.   Likewise, on the same day Philidor was incorporated*,* Valeant hired Laizer Kornwasser – a former senior executive at Medco – to oversee Valeant's relationship with Philidor.  Kornwasser, who supervised Tanner, reported directly to Valeant CEO Michael J. Pearson.  Immediately upon being hired, Kornwasser received nearly $5 million in equity awards. Both Kornwasser's prominence in Valeant's organizational structure and his outsized

compensation demonstrate that Valeant viewed its relationship with Philidor as critically important to the Company's success. Tanner and Kornwasser were key employees who remained closely involved in the details of running the pharmacy, including expanding its business.

41.     During the Class Period, Valeant installed a cadre of its employees within Philidor (in addition to Tanner and Kornwasser) to supervise operations at the pharmacy and fraudulently increase the sale of Valeant drugs. For instance, Valeant placed a 30-person team inside Philidor with instructions to show doctors how to direct patients to Valeant products. At different points in Philidor's evolution, Valeant employees were responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations.

42.     In order to conceal Philidor's connection to Valeant, these employees used aliases when sending emails from Philidor accounts. For example, one Valeant employee who also worked for Philidor, Bijal Patel, was instructed to and used "Peter Parker" as an alias (the comic book character Spiderman's real name) when sending emails from his Philidor account to obscure the fact that he was employed by both Valeant and Philidor. For the same reason, other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child) and "Brian Wilson" (the lead singer and songwriter of the Beach Boys).

43.     Defendants then created a host of shell companies through Philidor, which they used to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network. Indeed, Defendants created a network of at least 76 "phantom" pharmacies by causing Philidor or its affiliates to file with state regulators pharmacy applications on behalf of various shell companies that Valeant and Philidor used to implement

15

their scheme.  In order to keep their captive pharmaceutical network a secret, Defendants caused the shell companies to make false and misleading statements in pharmacy applications filed with state regulators that failed to disclose the companies' relationship with Valeant and Philidor.

44.     For example, Philidor submitted an application with the California State Board of Pharmacy on or about August 15, 2013 that contained numerous false and misleading statements designed to hide Valeant's control over Philidor.  In that application, the California State Board of Pharmacy found that Philidor and its CEO Andrew Davenport, while under penalty of perjury, falsely represented:

- that Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- that Gregory W. Blaszczynski was an authorized signatory for Philidor's financial transactions;

- that that there were no individuals or entities with a beneficial interest in Philidor;

- that there were no owners or shareholders of Philidor, when in fact there were sixteen;

- that there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- that there were no entities with 10% or more ownership interest in Philidor; and

- that Andrew Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

45.     On May 16 2014, the California State Board of Pharmacy denied Philidor's application, finding that Philidor and Davenport knowingly made false statements concerning these topics, and that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements,

were "guilty of unprofessional conduct." The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy license in February 2016.

46.     Undeterred by the California State Board of Pharmacy's findings and determined to gain access to the California market, the largest insurance marketplace in the United States, Defendants caused a Valeant/Philidor-controlled shell company, Lucena Holdings ("Lucena"), to acquire a stake in a California pharmacy called "West Wilshire Pharmacy" in an effort to circumvent the Board of Pharmacy's licensing denial. In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

47.     Similarly, Philidor caused another shell company, Isolani, LLC ("Isolani"), to purchase California-based mail order pharmacy, R&O Pharmacy, LLC ("R&O"), in an agreement dated December 1, 2014. After Philidor's purchase through Isolani, R&O began dispensing thousands of prescriptions, dwarfing the size of its business prior to its acquisition by Philidor/Valeant. These new prescriptions were extraordinarily expensive for simple dermatological conditions like acne or eczema – all for drugs manufactured by Valeant. It was only when R&O began its own investigation into Philidor that it discovered the relationship

between Philidor and Valeant.  In connection with its purchase of R&O, Isolani concealed from California regulators its relationship with Philidor and Valeant.

48.     To date, Defendants have not disclosed the full scope of Valeant's secret pharmacy network and the identities of all the pharmacies and shell companies that comprised the Valeant Enterprise.  However, elements of that network have become public.  For example, the below chart illustrates one segment of Valeant's retail pharmacy network, the California associates in the Valeant Enterprise that have been revealed to date, and the byzantine corporate structure Valeant used to maintain its secrecy:



**Figure 2. Valeant's Network of Captive Pharmacies in California**

49.     Likewise, Defendants misled state regulators in Texas in filings related to the purchase of a retail pharmacy.  Defendants caused Back Rank, LLC ("Back Rank"), a Philidor-controlled shell company, whose managing member, James R. Fleming, was Philidor's Controller, and whose address is the same as a listed Philidor mailing address, to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit").  In a September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent that no state had

18

ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]." In reality, as referenced above, California had denied Philidor's pharmacy application the previous year. Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

50.     Like Philidor itself, many of the shell companies Defendants used to build their covert pharmacy network had chess-related names. "Philidor" is a reference to 18th Century chess master Francois-Andre Philidor and his eponymous Philidor defense. "Lucena" and "Back Rank," both discussed above, refer to endgame chess strategies, while "Isolani" is a term for an isolated queen's pawn. A sampling of the numerous additional shell companies in Defendants' captive network, all registered in Delaware, likewise share chess-related names:

- Fifty Moves, LLC is a reference to the "Fifty Move Rule";

- ELO Pharmacy LLC is a reference to the ELO chess ranking system;

- C-K Pharmacies LLC is a reference to the Caro-Kahn chess defense;

- Tarrasch Pharmacy Holdings, LLC is a reference to the Siegbert Tarrasch, an acclaimed 19th Century chess master;

- NC3 Pharmacy LLC, is a reference to the Dunst Opening (a strategy popularized by American chess player Ted A. Dunst); and

- Lasker Pharmacies, LLC is a reference to the 19th Century chess player Emmanuel Lasker.

51.     Defendants also created specific entities that helped secretly facilitate the flow of money between Philidor and Valeant. One such entity was KGA Fulfilment Services, Inc. ("KGA"), a wholly-owned Valeant subsidiary which Valeant used to lend money to Philidor's co-owners and managers and which itself owned the option to purchase Philidor. Like the names of the shell companies in Valeant's covert pharmacy network, KGA's name is also a reference to chess: KGA stands for "Kings Gambit Accepted," a common opening move.

52.     Similarly, in connection with the U.S. Senate Special Committee on Aging's April 27, 2016 hearing on Valeant and the Company's practice of increasing the price of its drugs, Philidor admitted in an interrogatory that SafeRx Pharmacy, D&A Pharmacy, Presciption Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy were pharmacies through which Philidor dispensed Valeant drugs.

