James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Hannah Ross
James A. Harrod
Jai Chandrasekhar
Jake Nachmani
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

Lead Counsel for Plaintiffs and Interim Class Counsel
(*Additional counsel below*)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. THIRD-PARTY PAYOR LITIGATION | Civil Action No. 16-3087(MAS)(LHG)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT .................................................... 2

II.     JURISDICTION AND VENUE ................................................... 12

III.    THE PARTIES................................................................ 13

    A.     Plaintiffs.................................................................13

    B.     Defendants ...............................................................15

IV.     FACTUAL BACKGROUND ..................................................... 17

    A.     Third Party Payors and Pharmacy Benefit Managers ...........................17

    B.     How Drug Prices Are Set....................................................19

    C.     Valeant's Growth-by-Acquisition Strategy ....................................20

    D.     Philidor And Valeant's Secret Network of Captive Pharmacies .................24

    E.     Through Philidor, Defendants Expand Their Secret Network Of
        Pharmacies ...............................................................32

    F.     The Valeant Enterprise Causes Its Affilitiated Pharmacies to File False
        Applications with State Pharmacy Boards .....................................35

    G.     Defendants Use Their Secret Nationwide Network of Captive Pharmacies
        to Insulate Valeant's Branded Drugs from Generic Competition and
        Exponentially Inflate Drug Prices............................................40

    H.     Valeant's and Philidor's Misrepresentations to the Class......................45

    I.     Defendants Reaped Hundreds of Millions of Dollars in Ill-Gotten Profits ..........56

    J.     Defendants' Fraud Is Finally Revealed.......................................58

    K.     Valeant Becomes the Target of Multiple Government Investigations.................62

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN
       FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES ............... 64

    A.     Defendants' Misrepresentations to Third-Party Payors ........................64

    B.     Defendants' Misrepresentations to Patients and Physicians....................66

    C.     Defendants' Misrepresentations to State Regulators ..........................67

VI.     CAUSATION AND INJURY TO THE CLASS ..................................... 68

VII.    CLASS ACTION ALLEGATIONS ............................................... 71

VIII.   CLAIMS FOR RELIEF ........................................................ 74

IX.     PRAYER FOR RELIEF ........................................................ 80

X.      JURY DEMAND.............................................................. 80

Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust"), Fire and Police Health Care Fund, San Antonio ("San Antonio"), Plumbers Local Union No. 1 Welfare Fund ("NY Plumbers"), New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund ("NYHTC"), and the Detectives Endowment Association of New York City ("DEA" and collectively, "Plaintiffs") by their undersigned attorneys, bring this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, on behalf of themselves and all other similarly situated third party payors ("TPPs") as defined below, who paid claims, or incurred costs, in connection with prescriptions for Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company") branded drug products and were injured thereby (the "Class") from January 2, 2013 through November 9, 2015, inclusive (the "Class Period").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel. This investigation included, among other things, a review and analysis of (i) public reports and news articles; (ii) public filings by Valeant or its affiliates with state and federal regulators, including the California and Texas Boards of Pharmacy; (iii) contracts between pharmacy benefit managers and Valeant-affiliated pharmacies; (iv) research reports by securities and financial analysts; (v) litigation materials from the case *R&O Pharmacy, LLC v. Valeant Pharmaceuticals North America LLC*, 15-cv-07846, filed in the US District Court for the Central District of California; (vi) interviews with knowledgeable individuals, including certain former Philidor Rx Services, LLC ("Philidor") employees; and (vii) other publicly available material and data identified in this Complaint. Plaintiffs' counsel's investigation into the factual allegations contained in this

Complaint is continuing, and many of the facts supporting the allegations are known only to the Defendants or are exclusively within Defendants' custody or control. Plaintiffs contend that further substantial evidentiary support will exist for the allegations contained in this Complaint after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

1.      This case arises from a fraudulent scheme perpetrated by Valeant, its top executives, and co-conspirators at affiliated specialty pharmacies, including Defendants Andrew and Matthew S. Davenport, to use a secret network of captive pharmacies to shield the Company's drugs from competition, fraudulently inflate the prices of its products, and artificially boost sales. Valeant and its secret network of pharmacies and shell corporations named after various chess strategies, including Philidor, were created and controlled by the Defendants for the purpose of selling Valeant drugs (the "Valeant Enterprise"[1]) provided a platform through which Defendants implemented a host of fraudulent practices to improperly inflate the reimbursements for Valeant drugs paid for by TPPs, including Plaintiffs and the Class. The fraud Defendants perpetrated through the Valeant Enterprise was so vast in execution and so devastating to its victims that media and commentators have dubbed it the "Pharmaceutical Enron."

2.      Unlike traditional pharmaceutical companies, Valeant's business model has not been focused on the research and development of new drugs. Instead, the Company's business model, conceived by J. Michael Pearson, Valeant's CEO during the Class Period, was founded

---

[1]     The "Valeant Enterprise" includes Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, Matthew S. Davenport, Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP, R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, Parkwest Pharmacy, and other as yet unknown pharmacies, agents, and instrumentalities.

on acquiring promising drugs from other pharmaceutical companies and utilizing the Valeant Enterprise to make those drugs more profitable. With Pearson at its helm, Valeant went on a buying spree, acquiring numerous drugmakers, firing its scientists, and cutting expenditures on research and development of new drugs. Wall Street rewarded Valeant's strategy and apparent success, and Valeant's stock price ballooned over 1,000% in just three years.

3.     The key to Valeant's apparent success was the Company's practice of massively raising the prices of drugs it obtained through its serial acquisitions. For instance, after aquiring Cuprimine, a drug for Wilson's disease, in 2010 from Aton Pharma, Inc. ("Aton"), Valeant increased the price of the drug *2849%* between February 2013 and the first quarter of 2015 even though the drug had been on the market since the mid-1950's and is used long-term and on a daily basis. Likewise, after acquiring Syprine from Aton, another drug used to treat Wilson's disease, Valeant increased the price of the drug by *1424%* between the first quarter of 2013 and the third quarter of 2015. Valeant also acquired the blood clotting agent Mephyton from Aton and increased the price of the drug *527%* between the third quarter of 2014 and the fourth quarter of 2015.   After acquiring the dermatology drug Noritate 1%, used to treat the common skin condition rosacea, from Sanofi in 2011, Valeant proceeded to increase the price of the drug *212%* between the first quarter of 2014 and the third quarter of 2015. Similarly, Valeant increased the price of Targretin gel, another dermatology drug, by *250%* over the course of the Class Period after acquiring the drug from Esai Inc. in February 2013. Most egregiously, after acquiring Salix Pharmaceuticals in March 2015, Vaeleant immediately increased the cost of Salix's Glumetza to $10,020 for 90 1,000 mg tablets.  This increased the price of 90 1,000 mg Glumetza tablets from by a factor of more than 10 (1,018%) from their January 2013 price of

$896. In 2015 alone, Valeant raised prices on its branded drugs an average of *66%*, according to a Deutsche Bank analysis—approximately *five times* as much as its closest industry peers.

4.      The dramatic increase in costs for these and hundreds of other Valeant drugs— that have been borne directly by Plaintiffs and the members of the Class—was possible only through Defendants' exploitation of the Valeant Enterprise. Defendants, including Valeant, Philidor, Matthew S. Davenport, and Andrew Davenport, went to great lengths to conceal from the public and the members of the Class the secret pharmacy network that was essential to the successful manipulation of the market for Valeant's products and the implementation of these price increases.

5.      Critically, far cheaper generic equivalents are available for most of Valeant's drugs. For instance, while during the Class Period Valeant charged *$17,000* for a year's supply of branded Wellbutrin XL, a year's supply of the drug's generic equivalent cost *only $360*. Similarly, a 60g tube of Noritate (one month's supply) costs approximately $1,700, while an alternative treatment, Metronidazole, is available for approximately 96% less than the price charged by Valeant. Absent the scheme Defendants implemented through the Valeant Enterprise, Valeant's bloated drug prices would have been unsustainable in the face of competition from these cheaper generic alternatives. Many state laws, and many contracts entered into by and on behalf of TPPs, require substitution of generics for Valeant's expensive brand-name drugs, unless precluded by the prescribing physician. Moreover, because TPPs and pharmacy benefit managers ("PBMs") generally require a patient co-pay to provide patients with a cost incentive to avoid expensive or unnecessary drugs, consumers have an economic interest in selecting cheaper generics where available. However, Defendants provided customers with coupons and waived patient co-pays to discourage the use of available, cheaper generic alternatives and to

steer customers to their more expensive branded drugs. Accordingly, absent Defendants' fraudulent scheme, patients would have sought out, and dispensing pharmacies would have substituted, generic prescriptions for Valeant's brand-name drugs.

6.     Defendants' goal was to employ the Valeant Enterprise and its fraudulent tactics to sell Valeant drugs at inflated prices.  Specifically, the secret pharmacy network at the heart of the Valeant Enterprise was created specifically to circumvent the problem of generic competition. The Valeant Enterprise operated to enable Defendants to control the distribution of Valeant's expensive branded drugs by steering patients and physicians away from generic equivalents and thereby frustrate generic-substitution mandates and related mechanisms (such as tiered co-payments and incentive payments provided by payers to pharmacies for generic substitution), to ensure that generics were substituted for Valeant products as infrequently as possible.

7.     Defendants built their secret network of captive pharmacies around Philidor, a Pennsylvania mail-order pharmacy. Valeant then created a host of shell companies owned through Philidor, which like Philidor, were named for chess strategies and then used to acquire interests in additional retail pharmacies all over the United States.

8.     With their secret pharmacy network in place, Defendants channeled prescriptions for Valeant's branded drugs—particularly those that were especially susceptible to generic competition, like the Company's dermatological products—through Philidor. Philidor employees, as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of fraudulent practices to prevent the substitution of cheaper generic equivalents for Valeant branded drugs. This conduct was often in contravention of state laws and contractual mandates requiring generic substitution. As a direct consequence of Defendants' scheme, TPPs

5

paid highly inflated prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could and should have been dispensed.

9.      During the Class Period, and as described in more detail below, Defendants secretly developed a nationwide network of captive pharmacies, including and at the center of which was Philidor, and used the Valeant Enterprise to engage in the following fraudulent misconduct:

- Valeant employees worked at those pharmacies using aliases to conceal their identity as Valeant employees;

- Defendants instructed employees to change codes on prescriptions to ensure that the prescriptions would be filled with Valeant drugs, rather than generic equivalents;

- Defendants falsified pharmacy identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursements;

- Defendants submitted numerous prescription renewals for reimbursement, falsely representing to TPPs and PBM agents that patients had requested renewals of their prescriptions when no renewal request had been made;

- Defendants waived patient co-pays to remove patients' incentive to seek out cheaper drugs, and then misrepresented the "actual charges" for Valeant drugs by failing to account for the co-pay waivers;

- Defendants illegally acquired pharmacies to further the Valeant Enterprise by enabling Philidor to indirectly operate in states where it had been denied a license;

- Defendants made misrepresentations in advertisements and marketing materials directly to patients in order to boost Valeant's drug sales; and

- Defendants responded to PBMs' rejections of reimbursement requests for prescriptions for Valeant brand-name drugs by resubmitting the requests at different prices and volumes until the PBMs agreed to pay for them.

6

10.     Many of these fraudulent practices are catalogued in claims-handling manuals Defendants distributed to employees, assuring those employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." As explained in further detail below, those "back door approaches" were fraudulent, and included: (1) changing prescription codes on claims, i.e., ***deliberately altering the prescribing doctor's instructions as set forth in the prescription***, to require that the prescription be filled with Valeant's brand-name drugs; (2) making claims for refills that were never requested by patients—a scheme that former Philidor employees have confirmed was jointly developed by top Valeant and Philidor executives; (3) misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs—***a fraudulent practice that Andrew Davenport, Philidor's CEO, acknowledged he knew was ongoing in a July 19, 2015 email***; and (4) submitting claims that inflated the price charged by failing to take into account serial waivers of patient co-pays.

11.     The success of Defendants' scheme hinged on its secrecy: had TPPs or PBMs known the truth about Defendants' captive pharmacy network, they would have denied claims submitted by pharmacies in the Valeant Enterprise. Indeed, Defendants deliberately misrepresented to state regulators the ownership and control of the captive pharmacies that participated as members of the Valeant Enterprise precisely to ensure that Valeant could charge supra-competitive prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased. To maintain the secrecy of the Valeant Enterprise, Defendants issued a host of false and misleading statements to a number of constituencies, including TPPs, PBMs, and state regulators, designed to conceal Valeant's relationship with its captive pharmacies and its improper use of the secret pharmacy network to inflate drug prices

and sales.   All of those misrepresentations—to the Class and others—were made to enable Defendants to engage in the misconduct described in this Complaint that caused harm to the Class.

12.   Through their fraudulent scheme, Valeant reaped hundreds of millions of dollars in ill-gotten profits at the expense of the Class, whose members paid inflated prices for Valeant drugs, and paid for Valeant drugs that should never have been dispensed. In 2015 alone, Valeant secretly channeled nearly $500 million worth of its drugs through its central pharmacy hub, Philidor.

13.   The fallout from the unmasking of Valeant's secret pharmacy network since late October 2015 has been severe. An online article published by the *Wall Street Journal* on October 25, 2015, entitled "Valeant and Pharmacy More Intertwined Than Thought," reported that Valeant employees were working at Philidor's offices and using fictitious names when sending emails from Philidor addresses. The article specifically mentioned Bijal Patel, who, on a LinkedIn page, was identified as a Manager of Access Solutions at Valeant. Patel, however, actually worked out of Philidor's Phoenix-area office and sent emails to Philidor employees using the fictitious name "Peter Parker." These emails detailed how many prescriptions Philidor was filling, which drugs were most popular, and what doctors were the biggest prescribers. According to the *Journal* article:

> Interviews with former employees, doctors who prescribe Valeant drugs and patients indicate that the ties between Valeant and Philidor are more interconnected than previously disclosed. ***The people gave details of how the companies worked together, with Valeant employees working directly in Philidor offices, sometimes using fictional names. The people said this was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products***, which Philidor strongly denied. (emphasis added).

