James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Michael A. Innes
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Hannah Ross
James A. Harrod
Jai Chandrasekhar
Jake Nachmani
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

Lead Counsel for Plaintiffs and Interim Class Counsel
(*Additional counsel below*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. THIRD-PARTY PAYOR LITIGATION | Civil Action No. 16-3087(MAS)(LHG)<br><br>(ORAL ARGUMENT REQUESTED)<br><br>Motion Day: June 5, 2017 |

## PLAINTIFFS' COMBINED MEMORANDUM OF LAW
## IN OPPOSITION TO MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

I.   PRELIMINARY STATEMENT .......................................................... 1

II.  STATEMENT OF FACTS .................................................................. 6

   A.   The Parties, the Roles of the Participants in the Pharmaceutical Market, and the Valeant Enterprise ....................................................................... 6

      1.   The Parties ................................................................... 6

      2.   The Roles of the Participants in the Pharmaceutical Market .................... 7

      3.   The Valeant Enterprise .................................................... 8

   B.   Defendants' Scheme to Artificially Inflate the Prices and Sales Volumes of Valeant Drugs Through the Secret Philidor Pharmacy Network ......................... 9

   C.   Defendants' Fraudulent Practices in Selling Valeant Drugs Through Philidor's Network ................................................................................. 11

   D.   Defendants' Illicit Profits and Plaintiffs' Economic Injury ....................... 15

   E.   The Aftermath of the Valeant/Philidor Fraudulent Scheme ........................ 16

III. ARGUMENT ....................................................................................... 17

   A.   Rule 8(a) Applies to Every Element of Plaintiffs' Claims Except for Defendants' Predicate Acts of Mail Fraud and Wire Fraud ................................. 17

   B.   Plaintiffs Have Standing to Bring RICO Claims ................................. 19

      1.   Plaintiffs Suffered a Direct Injury from Defendants' RICO Violations ... 20

      2.   Plaintiffs' Injury Was Proximately Caused by Defendants' RICO Violations ................................................................... 24

      3.   Plaintiffs' Excess-Price Theory of Harm Is Sufficiently Alleged ........... 26

      4.   Plaintiffs' Quantity-Effect Theory of Harm Is Sufficiently Alleged ....... 27

   C.   The Complaint Adequately Pleads Defendants' RICO Violations ..................... 28

      1.   The Complaint Adequately Alleges the Valeant Enterprise ................... 28

                a.     The Complaint Adequately Pleads that Andrew Davenport Participated in the Operation of the Valeant Enterprise .............. 31

                b.     The Complaint Adequately Pleads that Matthew Davenport Participated in the Operation of the Valeant Enterprise .............. 33

        2.     The Complaint Adequately Alleges Defendants' Predicate Acts ............ 36

                a.     The Complaint Adequately Alleges Mail and Wire Fraud .......... 36

                b.     Matthew Davenport Engaged in Racketeering ........................... 45

                c.     The Complaint Does Not Allege Mere Contract Claims ............. 46

        3.     Defendants' Argument with Respect to State Laws Is Meritless ............ 47

        4.     The Complaint Adequately Alleges a RICO Conspiracy ........................ 50

                a.     Pleading a RICO Conspiracy Does Not Require Pleading that Defendants Violated § 1962(c) .................................................. 51

                b.     The Complaint Alleges that Valeant Conspired with the Other Defendants to Conduct or Participate in the Conduct of the Valeant Enterprise's Affairs ........................................................ 52

                c.     The Intra-Corporate Immunity Doctrine Does Not Immunize Valeant .................................................................................. 54

                d.     The Complaint Sufficiently Gives Defendants Notice of the Basis for the Conspiracy Claims .................................................. 55

        5.     If Any Part of the Complaint Is Dismissed, Plaintiffs Should Be Permitted to File an Amended Complaint ................................................ 57

IV.    CONCLUSION ................................................................................................ 57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*,
973 F. Supp. 2d 839 (N.D. Ill. 2013) ................................................................48

*In re Aetna UCR Litig.*,
Civ. No. 07-3541, 2015 WL 3970168 (D.N.J. June 30, 2015) .........................35

*Am. Fed. of State, Cty. & Municipal Emps. v. Ortho-McNeil-Janssen Pharms., Inc.*,
Civ. No. 08-cv-5904, 2010 WL 891150 (E.D. Pa. Mar. 11, 2010)..................18

*Annulli v. Panikkar*,
200 F.3d 189 (3d Cir. 1999)...........................................................................47

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)......................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................17

*Ashland Oil, Inc. v. Arnett*,
875 F.2d 1271 (7th Cir. 1989) ......................................................................54

*In re Avandia Marketing, Sales Practices & Product Liab. Litig.*,
804 F.3d 633 (3d Cir. 2015).........................5, 6, 17, 18, 19, 20, 22, 23, 24, 25, 26, 28, 38, 42

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
MDL No. 1871, 2013 WL 5761202 (E.D. Pa. Oct. 23, 2013)..........................38

*Bartholet v. Reishauer A.G. (Zurich)*,
953 F.2d 1073 (7th Cir. 1992) ......................................................................48

*Beck v. Prupis*,
529 U.S. 494 (2000).................................................................................52, 53

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................17, 18

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
Civ. No. 13-4663, 2016 WL 6612804 (E.D. Pa. Nov. 19, 2016) .....................18

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).................................................................24, 25, 26, 28

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ........................................................................................54

*Curley v. Cumberland Farms Dairy, Inc.*,
    728 F. Supp. 1123 (D.N.J. 1989) ...................................................................54

*In re DaimlerChrysler AG Sec. Litig.*,
    197 F. Supp. 2d 42 (D. Del. 2002) .................................................................44

*Darrick Enters. v. Mitsubishi Motors Corp.*,
    Civ. No. 05-4359, 2007 WL 2893366 (D.N.J. Sept. 28, 2007) ....................50

*De Sole v. Knoedler Gallery, LLC*,
    974 F. Supp. 2d 274 (S.D.N.Y. 2013) ...........................................................36

*Desiano v. Warner-Lambert Co.*,
    326 F.3d 339 (2d Cir. 2003) ..........................................................................25

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
    Civ. No. 06-3044, 2008 WL 5413105 (D.N.J. Dec. 23, 2008) .....................55

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
    102 F. Supp. 2d 237 (D.N.J. 2000) ..................................18, 19, 28, 33, 34, 50

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ............................................................17, 18, 26

*Fuce v. West*,
    Civ. No. 12-0874, 2012 WL 3046235 (E.D. Pa. July 26, 2012) ...................47

*Garber v. Lego*,
    11 F.3d 1197 (3d Cir. 1993) ..........................................................................43

*Griffin v. United States*,
    502 U.S. 46 (1991) .........................................................................................51

*Hemi Group, LLC v. City of New York*,
    559 U.S. 1 (2010) ...........................................................................................26

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .........................................................................43

*Holmes v. Sec. Investor Protection Corp.*,
    503 U.S. 258 (1992) .........................................................19, 24, 25, 26

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................28, 31, 51, 54

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ................................................................43, 44, 45

*Jaye v. Oak Knoll Village Condo. Owners Ass'n, Inc.*,
    Civ. No. 15-8324, 2016 WL 7013468 (D.N.J. Nov. 30, 2016) ...............................41

*In re JPMorgan Chase & Co. Sec. Litig.*,
    MDL No. 1783, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ................................44

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) ...........................................................................18, 36

*Kerchner v. Obama*,
    612 F.3d 204 (3d Cir. 2010) .................................................................................5

*Kirwin v. Price Commc'ns Corp.*,
    391 F.3d 1323 (11th Cir. 2004) .........................................................................54

*The Knit With v. Knitting Fever, Inc.*,
    625 F. App'x 27 (3d Cir. 2015) .....................................................................50, 57

*Lewis v. Curtis*,
    671 F.2d 779 (3d Cir. 1982) ...............................................................................43

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) .................................................................................52

*In re Loewen Grp. Inc. Sec. Litig.*,
    Civ. No. A 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ........................44

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004) ...............................................................................41

*Maio v. Aetna, Inc.*,
    221 F.3d 471 (3d Cir. 2000) ...............................................................................26

*Muscletech Research & Dev. Inc. v. E. Coast Ingredients, LLC*,
    Civ. No. 00-CV-0753A, 2004 WL 941815 (W.D.N.Y. Mar. 25, 2004) ...................36

*Nat'l Org. for Women, Inc. v. Scheidler*,
    510 U.S. 249 (1994) ...........................................................................................23

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013) ................................................................................25

*Paramount Enterprises, Inc. v. Laborers Eastern Region Organizing Fund*,
    Civ. No. 13-3295, 2014 WL 791825 (D.N.J. Feb. 25, 2014) ...............................42

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)...............................................................................17, 18

*Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.*,
   Civ. No. 12-1379, 2014 U.S. Dist. LEXIS 90313 (D.N.J. June 30, 2014)...........................42

*Rehkop v. Berwick Healthcare Corp.*,
   95 F.3d 285 (3d Cir. 1996).............................................................................................52

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)...........................................................................................33, 34, 35

*Rose v. Bartle*,
   871 F.2d 331 (3d Cir. 1989)......................................................................................18, 50

*Salinas v. United States*,
   522 U.S. 52 (1997)...........................................................................................50, 51, 52

*Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*,
   111 F. Supp. 2d 867 (S.D. Tex. 2000)................................................................33, 47

*Schmuck v. United States*,
   489 U.S. 705 (1989).......................................................................................................36

*Schwartz v. Lawyers Title Ins. Co.*,
   680 F. Supp. 2d 690 (E.D. Pa. 2010)...............................................36, 37, 38, 39, 40

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)...........................................................................................19, 46, 47

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
   742 F.2d 786 (3d Cir. 1984).......................................................18, 19, 23, 28, 36, 50

*Shearin v. E.F. Hutton Grp., Inc.*,
   885 F.2d 1162 (3d Cir. 1989)......................................................................................52, 54

*Smith v. Berg*,
   247 F.3d 532 (3d Cir. 2001)..........................................................................................50, 53

*Suessenbach Family Ltd. Partnership v. Access Midstream Partners, L.P.*,
   Civ. No. 3:14-1197, 2015 WL 1470863 (M.D. Pa. Mar. 31, 2015).......................46

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002).......................................................................................................49

*Swistock v. Jones*,
   884 F.2d 755 (3d Cir. 1989)..........................................................................................18

*Tabas v. Tabas*,
　　47 F.3d 1280 (3d Cir. 1995)............................................................................19

*Tolle v. Carroll Touch, Inc.*,
　　977 F.2d 1129 (7th Cir. 1992) .......................................................................48

*United States v. Bergrin*,
　　650 F.3d 257 (3d Cir. 2011)...........................................................................33

*United States v. Oreto*,
　　37 F.3d 739 (1st Cir. 1994)............................................................................34

*United States v. Philip Morris USA Inc.*,
　　566 F.3d 1095 (D.C. Cir. 2009)......................................................................39

*United States v. Riccobene*,
　　709 F.2d 214 (3d Cir. 1983).....................................................................50, 53

*United States v. Riley*,
　　621 F.3d 312 (3d Cir. 2010)...........................................................................39

*In re Warfarin Sodium Antitrust Litig.*,
　　391 F.3d 516 (3d Cir. 2004)...........................................................................22

*Webster v. Omnitrition Int'l, Inc.*,
　　79 F.3d 776 (9th Cir. 1996) ...........................................................................54

## STATUTES AND RULES

18 U.S.C. § 1341 ...................................................................................................36

18 U.S.C. § 1343 ...................................................................................................36

18 U.S.C. § 1952 ...................................................................................................40

18 U.S.C. § 1961(1) ..............................................................................................32

18 U.S.C. § 1961(4) ..............................................................................................28

18 U.S.C. § 1962 .............................................................................................19, 53

18 U.S.C. § 1962(c) ..............................................3-4, 32, 33, 42, 50, 51, 52, 53

18 U.S.C. § 1962(d) ..............................................................3-4, 33, 50, 52

18 U.S.C. § 1964(c) .................................................................................19, 46, 53

Fed. R. Civ. P. 8 ........................................................................................48, 53, 55

Fed. R. Civ. P. 8(a) ................................................................6, 18, 28, 50, 57

Fed. R. Civ. P. 9(b) ...................................................6, 19, 36, 44, 50, 53, 55

Fed. R. Civ. P. 12(b)(6)................................................................................5, 17

N.J.R. Prof. Conduct 3.3(a)(3) ................................................................5

**OTHER AUTHORITIES**

U.S. Dept. of Justice, Crim. Div., Organized Crime and Racketeering Section,
    "Civil RICO: A Manual for Federal Attorneys" (Oct. 2007), *available at*
    www.justice.gov/sites/default/files/usam/legacy/2014/10/17/civrico.pdf. ...........................54

5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE (1969).......................................50

Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund, Fire and Police Health Care Fund, San Antonio, Plumbers Local Union No. 1 Welfare Fund, New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund, and the Detectives Endowment Association of New York City respectfully submit this memorandum of law in opposition to the motions to dismiss their Consolidated Class Action Complaint (ECF No. 27; the "Complaint") filed by Defendants Valeant Pharmaceuticals International, Inc. ("Valeant") (ECF No. 38), Matthew Davenport ("Matthew") (ECF No. 42), and Andrew Davenport ("Andrew") and Philidor RX Services, LLC ("Philidor") (ECF No. 43).

## I.    PRELIMINARY STATEMENT

The four Defendants created a secret network of interrelated pharmacies for the purpose of selling Valeant products, at commercially nonviable prices, when generic alternatives should have been dispensed instead. This scheme was implemented through several nefarious means, including indicating that doctors' prescriptions for Valeant drugs required them to be "dispensed as written" even though the original prescriptions did not say that and where generics could and should have been substituted. Valeant and the Davenports secretly created Philidor and its affiliates to falsely create the appearance that independent pharmacies were filling these prescriptions. Defendants went to great (and to date, totally unexplained) lengths to conceal the Philidor network of pharmacies in a complex web of ownership structures named after obscure chess strategies. However, by failing to disclose that Philidor was really an instrumentality of Valeant, Defendants' fraudulent practices, and their purpose, were hidden. As a result, the Class was forced to bear the burden of paying for overpriced Valeant drugs purchased through Philidor and its affiliates, because no one knew that Philidor existed for the purpose of creating an "alternative fulfillment" channel for Valeant products. This scheme resulted in many millions of dollars in injuries to the Class members, entities that are already burdened with the massive expenses and thorny

bureaucracy of the healthcare market. Defendants' motions rest upon an alternate factual reality not drawn from the Complaint. Their approach does not conform to the law and shows a troubling disregard for the well-pleaded facts.