### E.     Defendants Use Their Secret Nationwide Network Of Captive Pharmacies To Insulate Valeant's Branded Drugs From Generic Competition And Exponentially Inflate Drug Prices

53.     While Valeant's success was predicated on its ability to sell the drugs it acquired at prices inflated far beyond those at which they had been previously marketed and sold, such a strategy would ordinarily have been impossible to execute because most of Valeant's drugs have cheaper generic equivalents.  Ordinarily, pricing a brand-name alternative to a generic drug at a huge premium would have caused that product to lose market share to the point where such a price increase would be unprofitable.  Indeed, the primary purpose behind Defendants' secret network of pharmacies was to ensure that Valeant's branded drugs would be insulated from generic competition at the retail outlet, where such competition plays out as a result of the incentives to pharmacies and patients. Valeant's dermatological products are especially sensitive to such competition.

54.     Through the Valeant Enterprise, Defendants were able to channel prescriptions for Valeant's branded drugs, including those ostensibly dispensed by smaller retail pharmacies in their captive network, through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure Valeant's branded drugs – and not generics – were dispensed. Fourteen states, including Pennsylvania (the state in which Philidor is headquartered), require

pharmacists to substitute generic equivalents for branded drugs.[1]  Moreover, contracts between pharmacies and TPPs or their PBM agents typically require the pharmacy to dispense a generic substitute for a branded drug where available.  Defendants' refusal to substitute generic alternatives for expensive Valeant branded drugs, despite their widespread availability, violated these statutory and contractual mandates.

55.    In fact, contrary to these requirements and unknown to Plaintiffs and the members of the Class, Philidor's internal policy mandated that Valeant-brand drugs be dispensed, even when a prescription expressly called for a generic.  For example, a former adjudication specialist at Philidor from July 2015 through November 2015 (the "Former Adjudication Specialist") who dealt with Valeant's dermatology drugs, including Jublia, said that  the witness was instructured by the witness's superiors to never dispense generic drugs.  According to the Former Adjudication Specialist, even when a prescription said a generic could be substituted, Philidor told employees to always put "brand" in Philidor's computer system and to change the prescription in order to dispense a brand drug.  Indeed, the Former Adjudication Specialist was told by the witness's supervisor that "We do not dispense generics.  You give them the brand drugs."  When the Former Adjudication Specialist received a prescription for a generic drug and entered a generic drug into the system,  the witness's supervisor said that doing so was wrong and to enter "brand" into the system instead.

56.    By minimizing generic substitution and, thus, substantially shielding Valeant branded products from generic competition, Defendants were able to inflate the prices of Valeant's drugs far beyond the prices at which the drug had previously been marketed and sold,

---

[1] These states, which include significant prescription drug markets, are Florida, Kansas, Kentucky, Massachusetts, Minnesota, Mississippi, Nevada, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Washington, and West Virginia.

both within Valeant's captive pharmacy network and by pharmacies outside of Valeant's network. Indeed, documents obtained by the Congressional Committee on Oversight and Government Reform through its investigation into Valeant's misconduct revealed that Valeant *first* identified goals for revenue and *then* set drug prices to reach those goals.

57. For example, Defendants' scheme allowed Valeant to triple the price of Wellbutrin XL, an off-patent antidepressant Defendants sold through Philidor and the captive pharmacy network, from less than $6,000 to $17,000 for a year's supply of the drug, compared to $360 for a year's supply of Wellbutrin XL's generic equivalent. Astonishingly, despite falling prescription rates for Wellbutrin XL and the availability of a generic alternative that costs 1/50 the price, Defendants' scheme allowed Valeant to double the revenue generated by Wellbutrin XL. These results could only be possible in a rigged market.

58. Likewise, Defendants' scheme allowed Valeant to increase the price of its dermatology drugs – drugs that have far cheaper generic bioequivalents – by extraordinary amounts. For example, in February 2013, Valeant acquired Tagretin gel from Eisai Co., Ltd., and in 2015, after Valeant had incorporated Philidor, dramatically increased the price of Tagretin gel such that the cost of the treatment rose from approximately $12,176 at the beginning of the Class Period to over $30,320 by 2015 – a 250% increase.

59. From 2014 to 2015 alone, Valeant dramatically increased the prices of more than 50 other drugs. While the Company referred to this strategy of increasing drug prices as "optimization," in reality, these price increases were effectuated through Defendants' fraudulent scheme. The below chart illustrates the increases that Defendants implemented for certain of Valeant's drugs during the Class Period:

| Valeant Drug | From | Through | Years | Percent Increase |
|---|---|---|---|---|

| Carac Cream | Q1-13 | Q3-15 | 2.50 | 557% |
|---|---|---|---|---|
| Wellbutrin XL 300 MG Tablet | Q1-13 | Q3-15 | 2.50 | 381% |
| Tretinoin 0.1% CRM | Q2-14 | Q3-15 | 1.25 | 328% |
| Vanos 0.1% CRM | Q1-13 | Q3-15 | 2.50 | 279% |
| Targretin 60g 1 % Gel | Q1-13 | Q3-15 | 2.50 | 250% |
| Aldara 5% CRM | Q1-13 | Q3-15 | 2.50 | 223% |
| Xerese 5%-1% Cream | Q1-13 | Q3-15 | 2.50 | 216% |
| Noritate 1% Cream | Q1-14 | Q3-15 | 1.50 | 212% |
| Migranal Nasal Spray | Q1-13 | Q3-15 | 2.50 | 159% |
| Loprox 1% Shampoo | Q1-13 | Q3-15 | 2.50 | 145% |
| Atralin 0.05% Gel | Q1-13 | Q3-15 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4 MG/ML Nasal Spray | Q1-14 | Q3-15 | 2.50 | 90% |
| Jublia (Efinaconazole topical solution 10%) | Q2-14 | Q3-15 | 1.25 | 20% |

60.     Ordinarily, the fact that a high volume of claims for expensive branded drugs from a single manufacturer were coming from a single pharmacy that was failing to substitute generic drugs for any of that manufacturer's drugs – *i.e.*, Philidor – would have triggered heightened scrutiny and denials of claims from PBMs and scrutiny of the pharmacy's practices. However, by concealing Valeant's relationship with Philidor, its relationships with its network of pharmacies, and the pharmacies' relationship to each other, Defendants were able to spread claims across ostensibly unrelated pharmacies. This caused Defendants' deceptive practices to go undetected by creating the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons and burying fraudulent claims among the large volume of the pharmacy network's claims.

61.     Accordingly, secrecy was essential to Defendants' scheme, and Defendants went to great lengths to ensure that Valeant's ownership of Philidor and its network of captive retail pharmacies remained concealed from the public, including from TPPs and PBMs. For example,

neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed to the TPPs or PBMs – with whom they were negotiating contracts, reporting audits, submitting claims or otherwise transacting business – their relationship with Valeant.