These tactics enabled Valeant to obtain reimbursements that would otherwise have been denied

for certain pharmaceuticals.

14.    The *Wall Street Journal* article further reported that doctors who had prescribed Valeant pharmaceutical products said that the Company made them well aware of the services provided by Philidor, including financial support available to patients, while concealing its relationship to Philidor. Three doctors reportedly said that Valeant sales representatives furnished brochures and coupons offering to help pay for co-pays and directing patients to call a number for Philidor. According to the *Wall Street Journal* article:

> [D]octors would send prescriptions for Valeant drugs electronically to Philidor.
>
> Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to three former employees . . . .
>
> * * *
>
> If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said . . . .

15.    A declaratoty-judgment lawsuit filed against Valeant in the United States District Court for the Central District of California on October 6, 2016, by R&O Pharmacy, LLC ("R&O") (the "R&O Action") lays bare Defendants' conduct. The R&O action was filed after R&O received a repayment request for $69.8 million based on alleged "invoices" that *Valeant* sent to R&O, *even though R&O had not done any business, at least knowingly or directly, with Valeant*.

16.    In October 2014, Philidor created a shell company, Isolani LLC ("Isolani") for the sole purpose of acquiring R&O. That acquisition was intended to allow Philidor to surreptitiously access the lucrative California insurance market. By way of background, in May 2014, Philidor had been denied a California licence for making "*false statements of fact with the*

*intent to substantially benefit itself or others on its application for licenscure*," including false statements regarding Philidor's actual ownership. On or around December 1, 2014, R&O and its Pharmacist in Charge, Russell N. Reitz ("Reitz") entered into a Purchase and Sale Agreement with Isolani pursuant to which Isolani agreed to purchase 10% of R&O for $350,000 with an agreement to purchase the remaining 90% upon the satisfaction of certain terms, including most notably, Isolani obtaining a pharmacy permit from the California State Board of Pharmacy. Similarly, at the same time, R&O and Isolani entered into a Management Services Agreement ("MSA") appointing Isolani as the manager of R&O Pharmacy, and delegating responsibility for the day-to-day operations of R&O to Isolani. The MSA authorized Isolani to, among other things, order medications from Valeant, collect co-payments and reimbursements from insurance companies. Moreover, Philidor and R&O also entered into a Prescription Drug Services Agreement allowing Philidor to deliver prescriptions to R&O that would then seek "authorization for fulfillment of the prescription and confirmation of coverage from the applicable insurance carrier, plan or other third party payer." The Prescription Drug Services Agreement was signed by Philidor executive Eric Rice on behalf of R&O in his capacity as sole member of Isolani.

17.    As the R&O Action alleges, Philidor went to great lengths to conceal its relationship with Valeant in order to use R&O to dispense Valeant drugs. Even before the R&O-Isolani agreement was executed, Philidor began using R&O's National Provider Identifier ("NPI") number without permission to dispense Valeant drugs. As Reitz began to discover other fraudulent practices, he began withholding millions of dollars of prescription reimbursements for Valeant drugs, rather than turning the funds over to Isolani/Philidor. This prompted *Valeant's* General Counsel to send a letter "reflecting gross invoiced amounts due of $69,861,343.08" and

demanding "immediate payment" to avoid "further damage *to Valeant* and other parties." R&O responded by filing the R&O Action in October 2015 against Valeant, stating that R&O had no relationship with Valeant and that Valeant was conspiring with others to defraud R&O.

18.     Further casting light upon Defendants' scheme was a Citron Research report dated October 21, 2015, asserting that Valeant controlled both Philidor and R&O. The Citron report noted similarities between the websites of Philidor and R&O (as well as other captive pharmacies described below) and reported that they were effectively the same company. The Citron report also questioned Valeant's practice of rapid acquisitions and massive price increases:

> Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about [Valeant] focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development. But no one had discussed how these drugs were distributed . . . until this week.

19.     Shortly after Valeant's relationship with Philidor was revealed, the three largest pharmacy benefit managers in the United States, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx, all announced that they were dropping Philidor from their networks. CVS stated that audits found that Philidor was not complying with their agreement. Express Scripts stated that it was not only cutting off Philidor but also evaluating four additional pharmacies with which Valeant "has a similar relationship." After these announcements, Valeant reported that it was "severing all ties" with Philidor and that Philidor had "informed Valeant that [Philidor] will shut down operations as soon as possible."

20.     On October 30, 2015, after the disclosure of the Valeant-Philidor relationship and the existence of Valeant's captive pharmacy network, Valeant announced that it had terminated its relationship with Philidor. Valeant also announced in October 2015, that it had received a

subpoena issued as part of a criminal investigation into possible violations of federal health-care laws. On November 9, 2015, Valeant had a conference call to discuss Philidor and disclosed that Philidor would stop adjudicating insurance claims.

21.     After news about the secret pharmacy network reached investors—and the Company failed to provide reasonable explanations for the existence and secrecy of that network—Valeant lost over $100 billion of its market capitalization. In March 2016, Pearson, Valeant's CEO during the Class Period, was forced to resign as a result of numerous government investigations, as well as investor and public scrutiny into Valeant's misconduct.

22.     Currently, Valeant and the Valeant Enterprise are the focus of investigations by Congress, the US Department of Justice, and the SEC. In testimony before the US Senate Special Committee on Aging on April 27, 2016, Pearson conceded that Valeant's price-inflation practices were improper, admitting that Valeant was "too aggressive—and I as its leader, was too aggressive—in pursuing price increases on certain drugs."

23.     Through this action, Plaintiffs seek to recover the damages caused by Valeant's misconduct and the "aggressive" price increases that were facilitated through the fraud and violations of law alleged in this Complaint.

## II.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Because Valeant sold at least $500 million worth of its drugs through its captive pharmacy network during the Class Period, Plaintiffs believe that the amount in controversy exceeds $5 million. The Class is composed of thousands of TPPs, such as welfare benefit funds and insurers, located throughout the United States, less than one third of which are citizens of New Jersey.

25.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 with respect to Counts I and II because those Counts arise under the laws of the United States, and under 28 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

26.     This Court has personal jurisdiction over the Defendants because they have sufficient minimum contacts with New Jersey, as each Defendant either resides in New Jersey or communicated with, and coordinated his or its activities, with Defendant Valeant, which has its US headquarters in New Jersey.

27.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because Defendant Valeant is headquartered and resides in this District and conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District. Defendants Philidor, Andrew Davenport, and Matthew Davenport conducted business in this District during the Class Period.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails and interstate telephone communications.

## III.    THE PARTIES

### A.    Plaintiffs

29.     Plaintiff Airconditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust") is a health and welfare benefit fund with its principal place of business at 3500 W. Orangewood Avenue, Orange, California 92868. ACR Trust is a multi-employer welfare benefit plan, within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(1), (3) and 1003(a), which provides health benefits to eligible participants and their beneficiaries. Membership comes from various union members, who are involved in the air

13

conditioning and refrigeration industries. Throughout the Class Period, ACR Trust paid or reimbursed eligible ACR Trust participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

30. Plaintiff Fire and Police Health Care Fund, San Antonio ("San Antonio") is a public healthcare fund located at 11603 W. Coker Loop, Suite 130, San Antonio, Texas 78216, which provides health benefits to over 12,000 eligible participants and beneficiaries. Throughout the Class Period, San Antonio paid or reimbursed eligible San Antonio participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

31. Plaintiff Plumbers Local Union No. 1 Welfare Fund ("NY Plumbers") is a health and welfare benefit fund with an office located at 50-02 Fifth Street, 2nd Floor, Long Island City, New York 11101. NY Plumbers is a multi-employer welfare benefit plan within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(1), (3), and 1003(a), which provides prescription drug, hospital, major medical, dental, and optical benefits to eligible participants and their beneficiaries. NY Plumbers' members include various union members who are involved in the plumbing industry. As reflected in utilization reports generated by CVS/Caremark, NY Plumbers' PBM, throughout the Class Period, NY Plumbers paid eligible NY Plumbers participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

32. Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund, ("NYHTC") is a jointly trusteed employee benefits fund that operates

for the benefit of active and retired unionized hotel workers in the New York metropolitan area. NYHTC is a multi-employer welfare benefit plan within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(1), (3), and 1003(a), which provides prescription drug, hospital, major medical, dental, and optical benefits to eligible participants and their beneficiaries. NYHTC has its principal place of business at 305 West 44th Street, New York, New York, 10036 and is a citizen of New York. Throughout the Class Period, NYHTC paid or reimbursed eligible NYHTC participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

33.    Plaintiff the Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department. The DEA was founded in 1917 to represent active and retired detectives of the New York City Police Department. The DEA represents 5,500 active and over 12,400 retired New York City Police Detectives. The DEA has its principal place of business at 26 Thomas Street, New York, New York 10007. Throughout the Class Period, the DEA paid or reimbursed eligible DEA participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

**B.    Defendants**

34.    Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") is a Canadian corporation, incorporated in British Columbia, Canada, and has its US headquarters in this District at 400 Somerset Corporate Blvd., Bridgewater, New Jersey. Valeant is a multinational pharmaceutical and medical-device company that markets a broad range of branded, generic, and

branded generic pharmaceuticals, over-the-counter products, and medical devices, directly or indirectly, in over 100 countries.

35.     Defendant Philidor Rx Services, LLC ("Philidor") has held itself out as a specialty, mail-order pharmacy that, during the Class Period, dispensed primarily Valeant products. Philidor is a Delaware limited liability company, with its headquarters located at 330 South Warminster Road, Hatboro, Pennsylvania. As detailed below, Philidor was a central participant in the Valeant Enterprise and was largely responsible for helping expand the secret network of pharmacies used to carry out Defendants' fraudulent scheme.

36.     Defendant Andrew Davenport was, at the time Philidor ceased operations, the Chief Executive Officer of Philidor, a central participant in the Valeant Enterprise. Andrew Davenport, reportedly one of Philidor's co-founders, also worked at BQ6 Media Group ("BQ6"), a marketing firm that had provided services to Medicis Pharmaceutical Corporation ("Medicis"), which was acquired by Valeant in December 2012, and consulted for Valeant thereafter. According to Philidor's January 15, 2013, Operating Agreement, Andrew Davenport was Philidor's largest beneficial owner, holding (both personally and through a shell company for which he was the sole signatory) a 36.5% equity stake in Philidor. After Valeant's acquisition of Medicis, Andrew Davenport collaborated with Valeant employees including Gary Tanner, Bijal Patel, and Alison Pritchet to establish Philidor.

37.     Defendant Matthew S. Davenport, reportedly the brother of Andrew Davenport, represented himself as Philidor's Chief Executive Officer in documents submitted to the California State Board of Pharmacy in support of Philidor's applications for a pharmacy license in California between 2013 and 2015. In May 2014, the California State Board of Pharmacy denied Philidor's application on the grounds that Matthew Davenport, under penalty of perjury,

"knowingly made false statements of fact with the intent to substantially benefit [himself] or others on [Philidor's] application for licensure." Notably, some of those false statements related to the ownership and management of Philidor, including concealing Andrew Davenport's ownership interest in Philidor, and were made to acquire additional specialty pharmacies in order to futher the goals of the Valeant Enterprise.

## IV.    FACTUAL BACKGROUND

### A.    Third Party Payors and Pharmacy Benefit Managers

38.    A third party payor ("TPP") is any organization, public or private, that pays or insures health or medical expenses on behalf of customers, members, beneficiaries, or their family members. TPPs can include commercial insurance companies, self-insured employers, and multi-employer Taft-Hartley health or welfare funds.

39.    Insureds and beneficiaries of a TPP generally pay a premium or premium contribution (for employer-sponsored plans) for coverage, or have a premium paid on their behalf by an employer. When an insured fills a prescription under a TPP plan, the TPP generally pays the majority of the insured's prescription drug costs. The remainder of the cost is generally covered by the insured in the form of a co-pay or deductible payment.

40.    Pharmacy benefit managers ("PBMs") serve as middlemen between drug manufacturers or pharmacies and the TPPs that pay for drug prescriptions. PBMs act as agents for TPPs. PBMs enter into contracts with TPPs to provide programs designed to help maximize drug effectiveness and contain drug expenditures by influencing the behaviors of prescribing physicians, pharmacists, and members. Accordingly, on behalf of TPPs, PBMs provide numerous services, including developing a pharmacy network, designing a formulary, negotiating drug rebates, reviewing drug utilization, and processing and analyzing prescription claims.

41.     In a typical situation where a benefit-plan participant seeks to fill a drug prescription, the role of the PBM is illustrated as follows: the insured patient visits a network pharmacy; the pharmacy checks with the PBM to confirm patient eligibility, coverage, and co-payment information; the patient pays the co-payment (and any deductible) and purchases the drug; the PBM then reimburses the pharmacy for the remainder of the negotiated drug price, including the ingredient cost and a dispensing fee, less the co-payment; and the PBM then bills the TPP for the payments it made on behalf of the TPP under the contract between the TPP and the PBM.

42.     Recognizing that TPPs generally pay the bulk of an insured's prescription costs, Defendants exploited TPPs by using their secret network of captive pharmacies to shield Valeant's drugs from competition, fraudulently raise the prices of its products, and artificially boost sales, improperly inflating the reimbursements for Valeant drugs paid for by TPPs. Indeed, after Defendants' fraud was revealed and the three largest PBMs in the country severed ties with Philidor because of its undisclosed relationship with Valeant, Valeant entered into a distribution deal with Walgreens, by which Walgreens would sell Valeant's skin and eye drugs as well as other Valeant-branded drugs. As reported in Fortune on December 16, 2015, Larry Merlo, CEO of CVS Health, one of the PBMs that had already cut ties with Philidor, stated in regards to the Valeant-Walgreens deal: "This is another example of Valeant attempting to circumvent what PBMs do for payers … These actions ultimately drive up costs for payers when you think about the use of prescription co-payment programs."  Valeant and its secret pharmacy network also provided a platform through which Defendants implemented a host of fraudulent practices described below to improperly inflate the reimbursements for Valeant drugs paid for by TPPs.