In the span of a week in late 2015, the country's three largest pharmacy benefits managers ("PBMs") abruptly terminated their contracts with Defendant Philidor, a mail-order pharmacy that had been generating $500 million per year in revenue, when it became known that Philidor was secretly affiliated with Defendant Valeant, a pharmaceutical manufacturer. Contrary to Philidor's presentation of itself as an independent pharmacy, drug purchasers learned that Valeant actually controlled Philidor for the purpose of creating excessive demand for and inflating the price of Valeant drugs. Over several years, Philidor had been submitting fraudulent reimbursement requests for Valeant drugs to PBMs and to third party payors ("TPPs")—including Plaintiffs—for which PBMs act as agents.

This revelation came to light when a California pharmacy, which Philidor had agreed to acquire, refused to pay $69 million in invoices for drugs manufactured by Valeant and sold by Philidor, ostensibly through the California pharmacy. The California pharmacy's owner had been duped; he neither knew he had sold nor intended to sell these Valeant drugs on Philidor's behalf. This pharmacist soon realized that Philidor had agreed to acquire his business in order to exploit his California pharmacy license and sell Valeant drugs in states where Philidor was banned from doing so or otherwise could not do business. In resisting being part of this illicit scheme, the pharmacist learned that it was in fact Valeant, with which he had never done any business, demanding payment for Philidor's illegal sales.

Thus began the unraveling of the Valeant Enterprise,[1] through which Valeant, Philidor, and the Davenports defrauded TPPs by using fraudulent methods to induce purchases of Valeant drugs in lieu of cheaper generic alternatives or at grossly inflated prices. These methods included changing doctors' prescriptions, resubmitting orders from a different pharmacy within Philidor's secret network after another captive pharmacy's order for the same product had been refused, and ordering refills when patients had not requested and did not need them. What Defendants now try to arrogantly pass off as normal, legitimate business practices were nothing of the kind. Rather, they were a scheme of fraudulent and deceptive tactics, many of which were specifically documented in Philidor's employee manual and overseen by Valeant itself, to deceive consumers and cause them to purchase Valeant drugs rather than cheaper generic substitutes, and to make TPPs, including Plaintiffs, bear the costs of those fraudulent sales. The scheme sought to shield Valeant's drugs from generic competition, fraudulently inflate Valeant drug prices, and artificially boost the quantity of Valeant drug sales.

Unable to meaningfully attack the Complaint, Defendants (1) seek to distract the Court with a competing factual narrative not derived from the Complaint (which is inappropriate at the pleading stage), (2) ignore controlling Third Circuit precedent, and (3) apply incorrect pleading standards.

Defendants ignore the Complaint's well-pleaded allegations when they argue that Plaintiffs fail to allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

---

[1]    The "Valeant Enterprise" is defined in the Complaint as including all four Defendants, fifteen named shell companies and pharmacies, and "other as yet unknown pharmacies, agents, and instrumentalities." Complaint, ¶ 1 n.1. All citations in this memorandum in the form "¶ __" are to paragraphs of the Complaint.

§ 1962(c)-(d) ("RICO"). Plaintiffs properly allege all of the elements of Defendants' RICO violations:

- *A RICO enterprise comprising Valeant, Philidor, the Davenports, and Philidor's secret pharmacy network*—Valeant and Andrew Davenport created Philidor and directed Philidor's fraudulent sales practices for Valeant drugs, which Philidor and both Davenports expanded through a secret network of other specialty pharmacies. Defendants' intent in establishing and growing the network was to deceive PBMs and the TPPs for which the PBMs acted by concealing the fact that thousands of prescriptions for Valeant branded drugs were filled at high prices when they should have been either replaced with  much less expensive generic alternatives or sold for much less. These wrongly filled or overpriced prescriptions were all coming from a single group of affiliated pharmacies associated with Valeant and Philidor.

- *A cognizable injury*—Plaintiffs and other TPPs directly suffered out-of-pocket losses both from the *quantity effect* of paying for Valeant drugs that would not have been dispensed but for Defendants' fraud, and from paying *excessive prices* for Valeant drugs that were artificially inflated by the fraud.

- *Proximate cause*—Valeant, Philidor, and the Davenports specifically targeted Plaintiffs and other TPPs as the intended victims of their fraud. These Defendants wrongfully obtained Plaintiffs' and other Class members' money by means of the illegal practices committed by Philidor and its captive pharmacies at the direction of Valeant and the Davenports, including fraudulently altering prescriptions, submitting unrequested refills, and using false pharmacy-identification numbers to circumvent denials of claims.

- *Predicate acts*—Philidor, the Davenports, and Philidor's captive pharmacies, acting at the direction of Valeant and the Davenports, committed mail and wire fraud by making misleading statements by mail and interstate wire to Plaintiffs, other TPPs, PBMs acting on behalf of TPPs, patients, physicians, and regulators.

Defendants' motions to dismiss ignore the Complaint's particularized allegations. Instead, Defendants assert that Valeant and Philidor's secret pharmacy network was a normal commercial relationship and that Plaintiffs' claims based on Defendants' fraudulent statements are mere commercial disputes. Defendants' attempt to ignore the Complaint's allegations and to present their own, alternate version of the facts is not a proper basis for their motions under Rule 12(b)(6).

Defendants also misstate the law in two critical areas. First, despite the fact that all three of Defendants' opening briefs contend that Plaintiffs do not have standing, each of the briefs fails to cite the Third Circuit's controlling decision in *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633 (3d Cir. 2015). In *Avandia*, the Third Circuit sustained a RICO class-action complaint brought by TPPs against a pharmaceutical company based on allegations that parallel those alleged in this case in all relevant respects. Plaintiffs' Complaint completely conforms to *Avandia*, where the Circuit rejected precisely the same arguments about plaintiff TPPs' standing to sue a drug maker under RICO. *Avandia* is "'legal authority in the controlling jurisdiction'" that is "'directly adverse to the position of [Defendants],'" and Defendants should have acknowledged it "in their opening brief[s]." *Kerchner v. Obama*, 612 F.3d 204, 210 n.5 (3d Cir. 2010) (quoting N.J.R. Prof. Conduct 3.3(a)(3)). Defendants' failure to acknowledge *Avandia,* which also distinguishes many of the cases Defendants seek to rely on, is telling—and troubling.

Second, Defendants improperly seek to apply Rule 9(b)'s fraud-pleading standards to all of the elements of Plaintiffs' RICO claims. It is well settled that (1) Rule 9(b) applies only to Plaintiffs' allegations concerning Defendants' predicate acts of mail fraud and wire fraud; and (2) Rule 8(a) governs the Complaint's allegations concerning all of the other elements of Plaintiffs' RICO claims, including Plaintiffs' standing, the existence of a RICO enterprise, the pattern connecting Defendants' predicate acts, and Defendants' conspiracy to violate RICO.

Consistent with *Avandia*, and applying the correct legal standards, the Complaint alleges that Defendants' misstatements and fraudulent acts caused Plaintiffs and the Class of TPPs (including through their PBM agents) both to pay for Valeant products that should never have been sold, and to pay artificially inflated prices for Valeant products. Plaintiffs have met their pleading burden, and Defendants' motions should be denied.

## II.   STATEMENT OF FACTS

### A.   The Parties, the Roles of the Participants in the Pharmaceutical Market, and the Valeant Enterprise

#### 1.   The Parties

Plaintiffs are all union or public healthcare funds that provide health benefits to their eligible participants and other beneficiaries. ¶¶ 29-33 (identifying each Plaintiff). Thus, Plaintiffs are all third party payors (defined above as "TPPs"). Throughout the Class Period, each Plaintiff "paid or reimbursed eligible [fund] participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in [the] Complaint." *Id.* (alleging this fact with respect to each Plaintiff).

Defendant Valeant is a Canadian pharmaceutical manufacturer with its US headquarters in Bridgewater, New Jersey. ¶ 34. Defendant Philidor is a mail-order pharmacy headquartered in

Pennsylvania. ¶ 35. Defendant Andrew Davenport was Philidor's largest beneficial owner and was its CEO when it ceased operations at the end of 2015. ¶ 36. Defendant Matthew Davenport was a Philidor officer and falsely represented himself as Philidor's CEO in a pharmacy-license application to the California State Board of Pharmacy between 2013 and 2015. ¶ 37.

## 2. The Roles of the Participants in the Pharmaceutical Market

A TPP is any organization, public or private—including commercial insurance companies, self-insured employers, and multi-employer Taft-Hartley health or welfare funds—that pays or insures health or medical expenses on behalf of customers, members, beneficiaries, or their family members. ¶ 38. Insureds and beneficiaries of a TPP generally pay a premium or premium contribution (for employer-sponsored plans) for coverage, or have a premium paid on their behalf by an employer. ¶ 39. Generally, when an insured fills a prescription under a TPP plan, the TPP pays the majority of the insured's prescription-drug costs, and the remainder of the cost is covered by the insured in the form of a co-pay or deductible payment. *Id.*

Pharmacy benefit managers (defined above as "PBMs") act as agents for TPPs. ¶ 40. PBMs provide programs designed to help maximize drug effectiveness and contain drug expenditures, including developing a pharmacy network, designing a formulary, negotiating drug rebates, reviewing drug utilization, and processing and analyzing prescription claims. *Id.*

When a benefit-plan participant seeks to fill a drug prescription, the following process occurs: the insured patient contacts a pharmacy; the pharmacy checks with the PBM to confirm patient eligibility, coverage, and co-payment information; the patient pays the co-payment (and any deductible) and purchases the drug; the PBM reimburses the pharmacy for the remainder of the negotiated drug price less the co-payment; and finally, the PBM bills the TPP for the payments it made on the TPP's behalf to the pharmacy. ¶ 41.

### 3.    The Valeant Enterprise

Recognizing that TPPs generally pay the bulk of an insured's prescription costs, Defendants exploited TPPs by using a secret network of captive pharmacies to shield Valeant's drugs from competition, fraudulently raise the prices of its products, and artificially boost sales, improperly inflating the reimbursements for Valeant drugs paid for by TPPs. ¶ 42.

Valeant carried out its scheme by acquiring promising drugs from other pharmaceutical companies and utilizing the Valeant Enterprise's fraudulent tactics to increase the prices and sales volumes of those drugs. ¶ 2. Among other acquisitions, Valeant acquired Biovail Corp. in 2010 and Medicis Pharmaceutical Corp. in 2012, and with them Valeant acquired these companies' portfolios of dermatological and other drugs. ¶ 48.

In order to artificially inflate the prices and sales volumes of Valeant drugs, especially dermatological drugs, Defendants built a secret network of captive pharmacies around Defendant Philidor. ¶¶ 7, 35, 49. Valeant then created a host of shell companies owned through Philidor, which, like Philidor, were named for chess strategies, evidencing their relationship to the Valeant Enterprise and reflecting Defendants' efforts to conceal their true ownership and interrelationships. Valeant and Philidor then used the shell companies to acquire interests in additional retail pharmacies throughout the United States. As detailed in the Complaint, the Valeant Enterprise included Valeant, Philidor, the Davenports, several identified shell companies, a dozen identified pharmacies, and other as yet unknown pharmacies, agents, and instrumentalities. ¶ 1 n.1, ¶ 194. Defendants then engaged in the fraudulent scheme described below through the Valeant Enterprise.

**B.     Defendants' Scheme to Artificially Inflate the Prices and Sales Volumes of Valeant Drugs Through the Secret Philidor Pharmacy Network**

The key to Valeant's apparent success was the Company's practice of massively raising the prices of drugs it acquired from other companies. ¶ 3. For instance, after acquiring the dermatology drug Noritate 1%, used to treat the common skin condition rosacea, from Sanofi in 2011, Valeant proceeded to increase the price of the drug *212%* between the first quarter of 2014 and the third quarter of 2015. ¶¶ 3, 106. Similarly, Valeant increased the price of Targretin gel, another dermatology drug, by *250%* over the course of the Class Period after acquiring the drug from Esai Inc. in February 2013. *Id.* In 2015 alone, Valeant raised prices on its branded drugs an average of *66%*, according to a Deutsche Bank analysis—approximately *five times* as much as its closest industry peers. ¶ 3. Critically, far cheaper generic equivalents are available for most of Valeant's drugs. ¶ 5. For instance, a 60g tube of Noritate (one month's supply) costs approximately $1,700, while an alternative treatment, Metronidazole, is available for approximately 96% less than the price charged by Valeant. *Id.* Similar price discrepancies existed for other Valeant-branded drugs sold through the Philidor network that could and should have been replaced with much less expensive generic equivalents. *See* ¶ 104 (Valeant-branded Wellbutrin XL sold through Philidor for $17,000 per year (after being increased by Valeant from $6,000 per year), while the generic equivalent cost only $360 per year); ¶ 140 (90-tablet course of Valeant-branded Lodosyn 25mg sold for more than $2,600, while the same course/dosage for the generic cost approximately $292).

The dramatic increase in costs for these and hundreds of other Valeant drugs—borne directly by Plaintiffs and the members of the Class—was possible only through Defendants' exploitation of the Valeant Enterprise. ¶ 4. Defendants went to great lengths to conceal from the public and the members of the Class the secret pharmacy network that was essential to the

successful manipulation of the market for Valeant's products and the implementation of these price increases. *Id.* Absent the scheme Defendants implemented through the Valeant Enterprise, Valeant's bloated drug prices would have been unsustainable because cheaper generic alternatives exist. ¶ 5. In fact, the laws of thirteen states and Puerto Rico and the typical contracts between pharmacies and TPPs (or the TPPs' PBM agents) *require substitution* of generics for Valeant's expensive brand-name drugs, unless precluded by the prescribing physician. ¶¶ 5, 101 & n.3.