62. Indeed, secrecy was so important to Defendants' scheme that former Philidor employees were forbidden and even reprimanded if they mentioned Philidor's relationship with Valeant to customers. For example, a former Philidor call center agent from August 2014 to October 2014 ("Call Center Agent"), received a written warning by Brad Greenfield, Philidor's Director of Sales who reported directly to Philidor CEO Andrew Davenport, in October 2014 when the Call Center Agent mentioned Valeant in a recorded phone call. Greenfield told the Call Center Agent that the the witness would be fired if Valeant was mentioned to a customer again, and told the Call Center Agent that mentioning Valeant's relationship to Philidor on a patient call "was putting the entire business at risk." In an October 2014 meeting, Greenfield provided the Call Center Agent with a written warning about mentioning Valeant by name in a patient phone call. The Call Center Agent was required to signed the warning, but was not allowed to keep a copy.

63. Similarly, Valeant never disclosed Philidor in any of its SEC filings during the Class Period prior to October 19, 2015. Likewise, Philidor never publicly discussed the nature of its relationship to Valeant prior to October 19, 2015.

64. Maintaining the secrecy of the Valeant-Philidor relationship was so important to Defendants that in September 2015, Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities.

### F.      Valeant's And Philidor's Misrepresentations To The Class

65.      In furtherance of their fraudulent scheme, Defendants made a host of false and misleading statements directly to TPPs, their PBM agents, and their members/beneficiaries in order to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales.  Many aspects of Defendants' fraudulent scheme are catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs.   Those manuals explained to employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." (Bloomberg, October 28, 2015, *Valeant's Philidor Used 'Back Door' Tactics to Boost Payments*).  As explained in further detail below, those "back door approaches" included altering prescription information, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs.  Internal emails, including a July 19, 2015 email from Philidor's CEO, Andrew Davenport, reveal that Valeant and Philidor senior management were well aware of these practices.

66.      *First*, Defendants instructed Philidor employees to change codes on prescriptions – *i.e.*, *to deliberately alter the prescribing doctor's instructions as set forth in the prescription* – to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives.  While pharmacists who receive a prescription for a branded drug will ordinarily dispense a generic substitute if available, doctors can indicate that the prescription be "dispensed as written" and order that no substitutions be made.  As reported by *Bloomberg* on October 29, 2015, former Philidor employees have confirmed that pharmacies in Valeant's network, acting on written instructions in claims handling manuals issued by Defendants, routinely altered doctors' prescriptions in order to ensure that more patients received Valeant products rather than less costly generics.   These employees explained that this fraud was

frequently implemented with respect to certain key Valeant dermatologic products that encountered repeated denials from TPPs, such as Retin-A Mirco and Vanos.

67.     In deliberately altering prescribing doctors' instructions with respect to prescriptions, Philidor employees engaged in at least two types of fraudulent conduct. When TPPs denied claims for these drugs, Philidor employees circumvented those denials by resubmitting the claims with altered prescription codes that falsely represented the prescribing doctor had ordered that only Valeant drugs be dispensed and that no generic substitutions were permitted.    Moreover, in resubmitting these denied claims, Philidor employees falsely resubmitted these claims as new claims, misrepresenting the fact that these claims had previously been denied.

68.     **Second**, Defendants also used false pharmacy identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursement. Specifically, Defendants' claims handling manual instructed Philidor employees to submit claims to TPPs or their PBM agents using Philidor's National Provider Identification Number, or "NPI." If a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging to a different pharmacy in Defendants' captive network – in other words, to claim that a pharmacy had dispensed a prescription it did not in fact dispense, and, in some cases, did not even stock.

69.     Indeed, former Philidor employees indicated that they were provided with maps and detailed instructions that set out the particular false NPI information that should be submitted in the event of a denial relating to a particular dispensing pharmacy. For instance, Defendants' claims handling manual instructed employees who received certain denials from TPPs to "submit the NPI for our partner in California, West Wilshire Pharmacy … There is a good chance they

are contracted." If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary" – referring to one of Philidor's secret retail pharmacies based out of Philadelphia, Pennsylvania. "They should then get a paid claim and then Cambria … will reimburse us." (Bloomberg, October 29, 2015, *Philidor Said to Modify Prescriptions to Boost Valeant Sales*).

70.     Likewise, Defendants routinely caused pharmacies in the Valeant network, including Isolani (mentioned above), to use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network discussed further below, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O didn't even stock. In a July 19, 2015 email to R&O, Philidor CEO Andrew Davenport himself acknowledged that he was aware this practice was ongoing.

71.     The purpose of this conduct was to fraudulently secure payment of a claim that was properly denied by a TPP or PBM. In an interview with the Southern Investigative Reporting Foundation, Taylor Geohagen a former Philidor claims adjudicator during the Class Period, confirmed that this fraudulent practice was routinely implemented: "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch." (Southern Investigative Reporting Foundation, October 25, 2015, *The Pawn Isolated: Valeant, Philidor and the Annals of Fraud*).

72.     The Former Adjudication Specialist similarly confirmed Defendants' practice of routing claims to various pharmacies in the Valeant network. The Former Adjudication Specialist explained that, while at Philidor, the Former Adjudication Specialist would send prescriptions to other pharmacies in the Valeant network in the event that a claim was denied. The Former Adjudication Specialist personally routed prescriptions for such denied claims to

27

R&O Pharmacy, Cambria Pharmacy, C-K Pharmacies, SafeRx, and Heritage Compounding Pharmacy.  The Former Adjudication Specialist explained that the witness sent prescriptions to Heritage Compounding Pharmacy on a daily basis.

73.     The Former Adjudication Specialist explained that there was a "back door process" for sending prescriptions from Philidor to other pharmacies, including Heritage Compounding Pharmacy.  According to the Former Adjudication Specialist, a claims adjudicator would enter the prescription data into Philidor's system and then share that information with another third-party outside of Philidor.  That entity would then share the prescription information with the pharmacy that would ultimately dispense the prescription.  Thus, the dispensing pharmacy would never communicate with Philidor directly, but only with the entity sharing the Philidor prescription – another means of concealing the true nature of the Valeant network.

74.     To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false and misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which they were secretly associated, falsely representing that the pharmacy had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies.  Relatedly, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies.  For instance, as evidenced by a July 14, 2015 email from Russell Reitz of R&O to Eric Rice, Senior Director at Philidor, Defendants' agents' audit statements on behalf of R&O falsely claimed that R&O had dispensed prescriptions for Valeant drugs that were actually filled by Philidor.  Specifically, Reitz told Rice that Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed *before* the exection of the R&O purchase and sale

28

agreement" and thus fraudulently billed using Reitz's NCPDP number without his knowledge or consent (emphasis in original).  Again, in some cases, these prescriptions were for drugs that R&O did not even stock.

75.     *Third*, Defendants Valeant and Philidor submitted for reimbursement numerous prescription renewals, falsely representing to TPPs and their PBM agents that patients had requested renewals of their prescriptions when, in fact, no such request had been made. Specifically, as Philidor customers have explained and as *New York Magazine* reported in a January 13, 2016 article, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, despite the fact that the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills.