### B.      How Drug Prices Are Set

43.      The common pricing benchmark for virtually all retail drug reimbursement transactions is the "Average Wholesale Price" ("AWP"). The AWP represents the manufacturer's published catalog or list price for a drug product. Commercial publishers of drug-pricing data, such as Red Book and First DataBank, have published AWP data since the 1970s. AWP is used to determine drug prices and third-party reimbursement throughout the healthcare industry.

44.      The AWP may be determined by several different methods. The drug manufacturer may report the AWP to the individual publisher of drug-pricing data. The AWP may also be calculated by the publisher based upon a mark-up specified by the manufacturer that is applied to the wholesale acquisition cost ("WAC") or direct price ("DP"). The WAC is the manufacturer's list price of the drug when sold to wholesalers, while the DP is the manufacturer's list price when sold to non-wholesalers.

45.      Pharmaceutical manufacturers typically sell their on-patent brand drugs to wholesalers at the manufacturers' list prices, usually WAC, net of prompt-pay discounts. The AWP is generally based on the standard formula of WAC + 20% or 25% or, far less frequently, the manufacturer's suggested wholesale price ("SWP")—i.e., the price the drug maker would set—if an SWP is provided.

46.      Accordingly, a pharmaceutical manufacturer's ability to set a benchmark data point, such as WAC, by increasing the price of its drugs sold to some parties, increases the drug's published AWP, which in turn raises the price of that drug when purchased by end-users, including by TPPs. Through Defendants' fraudulent scheme, Defendants were able to charge inflated prices for Valeant-branded drugs by eliminating generic competition through illegal and improper means, including by blatantly breaching contractual and state-law requirements

19

mandating generic substitution through the Valeant Enterprise. In doing so, Defendants were able to sustain artificially inflated benchmark prices for its branded drugs that otherwise would have been much lower. This caused Valeant's branded drugs to be sold at artificially high prices both within and outside the Valeant Enterprise, causing injury to the Class.

### C.    Valeant's Growth-by-Acquisition Strategy

47.    Before and during the Class Period, Valeant's business model was focused on achieving revenue growth by acquiring drugs and drug companies and then dramatically raising prices of the acquired drugs. Since 2010, Valeant has acquired companies with a total value of at least $36 billion. By the end of the Class Period, Valeant was the sixth-largest acquirer, globally, by deal size. Notably, since 2008, when Pearson became CEO of Valeant, Valeant has acquired at least 100 companies. For this reason, analysts and pharmaceutical industry observers referred to Valeant as a "serial acquirer."

48.    Valeant's acquisition strategy gave the Company access to a diverse portfolio of drugs. For example, in September 2010, Valeant engaged in a reverse merger with Biovail Corp., Canada's largest pharmaceutical company, for $3.3 billion, and Pearson became CEO of the combined company. The merger gave Valeant access to a portfolio of dermatological drugs, drugs treating disorders of the central nervous system, and the anti-depression drug Wellbutrin. In 2012, Valeant purchased Medicis Pharmaceutical Corp. for $2.6 billion, providing Valeant with access to drugs for the treatment of acne, as well as other aesthetic skin-care products.

49.    In addition to providing Valeant with access to Medicis' dermatological products, including Solodyn and Ziana, the Medicis acquisition served another purpose for Valeant: it allowed Valeant to acquire Medicis' "alternate fulfillment" ("AF") distribution program, which served as a model for the establishment of Philidor to begin distributing Valeant products. During a September 4, 2012 conference call announcing Valeant's acquisition of Medicis,

Valeant's then-CEO Pearson praised Medicis' distribution methods: "I think the whole alternate fulfillment program was a very clever idea. And give a great deal of credit to Medicis' management for coming up with it." Likewise, during a January 4, 2013 conference call with investors, and in response to an analyst's questions concerning Medicis' AF program, Pearson stated: "the more we understand about it, the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned . . . . And also as we had hoped, we think it will apply to more than just Solodyn . . . and we see application for a number of our dermatology products and potentially neurology products in the US." Valeant also hired former Medicis employees, including Gary Tanner, to run its own AF program through Philidor. Likewise, during a February 28, 2014 conference call, Pearson stated about Valeant's adopted AF program: "probably by mid year, there will be a number of other products that we will be using alternate fulfillment as well." In an October 26, 2015 presentation, when the truth about the Valeant-Philidor relationship was being revealed, Valeant *admitted* that its "specialty pharmacy program originated from Medicis Alternate Fulfillment Program."

50.     Also in 2012, Valeant acquired Natur Produckt International of Russia for $180 million, giving Valeant control of a portfolio of a cough and cold treatments. In 2013, Valeant bought eye-care giant Bausch & Lomb for $8.6 billion, giving Valeant access to Bausch & Lomb's specialized-ophthalmology and contact-lens portfolio. In March 2015, Valeant completed its $11 billion purchase of Salix Pharmaceuticals, a maker of drugs treating gastrointestinal disorders.

51.     Valeant also sought to acquire drugs designated by the FDA as "orphan drugs" under the Orphan Drug Act. An orphan drug is either (i) used to treat diseases or conditions that afflict a small portion of the population (200,000 persons or less in the United States); or (ii) a

drug whose sponsor has shown that the drug's sales are unlikely to be sufficient to recoup the sponsor's costs. As a result of these characteristics, orphan drugs generally face little, if any, competition. As an outside consultant reportedly explained to Valeant's CEO, products that "are not on the radar" have "material pricing potential."

52.    By pursuing this strategy, Valeant not only avoided massive research and development costs but, more importantly, focused on "premium" pricing to maximize revenues. One of Pearson's mottos was reportedly "*[d]on't bet on science—bet on management*." In order to successfully implement and maintain ultra-premium pricing, however, Valeant had to devise a means of steering physicians and their patients away from less expensive generic alternatives and into Valeant-branded drugs.

53.    How Valeant chose to implement this strategy has been harshly criticized. Earlier this year, on April 30, 2016, Charlie Munger, Vice Chairman of Berkshire Hathaway and a long-time critic of Valeant, declared that Valeant was a "sewer," adding that "those who created it deserved the opprobrium they got."

54.    In the short term, however, Valeant's growth-by-acquisition strategy appeared successful. Year after year, the Company reported consistent and steep growth, reporting $3.48 billion of revenues for 2012, $5.76 billion for 2013, $8.25 billion for 2014, and $7.71 billion of revenue for the first three quarters of 2015. As of July 2015, Valeant was valued at over $90 billion, making it the largest public company incorporated in Canada and the largest pharmaceutical company headquartered in the United States.

55.    During the Class Period, Valeant attributed the success of its strategy to its aggressive cost-cutting, its "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products." Similarly, in a February 22,

2015 Valeant press release, Pearson attributed Valeant's explosive growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services." These misrepresentations concealed from the Class—as well as regulators—the true driver of the Company's growth.

56.     In truth, a key driver of Valeant's growth was its fraudulent use of a secret network of captive pharmacies. Valeant's use of that secret pharmacy network enabled Valeant to exponentially increase the prices of its branded drugs, despite the fact that cheaper, generic substitutes existed for many of these drugs. In an effort to conceal its scheme, Valeant consistently downplayed the extent to which pricing increases contributed to the Company's growth. For instance, on an April 29, 2015 earnings call with investors, Pearson was asked how much price contributed to growth in the quarter. Pearson falsely responded that "In terms of price volume, actually, volume was greater than price in terms of our growth." On February 3, 2016, after the conclusion of the Class Period, Valeant issued a press release ***admitting*** that this statement was false and that, in truth, Valeant's growth was a result of its increasing the prices of its drugs.

57.     Likewise, in a further effort to obscure Valeant's reliance on the price increases facilitated by its captive network of pharmacies, Valeant changed the way it reported its financial results, refusing to break out the revenue numbers for major acquisitions and making it impossible for the public to track whether acquired drugs were experiencing any organic growth. In 2013, the year in which Valeant created Philidor, the drugmaker cut the number of operating segments reported in half, going from four to two. Because various segments were driven by just

a few main products, the public could previously track how those products were performing. But with just two operating segments, it became impossible for the public to obtain that same information.



**Figure 1. Valeant's changes to its financial reporting at the time it created Philidor.**

D.    **Philidor And Valeant's Secret Network of Captive Pharmacies**

58.    To insulate its brand-name drugs from generic competition and boost sales, Valeant embarked on a scheme to funnel sales of its branded drugs through a nationwide network of captive pharmacies. Through this secret network, Valeant insulated its products from generic competition throughout the Class Period by, among other things, flouting statutory or contractual mandates requiring substitution of generic equivalents for Valeant branded drugs and submitting false claims information to TPPs and PBMs.  This fraudulent scheme enabled Valeant to massively increase the prices of its drugs and inflate the number of claims paid on prescriptions for those drugs. As a result, the Class overpaid for Valeant's expensive branded drugs, was prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed.

59.    At the center of this network of captive pharmacies was Philidor. On January 2, 2013, the first day of the Class Period, Defendants incorporated Philidor, a purportedly

independent, specialty mail-order pharmacy led by co-founder Andrew Davenport. During the Class Period, Philidor was licensed in 45 states and the District of Columbia.

60.     In its state registrations, Philidor falsely identified David Wing, John Carne, and Gregory Blaszczynski as officers.  However, none of them actually worked at Philidor. Rather, each of these individuals worked at BQ6, a pharmaceutical-marketing company, named after a legendary chess move, that consulted for Valeant and shared its physical address with Philidor. Philidor's owners, Andrew Davenport, Matthew Davenport, and Blaszczynski, also worked at BQ6.

61.     During the Class Period, Philidor falsely held itself out to be a "specialty pharmacy." True specialty pharmacies focus on self-administered specialty drugs covered under a patient's pharmacy insurance benefit. These specialty drugs are almost always highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses such as cancer, rheumatoid arthritis, multiple sclerosis, and HIV. Often, these drugs come in the form of self-administered injections or require constant refrigeration. Philidor, by contrast, was principally devoted to dispensing Valeant's undifferentiated traditional drugs— principally its dermatological products—most of which had low-cost generic substitutes. Indeed, as Philidor has itself admitted, Valeant was Philidor's "only client." (Business Insider, October 22, 2015, *A Company involved with Valeant has shed light on a critical accusation in that brutal short-selling note*).

62.     Specialty pharmacies act as mail-order pharmacies that operate across state lines and are required to be licensed in any state where they sell drugs. Specialty pharmacies offer a convenient and reliable service for expensive drugs and ostensibly lower costs and maximize insurance reimbursements from companies that cover the drugs. However, specialty pharmacies

are not required to report their pharmaceutical sales to IMS Health, a tracking service that is used by companies and analysts to monitor drug sales and inventory channels. Thus, Philidor's specialty-pharmacy designation allowed Valeant to avoid public scrutiny of the price-gouging scheme that was directed at consumers and injured TPPs.

63.     Shortly after its incorporation, Philidor expanded its operations.  Philidor opened offices in Arizona and entered into a Master Service and Pharmacy Dispensing Agreement with Valeant's Medicis division on January 11, 2013. As a result, although its headquarters were just outside Philadelphia, Pennsylvania, Philidor also immediately began operating in Arizona.

64.     Valeant employees worked with Andrew Davenport to set up Philidor in 2013 and to expand its operations. At all times from Philidor's inception, Valeant was the exclusive supplier of products sold by Philidor. Valeant secretly controlled Philidor due to Philidor's financial dependence on Valeant for sales of Valeant products, and due to Philidor's reliance on Valeant  management, and personnel to operate its business. Later, as described below, Valeant acquired effective control over Philidor, by entering into the Option Agreement (defined below at ¶74) in December 2014. Under applicable accounting rules, this required Philidor's financial statements to be consolidated with Valeant's financial statements.

65.     One month before Philidor was even legally formed, Valeant hired manager Gary Tanner, a former employee of Medicis (which Valeant acquired in 2012), to act as the drug company's special "liaison" with Philidor and to help ramp up the pharmacy's operations. Tanner interacted directly with Valeant's top executives, including Valeant's CEO, Pearson. (Bloomberg, November 4, 2015, *Valeant Said to Have Planned Philidor Expansion for Products;* Bloomberg, Nov. 4, 2015; Reuters, November 12, 2015, *Valeant played a key role in building, operating Philidor RX*).

66.     Over the course of Tanner's employment with Valeant, Tanner supervised the operations of Philidor. Tanner interacted daily with Philidor CEO Andrew Davenport and supervised employees who worked out of Philidor's offices in Pennslyvannia, including sales and managerial staff, employed by both Valeant and Philidor.  Tanner's employment with Valeant was terminated in August 2015, and, immediately afterwards, he was hired by Philidor. In connection with Tanner's joining Philidor, Andrew Davenport sent a memo to Philidor employees noting the close ties between Valeant and Philidor by stating that "[Tanner] has been our client liaison with Valeant since the very beginning in January 2013 and has made an immeasurable contribution to Philidor's success." (Bloomberg, November 4, 2015, *Valeant Said to Have Planned Philidor Expansion for Products*).

67.     Likewise, on the same day Philidor was legally formed, Valeant hired Laizer Kornwasser, a former senior executive at Medco, to oversee Valeant's relationship with Philidor. Kornwasser, who supervised Tanner, reported directly to Valeant CEO Pearson. Immediately upon being hired, Kornwasser received nearly $5 million in equity awards. Both Kornwasser's senior position in Valeant's organizational structure and his outsized compensation demonstrate that Valeant viewed its relationship with Philidor as critically important to the Company's success. Tanner and Kornwasser were key employees who remained closely involved in the details of running the pharmacy, including expanding its business.

68.     On July 27, 2013, Philidor entered into a "Distribution Services Agreement" with Valeant to provide distribution services for all of Valeant's drugs. This agreement was amended just a few weeks later on August 2, 2013 to assign Philidor the role of administering Valeant's "co-pay assistance programs" related to Valeant-branded pharmaceuticals. Tanner was designated as the Valeant contact in the agreement.