Moreover, because TPPs and their PBMs generally require a co-pay to provide patients with a cost incentive to avoid expensive or unnecessary drugs, consumers have an economic interest in selecting cheaper generics where available. ¶¶ 5, 127. To circumvent these economic incentives, Defendants provided customers with coupons and waived patient co-pays to discourage the use of available, cheaper generic alternatives and to steer customers to Valeant's more expensive branded drugs. ¶¶ 5, 130-31. Accordingly, absent Defendants' fraudulent scheme, patients would have requested, and dispensing pharmacies would have substituted, generic prescriptions for Valeant's brand-name drugs. ¶¶ 5, 132.

Defendants' goal was to employ the Valeant Enterprise and its fraudulent tactics to sell Valeant drugs at inflated prices. ¶ 6. Specifically, the secret pharmacy network at the heart of the Valeant Enterprise was created to circumvent the problem of generic competition. *Id.* The Valeant Enterprise enabled Defendants to control the distribution of Valeant's expensive branded drugs by steering patients and physicians away from generic equivalents and thereby frustrate generic-substitution mandates and related mechanisms (such as tiered co-payments and incentive payments provided by payors to pharmacies for generic substitution), to avoid generic substitution for Valeant products. *Id.*

**C.** **Defendants' Fraudulent Practices in Selling Valeant Drugs Through Philidor's Network**

Defendants channeled prescriptions for Valeant's branded drugs—particularly those that were especially susceptible to generic competition, like the Company's dermatological products—through Philidor and its secret network of captive pharmacies. ¶ 8. Philidor only sold Valeant products and existed for the purpose of providing an "alternative fulfillment" channel for Valeant drugs. ¶¶ 49, 61, 64. Philidor employees, as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of fraudulent practices to prevent the substitution of cheaper generic equivalents for Valeant branded drugs. ¶ 8. This conduct was often in contravention of state laws and contractual mandates requiring generic substitution. *Id.* As a direct consequence of Defendants' scheme, TPPs paid highly inflated prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could and should have been dispensed. *Id.*

During the Class Period, Defendants secretly developed a nationwide network of captive pharmacies, with Philidor at the center, and used the Valeant Enterprise to engage in the following fraudulent misconduct:

- Philidor's policy was to "never" dispense generic drugs—even when they were explicitly prescribed. ¶ 102. Defendants' written claims-handling manuals provided detailed instructions to Philidor employees on how to change prescriptions, including by falsely specifying that doctors had indicated that the prescriptions should be "dispensed as written" and altering prescription codes to indicate that only Valeant drugs be dispensed. These practices were designed to ensure that the prescriptions would be filled with Valeant drugs rather than generic equivalents. ¶¶ 9, 113-15.

- Defendants falsified pharmacy-identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' previous denials of claims for reimbursement. This included resubmitting claims under a different pharmacy in the Philidor network, even if that pharmacy was not licensed to dispense drugs in the state to which they were being delivered—*a fraudulent practice that Defendant Andrew Davenport, Philidor's CEO, acknowledged he knew was ongoing in a July 19, 2015 email*. ¶¶ 9, 116-20.

- To conceal their use of false pharmacy-identification numbers, Defendants submitted false and misleading payor audits to TPPs or their PBM agents on behalf of the pharmacies in the Philidor network, falsely representing that the pharmacies had filled prescriptions that had actually been filed by other pharmacies in the network, in order to fraudulently bypass the TPPs' audits used to detect where denials of claims for reimbursement had been circumvented. ¶¶ 121-22.

- Defendants submitted numerous prescription renewals for reimbursement, falsely representing to TPPs and their PBM agents that patients had requested renewals of their prescriptions when no renewal requests had been made—a scheme that former Philidor employees have confirmed was jointly developed by top Valeant and Philidor executives. ¶¶ 9, 123-25.

- Defendants waived compulsory patient co-pays to remove the patients' incentive to seek out cheaper drugs, and then misrepresented the "actual charges" for Valeant drugs in statements to TPPs by failing to account for the co-pay waivers (misrepresenting that the co-pays had been paid by the patients). ¶¶ 9, 126-32.

- Defendants made misrepresentations in advertisements, marketing materials, and coupons provided directly to patients, falsely assuring them that their TPPs would not be charged for Valeant drugs, in order to boost Valeant's drug sales. ¶¶ 9, 133-35.

- Defendants responded to PBMs' rejections of reimbursement requests for prescriptions for Valeant branded drugs by resubmitting the requests at different prices and volumes until the PBMs agreed to pay for them. ¶¶ 9, 136-38.

- Valeant employees worked at the captive pharmacies (including Philidor) using aliases to conceal their identities as Valeant employees, which allowed them to secretly steer patients to Valeant-branded drugs. ¶¶ 9, 72-73.

- Defendants made false statements to state pharmacy regulators in California and Texas to illegally acquire pharmacies in order to further the Valeant Enterprise by enabling Philidor to operate indirectly in states where it had been denied a license. ¶¶ 9, 87-99.

Many of these fraudulent practices are catalogued in claims-handling manuals Philidor distributed to employees, assuring those employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." ¶¶ 10, 112; *see also* ¶ 123. Those fraudulent "back door approaches" included changing prescription codes to require that the prescriptions be filled with Valeant drugs (¶¶ 10, 112-15), making claims for refills that were never requested by patients (¶¶ 10, 112, 123-25), misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs (¶¶ 10, 116-20), and submitting claims that inflated the prices charged by failing to take into account serial waivers of patient co-pays (¶¶ 10, 126-32).

The success of Defendants' scheme hinged on its secrecy: had TPPs or PBMs known the truth about Defendants' captive pharmacy network, they would have known that Valeant controlled Philidor and accordingly would have denied claims submitted by pharmacies in the Valeant Enterprise. ¶ 11. Indeed, Defendants deliberately misrepresented to state regulators the ownership and control of the captive pharmacies that participated as members of the Valeant Enterprise precisely to enable Valeant to charge supra-competitive prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased. ¶¶ 11, 87-99. To maintain the secrecy of the Valeant Enterprise, Defendants issued the host of false and misleading statements described above to a number of constituencies, including TPPs, PBMs, and state regulators, designed to conceal Valeant's relationship with its captive pharmacies and its improper use of the secret pharmacy network to inflate drug prices and sales. ¶ 11.

A declaratory-judgment lawsuit filed against Valeant in the U.S. District Court for the Central District of California in October 2015 by R&O Pharmacy, LLC ("R&O") (the "R&O Action") lays bare Defendants' fraudulent conduct. ¶¶ 15, 17, 150-52. The R&O action was filed after R&O received a repayment request for $69.8 million based on alleged "invoices" that *Valeant* sent to R&O, *even though R&O had not done any business, at least knowingly or directly, with Valeant*. ¶¶ 15, 152.

In October 2014, Philidor created a shell company, Isolani LLC ("Isolani"), for the sole purpose of acquiring R&O. ¶ 16. That acquisition was intended to allow Philidor to surreptitiously access the lucrative California market after Philidor had been denied a California license in May 2014 for making "*false statements of fact with the intent to substantially benefit itself or others on its application for licensure*," including false statements regarding Philidor's actual ownership. In December 2014, R&O and its Pharmacist in Charge, Russell N. Reitz ("Reitz"), entered into an

agreement with Isolani under which Isolani agreed to purchase 10% of R&O for $350,000 with an agreement to purchase the remaining 90% upon the satisfaction of certain terms, including, most notably, Isolani obtaining a pharmacy permit from the California State Board of Pharmacy; an agreement appointing Isolani as the manager of R&O Pharmacy, and delegating responsibility for the day-to-day operations of R&O to Isolani; and an agreement allowing Philidor to deliver prescriptions to R&O, which would then seek "authorization for fulfillment of the prescription and confirmation of coverage from the applicable insurance carrier, plan or other third party payer." *Id.*

As the R&O Action alleges, Philidor went to great lengths to conceal its relationship with Valeant in order to use R&O to dispense Valeant drugs. ¶ 17. Even before the R&O-Isolani agreement was executed, Philidor began using R&O's National Provider Identifier number without permission to dispense Valeant drugs. *Id.* As Reitz began to discover other fraudulent practices, he began withholding millions of dollars of prescription reimbursements for Valeant drugs, rather than turning the funds over to Isolani/Philidor. *Id.* This prompted **Valeant's** General Counsel to send a letter "reflecting gross invoiced amounts due of $69,861,343.08" and demanding "immediate payment" to avoid "further damage **to Valeant** and other parties." *Id.* R&O responded by filing the R&O Action in October 2015 against Valeant, stating that R&O had no relationship with Valeant and that Valeant was conspiring with others to defraud R&O. *Id.*

D.    **Defendants' Illicit Profits and Plaintiffs' Economic Injury**

Through Defendants' fraudulent scheme, Valeant reaped hundreds of millions of dollars in ill-gotten profits at the expense of Plaintiffs and the Class, whose members paid inflated prices for Valeant drugs, and paid for Valeant drugs that should never have been dispensed. ¶¶ 12, 139. In 2015 alone, Valeant secretly channeled nearly $500 million worth of its drugs through its central pharmacy hub, Philidor. *Id.*

These illicit profits for Defendants correspond directly to out-of-pocket losses for Plaintiffs and the Class. In particular, the Class paid for expensive Valeant drugs when cheaper generic equivalents could and should have been dispensed (¶ 140); paid for Valeant drugs that should never have been dispensed because Defendants fraudulently altered prescriptions, submitted unrequested refills, and used false pharmacy-identification numbers to circumvent denials of claims (¶ 141); paid for Valeant drugs that would not have been prescribed if Defendants had not fraudulently waived patient co-pays while falsely representing to TPPs and PBMs that the patients paid full price (¶ 142); paid highly inflated prices for Valeant drugs from pharmacies both inside and outside the Valeant Enterprise as a result of Defendants' fraudulent suppression of generic competition (¶ 143); and paid artificially inflated prices for Valeant drugs that would not have been prescribed if not for Defendants' false statements to patients that their TPPs would not be billed (¶ 144). All of these fraudulent devices used by Defendants to extract excessive payments from TPPs caused massive out-of-pocket losses to Plaintiffs and the Class. ¶ 184.

### E.     The Aftermath of the Valeant/Philidor Fraudulent Scheme

In October 2015, R&O's lawsuit against Valeant and its explosive revelations about the secret relationship between Valeant and Philidor were publicly reported. ¶ 153. This led to articles in the *Wall Street Journal* and the *New York Times* about the Valeant-Philidor scheme, including Valeant employees' use of aliases while working at Philidor. ¶¶ 155, 157. At the end of October 2015, the three largest PBMs in the United States, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx, all announced that they were dropping Philidor from their networks. ¶¶ 19, 160. CVS Health Corp. stated that audits found that Philidor was not complying with their agreement. *Id.* After these announcements, Valeant reported that it was "severing all ties" with Philidor and that Philidor had "informed Valeant that [Philidor] will shut down operations as soon as possible." *Id.* Valeant also announced in October 2015 that it had

received a subpoena issued as part of a criminal investigation into possible violations of federal healthcare laws. ¶ 20. In November 2015, Valeant disclosed that Philidor would stop adjudicating insurance claims. *Id.*

In March 2016, J. Michael Pearson, Valeant's CEO during the Class Period, was forced to resign as a result of numerous government investigations, as well as investor and public scrutiny into Valeant's misconduct. ¶ 21. In testimony before the U.S. Senate Special Committee on Aging in April 2016, Pearson conceded that Valeant's price-inflation practices were improper, admitting that Valeant was "too aggressive—and I as its leader, was too aggressive—in pursuing price increases on certain drugs." *Id.*

## III.    ARGUMENT

### A.    Rule 8(a) Applies to Every Element of Plaintiffs' Claims Except for Defendants' Predicate Acts of Mail Fraud and Wire Fraud

In considering a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept[] all well pleaded allegations in the complaint as true, and view[] them in the light most favorable to plaintiff[]s . . . ." *Avandia*, 804 F.3d at 638. The Court must then "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Avandia*, 804 F.3d at 638; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009). The test for "facial plausibility" is met "when the plaintiff pleads factual context that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. In other words, the Court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

The Supreme Court has held that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556; *see also Phillips*, 515 F.3d at 231. Defendants "bear[] the burden of showing no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *see also Am. Fed. of State, Cty. & Municipal Emps. v. Ortho-McNeil-Janssen Pharms., Inc.*, 2010 WL 891150, at *2 (E.D. Pa. Mar. 11, 2010). The Third Circuit has held that "[e]ven post-*Twombly*, . . . a plaintiff is not required to establish the elements of a *prima facie* case but instead, need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213.

Federal Rule of Civil Procedure 8(a)'s requirement of only "a short and plain statement of the claim showing that the pleader is entitled to relief" applies to most elements of Plaintiffs' claims, including:

- ***Plaintiffs' standing under RICO***, ***including both standing elements***: ***injury to business or property*** and ***proximate causation***, *see Avandia*, 804 F.3d at 638, *aff'g* 2013 WL 5761202, at *4 (E.D. Pa. Oct. 23, 2013); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2016 WL 6612804, at *3 (E.D. Pa. Nov. 19, 2016); *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 242 (D.N.J. 2000);

- ***Defendants' pattern of racketeering activity***, *see Emcore*, 102 F. Supp. 2d at 250 (citing *Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir. 1989));

- ***The existence of a RICO "enterprise,"*** *see id.* at 263-64 (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 790 (3d Cir. 1984)); and

- ***Defendants' RICO conspiracy***, *see id.* at 264 (citing *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).

The *only* elements of Plaintiffs' claims that must satisfy Federal Rule of Civil Procedure 9(b)'s fraud-pleading standard are Defendants' predicate acts of ***mail fraud*** and ***wire fraud***. And importantly, "Rule 9(b) [is] satisfied where plaintiff described 'the nature and subject of the alleged misrepresentation,' though plaintiff had not plead the date, place or time of [the] alleged fraud," because the "purpose of [R]ule [9(b)] is to require notice pleading only." *Emcore*, 102 F. Supp. 2d at 249 (quoting *Seville Indus. Mach. Corp.*, 742 F.2d at 791)).