76.     Defendants' implementation of this practice in connection with Valeant's dermatological products was particularly injurious to TPPs because the conditions such products are designed to treat are not chronic and can be remediated by a limited course of treatment, limiting the need for renewals  absent Defendants' fraudulent scheme.  Notably, Philidor's practice of waiving patient co-pays in connection with this scheme allowed the scheme to go undetected as patients were not incentivized to complain about unnecessary refills for which they were not charged a co-payment.  These unnecessary refills harmed the Class because the cost of these drugs was imposed on TPPs through the payment of additional claims for unnecessary drugs.

77.     As a Philidor employee explained in an online forum, Philidor "auto ship[ped] [Valeant drugs] without proper approval, most people do not need these refills.  The reason they

ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550-$1220 from the insurance companies."

78.     Likewise, after the end of the Class Period, a Philidor employee explained in an online forum that this scheme was jointly developed by Brad Greenfield, Director of Sales and Marketing for Valeant, and Philidor executive Fabian Forrester-Charles. The employee stated:

> They took the list of customers who had been approved by [insurance] and had refills available. ***Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs. They would do this on the 30th day of the rx.*** Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not. Not a bad money making idea except ***most people did not really need refills of Solodyn so soon*** . . . Of course these refills were out the door ASAP ***sometimes within an hour of the call and the [insurance] money would come in***.
>
> What patients don't get is ***your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed. I would bet a lot of solodyn and Jublia bottles are just lying around still in the shipping package.***
>
> ***If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor***. Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$ and a ton of it! Think about it.
>
> (emphasis added and all typographical errors in original) (Cafepharma, Philidor employee post dated October 27, 2015).

79.     According to numerous former employees, including a former Philidor intake specialist from January to August 2015 (the "Former Intake Specialist"), there was an entire department at Philidor dedicated to calling patients and informing them that their refill would be processed. The Former Intake Specialist explained that Philidor had an entire department with approximately 10 employees devoted to calling patients to enroll them in the automatic refill program without their permission. According to the Former Intake Specialist, Philidor representatives in the automatic refill program department would call patients and say "if we don't hear from you in 24 hours, we will process your refill." This meant that if the patient did

not respond immediately to the message that was left, Philidor would automatically send a refill, and then bill the insurer or TPP for the prescription.

80.     *Fourth*, when submitting claims to TPPs, Defendants also misrepresented to TPPs the dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants' practice of routinely waiving patient co-pays.   The collection of co-pays from insureds discourages insureds from "overutilization," or wasteful consumption of pharmacy benefits beyond those medically necessary, and thereby incentivizes insureds to select generics when available and only refill medications when needed.   Conversely, waiving co-pays discourages patients from actively avoiding low-value or medically unnecessary medicines. Co-pay waivers can significantly distort an insured's economic incentives when choosing between a branded drug and its generic alternative, and when refilling a prescription.   As a result, PBM contracts with pharmacies mandate that pharmacies make every attempt to collect the copayment and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.   Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims for such prescriptions, Defendants falsely represented to TPPs that the patient had been charged the full price of the drug.

81.     *Fifth*, Defendants also made misrepresentations directly to patients in order boost Valeant's drug sales. Specifically, Defendants' disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost only if they submitted their prescriptions directly to Philidor.  By encouraging patients to submit claims directly to Philidor, Defendants ensured that prescriptions for Valeant drugs would not wind up being filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but would instead end up at Philidor, where Valeant's branded drug would be

dispensed.  To induce these patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed.  For example, in consumer complaint filed with the Better Business Bureau on March 2, 2015, a patient wrote about Philidor:

> **Complaint:** Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******. ***They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you".*** Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the ****** unopened in order to have this taken off my Claims. (emphasis added and all typographical errors in original) (Better Business Bureau, customer complaint dated March 5, 2015).

82.    In fact, TPPs were billed for these drugs.  For example, one patient reported in an online forum:

> My dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. ***The trial coupon offers a '$0 co-pay for 12 months' of this medicine . . . . Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.*** (emphasis added and all typographical errors in original) (Pissed Consumer, customer complaint dated January 2, 2015).

83.    Other customer complaints reported similar conduct, as reported to the Better Business Bureau:

> Hello. My child had an appointment with a local dermatologist. While we were there we were referred to Philidor RX Services for filling two acne prescriptions. ***The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company. She also gave us a coupon to use for one of the prescriptions that would make it free. I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription).*** I contacted Philidor and spoke with a man who said his name was Mickey. Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account. I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice. I have received no response and no refund. (Business Insider, October 23, 2015, *The secret firm at the heart of Valeant's crisis has an alleged history of shady behavior with customers*).

84.     In service of their fraudulent enterprise, Defendants made it as difficult as possible for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills.  For example, despite its massive investment in its sales force, Philidor invested very little in creating a call center to handle customer complaints and problems.  (Pissed Consumer, customer complaints dated February 19, 2015 and February 22, 2015).  In fact, customers and patients would routinely report that they were directed to sales staff when they tried report these problems.

## G.     Defendants Reaped Hundreds Of Millions Of Dollars In Ill-Gotten Profits

85.     Through their fraudulent scheme, Defendants obtained hundreds of millions of dollars in ill-gotten profits at the expense of the TPP Class, whose members paid inflated prices for Valeant drugs that in many cases should never have been dispensed.  Indeed, in 2015 alone, Valeant channeled nearly $500 million worth of its drugs through Philidor, its central pharmacy hub.

86.     *First*, as explained above, the Class paid for expensive Valeant drugs when a cheaper generic equivalent could have, and should have, been dispensed.  The Class suffered harm because it paid the dramatic difference between the cost of the generic drug that should have been dispensed and the expensive Valeant drug.  For instance, as discussed above, as a consequence of Defendants' fraud, members of the Class paid up to $17,000 for a year's supply of Valeant's Wellbutrin XL, when it should have paid only $360 for a year's supply of the drug's generic equivalent.  Similarly, while the price for a 90-tablet course of treatment with Valeant's branded Lodosyn 25mg costs as much as $2,609.14, the same course of treatment with its generic equivalent costs approximately $292.45.  In another example, a 60g tube of Noritate (a

33

one month's supply) costs approximately $2,000, while an alternative treatment is available for approximately 96% less.  Likewise, while a 4ml bottle of Jublia 10% costs approximately $562, an effective substitute treatment is available for approximately 97% less.

87.     *Second*, as explained above, the Class paid for Valeant drugs when, in fact, no drug should have been dispensed and/or a claim was properly denied.  The Class suffered this harm in connection with, for instance, Defendants' scheme to submit claims for unrequested refills and their schemes to circumvent denials of claims.  Defendants were improperly enriched because they received payments from the Class for drugs that should have never been dispensed.