69.     In August 2015, Tanner left Valeant to formally join Philidor as Executive Vice President and a member of its management team. Andrew Davenport memorialized Tanner's prior role by sending a memo to employees describing Tanner as "our client liaison with Valeant since the very beginning in January 2013," going on to note that Tanner had "made an immeasurable contribution to Philidor's success."

70.     During the Class Period, Valeant installed a cadre of its employees within Philidor (in addition to Tanner and Kornwasser) to supervise operations at the pharmacy and fraudulently increase the sale of Valeant drugs. For instance, Valeant placed a 30-person team inside Philidor with instructions to show doctors how to direct patients to Valeant products. At different points in Philidor's evolution, Valeant employees were responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations.

71.     Brad Greenfield ("Greenfield") also joined Valeant from Medicis and worked closely with Philidor. Greenfield had been the Area Director for Dermatology sales at Medicis and was the Senior Director Marketing, Acne Division at Valeant's Scottsdale, Arizona office with responsibility for products such as Solodyn. Greenfield also saw Philidor as part of the Valeant organization. For example, Jeff Becker ("Becker") was the Operations Manager at Philidor starting in April 2015. On Becker's LinkedIn profile, Greenfield provided a recommendation stating that he had "experience working with Jeff over the past 6 months" and that Becker "joined *our organization,* making an immediate impact by connecting with multiple layers of *our* staff and helping *our* Claims team…" (emphasis added.)

72.     To avoid detection as Valeant employees, and thereby conceal the fact that Valeant was using Philidor to steer patients to Valeant-branded drugs, Tanner and his former

Medicis colleagues, Bijal Patel and Alison Pritchet, used pseudonyms such as "Peter Parker" (Patel) from Spiderman and "Brian Wilson" (Tanner) of the Beach Boys. Patel communicated information to Valeant employees, including the number of prescriptions Philidor filled, the most popular drugs, and the physicians who prescribed the greatest amount of drugs. These Valeant employees, secretly embedded in Philidor, even used email addresses that belonged to Philidor. For the same reason of avoiding detection, other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child).

73.     News outlets, including *Bloomberg* and the *Wall Street Journal,* which interviewed former Philidor employees, reported that the use of fake names by Valeant employees "was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products." Pearson later claimed Valeant concealed the relationship for "competitive" reasons.

74.     Valeant's ties to Philidor went beyond personnel; Valeant also exercised financial control over Philidor. On December 15, 2014, Valeant entered into a purchase option agreement (the "Option Agreement") with Philidor wherein it paid $100 million for the option to acquire Philidor for $0 for 10 years, plus various milestone payments based on Philidor's sales. The first milestone payment of $33 million was paid on January 15, 2015. The remaining milestone payments were tied to Philidor hitting sales targets. Valeant's little known but wholly owned subsidiary, KGA Fulfillment Services, Inc. ("KGA"), was used to obtain the option to acquire Philidor. Notably, the agreement provided that Philidor was to enter into a purchase agreement with Isolani and Lucena (discussed below) as a condition to the acquisition and stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

75.     In exchange for the $100 million option payment, Valeant received contractual rights to literally control Philidor's operations. The Philidor Option Agreement permitted Valeant to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones. Significantly, the Option Agreement documented Valeant's right to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals" in the case of any tie of the joint steering committee members. The joint steering committee also had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."

76.     Similarly, on December 15, 2014, Valeant and Philidor entered into a distribution and services agreement that superseded the original Master Service and Pharmacy Dispensing Agreement agreement of January 11, 2013. The new agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify such compliance.

77.     Defendants' post-Class Period admissions concerning Valeant's restated financial results demonstrate that Philidor was an instrumentality of Valeant during the Class Period. Indeed, on October 26, 2015, in Valeant's Form 10-Q for the third quarter of 2015, Valeant announced that it had formed an ad hoc committee of Valeant's Board of Directors to review the allegations about Valeant's improper and previously undisclosed relationship with Philidor. On February 22, 2016, Valeant announced that the ad hoc committee had identified approximately $58 million in revenues "in the second half of 2014 that should not have been recognized upon delivery of product to Philidor." Based on the ad hoc committee's investigation, on March 21,

2016, Valeant announced that it would be restating its financial results for 2014 and the first three fiscal quarters of 2015 and that its internal controls over financial reporting suffered from "one or more" material weaknesses.

78.     Misconduct by Valeant's management was central to the ad hoc committee's findings concerning improper revenue recognition related to Philidor and the material weaknesses in the Company's internal controls. On March 21, 2016, Valeant admitted that the "tone at the top" of the Company could have been a "contributing factor[] resulting in the Company's improper revenue recognition . . . ." Valeant specifically admitted that by "improper conduct," Valeant's Class Period CFO Howard Schiller's and Corporate Controller Tanya Carro contributed to the misstatement of Valeant's Philidor-related revenues. In Valeant's belated 2015 Form 10-K, filed with the SEC on April 29, 2016, Valeant further admitted that the "tone at the top" was itself a material weakness in the Company's internal controls over financial reporting. In other words, Valeant would not have been able to improperly book revenue related to Philidor without improper conduct by Valeant's top management.

79.     Moreover, the nature of the misstatements themselves demonstrates that Philidor was an instrumentality of Valeant's during the Class Period. On March 21, Valeant stated that:

> In connection with the work of the Ad Hoc Committee, the Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement *were not executed in the normal course of business* and included actions taken by the Company *in contemplation of the option agreement*. As a result of these actions, revenue for certain transactions should have been recognized on a sell-through basis (i.e., record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement rather than incorrectly recognized on the sell-in basis utilized by the Company. *Additionally, related to these and certain earlier transactions, the Company also has concluded that collectability was not reasonably assured at the time the revenue was originally recognized*, and thus these transactions should have been recognized on a sell-through basis instead of a sell-in basis.

31

80.     Valeant's disclosure that it improperly booked revenue "in contemplation of the option agreement" demonstrates Valeant's de facto control over Philidor even before it obtained the option to formally acquire Philidor. Valeant was able to improperly book this revenue before the execution of the Philidor Option Agreement only because the Valeant Enterprise was on both sides of the deal—there was no way Philidor would not enter into the Option Agreement with Valeant. Valeant prematurely booked Philidor-related revenue before it was sure it could collect the revenue because it assumed that Philidor would be able to sell its expensive branded drugs to patients through the Valeant Enterprise's captive network of pharmacies despite the availability of less expensive generic alternatives.

### E.     Through Philidor, Defendants Expand Their Secret Network Of Pharmacies

81.     With the assistance of Valeant employees, Philidor began to acquire and oversee a secret pharmacy network. The Canadian newspaper the *Globe and Mail* depicted an example of the relationships of this secret pharmacy network in the graphic below:



**Figure 2. Valeant's Shell Companies**

82.     Defendants created a host of shell companies through Philidor, which they used to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network. Defendants created a network of "phantom" pharmacies by causing Philidor or its affiliates to file pharmacy applications with state regulators on behalf of various shell companies that Valeant and Philidor used to implement their scheme. These captive pharmacies include: R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria

Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy.[2]

83.     Like Philidor itself, many of the shell companies Defendants used to build their covert pharmacy network had chess-related names. "Philidor" refers to eighteenth-century chess master Francois-Andre Philidor and his eponymous Philidor defense. Many of the numerous additional shell companies in Defendants' captive network, all registered in Delaware, likewise share chess-related names:

- BQ6 refers to chess master Bobby Fisher's opening moves against chess master Boris Spassky in 1972;

- Lucena Holdings LLC and Back Rank, LLC refer to endgame chess strategies;

- Isolani LLC refers to an isolated queen's pawn;

- Fifty Moves, LLC refers to the "Fifty Move Rule";

- ELO Pharmacy LLC refers to the ELO chess-ranking system;

- C-K Pharmacies LLC refers to the Caro-Kahn chess defense;

- Tarrasch Pharmacy Holdings, LLC refers to Siegbert Tarrasch, an acclaimed nineteenth-century chess master;

- NC3 Pharmacy LLC, refers to the Dunst Opening (a strategy popularized by American chess player Ted A. Dunst); and

- Lasker Pharmacies, LLC refers to the nineteenth-century chess player Emmanuel Lasker.

84.     Defendants also created specific entities that helped secretly facilitate the flow of money between Philidor and Valeant. One of these entities was KGA, the wholly-owned Valeant

---

[2]     In connection with the US Senate Special Committee on Aging's April 27, 2016 hearing on Valeant and the Company's practice of increasing the price of its drugs, Philidor admitted that SafeRx Pharmacy, D&A Pharmacy, Presciption Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy were pharmacies through which Philidor dispensed Valeant drugs.

subsidiary that Valeant used to lend money to Philidor's co-owners and managers and which was the counterparty of record with Philidor in the $100 million Option Agreement. Valeant created KGA in November 2014 to hold Valeant's option to purchase Philidor. Like the names of many of the shell companies in Valeant's covert pharmacy network, KGA's name also refers to chess: KGA stands for "Kings Gambit Accepted," a common opening move.

85.     What was not publicly disclosed, but has since been reported by the Southern Investigative Reporting Foundation (the "SIRF") in an article dated October 19, 2015 and entitled "The Kings Gambit: Valeant's Big Secret," is that KGA was "listed as the 'secured party' on UCC–1 liens placed in January and February 2015 against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in the debtor's personal property. In this case, Valeant/KGA lent money to Philidor's ownership group and accordingly, the ownership group's equity stakes in Philidor are potentially collateral."

86.     So firm was Valeant's insistence on using Philidor as its pharmacy network that when Valeant acquired Sprout Pharmaceuticals, Inc. ("Sprout") in August 2015, Valeant immediately cancelled Sprout's existing distribution agreement with Cardinal Health for Sprout's marquee product, Addyi (also known as "Viagra for women"), a treatment option for hypoactive sexual desire disorder in pre-menopausal women, and then required that all sales of the product be made exclusively through Philidor.

### F.      The Valeant Enterprise Causes Its Affilitiated Pharmacies to File False Applications with State Pharmacy Boards

87.     To keep their captive pharmaceutical network a secret, Defendants caused the shell companies to make false and misleading statements in pharmacy applications filed with state regulators that failed to disclose the companies' relationship with Valeant and Philidor.

88.     For example, Philidor submitted an application to the California State Board of Pharmacy on or about August 15, 2013 that contained numerous false and misleading statements designed to hide Valeant's control over Philidor. The California State Board of Pharmacy found that Philidor and its CEO Andrew Davenport, while under penalty of perjury, falsely represented in that application:

- that Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor;

- that Blaszczynski was an authorized signatory for Philidor's financial transactions;

- that there were no individuals or entities with a beneficial interest in Philidor;

- that there were no owners or shareholders of Philidor, when in fact there were sixteen;

- that there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- that there were no entities with 10% or more ownership interest in Philidor; and

- that Andrew Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

89.     On May 16, 2014, the California State Board of Pharmacy denied Philidor's application, finding that Philidor and Andrew Davenport knowingly made false statements concerning these topics, that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements, were "guilty of unprofessional conduct." The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy-license application in February 2016.

### 1. Philidor Establishes Lucena to Acquire a Stake in West Wilshire Pharmacy

90. Undeterred by the California State Board of Pharmacy's findings and determined to gain access to the California market, the largest insurance marketplace in the United States, Defendants caused a Philidor-controlled shell company, Lucena Holdings LLC ("Lucena"), to acquire a stake in a California pharmacy, West Wilshire Pharmacy ("West Wilshire"), in an effort to circumvent the Board of Pharmacy's licensing denial. Philidor formed Lucena as a limited liability company in Delaware on or about July 31, 2014. Lucena's Certificate of Formation as a Delaware limited liability company identifies Defendant Matthew S. Davenport, Philidor's chief executive officer, as an "Authorized Person." Lucena's chief executive officer, Sherri Leon ("Leon"), identified herself through LinkedIn as Philidor's Director of Pharmacy Operations from August 2013 through 2015. (Her LinkedIn profile has since been removed.) Moreover, through Philidor, Valeant controlled Lucena as Valeant's $100 million option agreement with Philidor provided that Philidor was to enter into a purchase agreement with Lucena (as well as Isolani) as a condition to the acquisition.

91. In September 2014, Lucena acquired a 10 percent interest in Brighton Way Pharmacy, doing business as West Wilshire Pharmacy.

92. In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor; and

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . .

was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

93.     In other words, absent from the application was any disclosure that Leon was a Philidor employee; nor did Leon disclose Blaszczynski's ownership in Philidor. Although required to disclose this fact on the application, Leon concealed that she was associated with Philidor, which had been denied a Board license just months earlier. Yet attached to Lucena's application was its Certification of Formation under Delaware Law, with Philidor's CEO signing as an "Authorized Person."

94.     In researching West Wilshire's relationship with Philidor, *Pro Publica* discovered that West Wilshire shared Philidor's toll-free customer-assistance number and West Wilshire's website was hosted on a network belonging to Philidor.

## 2.     Philidor Surreptitiously Forms Isolani to Acquire R&O

95.     In another attempt to overcome its inability to secure the necessary pharmacy license in California, Philidor formed Isolani LLC ("Isolani") as a limited liability company under Delaware law on October 28, 2014. Philidor then caused Isolani to acquire R&O, a licensed pharmacy in Camarillo, California. In court documents, Isolani admitted that it was a single-member LLC and that it was formed for the sole purpose of acquiring ownership of R&O. Its sole member was Eric Rice, who also served as Philidor's Senior Member of Call Operations.

96.     R&O unwittingly became a part of Valeant's secret pharmacy network when it entered into a series of agreements with Isolani in December 2014. After Philidor's purchase of R&O through Isolani, R&O began dispensing thousands of prescriptions, dwarfing the size of its business before its acquisition by Philidor. These new prescriptions were extraordinarily expensive for simple dermatological conditions like acne or eczema and were all for drugs manufactured by Valeant. It was only when R&O began its own investigation into Philidor that it

discovered the relationship between Philidor and Valeant. In connection with its purchase of R&O, Isolani concealed from California regulators its relationship with Philidor and Valeant.