### B.   Plaintiffs Have Standing to Bring RICO Claims

RICO authorizes "[a]ny person injured in his business or property by reason of a violation" of 18 U.S.C. § 1962 to sue for treble damages in federal court. 18 U.S.C. § 1964(c); *see also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 278 (1992); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 483 (1985). The Supreme Court has instructed that "RICO is to be read broadly" in light of Congress's express direction that RICO must "'be liberally construed to effectuate its remedial purposes.'" *Sedima*, 473 U.S. at 496, 497-98 (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947). The Third Circuit likewise has held that "RICO, with its severe penalties, may be applicable to many 'garden variety' fraud cases . . . particularly considering the judiciary's broad interpretation of the mail fraud statute." *Tabas v. Tabas*, 47 F.3d 1280, 1296-97 (3d Cir. 1995). Here, Defendants' pervasive use of deceptive practices and misrepresentations to TPPs, PBMs, patients, doctors, and regulators constitutes a clear and compelling case of fraud.

Plaintiffs' standing to bring RICO claims against Defendants requires (i) an injury to Plaintiffs' business or property that was (ii) proximately caused by Defendants' violations. *See Avandia*, 804 F.3d at 638, 641. The Complaint here amply alleges both that Plaintiffs and the Class suffered massive out-of-pocket losses of the same kind as the plaintiffs' losses in *Avandia*, and that Plaintiffs' losses were proximately caused by Defendants' fraud in essentially the same manner as the plaintiffs' losses were caused by the defendant's fraud in *Avandia*. Thus, Plaintiffs

here have standing to assert RICO claims against Defendants under the controlling authority of *Avandia*.[2]

### 1.   Plaintiffs Suffered a Direct Injury from Defendants' RICO Violations

Plaintiffs have alleged a direct injury to their business that was caused by Defendants' fraudulent scheme. The RICO injury to Plaintiffs here caused by Defendants' fraudulent marketing practices is the same in all relevant respects as that sustained by the Third Circuit in *Avandia*. Specifically, Defendants' RICO violations harmed Plaintiffs in three ways.

First, all four Defendants and Philidor's shell companies and captive pharmacies concealed Valeant's relationship with the Philidor pharmacy network to induce Plaintiffs to pay for expensive Valeant drugs rather than generics:

> Defendants made false and misleading statements to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to increase sales and claims to TPPs, and to insulate Valeant's drugs from generic competition and thus facilitate Valeant's drug-price increases. Unaware of Defendants' scheme, Plaintiffs and the Class paid highly inflated prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could and should have been dispensed instead.

¶ 184.

Second, Philidor and its captive pharmacies, acting at the direction of Valeant and the Davenports, made false statements in reimbursement claims submitted to Plaintiffs and their PBMs to induce Plaintiffs to pay for expensive Valeant drugs that should never have been prescribed:

---

[2]       In his memorandum, Matthew argues that Plaintiffs also lack Article III standing by claiming that Plaintiffs fail to allege RICO violations attributable to Matthew directly. Matthew Davenport's Brief in Support of Motion to Dismiss (ECF No. 42-1; "MD Br.") at 28-32. Yet the Complaint alleges that Matthew falsely claimed to be Philidor's CEO. ¶ 11. He also served as Lucena's CEO in order to acquire an interest in West Wilshire Pharmacy, which enabled a Philidor network pharmacy to sell Valeant drugs in California. ¶¶ 90-94. TPPs and PBMs that paid for Valeant drugs in California (e.g., ¶ 29) were accordingly injured by Matthew's participation in the Valeant Enterprise. Accordingly, Matthew's standing argument can be swiftly rejected.

> Defendants made false and misleading statements to Plaintiffs and the Class to fraudulently secure or maximize reimbursement for prescriptions written and filled for Valeant's expensive branded drugs. When submitting claims to Plaintiffs and the Class, Defendants . . . falsified prescriptions, made claims for refills that were never requested by patients, and misrepresented the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the fact that either no drugs or cheaper generic alternative drugs should have been dispensed.

*Id.*

And third, Philidor and its captive pharmacies, acting at the direction of Valeant and the Davenports, made false statements to patients and doctors to induce them to use expensive Valeant drugs instead of cheaper generics:

> Defendants made false and misleading statements to patients and prescribing physicians that artificially increased the number of prescriptions for branded Valeant drugs written and filled during the Class Period. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the availability of cheaper generic alternative drugs that could and should have been dispensed instead.

*Id.*

Defendants caused these three types of injury by altering prescriptions to falsely represent that the doctors instructed that they be filled with Valeant drugs rather than generics (¶¶ 100-11, 113-15, 184); submitting false claims for prescription renewals that patients did not request (¶¶ 123-25, 136-38, 184); using false pharmacy-identification information to bill Plaintiffs and other TPPs for prescriptions for Valeant drugs (¶¶ 116-22, 184); submitting false and misleading payor audits to TPPs to conceal the use of false pharmacy-identification information (¶¶ 122, 149-56, 184); submitting falsely inflated claims to TPPs and their PBMs by misrepresenting that patients were charged the full prices of the drugs and concealing the actual, discounted prices charged to patients (¶¶ 126-32, 142-44, 184); and making false and misleading statements to conceal Valeant's relationship with the Philidor network of captive pharmacies (¶¶ 60, 70-99, 184). All of these fraudulent practices caused Plaintiffs and other TPPs to pay for drugs that should

never have been dispensed and to pay artificially inflated prices, thus incurring out-of-pocket losses.

Avandia squarely controls the standing inquiry here and demonstrates that Plaintiffs have adequately pleaded that they suffered direct injuries from Defendants' scheme and thus satisfy the standing test's first prong. In *Avandia*, the plaintiff TPPs alleged that GlaxoSmithKline ("GSK") violated RICO by mispresenting the drug Avandia's cardiovascular risks. *See* 804 F.3d at 636. The TPPs alleged that GSK's fraud injured them both by causing them to pay more for Avandia than it was worth, which the Third Circuit called the "'excess price' theory," and by causing physicians to prescribe Avandia more often than they otherwise would have, which the Circuit called the "'quantity effect' theory." *Id.* The Circuit noted that RICO plaintiffs can allege injury to their business or property by alleging "actual monetary loss, *i.e.*, an out-of-pocket loss." *Id.* at 638 (internal quotation marks and citation omitted). The Circuit went on to agree with the TPPs "that their injury is one which has long been considered concrete: overpayment due to illegal or deceptive marketing practices." *Id.* at 639. "TPPs, like individual consumers, suffer[] direct economic harm when, as a result of [a pharmaceutical company's] alleged misrepresentations, they pa[y] supracompetive prices for [brand drugs] instead of purchasing lower-priced generic [drugs]." *Id.* at 639-40 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004); alterations in original).

Just like the TPP plaintiffs in *Avandia*, Plaintiffs here allege that Defendants' fraudulent marketing of Valeant drugs caused Plaintiffs to pay artificially inflated prices for those drugs—the "excess price theory"—and caused physicians to prescribe and TPPs to approve Valeant drugs more often than they otherwise would have—the "quantity effect theory." *Id.* at 636.

Defendants assert that Plaintiffs fail to allege "that they suffered an 'injury' to *their* business or property" because they "do not allege a single instance in which they, as opposed to unnamed Class members, received any false statements by Defendants." Valeant's Memorandum of Law in Support of Motion to Dismiss (ECF No. 38-1; "Valeant Br.") at 11. The Supreme Court, however, has held that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994).

Here, the Complaint alleges specifically that each Plaintiff "paid or reimbursed eligible [Plaintiff plan] participants' prescription drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint." ¶¶ 29-33 (alleging this fact with respect to each Plaintiff). There is no requirement that Plaintiffs plead details of the thousands of specific prescriptions paid by them. *See Seville Indus. Mach. Corp.*, 742 F.2d at 791 (finding allegations of "the nature and subject of the alleged misrepresentation" sufficient, even though plaintiff did not plead date, place, or time of alleged fraud). Nevertheless, the Complaint details the nature of the statements and the way they were relayed to Plaintiffs and the other Class members—for example, the reimbursement requests for refills of Valeant drugs that no patient requested (¶¶ 112, 123-25), the reimbursement requests for Valeant drugs that were altered as "dispensed as written" (¶¶ 113-15), and the sales of Valeant's branded drugs in states that mandated generic substitutes (¶ 113).

Thus, Plaintiffs have pleaded far more than the "general factual allegations of injury resulting from the defendant's conduct [that] may suffice," *Nat'l Org. for Women*, 510 U.S. at 256, and have stated a "cognizable injury" under RICO, *Avandia*, 804 F.3d at 639.

23

## 2. Plaintiffs' Injury Was Proximately Caused by Defendants' RICO Violations

"In addition to cognizable injury, a RICO plaintiff must satisfy RICO's proximate causation requirements." *Avandia*, 804 F.3d at 641. The Supreme Court has held that this proximate-cause requirement serves three purposes: ensuring that plaintiffs' injuries are direct and thus not attributable to factors other than defendants' misconduct, preventing multiple recoveries by various parties along an indirect causal chain, and avoiding claims by indirect victims when direct victims can be expected to vindicate their own claims. *See Holmes*, 503 U.S. at 269-70. Plaintiffs' excess-price and quantity-effect theories here satisfy all three of these purposes and satisfy the proximate-cause inquiry under *Avandia*.

First, Plaintiffs' injuries are direct because "[t]he conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of [falsified prescriptions and the Valeant Enterprise's secret pharmacy network] that caused TPPs and PBMs to [pay artificially inflated prices for excessive quantities of Valeant drugs]." *Avandia*, 804 F.3d at 644. Importantly, the Supreme Court "has held that a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish proximate causation." *Id.* at 643 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-58 (2008)). Defendants assert that "[d]etermining whether and to what extent Plaintiffs' increased reimbursement costs are attributable to Defendants' alleged practices or the genuine preferences of doctors and patients for Valeant's branded drugs, rather than generics, is too speculative," and that the causal chain is too attenuated due to the roles of "pharmacies, doctors and patients, each with independent agency . . . ." Valeant Br. at 13. But the Third Circuit has rejected the identical argument that "the presence of intermediaries—physicians and patients—in the causal chain"

24

defeats proximate cause, holding that "*Bridge* precludes that argument." *Avandia*, 804 F.3d at 644, 645.[3]

Second, there will be no "difficulty in distinguishing between the amount of damages attributable to [the] defendant[s'] violation and to other, independent factors." *Avandia*, 804 F.3d at 644. Plaintiffs' damages are either the difference between the cost of Valeant branded drugs and the cost of cheaper generic alternatives, or the overvaluation of Valeant branded drugs caused by Defendants' misrepresentations. *See id.* As the Third Circuit held in *Avandia*, this issue of damages does not "demonstrate[] a lack of proximate causation," but rather "raises an issue of proof regarding the overall number of prescriptions (under the 'quantity effect' theory) or amount of price inflation (under the 'excess price' theory) attributable to [Defendants'] actions." *Id.* This damages calculation is "a question for another day." *Id.*

Third, "prescribing physicians did not suffer RICO injury from [Defendants'] marketing of [Valeant drugs]," so "no one is better suited than [Plaintiffs] to sue [Defendants] for [their] alleged fraud." *Id.* at 646. Likewise, there is no tenable argument that the PBMs, agents of the TPPs, suffered an injury, because their payments to pharmacies were reimbursed by the TPPs. ¶ 41. Thus, as in *Avandia*, the TPPs *are* best-suited to challenge Defendants' misconduct, and "this case does not present any of the three fundamental causation concerns expressed in *Holmes*,"

---

[3]    Other circuits' law is consistent with *Avandia. See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 25 (1st Cir. 2013) (affirming jury verdicts in favor of TPP against defendant manufacturer for RICO claims based on misrepresentations concerning effectiveness of off-label use of drug); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 340 (2d Cir. 2003) (analyzing sufficiency of causation allegations under *Holmes* and reversing dismissal of TPP's state-law claims based on defendant manufacturers' fraudulent marketing of drugs).

because Plaintiffs have "'put forth allegations that raise a reasonable expectation that discovery will reveal evidence' of proximate causation." *Id.* (quoting *Fowler*, 578 F.3d at 213).[4]

### 3.    Plaintiffs' Excess-Price Theory of Harm Is Sufficiently Alleged

As discussed above, Plaintiffs' excess-price theory is the same in all relevant respects as the excess-price theory sustained by the Third Circuit in *Avandia*. Defendants assert, however, that the Complaint's allegations concerning the excess-price theory are "conclusory." Valeant Br. at 12. Not so.

The Complaint alleges how Defendants' fraudulent practices artificially inflated the prices for Valeant branded drugs:

> Through Defendants' fraudulent scheme, Defendants were able to charge inflated prices for Valeant-branded drugs by eliminating generic competition through illegal and improper means, including by blatantly breaching contractual and state-law requirements mandating generic substitution through the Valeant Enterprise. In doing so, Defendants were able to sustain artificially inflated benchmark prices for its branded drugs that otherwise would have been much lower. This caused

---

[4]    Defendants cite *Holmes* and several other RICO standing cases without acknowledging that *Avandia* addresses all of those cases and explains why they are consistent with TPPs' standing to bring RICO claims against a drug manufacturer on facts like those here. The *Avandia* court held that "we view the case before us as more akin to *Bridge* than to *Holmes*, *Anza [v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)], or *Hemi [Group, LLC v. City of New York*, 559 U.S. 1 (2010)]" because "[t]he conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused TPPs and PBMs to place Avandia in the formulary." 804 F.3d at 643-44. Likewise here, Defendants' false statements that artificially inflated the sales volumes and prices of Valeant drugs caused Plaintiffs' injuries. The *Avandia* court also distinguished *Maio v. Aetna, Inc.*, 221 F.3d 471 (3d Cir. 2000), where insurance beneficiaries sued their insurer based on alleged inadequate care, but did not allege that they actually received inadequate care. *See id.* at 638-39. Thus, the *Maio* plaintiffs' potential injury was speculative. In *Avandia*, the court held that "unlike the injury suffered by plaintiffs in *Maio*, the injury suffered by the TPPs here is not contingent on future events," because "[t]he TPPs' damages do not depend on the effectiveness of the Avandia that they purchased, but rather on the inflationary effect that [defendant]'s allegedly fraudulent behavior had on the price of Avandia." 804 F.3d at 640. Plaintiffs here allege the same kind of injury from paying artificially inflated prices for excessive volumes of Valeant drugs. Thus, Defendants' citation of *Holmes*, *Anza*, *Hemi*, and *Maio*, without acknowledging how *Avandia* distinguished those cases, is misleading and unavailing.