88.     *Third*, as explained above, because of Defendants' failure to disclose their routine waiver of patient co-pays when submitting claims to Class Members or their PBM agents, Valeant was able to sell medically unnecessary and low-value drugs, and to sell them at artificially inflated prices, by removing a critical mechanism used to limit the use of such medically unnecessary, low-value drugs.  The undisclosed waiver of co-pays led patients to obtain higher priced Valeant drugs rather than lower priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the members of the Class.  Had Defendants charged co-pays, patients would have had the intended economic incentive to choose lower cost generic drugs and to avoid unnecessary prescriptions, thereby reducing unneeded costs that were ultimately born by the TPP Class.  Further, had Defendants properly disclosed their routine waiver of patient co-pays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs, or paid for them at all.

89.     *Fourth*, as explained above, the Class paid highly inflated prices for Valeant branded drugs.  This included claims for reimbursement submitted by pharmacies within Valeant's captive network and, based on Valeant's being able to maintain artificially inflated

34

prices that serve as inputs into the pricing formulae that determine TPP payments, by pharmacies outside of Valeant's network as well. But for Defendants' fraudulent scheme, the prices Defendants charged for Valeant branded drugs would have been influenced by competitive market forces and, driven by the presence of numerous low-cost generic drugs in the marketplace, would have been substantially lower. The Class was damaged because it reimbursed claims at inflated prices created by Defendants' fraud, rather than the prices a market free from manipulation would set.

### H. Defendants' Fraud Is Finally Revealed

90.    On December 1, 2014, Russell Reitz, a Southern California pharmacist, sold his business, R&O Pharmacy, a specialized dispensary for gastroenterology patients, to Philidor. In connection with the deal, Reitz learned that Philidor had not yet received a license from the California State Board of Pharmacy.

91.    Not long after the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service, numbers dwarfing the customary size of R&O's business. Philidor would send R&O bulk orders of Valeant-branded pharmaceuticals, and Reitz would dispense these to patients directly or by mail. Payment later arrived at the pharmacy in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over one million dollars.

92.    Not only was the volume of Philidor-channeled patients unusually large, the prescriptions that Philidor was filling were also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Consistent with Defendants' scheme, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel, an eczema treatment, and Jublia, a topical treatment for toenail fungus.

93.     In March 2015, Reitz received an audit from one of his PBMs.  The audit showed that, in addition to the business Reitz oversaw personally, R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard. Many were for medications that R&O didn't carry. Some prescriptions were even backdated to before Reitz had sold R&O to Philidor.  These practices continued throughout the summer of 2015.

94.     As a result of these suspicious practices, in the summer of 2015, R&O began investigating Philidor.  Its investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy – an application which California denied. Specifically, in a court filing before the Board of Pharmacy, Department of Consumer Affairs, dated December 18, 2014, the California State Board of Pharmacy denied Philidor's pharmaceutical license because Philidor made "false statements of fact" in its pharmacy application.  Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz finally realized that the purpose of the R&O purchase was to use R&O as a channel through which Philidor would surreptitiously conduct its own business in California and circumvent the licensing board's denial.

95.     In response to Reitz's investigation of Philidor, Reitz received letters, not from Philidor's, but from *Valeant's* General Counsel, demanding $69 million in payments from R&O. These letters made clear that Valeant was not simply a drug manufacturer supplying Philidor, but rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained. Ultimately, Reitz filed suit against Valeant and disclosed the facts described above

in connection with the suit. These disclosures set off a chain of events revealing the truth about Defendants' fraud and the Valeant Enterprise.

96.     On October 19, 2015, the Southern Investigative Reporting Foundation published a detailed account of Philidor and Valeant's dealings with Reitz and R&O. This report was the first to note that Valeant was Philidor's only client and provided extensive detail on Valeant's financial connection to Philidor, a connection that had never before been publicly disclosed.

97.     That same day, Valeant CEO Michael J. Pearson and CFO Robert L. Rosiello held a conference call to discuss the Company's third quarter of 2015 earnings results. On the conference call, Valeant, for the first time, discussed Philidor. During the conference call, Pearson stated in relevant part:

> Turning to how does Valeant work with specialty pharmacies specially Philidor. The top of specialty pharmacies has not been a focus of ours in past calls because *we believe this was at competitive advantage that we did not disclose to our competitors* . . . . Similar to many pharmaceuticals companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.

> Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our co-pay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor if we so choose. Given accounting rules, we consolidate Philidor's financials. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory.

98.     Also on October 19, 2015, *The New York Times* published an article detailing the use of specialty pharmacies by Valeant to increase pricing of its drugs. The article stated in relevant part:

> Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.

99.     Two days later, on October 21, 2015, a report by Citron Research (the "Citron Report") revealed more information about Philidor and its network of "phantom captive pharmacies" and Valeant's tactics to create fraudulent payor audits.  The Citron Report explained that Philidor was owned by Valeant and that Valeant used Philidor to establish "an entire network of phantom captive pharmacies."  Additionally, the Citron Report accused the Company of committing accounting fraud, referring to the Valeant as the equivalent to the "pharmaceutical Enron."

100.    Then, on October 26, 2015, *The Wall Street Journal* published a report detailing that Valeant employees were frequently involved with operations at Philidor.  As referenced above, *The Wall Street Journal* also reported that Valeant employees used fake aliases including those of comic book characters, like Peter Parker, to hide their identity as Valeant employees.

101.    On that same day, Valeant announced that it had set up a special committee to review the Company's relationship with Philidor.

102.    On October 30, 2015, Valeant announced that it was "severing all ties with Philidor" and that Philidor would be shut down immediately.

103.    In fact, Valeant had no choice but to cut ties with Philidor because TPPs and PBMs were already severing their relationships with the pharmacy.  Only one day before, on October 29, 2015, some of the biggest PBMs and customers of Philidor announced they were severing business relationships with Philidor after finding noncompliance with provider agreements.  Specifically, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx – the three largest PBMs in the U.S. which together handle three-quarters of the total estimated 5 billion U.S. prescriptions in 2014 and represent many members of the TPP Class – each announced that they were ending their relationship with and would stop paying

for drugs dispensed by Philidor.  As to its dropping of Philidor, CVS Health Corp. explained that, "CVS/caremark maintains a broad national network of 68,000 pharmacies. In accordance with CVS/caremark's standard auditing protocols, over the last several weeks we have been monitoring and reviewing the results of recent audits of Philidor's practices.  ***Based on the findings from those activities, we have terminated Philidor for noncompliance with the terms of its provider agreement.***"  Express Scripts and United Healthcare provided similar responses as to Philidor's noncompliance with the PBMs' provider agreements.

104.    As Defendants were coming under greater scrutiny from the press and public, Congress also began investigating Defendants' price increases for Valeant drugs and Valeant's relationship to Philidor.  Both the House Committee on Oversight and Government Reform and the Senate Special Committee on Aging have issued document requests and conducted interviews with Valeant employees. On February 2, 2016, the House Committee issued a memorandum reporting interim findings from its investigation, stating that it found, among other things, that while Pearson purchased drugs "in order to dramatically increase their prices and drive up his company's revenues and profits," Valeant engineered a public relations strategy to "divert attention away from its price increases" and to mitigate the "critical risk" of addressing "concerns from patients, ***insurance companies or managed care providers*** to prevent public displays of negative sentiment."