97.     To date, Defendants have not disclosed the full scope of Valeant's secret pharmacy network and the identities of all the pharmacies and shell companies that constituted the Valeant Enterprise. However, elements of that network have become public. The chart below illustrates one segment of Valeant's retail pharmacy network, the California associates in the Valeant Enterprise that have been revealed to date, and the byzantine corporate structure Valeant and Philidor used to maintain the Valeant Enterprise's secrecy:



**Figure 3. Valeant's Network of Captive Pharmacies in California, *Business Insider*, dated October 25, 2015.**

> 3.     **Philidor Creates Back Rank to Acquire an Interest in Texas-Based Orbit Pharmacy**

98.     As they did with California regulators, Defendants likewise misled Texas state regulators in filings related to the purchase of a retail pharmacy. On April 23, 2015, Philidor created Back Rank, LLC, a Delaware limited liability company also named after a chess strategy.

Back Rank's managing member was identified as James R. Fleming, who was also Philidor's Controller and located at Philidor and BQ6's address.

99.     Defendants caused Back Rank to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit Pharmacy"). On or about June 2015, Fleming filed an application with the Texas Board of Pharmacy seeking to replace Segun Azeez Audu as the managing officer of Orbit Pharmacy. On or about September 15, 2015, Philidor caused Back Rank to file a form for a location change for Orbit Pharmacy. Fleming, Philidor's controller, was identified in the application to the Texas State Board of Pharmacy and also executed the form on Orbit Pharmacy's behalf. In the September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit Pharmacy to falsely represent that no state had ever denied a pharmacy-license application filed by any of "the pharmacy's owner[s] or partner[s]." Fleming also failed to disclose his and Back Rank's relationship with Philidor. Attached to the application was an assignment and assumption of lease, executed on Back Rank's behalf by its General Counsel, Gretchen Wisehart ("Wisehart"). Wisehart's LinkedIn profile identifies her as Executive Vice President and General Counsel of Philidor. Moreover, like West Wilshire Pharmacy, Orbit Pharmacy shared Philidor's toll-free customer-assistance number, and Orbit Pharmacy's website was hosted on a network belonging to Philidor. In reality, as discussed above, California had denied Philidor's pharmacy-license application the previous year, and Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

### G.     Defendants Use Their Secret Nationwide Network of Captive Pharmacies to Insulate Valeant's Branded Drugs from Generic Competition and Exponentially Inflate Drug Prices

100.     While Valeant's success was predicated on its ability to sell the drugs it acquired at prices inflated far beyond those at which they had been previously marketed and sold, this

strategy would ordinarily have been impossible to execute because most of Valeant's drugs have cheaper generic equivalents. Ordinarily, pricing a brand-name alternative to a generic drug at a huge premium would have caused that product to lose market share to the point where the price increase would be unprofitable. Indeed, the primary purpose behind Defendants' secret network of pharmacies was to ensure that Valeant's branded drugs would be insulated from generic competition at the retail outlet, where generic competition plays out as a result of the incentives to pharmacies and patients. Valeant's dermatological products are especially sensitive to generic competition.

101.    Through the Valeant Enterprise, Defendants were able to channel prescriptions for Valeant's branded drugs, including those ostensibly dispensed by smaller retail pharmacies in Defendants' captive network, through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure that Valeant's branded drugs—and not generics—were dispensed. Thirteen states, including Pennsylvania (where Philidor is headquartered), and Puerto Rico require pharmacists to substitute generic equivalents for branded drugs.[3] Additionally, contracts between pharmacies and TPPs or their PBM agents typically require the pharmacies to dispense a generic substitute for a branded drug where available. Defendants' refusal to substitute generic alternatives for expensive Valeant branded drugs, despite the generics' widespread availability, violated these statutory and contractual mandates.

102.    In fact, contrary to these requirements and unknown to Plaintiffs and the members of the Class, Philidor's internal policy mandated that Valeant-brand drugs be dispensed, even when a prescription expressly called for a generic. For example, an adjudication specialist at

---

[3]     These states, which include significant prescription-drug markets, are Florida, Kansas, Kentucky, Massachusetts, Minnesota, Mississippi, Nevada, New Jersey, New York, Pennsylvania, Rhode Island, Washington, and West Virginia.

Philidor from July 2015 through November 2015 said that she[4] was instructured by supervisors to never dispense generic drugs and, even when the prescription said a generic could be substituted, Philidor told employees to always put "brand" in Philidor's computer system. In fact, when she received a prescription for a generic drug and entered a generic drug into the system, her supervisor told her that doing so was wrong and to enter "brand" into the system instead.

103.    By manipulating PBMs and the processes used to obtain the most appropriate prescriptions at the lowest possible cost, including by minimizing generic substitution and thus substantially shielding Valeant branded products from generic competition, Defendants were able to inflate the prices of Valeant's drugs far beyond the prices at which the drugs had previously been marketed and sold, both within Valeant's captive pharmacy network and by pharmacies outside Valeant's network. Documents obtained by the Congressional Committee on Oversight and Government Reform through its investigation into Valeant's misconduct revealed that Valeant *first* identified goals for revenue and *then* set drug prices to reach those goals.

104.    Defendants' scheme allowed Valeant to triple the price of Wellbutrin XL, an off-patent antidepressant that Defendants sold through Philidor and the captive pharmacy network, from less than $6,000 per year to $17,000 for a year's supply of the drug, compared to $360 for a year's supply of Wellbutrin XL's generic equivalent. Astonishingly, despite falling prescription rates for Wellbutrin XL and the availability of a generic alternative that costs 1/50 the price, Defendants' scheme allowed Valeant to double the revenue generated by Wellbutrin XL. These results could only be possible in a rigged market.

---

[4]     When referring to former employees in this Complaint, any pronouns will be in the female gender, irrespective of whether the employee was male or female.

105.    Likewise, Defendants' scheme allowed Valeant to increase the price of its drugs—many of which have far cheaper generic bioequivalents—by extraordinary amounts. After acquiring the dermatology drug Noritate 1%, used to treat the common skin condition rosacea, from Sanofi in 2011, Valeant proceeded to increase the price of the drug *212%* between the first quarter of 2014 and the third quarter of 2015.  Significantly, the cost of treatment for a generic alternative for Noritate is available at a fraction of the price.

106.    From 2013 to 2015 alone, Valeant dramatically increased the prices of more than 50 other drugs. While the Company referred to this strategy of increasing drug prices as "optimization," in reality, these price increases were effectuated through Defendants' fraudulent scheme. The below chart illustrates the increases that Defendants implemented for certain of Valeant's drugs during the Class Period:

| Valeant Drug | From | Through | Years | Percent Increase |
|---|---|---|---|---|
| Cuprimine 250 MG capsules | Q1-13 | Q1-15 | 2.00 | 2849% |
| Syprine 250 MG capsules | Q1-13 | Q3-15 | 2.50 | 1424% |
| Glumetza 100 MG tablets | Q1-13 | Q3-15 | 2.50 | 1018% |
| Edecrin (per vial) | Q2-14 | Q4-15 | 1.5 | 878% |
| Carac Cream | Q1-13 | Q3-15 | 2.50 | 557% |
| Mephyton (single tablet) | Q3-14 | Q4-15 | 1.25 | 527% |
| Wellbutrin XL 300 MG Tablet | Q1-13 | Q3-15 | 2.50 | 381% |
| Tretinoin 0.1% CRM | Q2-14 | Q3-15 | 1.25 | 328% |
| Vanos 0.1% CRM | Q1-13 | Q3-15 | 2.50 | 279% |
| Targretin  60g 1 % Gel | Q1-13 | Q3-15 | 2.50 | 250% |
| Aldara 5% CRM | Q1-13 | Q3-15 | 2.50 | 223% |
| Xerese 5%-1% Cream | Q1-13 | Q3-15 | 2.50 | 216% |
| Noritate 1% Cream | Q1-14 | Q3-15 | 1.50 | 212% |
| Migranal Nasal Spray | Q1-13 | Q3-15 | 2.50 | 159% |
| Loprox 1% Shampoo | Q1-13 | Q3-15 | 2.50 | 145% |
| Atralin 0.05% Gel | Q1-13 | Q3-15 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4 MG/ML Nasal Spray | Q1-14 | Q3-15 | 2.50 | 90% |

107.    Ordinarily, the fact that a high volume of claims for expensive branded drugs from a single manufacturer was coming from a single pharmacy that was failing to substitute generic drugs for any of that manufacturer's drugs—i.e., Philidor—would have triggered heightened scrutiny and denials of claims from PBMs and scrutiny of the pharmacy's practices. However, by concealing Valeant's relationship with Philidor, Philidor's relationships with its network of pharmacies, and the pharmacies' relationships to each other, Defendants were able to spread claims across ostensibly unrelated pharmacies. This caused Defendants' deceptive practices to go undetected by creating the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons and burying fraudulent claims among the large volume of the pharmacy network's claims.

108.    Accordingly, secrecy was essential to Defendants' scheme, and Defendants went to great lengths to ensure that Valeant's ownership of Philidor and its network of captive retail pharmacies remained concealed from the public, including from TPPs and PBMs. For example, neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed to the TPPs or PBMs—with whom they were negotiating contracts, reporting audits, submitting claims, or otherwise transacting business—their relationship with Valeant.

109.    Secrecy was so important to Defendants' scheme that former Philidor employees were forbidden to mention and were even reprimanded if they mentioned Philidor's relationship with Valeant to customers. For example, a former Philidor call-center agent from August 2014 to October 2014 received a written warning by Brad Greenfield, Philidor's Director of Sales, who reported directly to Philidor CEO Andrew Davenport, when she mentioned Valeant in a recorded phone call. Greenfield told the call-center agent that she would be fired if she mentioned Valeant to a customer again. Similarly, a claims specialist and intake supervisor at Philidor from

44

September 2014 to November 2015 explained that managers instructed Philidor employees like her to never mention Valeant. The claims specialist and intake supervisor was reprimanded by a trainer when she mentioned Valeant to a patient.

110.    Similarly, Valeant never disclosed Philidor in any of its SEC filings during the Class Period before October 19, 2015. Likewise, Philidor never publicly discussed the nature of its relationship to Valeant before October 19, 2015.

111.    Maintaining the secrecy of the Valeant-Philidor relationship was so important to Defendants that in September 2015, Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities.

**H.      Valeant's and Philidor's Misrepresentations to the Class**

112.    In furtherance of their fraudulent scheme, Defendants made a host of false and misleading statements directly to TPPs, their PBM agents, and their members and beneficiaries in order to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales. Many aspects of Defendants' fraudulent scheme are catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs. Those manuals explained to employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." (Bloomberg, October 28, 2015, *Valeant's Philidor Used 'Back Door' Tactics to Boost Payments*). As explained in further detail below, those "back door approaches" included altering prescription information, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs. Internal emails, including a July 19, 2015 email from Philidor's CEO, Andrew Davenport, reveal that Valeant and Philidor's senior management were well aware of these practices.

### 1. The Valeant Enterprise's Alteration of Prescriptions

113. Defendants instructed Philidor employees to change codes on prescriptions—i.e., *to deliberately alter the prescribing doctor's instructions as set forth in the prescription*—to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives. While pharmacists who receive prescriptions for branded drugs will ordinarily dispense generic substitutes if available (in fact, pharmacists are required to do so by law in thirteen states and Puerto Rico), doctors can indicate that the prescriptions be "dispensed as written" or "DAW" and order that no substitutions be made. When TPPs denied reimbursement claims for Valeant branded drugs, Philidor employees circumvented those denials by resubmitting altered claims that falsely represented that the prescribing doctors had ordered the the prescriptions be DAW. Moreover, Philidor employees falsely resubmitted these claims as new claims, misrepresenting the fact that these claims had previously been denied.

114. As reported by Bloomberg on October 29, 2015, former Philidor employees have confirmed that pharmacies in Valeant's network, acting on written instructions in claims-handling manuals issued by Defendants, routinely altered doctors' prescriptions to ensure that more patients received Valeant products rather than less costly generics. These employees explained that this fraud was frequently implemented with respect to certain key Valeant dermatologic products that encountered repeated denials from TPPs, such as Retin-A Micro and Vanos. Bloomberg has reported that an "undated Philidor document . . . provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological cream and gels, including Retin-A Micro and Vanos is rejected. Similar instructions for changing the DAW indication are supplied for patients who are paying in cash." Bloomberg also reported that ex-employees of Philidor confirmed that prescriptions were altered as the claims-handling manual instructed and said the intent was to fill more prescriptions with Valeant products than generics.

46

115.    In deliberately altering prescribing doctors' instructions with respect to prescriptions, Philidor employees engaged in at least two types of fraud. When TPPs denied claims for these prescriptions, Philidor employees circumvented those denials by resubmitting the claims with altered prescription codes that falsely represented that the prescribing doctors had ordered that only Valeant drugs be dispensed and that no generic substitutions were permitted. Moreover, in resubmitting these denied claims, Philidor employees falsely resubmitted these claims as new claims, misrepresenting the fact that these claims had previously been denied.

### 2.    The Valeant Enterprise's Use of False Pharmacy Identification Numbers

116.    Defendants also used false pharmacy identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursement. Specifically, Defendants' claims-handling manual instructed Philidor employees to submit claims to TPPs or their PBM agents using Philidor's NPI. If a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging to a different pharmacy in Defendants' captive network—in other words, to misrepresent that a pharmacy had dispensed a prescription it did not in fact dispense, and, in some cases, did not even stock.

117.    Former Philidor employees indicated that they were provided with maps and detailed instructions that set out the particular false NPI information that should be submitted in the event of a denial relating to a particular dispensing pharmacy. For instance, Defendants' claims-handling manual instructed employees who received certain denials from TPPs to "submit the NPI for our partner in California, West Wilshire Pharmacy. . . . There is a good chance they are contracted." If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary"—referring to one of

Philidor's secret retail pharmacies based out of Philadelphia, Pennsylvania. "They should then get a paid claim and then Cambria . . . will reimburse us." (Bloomberg, October 29, 2015, *Philidor Said to Modify Prescriptions to Boost Valeant Sales*). In other words, Philidor employees were "instructed . . . to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim—to essentially shop around for one that would be accepted."