Valeant's branded drugs to be sold at artificially high prices both within and outside
the Valeant Enterprise, causing injury to the Class.

¶ 46.

In support of this allegation, the Complaint provides specific examples of Valeant drugs
whose prices were artificially inflated as a result of Defendants' fraud. E.g., ¶ 106. For example,
pharmacies in Philidor's secret network, acting on written instructions in claims-handling manuals
written by Defendants, routinely altered doctors' prescriptions to ensure that patients received a
key Valeant-branded dermatological drug called Vanos despite TPPs' repeated denials of Vanos
claims (¶ 114), and the price of Vanos increased by 279% from the first quarter of 2013 to the third
quarter of 2015 (¶ 106).

In further support of Plaintiffs' excess-price allegation, the Complaint describes how retail
drug reimbursement prices are set through an "Average Wholesale Price" ("AWP"), which is
published by third-party publishers and includes prices supplied by the manufacturer or calculated
by the publisher based on a markup specified by the manufacturer and applied to the wholesale
acquisition cost ("WAC") (i.e., the manufacturer's list price for sales to wholesalers) or the direct
price (i.e., the manufacturer's list price for sales to non-wholesalers). ¶¶ 43-44. "Accordingly, a
pharmaceutical manufacturer's ability to set a benchmark data point, such as WAC, by increasing
the price of its drugs sold to some parties, increases the drug's published AWP, which in turn raises
the price of that drug when purchased by end-users, including by TPPs." ¶ 46.

Far from being "conclusory," the Complaint's allegations about Plaintiffs' injury stemming
from excess prices are precise and concrete.

### 4.    Plaintiffs' Quantity-Effect Theory of Harm Is Sufficiently Alleged

Defendants assert that the Complaint fails to allege that they "received any false statements
by Defendants" and therefore that "*they* paid for or reimbursed a prescription as a result of fraud."

Valeant Br. at 11-12. As discussed above in Section III.B.2 with respect to proximate cause, Defendants' assertion is foreclosed by *Bridge*, where the Supreme Court held that a RICO plaintiff need not rely on the defendant's fraudulent statements so long as those statements proximately cause the plaintiff's injury, *see* 553 U.S. at 657-58, and *Avandia*, where the Third Circuit held that the plaintiff TPPs' quantity-effect theory of harm was sufficiently alleged based on the defendant drug manufacturer's false statements to the market that led to artificially inflated sales volumes for its drug, *see* 804 F.3d at 644. Furthermore, even Rule 9(b)—which does not apply to the injury element of RICO standing—requires only that Plaintiffs allege "'the nature and subject of the alleged misrepresentation,'" not "the date, place or time of [the] alleged fraud." *Emcore*, 102 F. Supp. 2d at 249 (quoting *Seville Indus. Mach. Corp.*, 742 F.2d at 791)).

### C.      The Complaint Adequately Pleads Defendants' RICO Violations

#### 1.      The Complaint Adequately Alleges the Valeant Enterprise

Under RICO, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise must have "some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 365 (3d Cir. 2010) (citation omitted). The Complaint's allegations concerning the existence of a RICO enterprise need only satisfy Rule 8(a)'s notice-pleading standard. *See Seville Indus. Mach. Corp.*, 742 F.2d at 790.

Here, Plaintiffs allege that the Valeant Enterprise comprised Valeant, Philidor, Andrew Davenport, Matthew Davenport, a series of shell companies, a dozen individually named pharmacies that were secretly controlled by Philidor, and "other as yet unknown pharmacies, agents, and instrumentalities." ¶ 1 n.1, ¶ 194. As shown below, Defendants' assertion that

"Plaintiffs allege nothing more than a business relationship between a manufacturer [Valeant] and distributor [Philidor]" (Valeant Br. at 15) is baseless.

Specifically, the Complaint alleges that Defendants incorporated Philidor on the first day of the Class Period to serve as a distributor for Valeant drugs and falsely identified three persons in its state registrations as officers when in reality, those persons worked not for Philidor, but for BQ6, a consulting company that worked for Valeant. ¶¶ 59-60. From Philidor's inception, Valeant secretly controlled Philidor due to Philidor's financial dependence on Valeant as its sole source of drugs and revenue, and Valeant employees worked closely with Andrew to establish and operate Philidor. At all times, Philidor relied on Valeant's management and personnel to operate its business. ¶ 64. Moreover, Valeant's control over and ownership of Philidor required Valeant to consolidate Philidor's financial statements with its own. *Id*.

For example, a Valeant officer (whose boss reported directly to Valeant CEO Pearson) supervised Philidor's operations, interacting daily with Philidor CEO Andrew Davenport and supervising Valeant employees who worked at Philidor's offices. ¶ 66. Valeant placed a 30-person team inside Philidor to boost sales of Valeant drugs and perform key business functions for Philidor; indeed, the ties were so close that Philidor referred to Valeant as part of "our organization." ¶¶ 70-71. Valeant employees working at Philidor used pseudonyms such as "Peter Parker" (Spiderman) and "Brian Wilson" (the Beach Boys) to conceal that they were Valeant employees. ¶ 72. Based on interviews with former Philidor employees, Bloomberg and the *Wall Street Journal* reported that the use of fake names by Valeant employees was meant to conceal the ties so it would not appear that Valeant was using Philidor to steer patients to Valeant products. ¶ 73.

Furthermore, Valeant secretly took formal control over Philidor in December 2014 by paying $100 million for an option to acquire Philidor for $0 for 10 years, plus milestone payments based on Philidor's sales. ¶ 74. In exchange for the $100 million payment, the option agreement gave Valeant the authority to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals." ¶ 75. In addition, another December 2014 agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify such compliance. ¶ 76. Thus, Defendants' assertion that the Complaint contains only "conclusory allegations of control over Philidor" is baseless. Valeant Br. at 16. The statement that "[t]he Complaint refers to no term or provision in the Option Agreement that vests Valeant with a 'mechanism for controlling' Philidor's operations" is simply untrue. *Id.* (quoting ¶ 64 but ignoring ¶ 75).

Furthermore, the Complaint alleges Valeant's control over Philidor even before Valeant acquired the option to buy Philidor. ¶¶ 79-80. Valeant has admitted that it improperly booked sales revenue for deliveries to Philidor in 2014 "in contemplation of the option agreement," which it was only able to do because Valeant already had *de facto* control over Philidor, and therefore knew that Philidor would enter into the option agreement and sell the delivered drugs through Philidor's secret pharmacy network. *Id.*

The Complaint also alleges that Valeant controlled Philidor's establishment of its secret pharmacy network. For example, Philidor acquired West Wilshire Pharmacy, one of the pharmacies in the Valeant Enterprise, through a Philidor-controlled shell company, Lucena Holdings. ¶ 90. Philidor acquired R&O Pharmacy, another of the pharmacies in the Valeant

Enterprise, through another Philidor-controlled shell company, Isolani LLC. ¶ 95. Critically, Valeant controlled both Lucena and Isolani because the option agreement between Valeant and Philidor was conditioned upon Philidor's acquisition of Lucena and Isolani. ¶ 90.

Taken together, the allegations summarized above amply demonstrate that Defendants controlled and directed the affairs of the Valeant Enterprise on an ongoing basis. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 365.

<b>a.    The Complaint Adequately Pleads that Andrew Davenport<br/>Participated in the Operation of the Valeant Enterprise</b>

Andrew Davenport argues that the Complaint lacks the "details of [his] allegedly improper activities and how they fit into the alleged RICO scheme." Andrew Davenport and Philidor's Memorandum in Support of Motion to Dismiss (ECF No. 43-1; "AD Br.") at 16. This argument is similarly unavailing, because the Complaint alleges specific facts tying Andrew to the operation and management of the Valeant Enterprise.

- Andrew collaborated with Valeant employees to establish Philidor and served as Philidor's CEO during the relevant time period, leading its growth from nothing to a $500 million per year company. ¶¶ 12, 36. Andrew was also Philidor's largest owner, holding a 36.5% equity stake. ¶ 36.

- Through Philidor and other pharmacies acquired to be part of its captive pharmacy network, which the Valeant Enterprise operated, Philidor made false and misleading statements directly to TPPs and their members and beneficiaries to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales. ¶ 112. Philidor employed "back door" approaches, including altering prescription information, making claims for refills that patients never requested, and misrepresenting the identity of dispensing pharmacies to bypass denials of

31

claims for Valeant drugs. ¶¶ 112, 118. Andrew was directly involved in these practices. *Id.*

- Andrew—like his brother Matthew—submitted false statements to the California State Board of Pharmacy in support of Philidor's applications for a pharmacy license. ¶¶ 88-89. The State Board found that Philidor committed acts involving "dishonesty, fraud, or deceit, with the intent to substantially" benefit Philidor (and Matthew), and that under penalty of perjury, Philidor and Matthew made "false statements of fact" concealing Philidor's relationship to Valeant. ¶¶ 37, 88, 183.

These facts establish that Andrew conducted or participated in the affairs of the Valeant Enterprise.

Andrew argues that Plaintiffs attempt to blame both him and Matthew for the same false statements to the California State Board of Pharmacy, or that Plaintiffs' confusion regarding which one was actually responsible highlights the lack of specificity regarding the roles that each of these Defendants played in the Valeant Enterprise. AD Br. at 17. This is wrong. The Complaint alleges that Andrew was Philidor's CEO by at least the time it ceased operations, ¶ 36, and Matthew represented himself as Philidor's CEO in filings to the California State Board of Pharmacy, ¶ 37. To the extent that Matthew's false statements to the State Board included a false description of Andrew's financial interest in Philidor (for which Andrew served as the CEO), both Andrew and Matthew are properly implicated in the wrongdoing that was done in furtherance of Philidor's participation in the Valeant Enterprise.

Andrew further argues that attempting to mislead the California State Board of Pharmacy was not "racketeering activity" under 18 U.S.C. § 1961(1) and therefore cannot be a predicate act under 18 U.S.C. § 1962(c). AD Br. at 17-18. However, courts have found that making false statements to regulators *is* a sufficient predicate racketeering act of mail and wire fraud. *See*

*Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 111 F. Supp. 2d 867, 876 (S.D. Tex. 2000).[5] Indeed, the Complaint is replete with instances in which Philidor, Valeant, and their affiliates and employees used the mails and wires to further the Valeant Enterprise's goals by providing false submissions to the Texas and California state boards. ¶¶ 87-99, 199.

Thus, the Complaint sufficiently pleads Andrew's participation in the scheme.

**b.    The Complaint Adequately Pleads that Matthew Davenport Participated in the Operation of the Valeant Enterprise**

Notwithstanding Plaintiffs' detailed allegations concerning Matthew Davenport's role in the Valeant Enterprise, Matthew also argues that Plaintiffs have failed to allege that he "participated in the operation or management" of the Valeant Enterprise. MD Br. at 11. His contention fails.

"[C]orporate insiders who participate in the operation or management of a corporate enterprise can be liable for RICO violations" under 18 U.S.C. § 1962(c)-(d). *Emcore*, 102 F. Supp. 2d at 257. In *Emcore*, the plaintiff asserted that each individual defendant alleged to be part of the RICO enterprise—including persons who served as the CEO, a partner, and an in-house counsel of the defendant accounting firm—had conducted or participated in the partnership's affairs. Defendants moved to dismiss, arguing that the plaintiff alleged neither that there was a connection among the individual defendants nor that the individual defendants assumed a role in directing the alleged enterprise. Applying *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the court denied the

---

[5]    Andrew's citation to *United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011), is of no import because, as described above (*supra* at 31-32), Plaintiffs allege that Andrew participated in the Valeant Enterprise through a pattern of racketeering activity by, among other activities, establishing Philidor to serve as a fraudulent conduit for Valeant products, overseeing the work that Valeant employees did at Philidor (including through false names), putting in place Philidor's manuals that instructed employees to falsely bill customer prescriptions, overseeing the acquisitions to form a captive set of pharmacies that would distribute Valeant products, and making false statements to state regulators. ¶¶ 59-60, 64, 66, 88 and 89.

defendants' motions, holding that the complaint adequately alleged that the individual defendants were "part of the enterprise itself," which sufficed to state a claim. 102 F. Supp. 2d at 262 (citation omitted).[6]

The Complaint describes in detail Matthew's participation in the operation or management of the Valeant Enterprise:

- Matthew represented himself as the CEO of Philidor, a mail-order pharmacy that was crucial to the successful manipulation of the market for Valeant's products and the implementation of price increases, and he took direct, fraudulent action to further the Valeant Enterprise's goals. He did this in documents submitted to the California State Board of Pharmacy in support of Philidor's applications for a California pharmacy license, which would have allowed Philidor and Valeant to extend their distribution of falsely prescribed products into that state. ¶ 37. Notably, the State Board denied Philidor's application in May 2014, finding that Matthew, under penalty of perjury, "knowingly made false statements of fact with the intent to substantially benefit [himself] or others on [Philidor's] application for licensure." *Id.* Some of those false statements related to the ownership and management of

---

[6]     Matthew cites *Reves* for the proposition that a RICO plaintiff must allege that the defendant "participate[d] in the *operation or management* of the enterprise itself." MD Br. at 11. But *Reves* is primarily about RICO liability for outsiders, not corporate insiders like Matthew. As explained in *Emcore*, the *Reves* Court examined whether to impose liability *on outside auditors hired to conduct an audit for a corrupt corporation* and found that the auditors were outside the chain of command through which the enterprise's affairs were conducted. *See Emcore*, 102 F. Supp. 2d at 262-63 (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)). Here, Matthew was hardly an outside auditor that, by definition, must be independent of and outside the chain of command of its audit client. Rather, as alleged in the Complaint and summarized below, Matthew took actions directly to further the goals of the Valeant Enterprise, even going so far as to represent himself in a California pharmacy licensing application as the CEO of Philidor—Valeant's captive pharmacy utilized to conduct the RICO enterprise. He was therefore an integral part of the "chain of command" that operated the Valeant Enterprise. *See, e.g.*, ¶¶ 37, 60, 90.