105.    On February 22, 2016, in connection with the Company's investigation of its relationship with Philidor previously announced in October 2015, Valeant announced that it would restate its financial results for 2014 and 2015 in connection with its sales to Philidor.

106.    On February 29, 2016, Valeant announced that it was under investigation by the SEC in connection with its relationship with Philidor and was also being investigated by the U.S.

Attorney's Offices for Massachusetts and the Southern District of New York. These investigations are currently ongoing.

107.  On March 21, 2016, Valeant announced that its board had initiated a search to identify a new CEO to replace Michael J. Pearson. After Pearson was removed from his post at Valeant, he was subpoenaed by the U.S. Congress to testify about Valeant's practices.

108.  On April 27, 2016, Defendant Pearson testified before the U.S. Senate Special Committee on Aging that Valeant's strategy of dramatically raising the prices of its drugs was "too aggressive" – a strategy which Pearson admitted "was a mistake" which he "regret[ted] pursuing."

## V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES

### A.  Defendants' Misrepresentations To Third Party Payors

109.  Defendants submitted false claims information to TPPs or their agents, including their PBMs, in order to fraudulently maximize the reimbursements paid by those TPPs and boost Valeant's drug sales and revenues.

110.  The claims that Defendants submitted to the Class were materially false and misleading because the claims (1) misrepresented either the dispensing pharmacy or the pharmacy to which the patient/insured had submitted his or her prescription; (2) misrepresented whether the claim had been previously submitted and denied; (3) misrepresented the cost of the drugs by concealing the waiver of co-pays; (4) implicitly misrepresented that the claim was for a medication prescribed by a physician; (5) implicitly misrepresented that the claim was for a medication requested by a patient/insured; or (6) implicitly misrepresented that the pharmacy was licensed to conduct business in the state in which the drugs were dispensed.

40

111.    As discussed above in detail, such claims were false and misleading as a result of the deceptive tactics Defendants employed to fraudulently increase the sales of Valeant products over generics and to enable the charging of higher prices for those Valeant drugs. Specifically:

- Defendants renewed prescriptions without a patient's request and/or consent;

- Defendants used false pharmacy identification information for prescriptions that had previously been denied in order to fraudulently bypass the TPPs' denials of claims for reimbursement;

- Defendants caused pharmacies in the Valeant network, including Isolani, to use R&O's identification information, including its NCPDP and NPI numbers, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O didn't even stock;

- Defendants also submitted false and misleading payer audits to TPPs or their agents on behalf of retail pharmacies with which they secretly associated, falsely representing that the pharmacy had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies. In addition, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies;

- Defendants routinely waived co-pays for patients prescribed Valeant drugs, often when soliciting patients to order unnecessary refills of their prescriptions. When submitting claims to TPPs for these prescriptions, however, Defendants concealed the discount; and

- Defendants modified prescriptions to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives.

112.    Finally, Defendants deceived TPPs and PBMs with respect to the identity and ownership of the pharmacies with whom they were contracting to provide prescription services to their members and insureds. While TPPs and PBMs believed they were contracting with independent retail pharmacies, Defendants failed to disclose that they were using the retail pharmacies to insulate Valeant's products from generic competition and to funnel prescriptions

through Philidor where those prescriptions and claims relating to them would be manipulated by means of the fraudulent practices described above.   By concealing the association and relationship between and among the pharmacies in the Valeant Enterprise, Defendants also concealed that certain of those pharmacies – including Philidor – did not have pharmacy licenses in states in which members of the Class and their beneficiaries were located.

**B.    Defendants' Misrepresentations To Patients And Physicians**

113.    Defendants constructed and deployed a dishonest sales campaign, specifically instructing the Valeant and Philidor sales force to make a number of false and misleading statements to both patients and physicians in an effort to boost Valeant's drug sales, and thereby impose added costs on TPPs.  While these statements were made to the members, beneficiaries and insureds (and their physicians) covered by the TPPs rather than to the TPPs directly, the purpose of these misrepresentations was to fraudulently cause the members of the Class to pay more for Valeant drugs than they would have paid but for Defendants' misconduct.

114.    Defendants fraudulently induced doctors to prescribe, and patients to request, Valeant's pharmaceutical products – rather than less expensive generic drugs – by disseminating statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at either no cost or at the cost of only a co-pay.  In both cases, patients were falsely assured that their TPPs would not be billed.  In fact, TPPs were billed for these drugs and patients were subsequently billed for amounts not covered by their TPPs.

**C.    Defendants' Misrepresentations To State Regulators**

115.    Defendants made numerous false statements to a host of different constituencies in an effort to conceal the true ownership and identity of a vast network of Valeant-affiliated pharmacies, which Defendants used to insulate Valeant products from generic competition. Although these statements were not made directly to TPPs, they were made for the purpose of

concealing the fraudulent conduct employed by the Valeant Enterprise, and thereby caused the Class to pay inflated prices for Valeant drugs.

116.    Defendants' fraudulent scheme depended entirely on its secrecy – if *anyone* outside of the Valeant Enterprise discovered the true ownership and structure of Valeant's network of captive pharmacies, the scheme would collapse, as it ultimately did.  To that end, Defendants made numerous false and misleading statements to regulators designed to conceal Defendants' illicit pharmacy network.

117.    Defendants caused Philidor or its affiliates to file with state regulators pharmacy applications on behalf of various shell companies they controlled in which the companies falsely denied and failed to disclose their relationship with Philidor and Valeant, and made other false statements designed to conceal the true ownership of Valeant's network of captive retail pharmacies.

118.    For example, after California state regulators denied Philidor's application for a pharmaceutical license, Defendants caused a Valeant/Philidor-controlled shell company, Lucena Holdings ("Lucena"), to acquire a stake in a California pharmacy called West Wilshire Pharmacy in an effort to circumvent the state's licensing denial.  In a "Change of Permit Request" filed with the California State Board of Pharmacy, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory Blaszczynski, who, unknown to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor; and

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied."  In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

Accordingly, Lucena's deceptive and misleading representation concealed its connection with Philidor and Valeant from state regulators.