118.    Likewise, Defendants routinely caused pharmacies in the Valeant network, including Isolani (mentioned above), to use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network discussed further below, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O didn't even stock. Philidor used its network of pharmacies and their NPIs to fill prescriptions and obtain reimbursements in states where Philidor was not licensed, including California. Philidor also shipped Valeant drugs to states where neither Philidor nor the pharmacy associated with the NPI were licensed. In a July 19, 2015 email to R&O, Defendant and Philidor CEO Andrew Davenport himself acknowledged that he was aware this practice was ongoing.

119.    The purpose of this conduct was to fraudulently secure payment of claims that were properly denied by TPPs or PBMs, as described by both the *Wall Street Journal* and Bloomberg. Moreover, in an interview with SIRF, Taylor Geohagen, a former Philidor claims adjudicator during the Class Period, confirmed that this fraudulent practice was routinely implemented: "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch." (Southern Investigative Reporting Foundation, October 25, 2015, *The Pawn Isolated: Valeant, Philidor and the Annals of Fraud*).

120. Similarly, the claims specialist and intake supervisor at Philidor from September 2014 to November 2015 described how this practice worked in the Advanced Care Specialist Department, which she joined in October 2015. According to this claims specialist and intake supervisor, when Philidor was unable to get a claim paid through a certain pharmacy, Philidor would then attempt to process the claim through a different pharmacy that Philidor had a "partnership" with, such as West Wilshire or Orbit. She said that the location of the patient did not determine which pharmacy was used.

121. To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false and misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which they were secretly associated, falsely representing that the pharmacies had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies.

122. Relatedly, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies. For instance, as evidenced by a July 14, 2015 email from Russell Reitz of R&O to Eric Rice, Senior Director at Philidor, Defendants' agents' audit statements on behalf of R&O falsely claimed that R&O had dispensed prescriptions for Valeant drugs that were actually filled by Philidor. Specifically, Reitz told Rice that Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed *before* the exection of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's NCPDP (National Council for Prescription Drug Programs) number without his knowledge or consent (emphasis in original). Again, in some cases, these prescriptions were for drugs that R&O did not even stock.

### 3.   The Valeant Enterprise's Automatic-Refill Program

123.   Another "back door" fraudulent billing practice implemented by Defendants was submitting unnecessary or unwanted prescription renewals for reimbursement, falsely representing to TPPs and their PBM agents that patients had requested renewals of their prescriptions when in fact no renewal request had been made. As Philidor customers have explained and as *New York Magazine* reported in a January 13, 2016 article, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, even though the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills.

124.   Defendants' implementation of this practice in connection with Valeant's dermatological products was particularly injurious to TPPs because the conditions these products are designed to treat are not chronic and can be remediated by a limited course of treatment, limiting the need for renewals absent Defendants' fraudulent scheme. Notably, Philidor's practice of waiving patient co-pays in connection with this scheme (described in detail below) allowed the scheme to go undetected, as patients were not incentivized to complain about unnecessary refills for which they were not charged co-payments. These unnecessary refills harmed the Class because the cost of these drugs was imposed on TPPs through the payment of additional claims for unnecessary drugs that had not actually been ordered by either a physician or a patient.

125.   Philidor employees have confirmed this practice.  As a Philidor employee explained in an online forum, Philidor "auto ship[ped] [Valeant drugs] without proper approval, most people do not need these refills. The reason they ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550–$1220 from the insurance companies." Likewise, after the end of the Class Period, a Philidor employee explained in an online forum

that this scheme was jointly developed by Brad Greenfield, Director of Sales and Marketing for

Valeant, and Philidor executive Fabian Forrester-Charles. The employee stated:

> They took the list of customers who had been approved by [insurance] and had refills available. ***Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs. They would do this on the 30th day of the rx.*** Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay . . . 0 allowed them to ship refills whether u wanted them or not. Not a bad money making idea except ***most people did not really need refills of Solodyn so soon*** . . . Of course these refills were out the door ASAP ***sometimes within an hour of the call and the [insurance] money would come in***.
>
> What patients don't get is ***your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed. I would bet a lot of solodyn and Jublia bottles are just lying around still in the shipping package.***
>
> ***If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor***. Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$$ and a ton of it! Think about it.
>
> (emphasis added and all typographical errors in original) (Cafepharma, Philidor employee post dated October 27, 2015).

### 4.    The Valeant Enterprise's Waiver of Co-Pays

126.    When submitting claims to TPPs, Defendants also misrepresented to TPPs the

dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants'

practice of routinely waiving patient co-pays.

127.    As a general matter, the collection of co-pays from insureds discourages insureds

from "overutilization," or wasteful consumption of pharmacy benefits beyond those medically

necessary, and thereby incentivizes insureds to select generics when available and only refill

medications when needed. Conversely, waiving co-pays discourages patients from actively

avoiding low-value or medically unnecessary medicines.

128.    Notably, even if these co-pay waivers at first seem to protect consumers, that

protection is in fact short-lived. As the *New York Times* reported, "even if patients are often

shielded, the costs are paid by insurers, hospitals and taxpayers and lead to higher premiums and co-payments for everyone." Co-pay waivers can significantly distort an insured's economic incentives when choosing between a branded drug and its generic alternative and when refilling a prescription.  As a result, PBM contracts with pharmacies mandate that pharmacies make every attempt to collect co-payments and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.

129.    For this reason, such practices are generally discouraged, or outright prohibited, by TPPs.  For example Optum Rx's 2015 Provider Manual "strictly prohibited" pharmacies from waiving patient cost-sharing amount (*i.e.* co-pays).  Similarly, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association (the "PCMA"), a national association which represents PBMs, explained to Congress at a hearing on February 4, 2016 concerning Valeant's price gauging tactics that PBMs "encourag[e] the use of generics and more affordable brand medications." He noted that PBMs restrain drug costs by "using differential copays and other tools to encourage patients to choose more affordable options." Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce "resistance to higher prices." He testified that by providing co-pay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced "the employer's unions and others to pay hundreds of thousands more for the most expensive brands on the formulary."  Merritt noted that "such practices are considered illegal kickbacks in federal programs."

130.    Here, Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims for the prescriptions, Defendants falsely represented to TPPs that the patients had been charged the full prices of the drugs.  For example, Philidor's training manual instructed employees that Philidor had set up "numerous house insurances that will bring

[patient] copay[s] down."  Moreover, in an article dated February 2016, *The Pharmacist Activist* reported on an incident in which Philidor waived a patient's co-pays without disclosure of this practice to TPPs:

> The patient was prescribed Luzu for athlete's foot but was surprised that the prescriber suggested that he obtain the prescription from a mail-order pharmacy (Philidor) that would cover the co-pay for the first prescription. The prescription was delivered and several weeks later the patient received a call from Philidor offering to waive his co-pay for all his remaining refills. The patient observed that he probably would not have needed or ordered the refills if he would have been charged a co-pay. He now has "a few years' supply of athlete's foot cream" and is also suspicious of what incentives the prescriber may have received, as well as the relationship between Valeant and Philidor.

131.    Similarly, an October 25, 2015 article in the *Wall Street Journal* explained that doctors reportedly said that Valeant sales representatives furnished brochures and coupons offering to help pay for co-pays and directing patients to call a number for Philidor.  According to the *Wall Street Journal* article:

> [D]octors would send prescriptions for Valeant drugs electronically to Philidor.
>
> Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to three former employees . . . .
>
> * * *
>
> If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said . . . .

132.    Philidor employed these co-pay practices in order to increase sales by removing incentives for patients to use much cheaper generics, concealing this practice from TPPs and harming them in the process.

### 5.    The Valeant Enterprise's Misrepresentations Directing Patients to Philidor

133.    Defendants also made misrepresentations directly to patients to boost Valeant's drug sales. Specifically, Defendants' disseminated false statements (including in brochures and

coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost only if they submitted their prescriptions directly to Philidor. By encouraging patients to submit claims directly to Philidor, Defendants ensured that prescriptions for Valeant drugs would not wind up being filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but would instead end up at Philidor, where Valeant's branded drug would be dispensed. To induce patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed. For example, in a consumer complaint filed with the Better Business Bureau on March 5, 2015, a patient wrote about Philidor:

> **Complaint:** Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******. ***They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you".*** Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the ****** unopened in order to have this taken off my Claims. (emphasis added and all typographical errors in original) (Better Business Bureau, customer complaint dated March 5, 2015).

134.    In fact, TPPs were billed for these drugs. As one patient reported in an online forum:

> My dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. ***The trial coupon offers a '$0 co-pay for 12 months' of this medicine . . . . Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.*** (emphasis added and all typographical errors in original) (Pissed Consumer, customer complaint dated January 2, 2015).

135.    To protect their fraudulent enterprise, Defendants made it as difficult as possible for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills. Indeed, despite its massive investment in its sales force, Philidor invested

very little in creating a call center to handle customer complaints and problems. (Pissed Consumer, customer complaints dated February 19, 2015 and February 22, 2015). In fact, customers and patients would routinely report that they were directed to sales staff when they tried to report these problems.

### 6. The Valeant Enterprise's Manipulation to Achieve the Highest Customary Price and Volume an Insurer Would Accept

136.     Philidor instructed employees to manipulate the "usual and customary price" of prescription drugs when adjudicating claims in an attempt to secure insurance payment for high-priced Valeant drugs, which was accomplished by repeatedly lowering the purported usual and customary price until the insurer's system accepted the claim. Rather than accept payment at that price, Philidor employees were trained to raise the price again in order to pinpoint a plan's maximum allowable price.

137.     Defendants also misrepresented the quantities of drugs to secure approval. If a claim for reimbursement was rejected by an insurer, Philidor employees would resubmit the claim with a lower quantity of drugs so the price would be lower to secure insurance approval. The employee would then compensate for the lower quantity by increasing the number of prescription refills to secure the maximum reimbursement.

138.     Had Valeant not concealed its relationship with Philidor, and had Philidor not spread its prescriptions and reimbursement claims across the broad network of captive pharmacies, TPPs or their PBMs would have noticed both that Philidor submitted an unusually high volume of claims for Valeant-branded drugs and that these drugs had high prices, which would have resulted in additional audits or claim rejections.

55

I.     **Defendants Reaped Hundreds of Millions of Dollars in Ill-Gotten Profits**

139.   Through their fraudulent scheme, Defendants obtained hundreds of millions of dollars in ill-gotten profits at the expense of the Class, whose members paid inflated prices for Valeant drugs that in many cases should never have been dispensed.  In 2015 alone, Valeant channeled nearly $500 million worth of its drugs through Philidor, its central pharmacy hub.

140.   *First*, as explained above, the Class paid for expensive Valeant drugs when cheaper generic equivalents could and should have been dispensed. The Class suffered harm because it paid the dramatic difference between the cost of the generic drugs that should have been dispensed and the expensive Valeant drugs. For instance, as discussed above, as a consequence of Defendants' fraud, members of the Class paid up to $17,000 for a year's supply of Valeant's Wellbutrin XL, when they should have paid only $360 for a year's supply of the drug's generic equivalent. Similarly, while the price for a 90-tablet course of treatment with Valeant's branded Lodosyn 25mg cost as much as $2,609.14, the same course of treatment with its generic equivalent cost approximately $292.45.

141.   *Second*, as explained above, the Class paid for Valeant drugs when, in fact, no drugs should have been dispensed or claims were properly denied. The Class suffered this harm in connection with, for instance, Defendants' scheme to fraudulently alter prescriptions, submit claims for unrequested refills, and use false pharmacy identification numbers to circumvent denials of claims. Defendants were improperly enriched because they received payments from the Class for drugs that should have never been dispensed.

142.   *Third*, as explained above, because of Defendants' failure to disclose their routine waiver of patient co-pays when submitting claims to Class members or their PBM agents, Valeant was able to sell medically unnecessary and low-value drugs, and to sell the drugs at

artificially inflated prices, by removing a critical mechanism used to limit the use of medically unnecessary, low-value drugs. The undisclosed waiver of co-pays led patients to obtain higher-priced Valeant drugs rather than lower-priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the members of the Class. Had Defendants charged co-pays, patients would have had the intended economic incentive to choose lower-cost generic drugs and to avoid unnecessary prescriptions, thereby reducing unneeded costs that were ultimately born by the Class. Further, had Defendants properly disclosed that Defendants routinely waived patient co-pays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs or paid for the drugs at all.

143.    **Fourth**, as explained above, the Class paid highly inflated prices for Valeant branded drugs. This happened on claims for reimbursement submitted both by pharmacies within Valeant's captive network and, based on Valeant's being able to maintain artificially inflated prices that served as inputs into the pricing formulas that determined TPP payments, by pharmacies outside Valeant's network as well. But for Defendants' fraudulent scheme, the prices Defendants charged for Valeant branded drugs would have been influenced by competitive market forces and, driven by the presence of numerous low-cost generic drugs in the marketplace, would have been substantially lower. The Class was damaged because it reimbursed claims at inflated prices created by Defendants' fraud, rather than the prices a market free from manipulation would have set.

144.    **Fifth**, as explained above, the Class paid highly inflated prices for Valeant branded drugs as a result of Defendants' misrepresentations assuring patients that their TPPs would not be billed, when in fact the TPPs were billed. The Class was damaged because it

reimbursed claims for Valeant drugs that patients accepted in reliance on Defendants' promises that their TPPs would not be billed.

### J.    Defendants' Fraud Is Finally Revealed

145.    As alleged above, in an effort to overcome the California State Board of Pharmacy's licensure denial, Philidor created a shell company called Isolani to acquire R&O, a licensed pharmacy in Camarillo, California. R&O and Russel Reitz, its owner and Pharmacist in Charge, unwittingly became entangled in the Valeant Enterprise when they entered into a series of agreements with Isolani, including a Purchase and Sale Agreement, on or about December 1, 2014.