Philidor, including Matthew's attempt to conceal his brother Andrew's ownership interest in Philidor, and all of them were made to acquire additional specialty pharmacies in furtherance of the Valeant Enterprise's goals. *Id.*

- Matthew worked at BQ6, a pharmaceutical-marketing company that consulted for Valeant, shared its physical address with Philidor, and was used to further the Valeant Enterprise. ¶ 60.

- Matthew caused a Philidor-controlled shell company, Lucena Holdings LLC, to acquire a stake in West Wilshire Pharmacy in order to circumvent the licensing denial by the California State Board of Pharmacy. ¶ 90. Matthew argues that executing a company-formation document for Lucena does not constitute operation or management of the Valeant Enterprise (MD Br. at 14-15), but formation of Lucena allowed the Valeant Enterprise to continue to operate in California notwithstanding the rejection of Philidor's fraudulent license application—an application that listed Matthew as Philidor's CEO. ¶¶ 90, 182.[7]

These allegations—independently and even more so together—sufficiently plead Matthew's liability as an integral "part of the enterprise."[8]

---

[7]    Matthew cites *In re Aetna UCR Litigation*, 2015 WL 3970168, at *28 (D.N.J. June 30, 2015) (MD Br. at 11-12), to argue that the *Reves* "operation or management" test is "a very difficult test to satisfy, because mere association with an enterprise does not violate" RICO. But in *Aetna*, unlike here, the court found that the "conduct alleged aided the goals of the enterprise *only incrementally* . . . ." *Id.* at *29 (emphasis added). Here, Matthew's actions were integral to achieving the Valeant Enterprise's goals. Matthew's further references to *Aetna* and other cases to support his argument that Plaintiffs fail to plead that he participated in any capacity in directing the RICO enterprise (MD Br. at 12) are inapposite because, as shown above, Plaintiffs have pleaded with particularity his direct involvement in the Valeant Enterprise. *See, e.g.*, ¶¶ 37, 60, 90.

[8]    The cases Matthew cites in arguing that the allegations are insufficient to demonstrate his participation in the RICO enterprise, *see* MD Br. at 13-14, are inapposite for the reasons noted

### 2.  The Complaint Adequately Alleges Defendants' Predicate Acts

#### a.  The Complaint Adequately Alleges Mail and Wire Fraud

Plaintiffs clearly plead the predicate racketeering acts of mail and wire fraud under RICO. The wire fraud statute, 18 U.S.C. § 1343, is similar in all material respects to the mail fraud statute, 18 U.S.C. § 1341. *See Muscletech Research & Dev. Inc. v. E. Coast Ingredients, LLC*, 2004 WL 941815, at *17 (W.D.N.Y. Mar. 25, 2004). To state a RICO claim based on predicate acts of mail or wire fraud, Plaintiffs must (and do) allege (1) a scheme to defraud, (2) the use of the mails or wires for the purpose of executing the scheme, and (3) fraudulent intent. 18 U.S.C. §§ 1341, 1343; *Schwartz v. Lawyers Title Ins. Co.*, 680 F. Supp. 2d 690, 708-09 (E.D. Pa. 2010).

Plaintiffs' wire-fraud and mail-fraud claims meet Rule 9(b)'s pleading standard because Plaintiffs need only plead with particularity the circumstances of the alleged fraud in order to place Defendants on notice of the precise misconduct with which they are charged. *See Seville Indus. Mach.*, 742 F.2d at 791. While a claim for mail or wire fraud requires use of the mails or wires, the mailings need only to be incidental to the essential part of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 710-11 (1989); *Schwartz*, 680 F. Supp. 2d at 711. Even "completely 'innocent' mailings" that contain no false information can satisfy the mailing element. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting *Schmuck*, 489 U.S. at 715). Here, the Complaint satisfies all three elements of mail and wire fraud.

---

above. *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 302-04 (S.D.N.Y. 2013), cited in MD Br. at 13, is also easily distinguishable. In that case, the plaintiffs failed to attribute knowledge of the fraud to a gallery owner, but the court sustained RICO claims against other defendants where the complaint broadly alleged numerous misrepresentations about their personal knowledge of the fraud. Here, as shown above, Plaintiffs expressly plead Matthew's knowledge of and participation in the fraud.

First, a scheme to defraud is any deliberate plan of action or course of conduct by which one intends to deceive or cheat another or by which someone intends to deprive another of something of value, and can be alleged by misrepresentations or omissions reasonably calculated to deceive. *See Schwartz*, 680 F. Supp. 2d at 709. Deceitful statements, half-truths, or the knowing concealment of material facts are all actionable under the mail- and wire-fraud statutes. *See id.* Defendants' statements need not be false or fraudulent on their face, and they need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive persons of ordinary prudence and comprehension, and that the US mail or wires be used in executing that scheme. *See id.* Here, the Complaint sufficiently alleges Defendants' scheme to defraud by alleging facts that raise the inference that their misrepresentations and omissions about Valeant and Philidor's control over Philidor's secret pharmacy network, falsified prescriptions, false refill claims, and other misrepresentations served as steps in the scheme to cause pecuniary loss to Plaintiffs and other TPPs. ¶¶ 112-44. Plaintiffs allege that Defendants charged excessive prices and used the Valeant Enterprise to sell drugs that were not ordered or could not be sold in certain regions to achieve a quantity effect that defrauded plaintiffs. ¶¶ 100-02, 113-35, 140-42. The representations of legitimate sales in invoices to TPPs were materially incorrect and were designed to lull Plaintiffs and the Class into paying for Valeant drugs that they would not have paid for had they known the truth. ¶¶ 140-42.

For instance, the Complaint details the various misrepresentations Philidor, the Davenports, and Philidor's captive pharmacies, acting at the direction of Valeant and the Davenports, made to regulators, patients, doctors, TPPs, and PBMs in order to establish and conceal Philidor's secret pharmacy network and to artificially increase the prices and volumes of Valeant drugs sold through that network to unsuspecting TPPs nationwide like Plaintiffs, and it

alleges that these misrepresentations were made through the mails and wires. ¶¶ 173-83, 199. The misrepresentations included the submission by Philidor and its captive pharmacies of false claims for reimbursement to Plaintiffs and other TPPs (or the TPPs' PBM agents), which misrepresented the dispensing pharmacy's identity, whether the claim had been previously submitted or denied, the cost of the drugs (by concealing the waiver of co-pays), whether the doctor had designated the prescription to be "dispense as written" (forbidding substitution of generic alternatives), whether the patient requested a refill, and whether the pharmacy was licensed in the relevant state. ¶ 175. In addition, Defendants deceived TPPs and their PBM agents about the identity of the pharmacies with which the TPPs and PBMs were contracting, presenting them as independent when they were really part of Philidor's secret network that served to protect Valeant drugs from generic competition, which misrepresentations compounded their related lies and obfuscations in statements to state pharmacy regulators. ¶ 176.

Thus, Plaintiffs have adequately pleaded the mechanics of the fraudulent scheme and the specifics of the alleged mail and wire fraud. Indeed, the false mailings and wires here were not merely incidental, but integral to the fraudulent scheme. *See Schwartz*, 680 F. Supp. 2d at 711. On similar facts in *Avandia*, the district court held that plaintiffs adequately alleged predicate acts of mail and wire fraud by pleading that defendants' fraudulent scheme included "the nationwide distribution of marketing materials to prescribing doctors and TPPs, all involving the use of the mail and interstate wires." *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 2013 WL 5761202, at *8 (E.D. Pa. Oct. 23, 2013), *aff'd*, 804 F.3d 633 (3d Cir. 2015). The result should be the same here.

The Complaint also sufficiently pleads that Defendants acted with an intent to defraud Plaintiffs, other TPPs, the TPPs' PBM agents, and others. An intent to defraud requires that a party

act knowingly and with the intention to deceive or to cheat. *See Schwartz*, 680 F. Supp. 2d at 712.

"An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." *Id.* Here, Plaintiffs allege that the representations Philidor and the Davenports made to regulators in connection with establishing the secret Philidor network of pharmacies, and that Philidor and its captive pharmacies, acting at the direction of Valeant and the Davenports, made to patients, doctors, PBMs, and TPPs in connection with falsified, unnecessary prescriptions and refills, were deceitful and were intended to fraudulently increase the sales of Valeant products over generics and to enable the charging of higher prices for those Valeant drugs. ¶¶ 175, 177, 179. Indeed, the California State Board of Pharmacy found expressly that Philidor and Matthew Davenport made false statements to it knowingly with the intent of benefitting themselves. ¶ 183.

Each Defendant's intent is shown in the substantial number of allegations demonstrating (a) the level of coordination between Valeant, Philidor, and the Davenports to carry out their scheme to defraud Plaintiffs, (b) participation by each Defendant in various parts of the scheme to enable further misrepresentations, and (c) each Defendant's obsessive emphasis on secrecy—all of which demonstrates that each Defendant was aware that public disclosure of the interconnections between and amongst them would explode their illegal scheme to defraud Plaintiffs. *See United States v. Riley*, 621 F.3d 312, 333 (3d Cir. 2010) ("Juries may infer intent from circumstantial evidence."); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (sustaining RICO claims with fraud predicates and stating that "specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence").

For example, among other things, the fact that Philidor, its captive pharmacies, and Valeant's wholly owned subsidiary KGA all shared chess-related names shows a high level of coordination in service of a larger mission. ¶¶ 81-84. That Valeant (a) employed a sustained strategy of acquiring and then raising astronomically the price of drugs (¶¶ 55-56), (b) falsely attributed its growth to research, development, and increased sales instead of those price increases (¶¶ 55-56), and (c) was so closely tied to Philidor—whose primary business strategy was to engage in fraud to secure reimbursement for high volumes of those high-cost Valeant drugs (¶¶ 113-22)— further demonstrates a level of coordination that cannot be explained by typical business practice or happenstance. That Andrew Davenport was Philidor's CEO and cofounded Philidor with Valeant's help in 2013 demonstrates a high level of involvement in his company and coordination with Valeant (¶¶ 57, 59, 64); and that he personally acknowledged in July 2015 that *he was aware* that Philidor shipped Valeant drugs to States where neither Philidor nor any of its secretly controlled pharmacies were licensed shows his awareness of and participation in the scheme (¶ 118).

Given the allegations showing how intricately tied together Valeant, the Davenports, and Philidor were, *supra* at 8, 11-15, 28-35, the allegations taken in totality support an inference that each Defendant made the misrepresentations with the intent to defraud Plaintiffs and other TPPs. *See Schwartz*, 680 F. Supp. 2d at 712.[9]

---

[9]     In addition to mail fraud and wire fraud, the Complaint alleges that Defendants committed RICO predicate acts by violating the Travel Act, 18 U.S.C. § 1952. However, the alleged Travel Act violations are duplicative of the alleged mail fraud and wire fraud because they are all based on the same alleged misrepresentations by mail and wire and sending and receipt of money by mail or wire and pharmaceuticals by mail. Thus, the alleged Travel Act violations are unnecessary to support Plaintiffs' claims under RICO. Should the Court dismiss the Travel Act allegations, the dismissal of those allegations should have no effect on the Complaint's RICO claims, including the predicate acts of mail and wire fraud.

Defendants' reliance on several other arguments and authorities regarding the pleading of their alleged predicate acts also fails. For example, Defendants cite *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), in support of their arguments that "the Complaint fails because it does not allege that any representation was made to a named plaintiff" and that the Complaint's mail and wire fraud allegations lack "particularity." Valeant Br. at 17, 22 n.9. But *Lum* does not support Defendants' arguments. First, the Complaint alleges that each Plaintiff paid for Valeant drugs that were dispensed by Philidor's secret network of controlled pharmacies and that these payments were made based on fraudulent reimbursement claims submitted by Philidor and other members of the Valeant Enterprise. ¶¶ 29-33. Second, the RICO allegations in *Lum* were based on the defendant bank's representations that loans were at the "prime rate," but plaintiffs "d[id] not, and [could] not, allege that any of the three purportedly fraudulent credit agreements define[d] the term 'prime rate' as the lowest interest rate available to a bank's most creditworthy borrowers"; "the meaning of the term 'prime rate' [wa]s sufficiently indefinite that it is reasonable for the parties to have different understandings of its meaning"; and "the defendants . . . clearly did disclose that some borrowers obtained financing below the prime rate." *Lum*, 361 F.3d at 225-27. Thus, there simply were no material misrepresentations in *Lum*, which contrasts starkly with the Valeant Enterprise's use of forged "dispense as written" instructions, false pharmacy-identification numbers, and other fraudulent statements here.