119. Likewise, Defendants caused Back Rank, LLC ("Back Rank"), a Philidor shell company, to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit"). In a September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]." In fact, California had denied Philidor's pharmacy application the previous year, expressly finding that Philidor and its CEO, Andrew Davenport, had commited acts involving "dishonesty, fraud, or deceit, with the intent to substantially" benefit Philidor and Davenport, and, that under penalty of perjury, Philidor and Davenport had made "false statements of fact" concealing Philidor's relationship to Valeant. Accordingly, Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

## VI.     CAUSATION AND INJURY TO THE CLASS

120. Defendants made false and misleading statements in order to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to increase sales and claims to TPPs, and to insulate Valeant's drugs from generic competition and thus facilitate Valeant's drug price increases. Unaware of Defendants' scheme, Plaintiffs and the Class paid highly inflated prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could have, and should have, been dispensed. Also, Defendants made false and misleading statements to Plaintiffs and the Class in order to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's expensive branded drugs. When submitting claims to Plaintiffs and the Class, Defendants falsified prescriptions, made claims for refills that were never requested by patients,

and misrepresented the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs, among other things.  Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the fact that either no drugs or cheaper generic alternative drugs should have been dispensed.  Additionally, Defendants' made false and misleading statements to patients and prescribing physicians that artificially increased the number of prescriptions for branded Valeant drugs written and filled during the Class Period.  Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the availability of cheaper generic alternative drugs that could have, and should have, been dispensed.  During the Class Period, Defendants amassed billions of dollars in ill-gotten gains through their scheme to fraudulently boost Valeant's drug sales and line Defendants' pockets. The manner in which each of the various components of Defendants' fraudulent enterprise artificially increased Valeant drug prices and sales, and injured Plaintiffs and the Class is described below:

- **Defendants altered prescriptions to provide that they be filled with brand-name Valeant drugs, rather than cheaper generic alternatives,** as described in ¶¶53-67 above.  But for Defendants' false and misleading statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false claims for reimbursement for prescription renewals**, as described in ¶¶75-79 above.  But for Defendants' conduct, Plaintiffs and the Class would not have paid for these prescriptions, but would have paid for either cheaper generic alternatives or would not have paid for any prescription at all. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs.  Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

45

- **Defendants used false pharmacy identification information, including NCPDP and NPI numbers, to bill TPPs, including Plaintiffs and the Class, for prescriptions**, as described in ¶¶68-74 above. Had Defendants not used false pharmacy identifying information to bypass Plaintiffs' and the Class' rejection of Defendants' claims for reimbursement for Valeant's branded drugs, lower cost generic drugs would have been dispensed. Accordingly, but for Defendants' conduct, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and misleading payer audits to TPPs**, as described in ¶¶74, 93-99 above. But for Defendants' false and misleading audit statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and inflated claims to TPPs (or their PBM agents)**, as described in ¶¶75-84 above. Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs (or their agents) for such prescriptions, falsely represented that the patient had been charged full price of the drug. But for Defendants' false and misleading statements inflating the price charged to the patient for Valeant drugs, Plaintiffs and the Class would have, at a minimum, paid claims based on the discounted price *actually* charged. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants made false and misleading statements in order to conceal Valeant's relationship with its network of captive pharmacies**, as described in ¶¶37-44, 61-62, 68-74 above. But for Defendants' misstatements, Defendants' practice of failing to substitute generic drugs for Valeant drugs, which contravened state law and contracts with PBMs, would have triggered denials of claims from TPPs and scrutiny of the pharmacy's practices. By concealing both Valeant's relationship with its network of pharmacies, as well as the pharmacies' relationship to each other, Defendants were able to create the false impression that independent pharmacies had dispensed the prescriptions and to spread flase claims across ostensibly

unrelated pharmacies. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants made false and misleading statements to patients and prescribing physicians that induced them to prescribe or request Valeant's branded drugs, rather than generic alternatives**, as described in ¶¶81-84 above. But for Defendants' false and misleading statements that Valeant drugs would be dispensed to patients at no or low cost, and that TPPs would not be billed for those prescriptions, patients would not have requested, and doctors would not have prescribed, expensive Valeant brand-name drugs; rather, patients would have requested, and doctors would have prescribed, cheaper generic alternatives. Accordingly, but for Defendants' conduct, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

## VII.   CLASS ACTION ALLEGATIONS

121.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and

23(b)(3) on behalf of a class consisting of:

> All health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, third party payors, and any other health benefit provider in the United States of America or its territories, that paid or incurred costs for Valeant branded drug products in connection with a claim submitted by Philidor, a claim submitted by any pharmacy in which Philidor had a direct or indirect ownership interest, or a claim by any pharmacy for which the amount sought for reimbursement was inflated as a result of Defendants' fraudulent scheme, between January 2, 2013 and November 9, 2015, and suffered damages thereby. Excluded from the Class are PBMs, Defendants, their successors or assigns, and any entity in which Defendants have or had a controlling interest.

122.    The members of the Class are so numerous that joinder of all members is

impracticable. The Class consists of all TPPs in the United States who were wrongfully induced

to pay claims for Valeant's branded drugs as a consequence of Defendants' fraudulent scheme,

including TPPs that paid for drugs Valeant drugs purchased through Defendants' captive

pharmacy network or from pharmacies outside of Valeant's network, and who suffered damages as a consequence of Defendants' fraudulent scheme during the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class. Class members may be identified from records maintained by Defendants and may be notified of this class action using a form of notice similar to that customarily used in class actions.

123. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

125. Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a)      whether Defendants' acts and omissions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c);

b)      whether Defendants conspired to violate 18 U.S.C. §1962(c) in violation of 18 U.S.C. §1962(d);

c)      whether Defendants made false or misleading statements that concealed Valeant's relationship with a network of pharmacies;

48

d)      whether, when submitting claims to Plaintiffs and the Class, Defendants changed codes on prescriptions to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives;

e)      whether Defendants submitted prescription renewals for reimbursement, falsely representing that the particular patient had requested renewal of their prescription;

f)      whether Defendants used false pharmacy identification information to allow its affiliated pharmacies to dispense Valeant's branded drugs;

g)      whether Defendants submitted false and misleading payer audits to TPPs on behalf of retail pharmacies with which they secretly associated;

h)      whether Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs for such prescriptions, falsely represented that the patient had been charged full price of the drug;

i)      whether Defendants disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients their TPPs would not be billed would not be billed for Valeant drugs they received at no cost;

j)      whether Defendants made misrepresentations to regulators to conceal the existence of the Valeant Enterprise and the relationship Valeant had with a secret network of pharmacies;

k)      whether Defendants' acts and omissions described herein constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §1962;

l)      whether Defendants administered an "enterprise," within the meaning of 18 U.S.C. §1962;

49

m)      whether Defendants' acts or omissions described herein affected interstate

commerce; and

n)      whether Defendants' acts or omissions described herein directly and

proximately caused injury to Plaintiffs and the Class.

126.    A class action is superior to all other available methods for the fair and efficient

adjudication of this action because joinder of all Class members is impracticable.  Additionally,

the damage suffered by some individual Class members may be relatively small so that the

burden and expense of individual litigation makes it impossible for such members to individually

redress the wrong done to them.  There will be no difficulty in the management of this action as a

class action.

## VIII.   CLAIMS FOR RELIEF

### <u>COUNT I</u>
### FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT, 18 U.S.C. §1962(c) – RACKETEERING
### (Against All Defendants)

127.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully

set forth herein.