146.    On December 1, 2014, Reitz, a Southern California pharmacist, sold his business, R&O Pharmacy, a specialized dispensary for gastroenterology patients, to Philidor. In connection with the sale, Reitz learned that Philidor had not yet received a license from the California State Board of Pharmacy.

147.    Not long after the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service, numbers dwarfing the customary size of R&O's business. Philidor would send R&O bulk orders of Valeant-branded pharmaceuticals, and Reitz would dispense these to patients directly or by mail. Payment later arrived at the pharmacy in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over one million dollars.

148.    Not only was the volume of Philidor-channeled patients unusually large, the prescriptions that Philidor was filling were also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Consistent with Defendants' scheme, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple

dermatological conditions, such as Solodyn for acne, Elidel for eczema, and Jublia for toenail fungus.

149.    In March 2015, Reitz received an audit from one of his PBMs. The audit showed that, in addition to the business Reitz oversaw personally, R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard. Many were for medications that R&O didn't carry. Some prescriptions were even backdated to before Reitz had sold R&O to Philidor. These practices continued throughout the summer of 2015.

150.    Indeed, by the summer of 2015, Reitz began to suspect that he may have been the victim of a fraud after, as reported in the *Los Angeles Times* on October 31, 2015, his "modest prescription-filling business*"* that he had agreed to sell for just $350,000 was flooded with "a ***torrent of insurers' money . . . on pace equal to $230 million a year, according to invoices***."

151.    As a result of these suspicious practices, R&O began investigating Philidor in the summer of 2015. Its investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy, which denied the application. Specifically, in a filing before the Board of Pharmacy, Department of Consumer Affairs, dated December 18, 2014, the California State Board of Pharmacy denied Philidor's pharmaceutical license because Philidor made "false statements of fact" in its pharmacy application. Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz finally realized that the purpose of the R&O purchase was to use R&O as a channel through which Philidor would surreptitiously conduct its own business in California and circumvent the licensing board's denial.

152.    In response to Reitz's investigation of Philidor, Reitz received letters, not from Philidor, but from **Valeant's** General Counsel, demanding $69 million in payments from R&O. These letters made clear that Valeant was not simply a drug manufacturer supplying Philidor, but rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained. Ultimately, Reitz filed suit against Valeant and disclosed the facts described above in the suit. These disclosures set off a chain of events revealing the truth about Defendants' fraud and the Valeant Enterprise.

153.    On October 19, 2015, the SIRF published a detailed account of Philidor and Valeant's dealings with Reitz and R&O. This report was the first to note that Valeant was Philidor's only client and provided extensive detail on Valeant's financial connection to Philidor, a connection that had never before been publicly disclosed.

154.    That same day, Valeant CEO Pearson and CFO Robert L. Rosiello held a conference call to discuss the Company's third-quarter 2015 earnings results. On the conference call, Valeant, for the first time, publicly discussed Philidor. During the conference call, Pearson stated:

> Turning to: How does Valeant work with specialty pharmacies, especially Philidor. The topic of specialty pharmacies has not been a focus of ours in past calls because *we believe this was a competitive advantage that we did not disclose to our competitors* . . . . Similar to many pharmaceuticals companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.

> ***

> Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our co-pay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor if we so choose. Given accounting rules, we consolidate Philidor's financials. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory.

155.    Also on October 19, 2015, the *New York Times* published an article detailing Valeant's use of specialty pharmacies to increase pricing of its drugs:

> Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.

156.    Two days later, on October 21, 2015, a report by Citron Research revealed more information about Philidor and its network of "phantom captive pharmacies" and Valeant's tactics to create fraudulent payor audits. The Citron report explained that Philidor was owned by Valeant and that Valeant used Philidor to establish "an entire network of phantom captive pharmacies." Additionally, the Citron report accused the Company of committing accounting fraud, referring to Valeant as the "pharmaceutical Enron."

157.    Then, on October 26, 2015, the *Wall Street Journal* reported that Valeant employees were frequently involved with operations at Philidor. As referenced above, the *Wall Street Journal* also reported that Valeant employees used aliases, including the names of comic book characters like Peter Parker, to hide their identity as Valeant employees.

158.    On that same day, Valeant announced that it had set up a special committee to review its relationship with Philidor.

159.    On October 30, 2015, Valeant announced that it was "severing all ties with Philidor" and that Philidor would be shut down immediately.

160.    In fact, Valeant had no choice but to cut ties with Philidor because TPPs and PBMs were already severing their relationships with the pharmacy. Only one day before, on October 29, 2015, some of the biggest PBMs and customers of Philidor announced that they were severing business relationships with Philidor after finding noncompliance with provider agreements. Specifically, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth

Group Inc.'s OptumRx—the three largest PBMs in the United States, which together handled three-quarters of the total estimated 5 billion US prescriptions in 2014 and represent many members of the TPP Class—all announced that they were ending their relationships with and would stop paying for drugs dispensed by Philidor. CVS Health Corp. explained that "CVS/caremark maintains a broad national network of 68,000 pharmacies. In accordance with CVS/caremark's standard auditing protocols, over the last several weeks we have been monitoring and reviewing the results of recent audits of Philidor's practices. ***Based on the findings from those activities, we have terminated Philidor for noncompliance with the terms of its provider agreement.***" Express Scripts and United Healthcare made similar statements about Philidor's noncompliance with the PBMs' provider agreements.

### K.    Valeant Becomes the Target of Multiple Government Investigations

161.    As Defendants were coming under greater scrutiny from the press and public, Valeant became the target of multiple government investigations. On October 14, 2015, Valeant received subpoenas from the US Attorney's Offices for Massachusetts and the Southern District of New York in connection with Valeant's relationship with Philidor, its drug price increases, and its accounting treatment of sales by specialty pharmacies.

162.    In November 2015, Valeant received subpoenas for documents from the SEC concerning Valeant's relationship with Philidor and its accounting practices and policies.

163.    Congress also began investigating Defendants' price increases for Valeant drugs and Valeant's relationship to Philidor. Both the House Committee on Oversight and Government Reform and the Senate Special Committee on Aging have issued document requests and conducted interviews with Valeant employees. Bloomberg News reported that US Representative Elijah Cummings wrote Pearson requesting that Pearson make Bijal Patel and

certain others available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations."

164.    On February 2, 2016, the House Committee issued a memorandum reporting interim findings from its investigation, stating that it found, among other things, that while Pearson purchased drugs "in order to dramatically increase their prices and drive up his company's revenues and profits," Valeant engineered a public-relations strategy to "divert attention away from its price increases" and to mitigate the "Critical Risks" of addressing "concerns from patients, *insurance companies or managed care providers* to prevent public displays of negative sentiment."

165.    On February 22, 2016, in connection with the Company's investigation of its relationship with Philidor previously announced in October 2015, Valeant announced that it would restate its financial results for 2014 and 2015 in connection with its sales to Philidor.

166.    On February 29, 2016, Valeant announced that it was under investigation by the SEC in connection with its relationship with Philidor.

167.    On March 21, 2016, Valeant announced that its Board of Directors had initiated a search to identify a new CEO to replace Pearson. After Pearson was removed from his post at Valeant, he was subpoenaed by the US Congress to testify about Valeant's practices.

168.    Also in March 2016, Valeant received an investigative demand from the State of North Carolina Department of Justice, requesting documents relating to Nitropress, Isuprel, and Cuprimine, including information concerning Valeant's production, marketing, distribution, sale and pricing of, and patient-assistance programs covering, these products, as well as the Company's pricing decisions for certain of its other products.

169.    On April 20, 2016, Valeant received a document subpoena from the New Jersey State Bureau of Securities. The materials requested include documents concerning the Company's former relationship with Philidor and its accounting treatment of sales to Philidor.

170.    On April 25, 2016, Valeant announced that Joseph Papa would replace Pearson as the Company's CEO.

171.    On April 27, 2016, Defendant Pearson testified before the US Senate Special Committee on Aging that Valeant's strategy of dramatically raising the prices of its drugs was "too aggressive" and "was a mistake" that he "regret[ted] pursuing."

172.    On September 16, 2016, Valeant received an investigative subpoena from the California Department of Insurance, requesting documents concerning Valeant's relationship with Philidor and certain California-based pharmacies, the marketing and distribution of Valeant's products in California, and the billing of insurers for its products being used by California residents.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES

### A.    Defendants' Misrepresentations to Third-Party Payors

173.    Defendants submitted false claims information to TPPs or their agents, including their PBMs, to fraudulently maximize the reimbursements paid by those TPPs and boost Valeant's drug sales and revenues.

174.    The claims that Defendants submitted to the Class were materially false and misleading because the claims (1) misrepresented either the dispensing pharmacy or the pharmacy to which the patient/insured had submitted his or her prescription; (2) misrepresented whether the claim had been previously submitted and denied; (3) misrepresented the cost of the drugs by concealing the waiver of co-pays; (4) misrepresented that the prescription was

designated to be "DAW"; (5) implicitly misrepresented that the claim was for a medication prescribed by a physician; (6) implicitly misrepresented that the claim was for a medication requested by a patient/insured; or (7) implicitly misrepresented that the pharmacy was licensed to conduct business in the state in which the drugs were dispensed.

175.    As discussed above in detail, these claims were false and misleading as a result of the deceptive tactics Defendants employed to fraudulently increase the sales of Valeant products over generics and to enable the charging of higher prices for those Valeant drugs. Specifically:

- Defendants renewed prescriptions without a patient's request or consent;

- Defendants used false pharmacy identification information for prescriptions that had previously been denied in order to fraudulently bypass the TPPs' denials of claims for reimbursement;

- Defendants caused pharmacies in the Valeant network, including Isolani, to use R&O's identification information, including its NCPDP and NPI numbers, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O didn't even stock;

- Defendants also submitted false and misleading payer audits to TPPs or their agents on behalf of retail pharmacies with which they secretly associated, falsely representing that the pharmacies had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies. In addition, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies;

- Defendants routinely waived co-pays for patients prescribed Valeant drugs, often when soliciting patients to order unnecessary refills of their prescriptions. When submitting claims to TPPs for these prescriptions, however, Defendants concealed the waiver; and

- Defendants modified prescriptions to require that the prescriptions be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives.

176.    Finally, Defendants deceived TPPs and PBMs with respect to the identity and ownership of the pharmacies with which the TPPs and PBMs were contracting to provide

prescription services to their members and insureds. While the TPPs and PBMs believed that they were contracting with independent retail pharmacies, Defendants failed to disclose that Defendants were using the retail pharmacies to insulate Valeant's products from generic competition and to funnel prescriptions through Philidor, where those prescriptions and claims relating to the prescriptions would be manipulated by means of the fraudulent practices described above. By concealing the association and relationship among the pharmacies in the Valeant Enterprise, Defendants also concealed that certain of those pharmacies—including Philidor—did not have pharmacy licenses in states in which members of the Class and their beneficiaries were located.

### B.  Defendants' Misrepresentations to Patients and Physicians

177.   Defendants constructed and deployed a dishonest sales campaign, specifically instructing the Valeant and Philidor sales force to make a number of false and misleading statements to both patients and physicians in an effort to boost Valeant's drug sales and thereby impose added costs on TPPs. While these statements were made to the members, beneficiaries, and insureds (and their physicians) covered by the TPPs rather than to the TPPs directly, the purpose of these misrepresentations was to fraudulently cause Class members to pay more for Valeant drugs than the Class members would have paid but for Defendants' misconduct.

178.   Defendants fraudulently induced doctors to prescribe, and patients to request, Valeant's pharmaceutical products—rather than less expensive generic drugs—by disseminating statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost or reduced cost. In both cases, patients were falsely assured that their TPPs would not be billed. In fact, TPPs were billed for these drugs and patients were subsequently billed for amounts not covered by their TPPs.

### C.      Defendants' Misrepresentations to State Regulators

179.    Defendants made numerous false statements to a host of different constituencies in an effort to conceal the true ownership and identity of a vast network of Valeant-affiliated pharmacies, which Defendants used to insulate Valeant products from generic competition. Although these statements were not made directly to TPPs, they were made to conceal the fraudulent conduct of the Valeant Enterprise, and thereby caused the Class to pay inflated prices for Valeant drugs.

180.    Defendants' fraudulent scheme depended entirely on its secrecy—if *anyone* outside the Valeant Enterprise discovered the true ownership and structure of Valeant's network of captive pharmacies, the scheme would collapse, as it ultimately did. To keep the scheme secret, Defendants made numerous false and misleading statements to regulators to conceal Defendants' illicit pharmacy network.

181.    Defendants caused Philidor or its affiliates to file pharmacy applications with state regulators on behalf of various shell companies controlled by Defendants in which the companies falsely denied and failed to disclose their relationships with Philidor and Valeant, and made other false statements designed to conceal the true ownership of Valeant's network of captive retail pharmacies.

182.    For example, after California state regulators denied Philidor's application for a pharmacy license, Defendants caused a Valeant/Philidor-controlled shell company, Lucena Holdings , to acquire a stake in a California pharmacy called West Wilshire Pharmacy in an effort to circumvent the state's licensing denial. In a "Change of Permit Request" filed with the California State Board of Pharmacy, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory Blaszczynski, who, unknown to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor; and

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year. Accordingly, Lucena's deceptive and misleading representation concealed its connection with Philidor and Valeant from state regulators.