Defendants also rely on several of this Court's decisions dismissing RICO claims, but the detailed allegations here of Defendants' false statements to Plaintiffs and other TPPs and to the TPPs' PBM agents, doctors, patients, and regulators, as summarized above, make those cases inapplicable. In *Jaye v. Oak Knoll Village Condominium Owners Association, Inc.*, 2016 WL 7013468 (D.N.J. Nov. 30, 2016), an individual condominium owner who was delinquent in her

payments sued "all the lawyers, parties, contractors, and other individuals and entities involved in the [prior] litigation or the collection of the various judgments against Plaintiff." *Id.* at *3. In her RICO claims, "Plaintiff merely label[led] all of Defendants' alleged conduct as 'fraudulent,' 'illegal,' or as 'embezzlement' in conclusory fashion, without providing specific factual assertions in support of her claim." *Id.* at *15. Furthermore, "Plaintiff ma[de] no mention of the use of wires in interstate or foreign commerce, and ma[de] no mention of the United States Postal Service." *Id.*

Similarly, in *Paramount Enterprises, Inc. v. Laborers Eastern Region Organizing Fund*, 2014 WL 791825 (D.N.J. Feb. 25, 2014), a construction contractor suing a union only "allege[d] in a conclusory fashion that Defendants engaged in mail and wire fraud as 'predicate acts' under § 1962(c), but otherwise le[ft] the Court guessing as to pertinent facts underlying the claim," "alleg[ing] only that the misrepresentations were disseminated to the 'public' and 'borough and town officials' and using boilerplate language that 'the activities of the enterprise affected interstate commerce.'" *Id.* at *4. And in *Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.*, 2014 U.S. Dist. LEXIS 90313 (D.N.J. June 30, 2014), the plaintiffs "barely hint[ed] at the subject of the misrepresentation in question." *Id.* at *13.[10] The conclusory allegations in those cases are utterly unlike the detailed allegations here about Defendants' misrepresentations in false reimbursement claims to Plaintiffs and other TPPs (e.g., using false

---

[10]     In *Plumbers & Pipefitters*, the plaintiffs also "essentially concede[d] that Defendant's 'fraud' [wa]s too remote from Plaintiffs' injury to satisfy RICO's causation requirement," and did not allege "that Plaintiffs could refuse to pay for the prescriptions of members who used the [co-pay] subsidy." *Id.* at *14. Here, by contrast, the Complaint alleges—consistent with *Avandia*— that Defendants' fraud proximately caused Plaintiffs' and the other Class members' injuries by causing them to pay for Valeant drugs they would not have paid for absent Defendants' fraudulent statements in reimbursement claims, and by causing them to pay artificially inflated prices for the drugs. ¶¶ 140-44. The Complaint also alleges that Plaintiffs and the other Class members could and would have refused to pay for the Valeant drugs absent Defendants' fraudulent statements. ¶¶140-42. Thus, *Plumbers & Pipefitters*' proximate-cause holding does not apply here.

pharmacy-identification numbers and forging "dispense as written" instructions that the doctors did not include), as well as misrepresentations to doctors, patients, and regulators.

Defendants also assert that allegations based on newspaper reports citing information from former Philidor employees about Philidor's fraudulent practices "should be discounted" because Plaintiffs do not "provid[e] the bases for [the former employees'] knowledge, establish[] their reliability, or offer[] any other corroboration." Valeant Br. at 21-22 n.8 (citing *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009), and *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)). Defendants are wrong both legally and factually.

First, *Avaya*'s requirement that a complaint provide indicia of anonymous sources' reliability, such as "the sources' basis of knowledge," 564 F.3d at 263, addresses only allegations based on witnesses interviewed by counsel, not those based on reputable news publications, *see id.* at 260-63. And the *Avaya* court expressly rejected *Higginbotham*'s extreme position—upon which Defendants rely—that allegations based on confidential sources must be "discounted" simply because the sources are anonymous. *See id.* at 262-63.

Contrary to Defendants' assertion, the Third Circuit recognizes the validity of allegations quoting reputable news publications: "Reliance on an article in *The Wall Street Journal* is not reliance on an insubstantial or meaningless investigation. Plaintiffs and their attorneys need not make further expenditure to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal." *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) (finding that derivative complaint satisfied verification requirement under Fed. R. Civ. P. 23.1), *abrogated on other grounds by Garber v. Lego*, 11 F.3d 1197, 1206-07 (3d Cir. 1993).

District courts in this Circuit have applied *Lewis* to securities-fraud actions, to which the Private Securities Litigation Reform Act of 1995 ("PSLRA") applies even stricter pleading

requirements than the Rule 9(b) standard applicable here. Thus, courts hold that "[t]o meet the [PSLRA's] pleading requirements media sources must be 'sufficiently detailed to indicate . . . their reliability' and be 'based on an independent investigative effort.'" *In re Loewen Grp. Inc. Sec. Litig.*, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004) (quoting *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 80 (D. Del. 2002)). A securities-fraud complaint therefore may rely on "reputable newspapers (e.g., *The Wall Street Journal*)" as "meet[ing] the requirements of being independent and reliable." *Id.*

This is consistent with the Third Circuit's holding in *Avaya* that plaintiffs there properly relied on allegations quoting a securities analyst's report "which was based upon discussions with Avaya resellers," without any requirement that the plaintiffs allege the sorts of details establishing the resellers' reliability that would be required for witnesses interviewed by counsel. 564 F.3d at 263. Another court has explained why the standard for relying on reputable news publications is different from the standard for witnesses interviewed by counsel: "A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting. Further, the confidential nature of a journalist's source is used to encourage reporting and accuracy." *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007).

To the extent that Plaintiffs may be required to conduct their own investigation to support relying on the quoted news articles, *see DaimlerChrysler*, 197 F. Supp. 2d at 80-81, Plaintiffs have done so by interviewing and quoting former Philidor employees (e.g., ¶¶102, 109, 120)—who are identified by job title and dates of employment, satisfying *Avaya*—which facts are also corroborated by counsel's review, analysis, and citation to documents from a Congressional investigation (e.g., ¶103), the R&O litigation (e.g., ¶122), and other sources.

Thus, the Complaint's allegations based on reputable publications, including the *Wall Street Journal* (e.g., ¶¶114, 117, 119, 131), the *New York Times* (e.g., ¶128), Bloomberg (e.g., ¶112), and *New York* magazine (e.g., ¶123), are reliable under applicable law. And the Complaint's allegations based on witnesses interviewed by counsel sufficiently identify their former job titles and dates of employment, making those allegations reliable under *Avaya*. E.g., ¶¶102, 109, 120.

### b.    Matthew Davenport Engaged in Racketeering

Matthew Davenport asserts that the Complaint does not allege that he committed two predicate acts of mail or wire fraud. He is wrong. As discussed in more detail above with respect to Matthew's participation in the operation and management of the Valeant Enterprise, Matthew committed at least two predicate acts: (1) he represented himself as the CEO of Philidor in documents submitted to the California State Board of Pharmacy in support of Philidor's applications for a California pharmacy license, in which he "knowingly made false statements of fact with the intent to substantially benefit [himself] or others on [Philidor's] application for licensure" (¶ 37); and (2) he signed the formation documents of Lucena, one of Philidor's shell companies, which enabled Philidor to acquire a stake in West Wiltshire Pharmacy in order to circumvent the licensing denial by the California State Board of Pharmacy (¶¶ 90, 182). Thus, Matthew directly participated in the Valeant Enterprise to expand the volume of sales and to charge excessive prices by using the "mails and wires" to misrepresent Valeant and Philidor's roles to regulators. ¶ 199.

45

###### c.       The Complaint Does Not Allege Mere Contract Claims

Valeant argues that the conduct alleged in the Complaint is, at most, a breach of contract or tortious interference with contract rather than fraud. Valeant Br. at 26. Defendants' scheme to defraud via the Valeant Enterprise constitutes far more than a simple contract claim.[11]

In *Suessenbach Family Ltd. Partnership v. Access Midstream Partners, L.P.*, 2015 WL 1470863 (M.D. Pa. Mar. 31, 2015), plaintiffs alleged that defendants entered into an unlawful agreement to charge inflated gathering and transportation costs in order to artificially inflate deductions charged to lessors. The court, denying defendants' motion to dismiss in large part, held that the alleged fraudulent violation of the lease contracts also violated RICO:

> [B]eyond the terms of their contracts, of which the defendants are not parties, the plaintiffs allege that the defendants . . . were deducting monies that they were not legally entitled to and were unlawfully profiting at the plaintiffs' expense. These allegations, even if connected to the leases, concern a specific intent to defraud and deceive the lessors. *These actions, whether or not they also constitute a breach of contract, appear to go beyond a simple breach of contract claim and bring them into the realm of RICO.*

*Id.* at *13-14 (emphasis added). Here, as in *Suessenbach*, Plaintiffs' claims extend far beyond the terms of any contracts the TPPs, or their agents, may have had with Valeant, with Philidor, or with any other members of Valeant's captive pharmacy group. For instance, Plaintiffs allege that the Valeant Enterprise allowed Defendants (a) to inflate improperly the number and size of reimbursements for Valeant drugs paid for by TPPs, including Plaintiffs, and (b) to control the distribution of Valeant's expensive branded drugs by steering patients and physicians away from cheaper generic equivalents. Defendants built a secret network of captive pharmacies around Philidor, and then created a host of shell companies to use as additional distribution pharmacies in

---

[11]       Even if the conduct alleged in the Complaint was just a breach of contract, which it is not, in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499-500 (1985), the Court, construing the language of § 1964(c), found RICO to apply to garden-variety fraud and breach-of-contract claims.

which Philidor acquired interests throughout the country. With this network in place, Defendants channeled prescriptions for Valeant's branded drugs through Philidor and other captive pharmacies to prevent the substitution of cheaper generic alternatives. ¶¶ 2, 6, 42, 52, 82-84. Therefore, Valeant's assertion that Plaintiffs' allegations are merely breach-of-contract claims is without merit, and certainly the Supreme Court's decision in *Sedima*, 473 U.S. at 499-500, requires that even if they were, when coupled with fraud, they are actionable under RICO.[12]

### 3.    Defendants' Argument with Respect to State Laws Is Meritless

Defendants argue that RICO does not create a private right of action to enforce state laws and regulations, and attempt to portray the Complaint as inadequate because Plaintiffs fail to cite which specific state pharmacy-licensing and generic-substitution laws Defendants violated. Valeant Br. at 27-28. These arguments miss the mark.

Plaintiffs allege that Defendants violated RICO by participating in a fraudulent scheme that utilized the mails and wires to enable Philidor's secret network of captive pharmacies to shield Valeant's drugs from competition, fraudulently inflate prices of Valeant's products, and artificially boost sales of those products. Defendants' false statements made to the California State Board of Pharmacy were just one way the goals of the Valeant Enterprise were carried out, but they were important in allowing the Valeant Enterprise to conduct these fraudulent activities in the major pharmaceutical market of California. *See Sandwich Chef of Texas*, 111 F. Supp. 2d at 876

---

[12]    Defendants cite various cases finding that conduct that amounts to garden-variety state-law crimes, torts, and contract breaches does not qualify as racketeering activity under RICO. Valeant Br. at 27 (citing, *e.g.*, *Annulli v. Panikkar*, 200 F.3d 189, 192 (3d Cir. 1999) (dispute regarding management of farm); *Fuce v. West*, 2012 WL 3046235, at *3 (E.D. Pa. July 26, 2012) (employment dispute)). But, as described in this memorandum and in the Complaint, Defendants' fraudulent statements by mail and wire constitute a pattern of racketeering, not the type of garden-variety state-law claims that courts have rejected as not actionable under RICO. Therefore, the cases Valeant cites are inapposite.

(sustaining claim when evidence showed direct injury to the plaintiff from the defendants' "alleged misrepresentations made to it and to state regulators"). TPPs, including Plaintiffs, are entitled to assume that the pharmacies in the Valeant Enterprise complied with state laws and regulations in obtaining pharmacy licenses, and also that these pharmacies would comply with state laws requiring generic substitution. The alleged failures to so comply with state laws were a threshold source of the injuries to Plaintiffs and the Class and constituted predicate acts of mail and wire fraud under RICO. ¶¶ 179-83.

As for Defendants' argument that the Complaint does not identify sufficiently which state laws Defendants violated, notice pleading does not require Plaintiffs to identify the particular state statutes Defendants violated: "a complaint need not point to the appropriate statute or law in order to raise a claim for relief under Rule 8 of the Federal Rules of Civil Procedure." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 973 F. Supp. 2d 839, 840-41 (N.D. Ill. 2013) (citing *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992), and *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992)). Moreover, the Complaint identifies what the generic-substitution laws do and lists the 13 States (plus Puerto Rico) that have them. ¶ 101 & n.3.

Here, Plaintiffs allege RICO violations based in part on the fact that the California State Board of Pharmacy found that Philidor and Matthew Davenport, under penalty of perjury, falsely represented that:

- Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- Blaszczynski was an authorized signatory for Philidor's financial transactions;

- There were no individuals or entities with a beneficial interest in Philidor;

- There were no owners or shareholders of Philidor, when in fact there were sixteen;

- There were no [legal] persons with a beneficial interest in Philidor, when in fact there were sixteen;

- There were no entities with 10% or more ownership interest in Philidor; and

- Andrew Davenport himself was not an owner of Philidor, when in fact he owned a 36.5% equity stake in the company. ¶ 36.

The Complaint further alleges that when the State Board denied Philidor's application in May 2014, it found the false statements were made "with the intent to substantially benefit [Philidor and Matthew Davenport]," and that Philidor and Matthew, by virtue of their false statements, were "guilty of unprofessional conduct." ¶ 89. The State Board affirmed its denial of Philidor's pharmacy-license application in February 2016. *Id.* The Complaint also alleges that Defendants made false statements to the Texas State Board of Pharmacy (¶ 99) and that Lucena made false representations in a change-of-permit request to the California State Board (¶¶ 92-93).[13]

These specific allegations provide more than sufficient notice as to which laws Defendants have violated, especially because a plaintiff must only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

---

[13]   Defendants' argument (Valeant Br. at 27) that Valeant did not make any false statements to state regulators is inapposite, given Plaintiffs' allegations that Defendants deliberately misrepresented to state regulators the ownership and control of the captive pharmacies that participated as members of the Valeant Enterprise precisely to ensure that Valeant could charge supra-competitive prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased. E.g., ¶ 11.

### 4.   The Complaint Adequately Alleges a RICO Conspiracy

RICO makes it unlawful "for any person *to conspire* to violate any of" RICO's provisions. 18 U.S.C. § 1962(d) (emphasis added). Plaintiffs allege that Defendants conspired to violate 18 U.S.C. § 1962(c). ¶ 204. Defendants' contentions regarding this claim fail for two primary reasons. *First*, Defendants misapprehend the pleading standard: allegations of RICO conspiracy are measured against Rule 8(a)'s "short and plain statement" standard, *not* Rule 9(b)'s "particularity" standard. *See The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 43 n.9 (3d Cir. 2015); *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989). Because Plaintiffs' allegations "fairly apprise" Defendants of "the basis" of Plaintiffs' conspiracy claim, the Complaint readily satisfies the pleading standard. *See Emcore*, 102 F. Supp. 2d at 264.[14]

*Second*, all the Complaint need show is that Defendants "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001). A defendant does *not* need to commit any acts of racketeering to be liable for conspiring to violate RICO; "it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Nor must the defendant know the identity of his co-conspirators or every detail of the conspiracy to be liable for RICO conspiracy. *See United States v. Riccobene*, 709 F.2d 214,

---

[14]      *See also Darrick Enters. v. Mitsubishi Motors Corp.*, 2007 WL 2893366, at *23 (D.N.J. Sept. 28, 2007) ("[U]nder the modern federal rules, it is enough that a complaint put the defendant on notice of the claims against him. It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action.") (quoting *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 789-90 (3d Cir. 1984), and 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1215 (1969)).