128.    This Count is asserted on behalf of all members of the Class against Defendants

for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c).

129.    Defendants are "persons" within the meaning 18 U.S.C. §1961(3) who conducted

the affairs of the enterprise (the "Valeant Enterprise"), through a pattern of racketeering activity

in violation of 18 U.S.C. §1962(c).

130.    The Valeant Enterprise is an association-in-fact within the meaning of 18 U.S.C.

§1961(4), comprised of Defendants and their employees and agents, R&O, West Wilshire, Orbit,

BQ6, Back Rank, Lucena. KGA, Kinray, Isolani, End Game, SafeRx Pharmacy, D&A

50

Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy, and other as yet unknown pharmacies and other agents engaged, owned or controlled by Defendants to advance the fraudulent scheme described herein.   All entities comprising the Valeant Enterprise are "persons" within the meaning of 18 U.S.C. §1961(3), are "persons" distinct from the Valeant Enterprise, and acted to enable Defendants to fraudulently inflate the number and cost of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period.   The Valeant Enterprise functioned as an ongoing organization and continuing unit, and was created and/or used to effectuate a pattern of racketeering activity. The development and execution of Defendants' activities in furtherance of the Valeant Enterprise would exceed the capabilities of each member of the Enterprise acting singly or without the aid of any other member.

131.   Defendants, in concert with other participants in the Valeant Enterprise, created and maintained systemic links for a common purpose: to inflate the number and costs of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period. This scheme yielded substantial financial benefits for the participants in the Valeant Enterprise far in excess of those the participants would have received had they refrained from making the false and misleading statements to TPPs, regulators, doctors, and patients detailed in ¶¶109-19, above.   Defendants exercised control over the activities of the Valeant Enterprise in disseminating those false and misleading statements, and participants in the Valeant Enterprise were aware that Defendants exercised such control.   Furthermore, each component of the Enterprise benefitted from the existence of all other components.

132.   The Valeant Enterprise engaged in and affected interstate commerce because, among other things, it made and disseminated false and misleading statements to thousands of

individuals and entities, including patients, doctors, regulators, and TPPs, throughout the United States. Valeant and the pharmacies comprising the Valeant Enterprise dispensed pharmaceuticals throughout the United States to thousands of patients, and submitted claims for reimbursement complained of herein to TPPs throughout the United States.

133. Defendants conducted and participated in the affairs of the Valeant Enterprise through patterns of racketeering activity, including acts indictable under 18 U.S.C. §1341 (mail fraud); 18 U.S.C. §1343 (wire fraud); and 18 U.S.C. §1952 (use of interstate facilities to conduct unlawful activity). These violations include the dissemination of the misrepresentations described herein through the mail and wires, and the shipment of drugs through the mails in furtherance of the fraudulent scheme described herein.

134. Defendants' fraudulent scheme to inflate the price of Valeant branded drugs and the number of prescriptions for those drugs written, filled, and reimbursed during the Class Period consisted of, among other things: (1) making false and misleading statements to the Class in order to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs; (2) making false and misleading statements to regulators in order to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to implement the fraudulent scheme described herein; and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

135. Defendants' use of the mail and wires to perpetrate their fraud involved thousands of communications, including but not limited to: (1) communications with, and among, the Enterprise participants in furtherance of their fraudulent scheme; (2) communications promulgating the false and misleading statements described above to TPPs, patients, doctors, and

regulators, throughout the United States; (3) receipt of proceeds generated by Defendants' fraudulent scheme, including payments made by TPPs for Valeant drugs; (4) shipment of Valeant drugs to the pharmacies that comprise the Valeant Enterprise; and (5) shipment of drugs by members of the Valeant Enterprise to patients, insureds, members and beneficiaries whose drug costs were covered by members of the Class.

136.    The foregoing racketeering activities constitute a common course of conduct intended to deceive and harm Plaintiffs and the Class.  Each such instance of racketeering activity was related, had the same or similar purposes, involved the same or similar participants, had the same or similar means of commission, and had the same or similar results affecting the same or similar victims, including Plaintiffs and the Class.

137.    Plaintiffs and the Class have been injured in their business or property by reason of these violations, in that Plaintiffs and the Class paid millions of dollars for Valeant drugs they would not have paid had Defendants not engaged in the pattern of racketeering activity described herein.  Defendants' racketeering activities were part of their ongoing business and, during the Class Period, constituted a continuing threat to property belonging to Plaintiffs and the Class.

138.    The injuries to Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity.

## COUNT II
## FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(d) – RACKETEERING CONSPIRACY
### (Against All Defendants)

139.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

140.    This Count is asserted on behalf of all members of the Class against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d), such violation arising from their conspiracy to violate 18 U.S.C. §1962(c)

141.    Defendants, their employees and agents, and other as yet unknown agents engaged by Defendants to inflate Valeant's drug sales knowingly agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Valeant Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. §1341 (mail fraud); 18 U.S.C. §1343 (wire fraud); and 18 U.S.C. §1952 (use of interstate facilities to conduct unlawful activity), including: (1) making false and misleading statements to state regulators in order to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class in order to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs); and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

142.    Defendants knew and agreed to act in furtherance of the Valeant Enterprise's common purpose: to inflate the cost and the number of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period by issuing a variety of false and misleading statements to numerous different constituencies in order to obtain money and benefits

for participants in, and associates of, the Valeant Enterprise at the expense of Plaintiffs and the Class.

143.     Defendants committed, or caused the commission of, numerous overt acts in furtherance of the conspiracy and to effect the objects thereof, including, (1) making false and misleading statements to state regulators in order to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class in order to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs); (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives; (4) constructing the shell companies, including Lucena and Back Rank, through which Valeant acquired interests in, and associated with, a network of retail pharmacies in order to execute Defendants' fraudulent scheme to boost Valeant's drug sales; and (5) promulgating employee manuals and handbooks instructing Philidor employees to, among other things, falsify prescriptions, make claims for refills that were never requested by patients, and misrepresent the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs.

## IX.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgement against Defendants jointly and severally, as follows:

1. Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

2. Awarding Plaintiffs and the Class compensatory and treble damages, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiffs and the Class their reasonable costs and expenses, including attorneys' fees; and

4. Awarding such other relief as the Court deems just and proper.

## X.    JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: May 27, 2016

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

/s/ James E. Cecchi
James E. Cecchi
Caroline F. Bartlett
Donald A Ecklund
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
decklund@carellabyrne.com
5 Becker Farm Road
Roseland, NJ 07068

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
Gerald H. Silk *(pro hac vice forthcoming)*
Avi Josefson *(pro hac vice forthcoming)*
Michael D. Blatchley *(pro hac vice forthcoming)*
Abe Alexander *(pro hac vice forthcoming)*
Jake Nachmani *(pro hac vice forthcoming)*
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com
abe.alexander@blbglaw.com
jake.nachmani@blbglaw.com