183.    Likewise, Defendants caused Back Rank, LLC, a Philidor shell company, to take ownership of Houston-based Orbit Pharmacy, Inc. In a September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent that no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]." In fact, California had denied Philidor's pharmacy application the previous year, expressly finding that Philidor and its CEO, Andrew Davenport, had commited acts involving "dishonesty, fraud, or deceit, with the intent to substantially" benefit Philidor and Davenport, and that under penalty of perjury, Philidor and Davenport had made "false statements of fact" concealing Philidor's relationship to Valeant. Accordingly, Orbit Pharmacy's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

## VI.    CAUSATION AND INJURY TO THE CLASS

184.    Defendants made false and misleading statements to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to increase sales and claims to TPPs, and to insulate Valeant's drugs from generic competition and thus facilitate Valeant's drug-price increases. Unaware of Defendants' scheme, Plaintiffs and the Class paid highly inflated prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could and should have been dispensed instead. Also, Defendants made false and misleading statements to Plaintiffs and the Class to fraudulently

secure or maximize reimbursement for prescriptions written and filled for Valeant's expensive branded drugs. When submitting claims to Plaintiffs and the Class, Defendants (among other fraudulent practices described above) falsified prescriptions, made claims for refills that were never requested by patients, and misrepresented the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the fact that either no drugs or cheaper generic alternative drugs should have been dispensed. Additionally, Defendants made false and misleading statements to patients and prescribing physicians that artificially increased the number of prescriptions for branded Valeant drugs written and filled during the Class Period. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the availability of cheaper generic alternative drugs that could and should have been dispensed instead. During the Class Period, Defendants amassed billions of dollars in ill-gotten gains through their scheme to fraudulently boost Valeant's drug sales and line Defendants' pockets. The manner in which each of the various components of Defendants' fraudulent enterprise artificially increased Valeant's drug prices and sales and injured Plaintiffs and the Class is described below:

- **Defendants altered prescriptions to provide that they be filled with brand-name Valeant drugs, rather than cheaper generic alternatives,** as described in ¶¶100-11, 113-15 above. But for Defendants' false and misleading statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false claims for reimbursement for prescription renewals**, as described in ¶¶123-25 and 136-38 above. But for Defendants' conduct, Plaintiffs and the Class would not have paid for these prescriptions, but either would have paid for cheaper generic alternatives or would not have

paid for any prescription at all. Also, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants used false pharmacy identification information, including NCPDP and NPI numbers, to bill TPPs, including Plaintiffs and the Class, for prescriptions**, as described in ¶¶116-22 above. Had Defendants not used false pharmacy identifying information to bypass Plaintiffs' and the Class' and their PBMs' rejection of Defendants' claims for reimbursement for Valeant's branded drugs, lower-cost generic drugs would have been dispensed instead. Accordingly, but for Defendants' conduct, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and misleading payer audits to TPPs**, as described in ¶¶122, 149-56 above. But for Defendants' false and misleading audit statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and inflated claims to TPPs (or their PBM agents)**, as described in ¶¶126-32 and 142-44 above. Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs (or their agents) for these prescriptions, falsely represented that the patients had been charged the full prices of the drugs. But for Defendants' false and misleading statements inflating the prices charged to the patients for Valeant drugs, Plaintiffs and the Class would have, at a minimum, paid claims based on the discounted prices *actually* charged. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants made false and misleading statements to conceal Valeant's relationship with its network of captive pharmacies**, as described in ¶¶60, 70-99 above. But for Defendants' misstatements, Defendants' practice of

failing to substitute generic drugs for Valeant drugs, which contravened state law and contracts with PBMs, would have triggered denials of claims from TPPs and scrutiny of the pharmacies' practices. By concealing both Valeant's relationship with its network of pharmacies and the pharmacies' relationships to each other, Defendants were able to create the false impression that independent pharmacies had dispensed the prescriptions and to spread false claims across ostensibly unrelated pharmacies. But for Defendants' conduct, Plaintiffs and the Class would not have paid for these prescriptions, but either would have paid for cheaper generic alternatives or would not have paid for any prescription at all. Since Defendants used this fraudulent practice to create artificial demand for, and support the inflated price of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class' injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

## VII. CLASS ACTION ALLEGATIONS

185.    Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(a) and

23(b)(3) on behalf of a class consisting of:

> All health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, third party payors, and any other health benefit provider in the United States of America or its territories, that paid or incurred costs for Valeant branded drug products in connection with a claim submitted by Philidor, a claim submitted by any pharmacy in which Philidor had a direct or indirect ownership interest, or a claim by any pharmacy for which the amount sought for reimbursement was inflated as a result of Defendants' fraudulent scheme, between January 2, 2013 and November 9, 2015, and suffered damages thereby. Excluded from the Class are PBMs, Defendants, Defendants' successors or assigns, and any entity in which Defendants have or had a controlling interest.

186.    The members of the Class are so numerous that joinder of all members is

impracticable. The Class consists of all TPPs in the United States that were wrongfully induced

to pay claims for Valeant's branded drugs as a consequence of Defendants' fraudulent scheme,

including TPPs that paid for Valeant drugs purchased through Defendants' captive pharmacy

network or from pharmacies outside Valeant's network, and that suffered damages as a

consequence of Defendants' fraudulent scheme during the Class Period. While the exact number

of Class members is unknown to Plaintiffs at this time and can be ascertained only through

appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class. Class members may be identified from records maintained by Defendants and PBMs and may be notified of this class action using a form of notice similar to that customarily used in class actions.

187.    Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of in this action.

188.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and in RICO and pharmaceutical-related litigation.

189.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a)    whether Defendants' acts and omissions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

b)    whether Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

c)    whether Defendants made false or misleading statements that concealed Valeant's relationship with a network of pharmacies;

d)    whether, when submitting claims to Plaintiffs and the Class, Defendants changed codes on prescriptions to require that the prescriptions be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives;

e)      whether Defendants submitted prescription renewals for reimbursement, falsely representing that the particular patients had requested renewals of their prescriptions;

f)      whether Defendants used false pharmacy identification information to allow their affiliated pharmacies to dispense Valeant's branded drugs;

g)      whether Defendants submitted false and misleading payer audits to TPPs on behalf of retail pharmacies with which they secretly associated;

h)      whether Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs for the prescriptions, falsely represented that the patients had been charged the full prices of the drugs;

i)      whether Defendants disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients their TPPs would not be billed for Valeant drugs they received at no cost;

j)      whether Defendants made misrepresentations to regulators to conceal the existence of the Valeant Enterprise and the relationship Valeant had with a secret network of pharmacies;

k)      whether Defendants Andrew Davenport and Matthew S. Davenport supervised and participated in the wrongdoing by Philidor and its affiliated pharmacies alleged in this Complaint;

l)      whether Defendants' acts and omissions described in this Complaint constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1962;

m)      whether Defendants administered an "enterprise," within the meaning of 18 U.S.C. § 1962;

n)      whether Defendants' acts or omissions described in this Complaint affected interstate commerce; and

o)      whether Defendants' acts or omissions described in this Complaint directly and proximately caused injury to Plaintiffs and the Class.

190.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small, so that the burden and expense of individual litigation makes it impossible for those members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) – RACKETEERING
### (Against All Defendants)

191.    Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

192.    This Count is asserted on behalf of all members of the Class against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

193.    Defendants are "persons" within the meaning 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise (the "Valeant Enterprise"), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

194. The Valeant Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants and their employees and agents including Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, Matthew S. Davenport, Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP,  R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy, and other as yet unknown pharmacies, agents, and instrumentalities engaged, owned, or controlled by Defendants to advance the fraudulent scheme described in this Complaint. All entities constituting the Valeant Enterprise are "persons" within the meaning of 18 U.S.C. § 1961(3), are "persons" distinct from the Valeant Enterprise, and acted to enable Defendants to fraudulently inflate the number and cost of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period. The Valeant Enterprise functioned as an ongoing organization and continuing unit, and was created and used to effectuate a pattern of racketeering activity. The development and execution of Defendants' activities in furtherance of the Valeant Enterprise would exceed the capabilities of each member of the Enterprise acting singly or without the aid of any other member.

195. Defendants, in concert with other participants in the Valeant Enterprise, created and maintained systemic links for a common purpose: to inflate the number and costs of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period. This scheme yielded substantial financial benefits for the participants in the Valeant Enterprise far in excess of those the participants would have received had they refrained from making the false and misleading statements to TPPs, regulators, doctors, and patients detailed in ¶¶58-144

above. Defendants exercised control over the activities of the Valeant Enterprise in disseminating those false and misleading statements, and participants in the Valeant Enterprise were aware that Defendants exercised that control. Furthermore, each component of the Enterprise benefitted from the existence of all other components.

196.    The Valeant Enterprise engaged in and affected interstate commerce because, among other things, it made and disseminated false and misleading statements to thousands of individuals and entities, including patients, doctors, regulators, and TPPs, throughout the United States. Valeant and the pharmacies constituting the Valeant Enterprise dispensed pharmaceuticals throughout the United States to thousands of patients, and submitted claims for reimbursement complained of in this Complaint to TPPs throughout the United States.

197.    Defendants conducted and participated in the affairs of the Valeant Enterprise through patterns of racketeering activity, including acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (use of interstate facilities to conduct unlawful activity). These violations include the dissemination of the misrepresentations described in this Complaint through the mails and wires, and the shipment of drugs through the mails in furtherance of the fraudulent scheme described in this Complaint.

198.    Defendants' fraudulent scheme to inflate the price of Valeant branded drugs and the number of prescriptions for those drugs written, filled, and reimbursed during the Class Period consisted of, among other things, (1) making false and misleading statements to the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs; (2) making false and misleading statements to regulators to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to implement the fraudulent scheme described in this Complaint; and (3) making false and misleading statements

to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

199.     Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications, including but not limited to (1) communications with, and among, the Enterprise participants in furtherance of their fraudulent scheme; (2) communications promulgating the false and misleading statements described above to TPPs, patients, doctors, and regulators throughout the United States; (3) receipt of proceeds generated by Defendants' fraudulent scheme, including payments made by TPPs for Valeant drugs; (4) shipment of Valeant drugs to the pharmacies that constituted the Valeant Enterprise; and (5) shipment of drugs by members of the Valeant Enterprise to patients, insureds, members, and beneficiaries whose drug costs were covered by members of the Class.

200.     The foregoing racketeering activities constitute a common course of conduct intended to deceive and harm Plaintiffs and the Class. Each of these instances of racketeering activity was related, had the same or similar purposes, involved the same or similar participants, had the same or similar means of commission, and had the same or similar results affecting the same or similar victims, including Plaintiffs and the Class.

201.     Plaintiffs and the Class have been injured in their business or property by reason of these violations, in that Plaintiffs and the Class paid millions of dollars for Valeant drugs that they would not have paid had Defendants not engaged in the pattern of racketeering activity described in this Complaint. Defendants' racketeering activities were part of their ongoing business and, during the Class Period, constituted a continuing threat to property belonging to Plaintiffs and the Class.

202.     The injuries to Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity.

## COUNT II

**FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d) – RACKETEERING CONSPIRACY**
**(Against All Defendants)**

203.     Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

204.     This Count is asserted on behalf of all members of the Class against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), the violation arising from their conspiracy to violate 18 U.S.C. § 1962(c).

205.     Defendants, their employees and agents, including Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, Matthew S. Davenport, Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP,  R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy, and other as yet unknown pharmacies, agents, and instrumentalities engaged, owned, or controlled by Defendants, engaged by Defendants to inflate Valeant's drug sales knowingly agreed, combined, and conspired to conduct or participate, directly or indirectly, in the conduct of the Valeant Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (use of interstate facilities to conduct unlawful activity), including (1) making false and misleading statements to state regulators to conceal Valeant's relationship with a network of captive pharmacies, which

Defendants used to insulate Valeant's drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs); and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

206.    Defendants knew and agreed to act in furtherance of the Valeant Enterprise's common purpose: to inflate the cost and the number of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period by issuing a variety of false and misleading statements to numerous different constituencies in order to obtain money and benefits for participants in, and associates of, the Valeant Enterprise at the expense of Plaintiffs and the Class.

207.    Defendants committed, or caused the commission of, numerous overt acts in furtherance of the conspiracy and to effect the conspiracy's objects, including (1) making false and misleading statements to state regulators to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs); (3) making false and misleading statements to patients and

prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives; (4) constructing the shell companies, including Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, and End Game, LLP, through which Valeant acquired interests in, and associated with, a network of retail pharmacies in order to execute Defendants' fraudulent scheme to boost Valeant's drug sales; and (5) promulgating employee manuals and handbooks instructing Philidor employees to, among other things, falsify prescriptions, make claims for refills that were never requested by patients, and misrepresent the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgement against Defendants jointly and severally, as follows:

1. Declaring the action to be a proper class action under Fed. R. Civ. P. 23;

2. Awarding Plaintiffs and the Class compensatory and treble damages, in an amount to be proven at trial, including interest;

3. Awarding Plaintiffs and the Class their reasonable costs and expenses, including attorneys' fees; and

4. Awarding such other relief as the Court deems just and proper.

## X.   JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: December 14, 2016

**CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.**
/s/ James E. Cecchi
James E. Cecchi
Tel: (973) 994-1700
Fax: (973) 994-1744
JCecchi@carellabyrne.com
5 Becker Farm Road
Roseland, NJ 07068

*Lead Counsel, Interim Class Counsel, and
Local Counsel for Plaintiffs AirConditioning
and Refrigeration Industry Health and
Welfare Trust Fund, Fire and Police Health
Care Fund, San Antonio, and Plumbers
Local Union No. 1 Welfare Fund*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Hannah Ross (*pro hace vice pending*)
James A. Harrod *(pro hac vice)*
Jai Chandrasekhar *(pro hac vice)*
Jake Nachmani *(pro hac vice pending)*
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
hannah@blbglaw.com
jim.harrod@blbglaw.com
jai@blbglaw.com
jake.nachmani@blbglaw.com

*Lead Counsel, Interim Class Counsel, and
Counsel for Plaintiffs AirConditioning and
Refrigeration Industry Health and Welfare
Trust Fund, Fire and Police Health Care
Fund, San Antonio, and Plumbers Local
Union No. 1 Welfare Fund*

81

**BARRACK, RODOS & BACINE**
Robert A. Hoffman
Julie B. Palley
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 297-1484
      - and -
Jeffrey W. Golan
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

*Counsel for Plaintiff the Detectives*
*Endowment Association of New York City*

**COHEN MILSTEIN SELLERS & TOLL**
  **PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
      - and -
Christopher Lometti
Joel P. Laitman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797

*Counsel for Plaintiff New York Hotel Trades*
*Council & Hotel Association of New York*
*City, Inc. Health Benefits Fund*