225 (3d Cir. 1983), *overruled on other grounds by Griffin v. United States*, 502 U.S. 46 (1991). The Complaint alleges a RICO conspiracy in accordance with these standards.

### a. Pleading a RICO Conspiracy Does Not Require Pleading that Defendants Violated § 1962(c)

Defendants assert that Plaintiffs' RICO conspiracy claim depends upon successfully pleading a violation of one of RICO's other provisions, such that if the Court dismisses the latter, it must dismiss the former.[15] *See* Valeant Br. at 29; MD Br. at 25-26; AD Br. at 23-24. This argument is foreclosed by decades-old precedent, *Salinas*, where the Supreme Court upheld a defendant's conviction for *conspiring* to violate RICO even when the jury acquitted him of violating RICO. *See* 522 U.S. at 55, 65. The Court rejected the defendant's argument that his RICO conspiracy conviction could not stand without a § 1962(c) conviction because "[i]t is elementary that a conspiracy may exist and be punished *whether or not the substantive crime ensues*, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Id.* (emphasis added). *Salinas* disposes of Defendants' contention. Neither Valeant nor Matthew even acknowledges or cites the Supreme Court's decision in *Salinas,* and Andrew mentions it only in passing on an unrelated point (*see* AD Br. at 5).

Thus, even if, for example, Plaintiffs do not establish that Valeant, Philidor, and the Davenports violated RICO, or even if Plaintiffs establish only that Philidor conducted the mail and wire fraud and not Valeant or the Davenports (not the case here), they could all still be held liable for *conspiring* to violate RICO. The Third Circuit has repeatedly reversed the dismissal of civil RICO claims on this point. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 373 n.72

---

[15]     Insofar as Defendants' arguments on the RICO conspiracy claim duplicate earlier arguments, Plaintiffs incorporate the earlier sections of this memorandum. *See supra*, Section III.C.1-4.

("[A] violation of § 1962(d) does not require a consummated violation of a substantive RICO provision; it is sufficient that the conspiracy have as its object acts which, if completed, would constitute a substantive violation."); *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1169 (3d Cir. 1989) ("[A] conspiracy to commit the other RICO violations may occur absent the actual commission of the other violations or the racketeering activities that underpin them."), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000).

In support of their argument that a RICO conspiracy claim requires a § 1962(c) claim, Defendants cite *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (and several other cases citing it)—but then fail to cite subsequent controlling case law that rejects the very argument they advance here. In *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285 (3d Cir. 1996), the Third Circuit clarified *Lightning Lube*, explaining that a claim for conspiracy can stand where the objective contemplated *would* constitute a § 1962(c) violation, regardless of whether the § 1962(c) claim is successful. *See id.* at 289-90. Plaintiffs sufficiently plead that the Valeant Enterprise contemplated a purpose that would violate RICO: securing fraudulent overcharges and reimbursements for Valeant pharmaceuticals via a series of intentionally false and misleading statements *would* violate § 1962(c) if completed. ¶ 206; *see Salinas*, 522 U.S. at 65.

### b. The Complaint Alleges that Valeant Conspired with the Other Defendants to Conduct or Participate in the Conduct of the Valeant Enterprise's Affairs

Valeant blithely contends that the Complaint alleges a mere "commercial relationship between a drug manufacturer and a pharmacy which sold Valeant's products to customers." Valeant Br. at 29. It argues that no Valeant employees committed illegal acts, that Valeant was unaware of Philidor's illegal practices, and that the facts do not "show an agreement to commit mail and wire fraud." *Id.* at 29. These arguments misstate the law and ignore the facts.

RICO conspiracy law does not require Valeant or the other Defendants to have violated § 1962(c), or to have engaged in racketeering, mail, or wire fraud, or to have specific knowledge of every aspect of the conspiracy. *See supra* at 50 (discussing *Salinas*, 522 U.S. at 65, and *Riccobene*, 709 F.2d at 225). Rather, "a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962." *Beck*, 529 U.S. at 506-07. *See also Smith*, 247 F.3d at 538 (holding that a conspirator need not commit a predicate act).

On the facts, Plaintiffs satisfy Rule 8's notice-pleading standard. Valeant and the other Defendants knowingly agreed to facilitate a scheme that operated or managed the Valeant Enterprise. E.g., ¶¶ 72-73 (Valeant embedded employees at Philidor and had them use aliases); ¶¶ 88-89, 152 (Philidor and Matthew Davenport lied to the California State Board of Pharmacy about their relationship with Valeant, and then Valeant's General Counsel tried to collect payment from a California pharmacy that Philidor ostensibly acquired); ¶¶ 108-11 (Valeant concealed its relationship with Philidor from the public, the SEC, state pharmacy agencies, and Plaintiffs); ¶¶ 57, 64 (Valeant helped create Philidor); ¶¶ 74-75 (Valeant purchased an option to buy Philidor); ¶ 72 (Philidor reported prescription numbers to Valeant); ¶ 75 (Valeant controlled Philidor's policies). Indeed, this level of detail would readily satisfy even a heightened Rule 9(b) pleading standard.

Valeant's argument about its lack of awareness of Philidor's tactics defies common sense: why would Philidor dedicate its entire business to fraudulently dispensing only Valeant products (¶ 86)—but not, for example, Merck or Bayer products? And why would Philidor go to such brazenly illegal lengths—like altering prescriptions, violating state laws requiring generic substitution, or falsely resubmitting reimbursement requests with different pharmacy-

identification numbers (¶¶ 113-14, 116-17, 120)—only for Valeant and for no other drug manufacturer? The plausible inference, supported by Valeant's oversight and control of Philidor's operations, is that there was a mutually beneficial agreement: Defendants banded together to perpetrate a scheme none of them could accomplish alone, allowing them to deceive Plaintiffs "in a way not likely without such collusion." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 378 (reversing in part dismissal of RICO conspiracy claims).

### c.   The Intra-Corporate Immunity Doctrine Does Not Immunize Valeant

Valeant argues that there can be no RICO conspiracy between it, Philidor, and the Davenports because, even if Plaintiffs' allegations are true, a parent corporation cannot conspire with its subsidiary. Valeant Br. at 30. Not so. *First*, the Third Circuit has permitted a RICO conspiracy claim against a parent and its wholly owned subsidiaries, holding that such close association between intra-corporate entities "gives rise to a necessary inference that all three parties not only agreed to the ongoing . . . fraud scheme, but that all three were aware that ongoing acts . . . were part of an overall pattern of racketeering activity." *Shearin*, 885 F.2d at 1164, 1167.

*Second*, the case law Valeant cites for the proposition that a parent cannot conspire with its subsidiary applies only to the Sherman Act, *see Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984), and does not apply to RICO. That is why three federal appeals courts, courts within this District, and the Department of Justice have all rejected applying *Copperweld*'s antitrust intra-corporate conspiracy immunity to RICO.[16]

---

[16]      *See Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1135 (D.N.J. 1989); U.S. Dept. of Justice, Crim. Div., Organized Crime and Racketeering Section, "Civil RICO: A Manual for Federal Attorneys," at 59 (Oct. 2007), *available at* www.justice.gov/sites/default/files/usam/legacy/2014/10/17/civrico.pdf.

*Third*, Plaintiffs have never alleged that Philidor was Valeant's *subsidiary*. Rather, Plaintiffs allege that Valeant exercised secret *control* over Philidor. ¶¶ 64, 74. While these allegations demonstrate a close connection between the two entities and their awareness of acting in concert, Plaintiffs do not allege an intra-corporate conspiracy. *Cf. Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *14 (D.N.J. Dec. 23, 2008).

*Finally*, the case law Valeant cites *permits* intra-corporate RICO conspiracies if there are allegations "that the subsidiary was fraudulently created to accomplish the racketeering activity." *Id.* at *15. Here, Valeant helped create Philidor and operated its business, ¶¶ 57, 59, 64, to enable the illegal and aggressive dispensing of Valeant products, ¶ 70. Indeed, Valeant contemplated this objective even before Philidor was created, when it acquired Medicis' "alternate fulfillment" distribution program that served as the model for Philidor. ¶ 49. Even if these allegations are construed as an intra-corporate conspiracy, it is thus plausible to infer that Valeant fraudulently created Philidor to accomplish the Valeant Enterprise's goals.

### d. The Complaint Sufficiently Gives Defendants Notice of the Basis for the Conspiracy Claims

The Davenports and Philidor assert that the Complaint is "devoid" of allegations "containing the necessary specificity," and instead maintain that they have been improperly grouped with the other Defendants. AD Br. at 23-24; MD Br. at 26-28. As discussed above, this argument is premised on an inapplicable pleading standard; because Rule 8's liberal pleading standard applies, these arguments are easily rejected. *Supra* at 49.[17]

Taken in its totality, the Complaint alleges that each Defendant took various steps demonstrating an agreement to facilitate a scheme to operate or manage the Valeant Enterprise,

---

[17]    Even applying Rule 9(b)'s heightened standard, these arguments fail. *Supra* at 52.

knowing that the general goal of that agreement was to inflate the cost, number of prescriptions, and reimbursements of Valeant drugs by making false statements. E.g., ¶ 206. This summary, in and of itself, merits denial of Defendants' motions to dismiss. But the Complaint goes many steps further by offering vastly greater detail, including the following examples: Philidor, the captive pharmacies, and Valeant's wholly owned subsidiary KGA shared chess-related names, ¶¶ 81-84; Valeant's growth strategy was to acquire drugs and then jack their prices up, but it falsely attributed its growth to research, development, and sales, ¶¶ 55-56; Valeant tightly controlled Philidor, whose sole business purpose was to secure reimbursement for high volumes of high-cost Valeant drugs by illegal tactics, ¶¶ 113-22; Andrew Davenport was Philidor's CEO and co-founded Philidor with Valeant's help, ¶¶ 57, 59, 64; Andrew was aware that Philidor shipped Valeant drugs to states where neither Philidor nor any of its captive pharmacies were licensed, ¶ 118; the California State Board of Pharmacy found that Philidor and Matthew Davenport misrepresented—*with the intent of benefiting themselves*—Philidor's ownership by not disclosing that Valeant, Matthew, and BQ6 (Valeant's instrumentality and Matthew's company, ¶ 60) had ownership interests in Philidor, ¶¶ 88-89;[18] and Defendants made similar misrepresentations to the Texas State Board of Pharmacy, ¶¶ 92-93. This secret, coordinated, and unlawful conduct distinguishes this case from

---

[18]     The Complaint mistakenly states at ¶¶ 88-89 that *Andrew* Davenport was represented as Philidor's CEO in the August 2013 application. Although Andrew was Philidor's CEO and founder, ¶¶ 36, 59, *Matthew* Davenport held himself out as Philidor's CEO on the California license application, as stated in ¶ 36 and in the *ProPublica* article cited in ¶ 94. *See* Charles Ornstein, "Documents Raise New Questions About Valeant's Pharmacy Relationships in California," *ProPublica*, Oct. 22, 2015, *available at* www.propublica.org/article/documents-raise-questions-about-valeant-pharmacy-relationships-california. Andrew and Philidor contend that inadvertently switching the names in ¶¶ 88-89 "highlights the Complaint's lack of specificity," AD Br. at 17, but the Complaint read in its totality shows that *both* Andrew and Matthew held themselves out as CEO of Philidor while engaging in conduct that furthered the goal of the RICO conspiracy—to operate and manage the Valeant Enterprise.

those cited by Defendants, *cf. The Knit With*, 625 F. App'x. at 36-40, and adequately informs Defendants of the basis for the conspiracy claims against them.

> **5.      If Any Part of the Complaint Is Dismissed, Plaintiffs Should Be Permitted to File an Amended Complaint**

For all of the reasons discussed above, Plaintiffs believe that their Complaint appropriately pleads claims against Defendants. However, if the Court disagrees, Plaintiffs respectfully request an opportunity to file an amended complaint to cure any defects the Court might find in the present Complaint. For example, while Plaintiffs believe that their allegations concerning their payments of claims for reimbursement for Valeant drugs dispensed by Philidor and its captive pharmacies more than satisfy their pleading burden under Rule 8(a), Plaintiffs could provide further details concerning these payments, such as particular drugs or pharmacies that were involved, should the Court consider it necessary at the pleading stage.

## IV.     CONCLUSION

Defendants' motions to dismiss should be denied in their entirety. Alternatively, if the Court determines to dismiss any part of the Complaint, Plaintiffs should be granted leave to amend.

Dated: April 17, 2017

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

/s/ James E. Cecchi
James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
Michael A. Innes
Tel: (973) 994-1700
Fax: (973) 994-1744
JCecchi@carellabyrne.com
5 Becker Farm Road
Roseland, NJ 07068

*Lead Counsel, Interim Class Counsel, and Local Counsel for Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund, Fire and Police Health Care Fund, San Antonio, and Plumbers Local Union No. 1 Welfare Fund*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Hannah Ross (*pro hace vice pending*)
James A. Harrod *(pro hac vice)*
Jai Chandrasekhar *(pro hac vice)*
Jake Nachmani *(pro hac vice pending)*
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
hannah@blbglaw.com
jim.harrod@blbglaw.com
jai@blbglaw.com
jake.nachmani@blbglaw.com

*Lead Counsel, Interim Class Counsel, and Counsel for Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund, Fire and Police Health Care Fund, San Antonio, and Plumbers Local Union No. 1 Welfare Fund*

**BARRACK, RODOS & BACINE**
Robert A. Hoffman
Julie B. Palley
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 297-1484
     - and -
Jeffrey W. Golan
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

*Counsel for Plaintiff the Detectives*
*Endowment Association of New York City*

**COHEN MILSTEIN SELLERS & TOLL**
   **PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
     - and -
Christopher Lometti
Joel P. Laitman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797

*Counsel for Plaintiff New York Hotel Trades*
*Council & Hotel Association of New York*
*City, Inc. Health Benefits Fund*