James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Hannah Ross
James A. Harrod
Jai Chandrasekhar
James M. Fee
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

Lead Counsel for Plaintiffs and Interim Class Counsel
(*Additional counsel below*)

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. THIRD-PARTY PAYOR LITIGATION | Civil Action No. 16-3087(MAS)(LHG) **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ............................................................. 2

II.  JURISDICTION AND VENUE ........................................................... 14

III.  THE PARTIES ............................................................................ 15

    A.  Plaintiffs ............................................................................ 15

    B.  Defendants ........................................................................ 17

IV.  FACTUAL BACKGROUND ............................................................ 19

    A.  Third Party Payors and Pharmacy Benefit Managers ......................... 19

    B.  How Drug Prices Are Set ........................................................ 20

    C.  Valeant's Growth-by-Acquisition Strategy .................................... 21

    D.  Philidor and Valeant's Secret Network of Captive Pharmacies ............. 26

    E.  Through Philidor, Defendants Expand Their Secret Network of Pharmacies ....................................................................... 43

    F.  The Valeant Enterprise Causes Its Affilitiated Pharmacies to File False Applications with State Pharmacy Boards ..................................... 51

        1.  Philidor Establishes Lucena to Acquire a Stake in West Wilshire Pharmacy ................................................................... 52

        2.  Philidor Surreptitiously Forms Isolani to Acquire R&O ........... 54

        3.  Philidor Creates Back Rank to Acquire an Interest in Texas-Based Orbit Pharmacy ........................................................... 55

    G.  Defendants Use Their Secret Nationwide Network of Captive Pharmacies to Insulate Valeant's Branded Drugs from Generic Competition and Exponentially Inflate Drug Prices ......................................... 57

    H.  Valeant's and Philidor's Misrepresentations to the Class ................... 62

        1.  The Valeant Enterprise's Alteration of Prescriptions .............. 63

        2.  The Valeant Enterprise's Use of False Pharmacy-Identification Numbers ................................................................... 64

        3.  The Valeant Enterprise's Automatic-Refill Program .............. 67

4. The Valeant Enterprise's Waiver of Co-Pays ............................................ 69

5. The Valeant Enterprise's Misrepresentations Directing Patients to Philidor ........................................................................... 75

6. The Valeant Enterprise's Manipulation to Achieve the Highest "Customary" Price and Volume an Insurer Would Accept ..................... 76

I. Defendants' Violation of PBM Contracts ................................................................ 78

J. Defendants Reaped Hundreds of Millions of Dollars in Ill-Gotten Profits .......... 79

K. Defendants' Fraud Is Finally Revealed .................................................................... 81

L. Valeant Becomes the Target of Multiple Government Investigations ................... 88

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES ............... 90

A. Defendants' Misrepresentations to Third-Party Payors ........................................ 90

B. Defendants' Misrepresentations to Patients and Physicians ................................. 92

C. Defendants' Misrepresentations to State Regulators ............................................ 93

VI. CAUSATION AND INJURY TO THE CLASS ................................................. 94

VII. CLASS-ACTION ALLEGATIONS ................................................................. 99

VIII. CLAIMS FOR RELIEF ................................................................................. 102

COUNT I

FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)—RACKETEERING (Against All Defendants) ................................................................................................................ 102

COUNT II

FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)—RACKETEERING CONSPIRACY (Against All Defendants) ............................................................................................... 105

IX. PRAYER FOR RELIEF ................................................................................... 107

X. JURY DEMAND ............................................................................................... 108

Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust"), Fire and Police Health Care Fund, San Antonio ("San Antonio"), Plumbers Local Union No. 1 Welfare Fund ("NY Plumbers"), New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund ("NYHTC"), and the Detectives Endowment Association of New York City ("DEA" and collectively, "Plaintiffs") by their undersigned attorneys, bring this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, on behalf of themselves and all other similarly situated third party payors ("TPPs") as defined below, who paid claims, or incurred costs, in connection with prescriptions for Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company") branded drug products and were injured thereby (the "Class") from January 2, 2013 through November 9, 2015, inclusive (the "Class Period").[1]

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel. This investigation included, among other things, a review and analysis of (i) public reports and news articles; (ii) public filings by Valeant or its affiliates with state and federal regulators, including the California and Texas Boards of Pharmacy; (iii) contracts between pharmacy benefit managers and Valeant-affiliated pharmacies; (iv) research reports by securities and financial analysts; (v) litigation materials from the case *R&O Pharmacy, LLC v. Valeant Pharmaceuticals North America LLC*, 15-cv-07846, filed in the US District Court for the Central District of California; (vi) interviews with knowledgeable individuals, including certain former Philidor Rx Services, LLC ("Philidor")

---

[1] Since the filing of this action, Valeant has changed its name to Bausch Health Companies Inc. This Complaint refers to it as Valeant, the name it used during the Class Period.

employees; (vii) the trial transcript ("Cr. Tr.") and exhibits from *United States v. Tanner, et al.*, No. 17 Cr. 0061 (LAP) (S.D.N.Y.); (viii) the First Amended Consolidated Complaint for Violations of the Federal Securities Laws in *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (MAS) (LHG), filed on September 20, 2018 ("Sec. Cmplt."); and (ix) other publicly available material and data identified in this Complaint. Plaintiffs' counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the facts supporting the allegations are known only to the Defendants or are exclusively within Defendants' custody or control. Plaintiffs contend that further substantial evidentiary support will exist for the allegations contained in this Complaint after a reasonable opportunity for discovery.

## I.   PRELIMINARY STATEMENT

1.   This case arises from a fraudulent scheme perpetrated by Valeant, its top executives, and co-conspirators at affiliated specialty pharmacies, including Defendants Andrew and Matthew S. Davenport, to use a secret network of captive pharmacies to shield the Company's drugs from competition, fraudulently inflate the prices of its products, and artificially boost sales. Valeant and its secret network of pharmacies and shell corporations named after various chess strategies, including Philidor, were created and controlled by the Defendants for the purpose of selling Valeant drugs (the "Valeant Enterprise"[2]) and provided a platform through which Defendants implemented a host of fraudulent practices to improperly inflate the reimbursements for Valeant drugs paid for by TPPs, including Plaintiffs and the Class. The fraud Defendants

---

[2]      The "Valeant Enterprise" includes Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, Matthew S. Davenport, Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP, R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, Parkwest Pharmacy, and other as yet unknown pharmacies, agents, and instrumentalities.

perpetrated through the Valeant Enterprise was so vast in execution and so devastating to its victims that media and commentators dubbed it the "Pharmaceutical Enron."

2. Unlike traditional pharmaceutical companies, Valeant's business model was not focused on the research and development of new drugs. Instead, the Company's business model, conceived by J. Michael Pearson, Valeant's CEO during the Class Period, was founded on acquiring promising drugs from other pharmaceutical companies and utilizing the Valeant Enterprise to make those drugs more profitable. With Pearson at its helm, Valeant went on a buying spree, acquiring numerous drugmakers, firing its scientists, and cutting expenditures on research and development of new drugs. Wall Street rewarded Valeant's strategy and apparent success, and Valeant's stock price ballooned over 1,000% in just three years.

3. The key to Valeant's apparent success was the Company's practice of massively raising the prices of drugs it obtained through its serial acquisitions. For instance, after aquiring Cuprimine, a drug for Wilson's disease, in 2010 from Aton Pharma, Inc. ("Aton"), Valeant increased the price of the drug *2,849%* between February 2013 and the first quarter of 2015 even though the drug had been on the market since the mid-1950's and is used long-term and on a daily basis. Likewise, after acquiring Syprine, another drug used to treat Wilson's disease, from Aton, Valeant increased the price of the drug by *1,424%* between the first quarter of 2013 and the third quarter of 2015. Valeant also acquired the blood clotting agent Mephyton from Aton and increased the price of the drug *527%* between the third quarter of 2014 and the fourth quarter of 2015. After acquiring the dermatology drug Noritate 1%, used to treat the common skin condition rosacea, from Sanofi in 2011, Valeant proceeded to increase the price of the drug *212%* between the first quarter of 2014 and the third quarter of 2015. Similarly, Valeant increased the price of Targretin gel, another dermatology drug, by *250%* over the course of the Class Period after acquiring the

drug from Esai Inc. in February 2013. Most egregiously, after acquiring Salix Pharmaceuticals in March 2015, Valeant immediately increased the cost of Salix's Glumetza to $10,020 for 90 1,000 mg tablets. This increased the price of 90 1,000 mg Glumetza tablets from by a factor of more than 10 (1,018%) from their January 2013 price of $896. According to a Deutsche Bank analysis, in 2015 alone, Valeant raised prices on its branded drugs an average of **_66%_**—approximately **_five times_** as much as its closest industry peers.

4.     The dramatic increase in costs for these and hundreds of other Valeant drugs—that have been borne directly by Plaintiffs and the members of the Class—was possible only through Defendants' exploitation of the Valeant Enterprise. Defendants, including Valeant, Philidor, Matthew S. Davenport, and Andrew Davenport, went to great lengths to conceal the secret pharmacy network, which was essential to the successful manipulation of the market for Valeant's products and the implementation of these price increases, from the public and the members of the Class.

5.     Critically, far cheaper generic equivalents were available for most of Valeant's drugs. For instance, while during the Class Period Valeant charged **_$17,000_** for a year's supply of branded Wellbutrin XL, a year's supply of the drug's generic equivalent cost **_only $360_**. Similarly, a 60g tube of Valeant's Noritate (one month's supply) cost approximately $1,700, while an alternative treatment, Metronidazole, was available for approximately 96% less than the price charged by Valeant. Absent the scheme Defendants implemented through the Valeant Enterprise, Valeant's bloated drug prices would have been unsustainable in the face of competition from these cheaper generic alternatives. Many state laws, and many contracts entered into by and on behalf of TPPs, require substitution of generics for brand-name drugs, unless precluded by the prescribing physician. Moreover, because TPPs and pharmacy benefit managers ("PBMs") generally require

a patient co-pay to provide patients with a cost incentive to avoid expensive or unnecessary drugs, consumers have an economic interest in selecting cheaper generics where available. However, Defendants provided customers with coupons and waived patient co-pays to discourage the use of available, cheaper generic alternatives and to steer customers to their more expensive branded drugs. Accordingly, absent Defendants' fraudulent scheme, patients would have sought out, and dispensing pharmacies would have substituted, generic prescriptions for Valeant's brand-name drugs.

6.      Defendants' goal was to employ the Valeant Enterprise and its fraudulent tactics to sell more Valeant drugs and to sell them at inflated prices. Specifically, the secret pharmacy network at the heart of the Valeant Enterprise was created specifically to circumvent generic competition. The Valeant Enterprise operated to enable Defendants to control the distribution of Valeant's expensive branded drugs by steering patients and physicians away from generic equivalents and thereby to frustrate generic-substitution mandates and related mechanisms (such as tiered co-payments and incentive payments provided by payers to pharmacies for generic substitution), to ensure that generics were substituted for Valeant products as infrequently as possible.

7.      Defendants built their secret network of captive pharmacies around Philidor, a Pennsylvania mail-order pharmacy. Valeant then created a host of shell companies owned through Philidor that (like Philidor) were named for chess strategies. The shell companies were then used to acquire interests in additional retail pharmacies all over the United States.

8.      With their secret pharmacy network in place, Defendants channeled prescriptions for Valeant's branded drugs—particularly those that were especially susceptible to generic competition, like the Company's dermatological products—through Philidor. Philidor employees,

as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of fraudulent practices to prevent the substitution of cheaper generic equivalents for Valeant's branded drugs. This conduct was often in contravention of state laws and contractual mandates requiring generic substitution. As a direct consequence of Defendants' scheme, (1) Valeant was able to sell far more of its expensive branded drugs than it otherwise would have sold, and (2) TPPs paid highly inflated prices for Valeant's branded drugs, in many cases notwithstanding the availability of far cheaper generic drugs that could and should have been dispensed.

9. During the Class Period, and as described in more detail below, Defendants secretly developed a nationwide network of captive pharmacies, including and at the center of which was Philidor, and used the Valeant Enterprise to engage in the following fraudulent misconduct:

- Valeant employees worked at Philidor using aliases to conceal their identity as Valeant employees;

- The Valeant employees embedded at Philidor had direct access to patients' "protected health information" ("PHI"), as defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rules, in violation of HIPAA, and Valeant and Philidor belatedly entered into an agreement purporting to give these employees access to PHI as "business associates" under HIPAA;

- Defendants instructed and required employees to change codes on prescriptions to ensure that the prescriptions would be filled with Valeant drugs, rather than generic equivalents;

- Defendants falsified pharmacy identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursements;

- Defendants submitted numerous prescription renewals for reimbursement, falsely representing to TPPs and PBM agents that patients had requested renewals of their prescriptions when no renewal request had been made;

- Defendants waived patient co-pays to remove patients' incentive to seek out cheaper drugs, and then misrepresented the "actual charges" for Valeant drugs by failing to account for the co-pay waivers;

- Defendants illegally acquired pharmacies to further the Valeant Enterprise by enabling Philidor to indirectly operate in states where it had been denied a license;

- Defendants made misrepresentations in advertisements and marketing materials directly to patients in order to boost Valeant's drug sales; and

- Defendants responded to PBMs' rejections of reimbursement requests for prescriptions for Valeant's brand-name drugs by resubmitting the requests at different prices and volumes until the PBMs agreed to pay for them.

10.     Many of these fraudulent practices are catalogued in claims-handling manuals Defendants distributed to employees, assuring those employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." As explained in further detail below, those "back door approaches" were fraudulent, and included (1) changing prescription codes on claims, i.e., *deliberately altering the prescribing doctor's instructions as set forth in the prescription*, to require that the prescription be filled with Valeant's brand-name drugs; (2) making claims for refills that were never requested by patients—a scheme that former Philidor employees have confirmed was jointly developed by top Valeant and Philidor executives; (3) misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs—*a fraudulent practice that Andrew Davenport, Philidor's CEO, acknowledged he knew was ongoing in a July 19, 2015 email*; and (4) submitting claims that inflated the price charged by failing to take into account serial waivers of patient co-pays.

11.     The success of Defendants' scheme hinged on its secrecy: had TPPs or PBMs known the truth about Defendants' captive pharmacy network, they would have denied claims submitted by pharmacies in the Valeant Enterprise. Indeed, Defendants deliberately misrepresented to state regulators the ownership and control of the captive pharmacies that participated as members of the Valeant Enterprise precisely to ensure that Valeant could charge

supra-competitive prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased. To maintain the secrecy of the Valeant Enterprise, Defendants issued a host of false and misleading statements to a number of constituencies, including TPPs, PBMs, and state regulators, designed to conceal Valeant's relationship with its captive pharmacies and its improper use of the secret pharmacy network to inflate drug prices and sales. All of those misrepresentations—to the Class and others—were made to enable Defendants to engage in the misconduct described in this Complaint that caused harm to the Class.

12.     Among other things, Pearson, Valeant's CEO, considered having Valeant acquire Philidor in late 2014, but he decided that instead of acquiring Philidor outright, Valeant should instead purchase an option to acquire Philidor at a later time and keep the existence of this option secret. Pearson made the decision on behalf of Valeant to acquire the option to acquire Philidor, and he negotiated the option agreement with Andrew Davenport. Valeant and Philidor entered into a secret agreement in December 2014 for Valeant to acquire the option for $100 million, plus specified milestone payments based on Philidor's sales of Valeant products. Valeant paid the Davenports and Philidor's other owners a total of $133 million for the option in December 2014–January 2015. The existence of the option was concealed from TPPs, PBMs, regulators, doctors, and patients.

13.     Valeant's top executives were aware that Philidor was not independent of Valeant. Laizer Kornwasser, a Valeant executive vice president and company group chairman who reported directly to Pearson and was responsible for overseeing Valeant's relationship with Philidor, testified at the criminal trial of Gary Tanner (a Valeant employee embedded at Philidor) and Andrew Davenport that "I was concerned from an independence perspective, I was concerned from a compliance perspective . . . ." (Cr. Tr. 937.) Kornwasser also testified that he had

"concerns . . . related to the relationship" that were "questions in relation to independence, how the relationship started." (Cr. Tr. 1046-47.) Kornwasser reported these concerns to other senior Valeant executives, including Pearson and Valeant's CFO, Howard Schiller. (Cr. Tr. 938.) Kornwasser felt so strongly about his concerns concerning Philidor and Valeant's relationship that he refused to sign the paperwork for Valeant's option to acquire Philidor. (Cr. Tr. 1175-81.) Despite his concerns, however, Kornwasser continued to work with Philidor and sought to push more Valeant product lines into Philidor. (Cr. Tr. 1181.)

14.    Notably, in 2016, after the Valeant-Philidor relationship was publicly revealed, Philidor confirmed in a written response to a U.S. Senate committee's questions that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of Valeant's controlling relationship with Philidor.

15.    Senior Valeant executives, including Pearson, Schiller, and Kornwasser, received weekly emails from Valeant employees embedded at Philidor, reporting the weekly volume of prescriptions for each Valeant branded drug handled by Philidor. (Cr. Tr. 1031-32, 1052, 1105-06.) Philidor also provided monthly financial reports to Valeant; these reports included the amounts of payments to Philidor from insurers, data concerning claims processed and inventory, and prescription-level shipping volumes. Tanner wrote in an email to another Valeant officer in October 2014: "I provided [a] detailed list of claims processed each month . . . , and with this file provides [sic] detail related to the insurance collection amounts. . . ." (Cr. Tr. 677, 680-81.) Pearson, Schiller, Kornwasser, Tanner, and other senior Valeant executives held weekly Friday meetings or conference calls starting in the second half of 2013 to discuss Philidor's sales of Valeant products. (Cr. Tr. 112, 927-28, 1051.)

16.     Through Defendants' fraudulent scheme, Valeant reaped hundreds of millions of dollars in ill-gotten profits at the expense of the Class, whose members paid inflated prices for Valeant drugs and paid for Valeant drugs that should never have been dispensed. In 2015 alone, Valeant secretly channeled nearly $500 million worth of its drugs through its central pharmacy hub, Philidor.

17.     The fallout from the unmasking of Valeant's secret pharmacy network since late October 2015 has been severe. An online article published by the *Wall Street Journal* on October 25, 2015, entitled "Valeant and Pharmacy More Intertwined Than Thought," reported that Valeant employees were working at Philidor's offices and using fictitious names when sending emails from Philidor addresses. The article specifically mentioned Bijal Patel, who, on a LinkedIn page, was identified as a Manager of Access Solutions at Valeant. Patel, however, actually worked out of Philidor's Phoenix-area office and sent emails to Philidor employees using the fictitious name "Peter Parker" (from Spiderman). These emails detailed how many prescriptions Philidor was filling, which drugs were most popular, and what doctors were the biggest prescribers. According to the *Journal* article:

> Interviews with former employees, doctors who prescribe Valeant drugs and patients indicate that the ties between Valeant and Philidor are more interconnected than previously disclosed. ***The people gave details of how the companies worked together, with Valeant employees working directly in Philidor offices, sometimes using fictional names. The people said this was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products,*** which Philidor strongly denied. (emphasis added).

These tactics enabled Valeant to obtain reimbursements that would otherwise have been denied for certain pharmaceuticals.

18.     The *Wall Street Journal* article further reported that doctors who had prescribed Valeant pharmaceutical products said that the Company made them well aware of the services

provided by Philidor, including financial support available to patients, while concealing Valeant's

relationship to Philidor. Three doctors reportedly said that Valeant sales representatives furnished

brochures and coupons offering to help pay for co-pays and directing patients to call a number for

Philidor. According to the *Wall Street Journal* article:

> [D]octors would send prescriptions for Valeant drugs electronically to Philidor.
>
> Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to three former employees . . . .
>
> * * *
>
> If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said . . . .

19.    A declaratory-judgment lawsuit filed against Valeant in the United States District

Court for the Central District of California on October 6, 2016, by R&O Pharmacy, LLC ("R&O")

(the "R&O Action") lays bare Defendants' conduct. The R&O action was filed after R&O received

a repayment request for $69.8 million based on alleged "invoices" that ***Valeant*** sent to R&O, ***even

though R&O had not done any business, at least knowingly or directly, with Valeant***.

20.    In October 2014, Philidor created a shell company, Isolani LLC ("Isolani"), for the

sole purpose of acquiring R&O. That acquisition was intended to allow Philidor to surreptitiously

access the lucrative California insurance market. By way of background, in May 2014, Philidor

had been denied a California licence for making "***false statements of fact with the intent to

substantially benefit itself or others on its application for licensure***," including false statements

regarding Philidor's actual ownership. On or around December 1, 2014, R&O and its Pharmacist

in Charge, Russell N. Reitz ("Reitz"), entered into a Purchase and Sale Agreement with Isolani

under which Isolani agreed to purchase 10% of R&O for $350,000 and agreed to purchase the

11

remaining 90% upon the satisfaction of certain terms, including most notably, Isolani obtaining a pharmacy permit from the California State Board of Pharmacy. Similarly, at the same time, R&O and Isolani entered into a Management Services Agreement ("MSA") appointing Isolani as the manager of R&O Pharmacy and delegating responsibility for the day-to-day operations of R&O to Isolani. The MSA authorized Isolani to, among other things, order medications from Valeant and collect co-payments and reimbursements from insurance companies. Moreover, Philidor and R&O also entered into a Prescription Drug Services Agreement allowing Philidor to deliver prescriptions to R&O, which would then seek "authorization for fulfillment of the prescription and confirmation of coverage from the applicable insurance carrier, plan or other third party payer." The Prescription Drug Services Agreement was signed by Philidor executive Eric Rice on behalf of R&O in his capacity as sole member of Isolani.

21.    As the R&O Action alleges, Philidor went to great lengths to conceal its relationship with Valeant in order to use R&O to dispense Valeant drugs. Even before the R&O-Isolani agreement was executed, Philidor began using R&O's National Provider Identifier ("NPI") number without permission to dispense Valeant drugs. As Reitz began to discover other fraudulent practices, he began withholding millions of dollars of prescription reimbursements for Valeant drugs, rather than turning the funds over to Isolani/Philidor. This prompted *Valeant's* General Counsel to send a letter "reflecting gross invoiced amounts due of $69,861,343.08" and demanding "immediate payment" to avoid "further damage *to Valeant* and other parties." R&O responded by filing the R&O Action in October 2015 against Valeant, stating that R&O had no relationship with Valeant and that Valeant was conspiring with others to defraud R&O.

22.    Further casting light upon Defendants' scheme was a Citron Research report dated October 21, 2015, asserting that Valeant controlled both Philidor and R&O. The Citron report

noted similarities between the websites of Philidor and R&O (as well as other captive pharmacies described below) and reported that they were effectively the same company. The Citron report also questioned Valeant's practice of rapid acquisitions and massive price increases:

> Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about [Valeant] focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development. But no one had discussed how these drugs were distributed . . . until this week.

23.    Shortly after Valeant's relationship with Philidor was revealed, the three largest PBMs in the United States, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx, all announced that they were dropping Philidor from their networks. CVS stated that audits found that Philidor was not complying with their agreement. Express Scripts stated that it was not only cutting off Philidor but also evaluating four additional pharmacies with which Valeant "has a similar relationship." After these announcements, Valeant reported that it was "severing all ties" with Philidor and that Philidor had "informed Valeant that [Philidor] will shut down operations as soon as possible."

24.    On October 30, 2015, after the disclosure of the Valeant-Philidor relationship and the existence of Valeant's captive pharmacy network, Valeant announced that it had terminated its relationship with Philidor. Valeant also announced in October 2015, that it had received a subpoena issued as part of a criminal investigation into possible violations of federal health-care laws. On November 9, 2015, Valeant had a conference call to discuss Philidor and disclosed that Philidor would stop adjudicating insurance claims.

25.    The revelation of Valeant's relationship with Philidor and the subsequent shuttering of Philidor severely reduced Valeant's ability to sell the high-priced brand-name drugs it had been selling through Philidor to avoid generic substitutions. For example, Valeant's reported revenue

for a product called Jublia declined 36% in the fourth quarter of 2015, when Valeant was forced

to close Philidor, and dropped another 44% in the first quarter of 2016.

26.     After news about the secret pharmacy network reached investors—and the

Company failed to provide reasonable explanations for the existence and secrecy of that network—

Valeant lost over $100 billion of its market capitalization. In March 2016, Pearson, Valeant's CEO

during the Class Period, was forced to resign as a result of numerous government investigations,

as well as investor and public scrutiny into Valeant's misconduct.

27.     Valeant and the Valeant Enterprise were the focus of investigations by Congress,

the US Department of Justice, and the SEC. In testimony before the US Senate Special Committee

on Aging on April 27, 2016, Pearson conceded that Valeant's price-inflation practices were

improper, admitting that Valeant was "too aggressive—and I as its leader, was too aggressive—in

pursuing price increases on certain drugs."

28.     Through this action, Plaintiffs seek to recover the damages caused by Valeant's

misconduct and the "aggressive" price increases that were facilitated through the fraud and

violations of law alleged in this Complaint.

## II.     JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action under the Class Action

Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Because Valeant sold at least $500 million worth of

its drugs through its captive pharmacy network during the Class Period, Plaintiffs believe that the

amount in controversy exceeds $5 million. The Class is composed of thousands of TPPs, such as

welfare benefit funds and insurers, located throughout the United States, less than one third of

which are citizens of New Jersey.

30.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 with respect to Counts I and II, because those Counts arise under the laws of the United States, and under 28 U.S.C. § 1964(c), because this action alleges violations of RICO, 18 U.S.C. § 1962.

31.     This Court has personal jurisdiction over the Defendants because they have sufficient minimum contacts with New Jersey, as each Defendant either resides in New Jersey or communicated with, and coordinated his or its activities, with Defendant Valeant, which has its US headquarters in New Jersey.

32.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), because Defendant Valeant is headquartered and resides in this District and conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District. Defendants Philidor, Andrew Davenport, and Matthew Davenport conducted business in this District during the Class Period.

33.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails and interstate telephone communications.

## III.    THE PARTIES

### A.    Plaintiffs

34.     Plaintiff Airconditioning and Refrigeration Industry Health and Welfare Trust Fund ("ACR Trust") is a health and welfare benefit fund with its principal place of business at 3500 W. Orangewood Avenue, Orange, California 92868. ACR Trust is a multi-employer welfare benefit plan, within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(1), (3) and 1003(a), which provides health benefits to eligible participants and their beneficiaries. ACR Trust's members include various union members who are involved in the air conditioning and refrigeration industries. Throughout the Class Period, ACR Trust paid or

reimbursed eligible ACR Trust participants' prescription-drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

35.     Plaintiff Fire and Police Health Care Fund, San Antonio ("San Antonio") is a public healthcare fund located at 11603 W. Coker Loop, Suite 130, San Antonio, Texas 78216, which provides health benefits to over 12,000 eligible participants and beneficiaries. Throughout the Class Period, San Antonio paid or reimbursed eligible San Antonio participants' prescription-drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

36.     Plaintiff Plumbers Local Union No. 1 Welfare Fund ("NY Plumbers") is a health and welfare benefit fund with an office located at 50-02 Fifth Street, 2nd Floor, Long Island City, New York 11101. NY Plumbers is a multi-employer welfare benefit plan within the meaning of ERISA, 29 U.S.C. §§ 1002(1), (3), and 1003(a), which provides prescription-drug, hospital, major-medical, dental, and optical benefits to eligible participants and their beneficiaries. NY Plumbers' members include various union members who are involved in the plumbing industry. As reflected in utilization reports generated by CVS/Caremark, NY Plumbers' PBM, throughout the Class Period, NY Plumbers paid eligible NY Plumbers participants' prescription-drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

37.     Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund ("NYHTC") is a jointly trusteed employee benefits fund that operates for the benefit of active and retired unionized hotel workers in the New York metropolitan area. NYHTC is a multi-employer welfare benefit plan within the meaning of ERISA, 29 U.S.C. §§

1002(1), (3), and 1003(a), which provides prescription-drug, hospital, major-medical, dental, and optical benefits to eligible participants and their beneficiaries. NYHTC has its principal place of business at 305 West 44th Street, New York, New York 10036 and is a citizen of New York. Throughout the Class Period, NYHTC paid or reimbursed eligible NYHTC participants' prescription-drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

38.     Plaintiff the Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department. The DEA was founded in 1917 to represent active and retired detectives of the New York City Police Department. The DEA represents 5,500 active and over 12,400 retired New York City Police Detectives. The DEA has its principal place of business at 26 Thomas Street, New York, New York 10007. Throughout the Class Period, the DEA paid or reimbursed eligible DEA participants' prescription-drug benefits for Valeant drugs through pharmacies secretly controlled by Defendants as part of the Valeant Enterprise, and was injured by the conduct alleged in this Complaint.

**B.     Defendants**

39.     Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") (now known as Bausch Health Companies Inc.) is a Canadian corporation, incorporated in British Columbia, Canada, and has its US headquarters in this District at 400 Somerset Corporate Blvd., Bridgewater, New Jersey. Valeant is a multinational pharmaceutical and medical-device company that markets a broad range of branded, generic, and branded generic pharmaceuticals, over-the-counter products, and medical devices, directly or indirectly, in over 100 countries.

40.     Defendant Philidor Rx Services, LLC ("Philidor") held itself out as a specialty, mail-order pharmacy that dispensed primarily Valeant branded products during the Class Period.

Philidor is a Delaware limited liability company, with its headquarters located at 330 South Warminster Road, Hatboro, Pennsylvania. As detailed below, Philidor was a central participant in the Valeant Enterprise and was largely responsible for helping expand the secret network of pharmacies used to carry out Defendants' fraudulent scheme.

41.     Defendant Andrew Davenport was, at the time Philidor ceased operations, the Chief Executive Officer of Philidor, a central participant in the Valeant Enterprise. Andrew Davenport, one of Philidor's co-founders, also worked at BQ6 Media Group ("BQ6"), a marketing firm that had provided services to Medicis Pharmaceutical Corporation ("Medicis"), which was acquired by Valeant in December 2012, and consulted for Valeant thereafter. According to Philidor's January 15, 2013, Operating Agreement, Andrew Davenport was Philidor's largest beneficial owner, holding (both personally and through a shell company for which he was the sole signatory) a 36.5% equity stake in Philidor. After Valeant's acquisition of Medicis, Andrew Davenport collaborated with Valeant employees including Gary Tanner, Bijal Patel, Alison Pritchett, and Dean Griffin to establish Philidor.

42.     Defendant Matthew S. Davenport, the brother of Andrew Davenport, represented himself as Philidor's Chief Executive Officer in documents submitted to the California State Board of Pharmacy in support of Philidor's applications for a pharmacy license in California between 2013 and 2015. In May 2014, the California State Board of Pharmacy denied Philidor's application on the grounds that Matthew Davenport, under penalty of perjury, "knowingly made false statements of fact with the intent to substantially benefit [himself] or others on [Philidor's] application for licensure." Notably, some of those false statements related to the ownership and management of Philidor, including concealing Andrew Davenport's ownership interest in Philidor,

and were made to acquire additional specialty pharmacies in order to futher the goals of the Valeant Enterprise.

## IV.    FACTUAL BACKGROUND

### A.    Third Party Payors and Pharmacy Benefit Managers

43.     A third party payor ("TPP") is any organization, public or private, that pays or insures health or medical expenses on behalf of customers, members, beneficiaries, or their family members. TPPs include commercial insurance companies, self-insured employers, and multi-employer Taft-Hartley health or welfare funds.

44.     Insureds and beneficiaries of a TPP generally pay premiums or premium contributions (for employer-sponsored plans) for coverage, or have premiums paid on their behalf by an employer. When an insured fills a prescription under a TPP plan, the TPP generally pays the majority of the insured's prescription drug costs. The remainder of the cost is generally covered by the insured in the form of a co-pay or deductible payment.

45.     Pharmacy benefit managers ("PBMs") serve as middlemen between drug manufacturers or pharmacies and the TPPs that pay for drug prescriptions. PBMs act as agents for TPPs. PBMs enter into contracts with TPPs to provide programs designed to help maximize drug effectiveness and contain drug expenditures by influencing the behaviors of prescribing physicians, pharmacists, and members. Accordingly, on behalf of TPPs, PBMs provide numerous services, including developing a pharmacy network, designing a formulary, negotiating drug rebates, reviewing drug utilization, and processing and analyzing prescription claims.

46.     In a typical situation where a benefit-plan participant seeks to fill a drug prescription, the role of the PBM is illustrated as follows: the insured patient visits a network pharmacy; the pharmacy checks with the PBM to confirm patient eligibility, coverage, and co-payment information; the patient pays the co-payment (and any deductible) and purchases the

drug; the PBM then reimburses the pharmacy for the remainder of the negotiated drug price, including the ingredient cost and a dispensing fee, less the co-payment; and the PBM then bills the TPP for the payments it made on behalf of the TPP under the contract between the TPP and the PBM.

47.     Recognizing that TPPs generally pay the bulk of an insured's prescription costs, Defendants exploited TPPs by using Defendants' secret network of captive pharmacies to shield Valeant's drugs from competition, fraudulently raise the prices of its products, and artificially boost sales, improperly inflating the reimbursements for Valeant drugs paid for by TPPs. Indeed, after Defendants' fraud was revealed and the three largest PBMs in the country severed ties with Philidor because of its undisclosed relationship with Valeant, Valeant entered into a distribution deal with Walgreens, by which Walgreens would sell Valeant's skin and eye drugs as well as other Valeant-branded drugs. As reported in *Fortune* on December 16, 2015, Larry Merlo, CEO of CVS Health, one of the PBMs that had already cut ties with Philidor, stated in regards to the Valeant-Walgreens deal: "This is another example of Valeant attempting to circumvent what PBMs do for payers. . . .  These actions ultimately drive up costs for payers when you think about the use of prescription co-payment programs." Valeant and its secret pharmacy network also provided a platform through which Defendants implemented a host of fraudulent practices described below to improperly inflate the reimbursements for Valeant drugs paid for by TPPs.

B.     **How Drug Prices Are Set**

48.     The common pricing benchmark for virtually all retail drug-reimbursement transactions is the "Average Wholesale Price" ("AWP"). The AWP represents the manufacturer's published catalog or list price for a drug product. Commercial publishers of drug-pricing data, such as Red Book and First DataBank, have published AWP data since the 1970s. The AWP is used to determine drug prices and third-party reimbursement throughout the healthcare industry.

20

49.     The AWP may be determined by several different methods. The drug manufacturer may report the AWP to the individual publisher of drug-pricing data. The AWP may also be calculated by the publisher based upon a mark-up specified by the manufacturer that is applied to the wholesale acquisition cost ("WAC") or direct price ("DP"). The WAC is the manufacturer's list price of the drug when sold to wholesalers, while the DP is the manufacturer's list price when sold to non-wholesalers.

50.     Pharmaceutical manufacturers typically sell their on-patent brand drugs to wholesalers at the manufacturers' list prices, usually WAC, net of prompt-pay discounts. The AWP is generally based on the standard formula of WAC + 20% or 25% or, far less frequently, the manufacturer's suggested wholesale price ("SWP")—i.e., the price the drug maker would set—if an SWP is provided.

51.     Accordingly, a pharmaceutical manufacturer's ability to set a benchmark data point, such as WAC, by increasing the price of its drugs sold to some parties, increases the drug's published AWP, which in turn raises the price of that drug when purchased by end-users, including by TPPs. Through Defendants' fraudulent scheme, Defendants were able to charge inflated prices for Valeant-branded drugs by eliminating generic competition through illegal and improper means, including by blatantly breaching contractual and state-law requirements mandating generic substitution through the Valeant Enterprise. In doing so, Defendants were able to sustain artificially inflated benchmark prices for Valeant's branded drugs, whose prices otherwise would have been much lower. This caused Valeant's branded drugs to be sold at artificially high prices both within and outside the Valeant Enterprise, causing injury to the Class.

### C.     Valeant's Growth-by-Acquisition Strategy

52.     Before and during the Class Period, Valeant's business model was focused on achieving revenue growth by acquiring drugs and drug companies and then dramatically raising

prices of the acquired drugs. Since 2010, Valeant acquired companies with a total value of at least $36 billion. By the end of the Class Period, Valeant was the sixth-largest acquirer, globally, by deal size. Notably, since 2008, when Pearson became CEO of Valeant, Valeant acquired at least 100 companies. For this reason, analysts and pharmaceutical industry observers referred to Valeant as a "serial acquirer."

53.     Valeant's acquisition strategy gave the Company access to a diverse portfolio of drugs. For example, in September 2010, Valeant engaged in a reverse merger with Biovail Corp., Canada's largest pharmaceutical company, for $3.3 billion, and Pearson became CEO of the combined company. The merger gave Valeant access to a portfolio of dermatological drugs, drugs treating disorders of the central nervous system, and the anti-depression drug Wellbutrin. In 2012, Valeant purchased Medicis Pharmaceutical Corp. for $2.6 billion, providing Valeant with access to drugs for the treatment of acne, as well as other aesthetic skin-care products.

54.     In addition to providing Valeant with access to Medicis' dermatological products, including Solodyn and Ziana, the Medicis acquisition served another purpose for Valeant: it allowed Valeant to acquire Medicis' "alternate fulfillment" ("AF") distribution program. That program (which operated through Oncosource, a specialty-pharmacy subsidiary of Cardinal Health (Cr. Tr. 146-47)) served as a model for the establishment of Philidor to begin distributing Valeant products.

55.     Valeant's then-CEO Pearson became concerned in 2012 about TPPs' rejection of claims for reimbursement for Valeant's branded drugs that had less-expensive generic substitutes, and he identified Medicis's Oncosource AF program as an attractive solution to this problem and a reason for Valeant to acquire Medicis. (Cr. Tr. 108-10.)

56.      For example, a presentation sent by Andrew Davis, Valeant's Manager of Business
Development, to Pearson and Schiller in August 2012, as Valeant was negotiating the acquisition
of Medicis, reported that Medicis's AF program had succeeded in the average selling price for
Solodyn being "driven higher than expected." (Cr. Tr. 616.) During a September 4, 2012
conference call announcing Valeant's acquisition of Medicis, Pearson praised Medicis'
distribution methods: "I think the whole alternate fulfillment program was a very clever idea. And
give a great deal of credit to Medicis' management for coming up with it." Likewise, during a
January 4, 2013 conference call with investors, and in response to an analyst's questions
concerning Medicis' AF program, Pearson stated: "the more we understand about it, the more
excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a
whole evolution being planned . . . . And also as we had hoped, we think it will apply to more than
just Solodyn . . . and we see application for a number of our dermatology products and potentially
neurology products in the US." Valeant also hired former Medicis employees, including Gary
Tanner and Alison Pritchett, who both worked for Medicis's AF program and were embedded at
Oncosource (Cr. Tr. 59), to run its own AF program through Philidor. Likewise, during a February
28, 2014 conference call, Pearson stated about Valeant's adopted AF program: "probably by mid
year, there will be a number of other products that we will be using alternate fulfillment as well."
In an October 26, 2015 presentation, when the truth about the Valeant-Philidor relationship was
being revealed, Valeant admitted that its "specialty pharmacy program originated from Medicis
Alternate Fulfillment Program."

57.      Also in 2012, Valeant acquired Natur Produckt International of Russia for
$180 million, giving Valeant control of a portfolio of cough and cold treatments. In 2013, Valeant
bought eye-care giant Bausch & Lomb for $8.6 billion, giving Valeant access to Bausch & Lomb's

specialized-ophthalmology and contact-lens portfolio. In March 2015, Valeant completed its $11 billion purchase of Salix Pharmaceuticals, a maker of drugs treating gastrointestinal disorders.

58.    Valeant also sought to acquire drugs designated by the Food and Drug Administration as "orphan drugs" under the Orphan Drug Act. An orphan drug is either (i) used to treat diseases or conditions that afflict a small portion of the population (200,000 persons or fewer in the United States) or (ii) a drug whose sponsor has shown that the drug's sales are unlikely to be sufficient to recoup the sponsor's costs. As a result of these characteristics, orphan drugs generally face little, if any, competition. As an outside consultant reportedly explained to Valeant's CEO, products that "are not on the radar" have "material pricing potential."

59.    By pursuing this strategy, Valeant not only avoided massive research and development costs but, more importantly, focused on "premium" pricing to maximize revenues. One of Pearson's mottos was reportedly "*[d]on't bet on science—bet on management*." In order to successfully implement and maintain ultra-premium pricing, however, Valeant had to devise a means of steering physicians and their patients away from less-expensive generic alternatives and into Valeant-branded drugs.

60.    How Valeant chose to implement this strategy has been harshly criticized. On April 30, 2016, Charlie Munger, Vice Chairman of Berkshire Hathaway and a long-time critic of Valeant, declared that Valeant was a "sewer," adding that "those who created it deserved the opprobrium they got."

61.    In the short term, however, Valeant's growth-by-acquisition strategy appeared successful. Year after year, the Company reported consistent and steep growth, reporting $3.48 billion of revenues for 2012, $5.76 billion for 2013, $8.25 billion for 2014, and $7.71 billion for the first three quarters of 2015. As of July 2015, Valeant was valued at over $90 billion, making it

the largest public company incorporated in Canada and the largest pharmaceutical company headquartered in the United States.

62.     During the Class Period, Valeant attributed the success of its strategy to its aggressive cost-cutting, its "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products." Similarly, in a February 22, 2015 Valeant press release, Pearson attributed Valeant's explosive growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services." These misrepresentations concealed from the Class—as well as regulators—the true driver of the Company's growth.

63.     In truth, a key driver of Valeant's growth was its fraudulent use of a secret network of captive pharmacies. Valeant's use of that secret pharmacy network enabled Valeant to exponentially increase the prices of its branded drugs, despite the fact that cheaper generic substitutes existed for many of these drugs. In an effort to conceal its scheme, Valeant consistently downplayed the extent to which pricing increases contributed to the Company's growth. For instance, on an April 29, 2015 quarterly earnings call with investors, Pearson was asked how much price contributed to growth in the quarter. Pearson falsely responded that "In terms of price volume, actually, volume was greater than price in terms of our growth."

64.     On May 21, 2015, however, CFO Schiller wrote to Pearson in an email with the subject "price/volume," "Last night, one of the investors asked about price versus volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." (Sec. Cmplt., p. 88 n.24.)

65.    On February 3, 2016, after the conclusion of the Class Period, Valeant issued a press release *admitting* that Pearson's April 29, 2015 statement was false and that, in truth, Valeant's growth was a result of its increasing the prices of its drugs.

66.    Likewise, in a further effort to obscure Valeant's reliance on the price increases facilitated by its captive network of pharmacies, Valeant changed the way it reported its financial results, refusing to break out the revenue numbers for major acquisitions and making it impossible for the public to track whether acquired drugs were experiencing any organic growth. In 2013, the year in which Valeant created Philidor, the drugmaker cut the number of operating segments reported in half, going from four to two. Because various segments were driven by just a few main products, the public could previously track how those products were performing. But with just two operating segments, it became impossible for the public to obtain that same information.



**Figure 1. Valeant's changes to its financial reporting at the time it created Philidor.**

### D.    Philidor and Valeant's Secret Network of Captive Pharmacies

67.    To insulate its brand-name drugs from generic competition and boost sales, Valeant embarked on a scheme to funnel sales of its branded drugs through a nationwide network of captive pharmacies. Through this secret network, Valeant insulated its products from generic competition throughout the Class Period by, among other things, flouting statutory or contractual mandates

requiring substitution of generic equivalents for Valeant's branded drugs and submitting false claims information to TPPs and PBMs. This fraudulent scheme enabled Valeant to massively increase the prices of its drugs and inflate the number of claims paid on prescriptions for those drugs. As a result, the Class overpaid for Valeant's expensive branded drugs, was prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed.

68.     At the center of this network of captive pharmacies was Philidor. On January 2, 2013, the first day of the Class Period, Defendants incorporated Philidor, a purportedly independent specialty mail-order pharmacy led by co-founder Andrew Davenport. As discussed in ¶¶ 54-56 above, Valeant was inspired by Medicis's AF program to establish Philidor in order to circumvent TPPs' rejection of reimbursement claims for expensive branded drugs that had less-expensive generic substitutes, and Valeant hired Tanner as part of its acquisition of Medicis and directed him to work with Andrew Davenport to establish Philidor.

69.     During the Class Period, Philidor was licensed in 45 states and the District of Columbia. In its state registrations, Philidor falsely identified David Wing, John Carne, and Gregory Blaszczynski as officers. However, none of them actually worked at Philidor. Rather, each of these individuals worked at BQ6, a pharmaceutical-marketing company, named after a legendary chess move, that consulted for Valeant and shared its physical address with Philidor. Philidor's owners, Andrew Davenport, Matthew Davenport, and Blaszczynski, also worked at BQ6.

70.     During the Class Period, Philidor falsely held itself out to be a "specialty pharmacy." True specialty pharmacies focus on self-administered specialty drugs covered under a patient's pharmacy insurance benefit. These specialty drugs are almost always highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex

illnesses such as cancer, rheumatoid arthritis, multiple sclerosis, and HIV. Often, these drugs come in the form of self-administered injections or require constant refrigeration. Philidor, by contrast, was principally devoted to dispensing Valeant's undifferentiated traditional drugs—principally its dermatological products—most of which had low-cost generic substitutes. Indeed, as Philidor has itself admitted, Valeant was Philidor's "only client." (Business Insider, October 22, 2015, *A Company involved with Valeant has shed light on a critical accusation in that brutal short-selling note*).

71.    Specialty pharmacies act as mail-order businesses that operate across state lines and are required to be licensed in any state where they sell drugs. Specialty pharmacies offer a convenient and reliable service for expensive drugs, and they ostensibly lower costs and maximize insurance reimbursements from companies that cover the drugs. However, specialty pharmacies are not required to report their pharmaceutical sales to IMS Health, a tracking service that is used by companies and analysts to monitor drug sales and inventory channels. Thus, Philidor's specialty-pharmacy designation allowed Valeant to avoid public scrutiny of the price-gouging scheme that was directed at consumers and injured TPPs.

72.    Shortly after its incorporation, Philidor opened offices in Arizona. As a result, although its headquarters were just outside Philadelphia, Pennsylvania, Philidor also immediately began operating in Arizona.

73.    Just nine days after its incorporation, Philidor entered into a Master Service and Pharmacy Dispensing Agreement with Valeant's Medicis division on January 11, 2013, to dispense products and provide call intake, prior authorization, delivery, and "[p]roduct refill services." The agreement provided that the manufacturer (Valeant) had a right to inspect and audit

Philidor to verify compliance with the agreement "and to assess and evaluate the operation of the program." (GX 100-13A.)

74.     Exclusivity provisions in the Master Services Agreement between Valeant and Philidor prevented Philidor from distributing non-Valeant dermatology products and from distributing non-Valeant ophthalmology products without Valeant's consent. (Cr. Tr. 1205-06.)

75.     The Master Services Agreement included the "Medicis Alternative Fulfillment Program," which required Philidor to "work with the retail pharmacy to transition the prescription over to [Philidor]." If Philidor could not get the retail pharmacy to agree, then it was to "call the physician's office for a new prescription, as needed" and "contact Consumer in an attempt to resolve any issues regarding the retail pharmacy withholding medication fulfillment." (GX 100-129.) The agreement also required Philidor to "proactively follow-up with customer[s] for covered Product refills." The agreement required Philidor to exclude any transaction identifying the payor "as any state or federally funded program." The agreement provided that "[i]f the insurance claim is adjudicated and a rejection code is received, it should be evaluated and reprocessed per written pharmacy SOP's [Standard Operating Procedures] as necessary." (Sec. Cmplt. ¶ 99.)

76.     Tanner and other Valeant employees, including Alison Pritchett, Dean Griffin, and Bijal Patel, worked with Andrew Davenport to set up Philidor in 2013 and to expand its operations. These Valeant employees were embedded at Philidor to use "their operational expertise and knowledge of the pharmaceutical manufacturing, retail pharmacy, and pharmacy benefits management businesses to aid in developing operational processes, validate and test information technology components, and building vital infrastructure functions," according to a Business Associate Agreement, dated November 21, 2013, between Philidor and Medicis Pharmaceutical Corporation, a division of Valeant. (GX 100-22; Cr. Tr. 340-41.) In addition to being Valeant

employees, Dean Griffin and Alison Pritchett were identified as full-time Philidor employees in the Valeant-Philidor Option Agreement (discussed in ¶ 92 below).

77.     Valeant also provided $2 million of start-up funding to Philidor as "prepayment of services," and Valeant's relationship with Philidor was directed by top Valeant management from the beginning. (*United States v. Tanner*, Defense Exhibit ("DX") 88-A at 1 (contract approval form); *United States v. Tanner*, Government Exhibit ("GX") 100-177 at 4; Cr. Tr. 112, 114, 335-37.) Valeant's contract-approval form for establishing its relationship with Philidor (then known as RxK, LLC, with Andrew Davenport as its contact) for "the build out and future operation of the next generation alternative fulfillment program" was signed nine days after Philidor's incorporation by CEO Pearson, CFO Schiller, and other top Valeant executives. (DX 88-A at 1; Cr. Tr. 321-23, 326-28, 1038-39.) Valeant never issued a request for proposals for alternatives to Philidor before establishing Philidor or for competing services after establishing it. (Cr. Tr. 141.) From Philidor's inception in January 2013 until at least October 2013, Valeant was the exclusive supplier of products sold by Philidor (Cr. Tr. 335), and as of late 2014 when Valeant acquired an option to acquire Philidor, Valeant products still accounted for approximately 90% of Philidor's sales volume (DX 2102-3; Cr. Tr. 699). Valeant secretly controlled Philidor due to Philidor's financial dependence on Valeant for sales of Valeant products, and due to Philidor's reliance on Valeant management and personnel to operate its business. Later, as described below, Valeant acquired contractual control over Philidor by entering into the Option Agreement (defined below at ¶ 92) in December 2014. Under applicable accounting rules, this required Philidor's financial statements to be consolidated with Valeant's financial statements, but Valeant concealed its control over Philidor by not consolidating Philidor's results.

78.     One month before Philidor was even legally formed, Valeant hired manager Gary Tanner, a former employee of Medicis (which Valeant acquired in 2012), to act as the drug company's special "liaison" with Philidor and to help ramp up the pharmacy's operations. Tanner interacted directly with Valeant's top executives, including Valeant's CEO, Pearson. (Bloomberg, November 4, 2015, *Valeant Said to Have Planned Philidor Expansion for Products*; Reuters, November 12, 2015, *Valeant played a key role in building, operating Philidor RX*). After Valeant acquired an option to acquire Philidor in December 2014, Tanner reported directly to Pearson. (Cr. Tr. 997.) (Although Tanner was a Valeant employee, he never had an office at Valeant but was expected to work full-time onsite at Philidor as the Valeant employee with day-to-day responsibility for the Valeant-Philidor relationship. (Cr. Tr. 112.))

79.     Over the course of Tanner's employment with Valeant, Tanner supervised the operations of Philidor. Tanner interacted daily with Philidor CEO Andrew Davenport and supervised employees who worked out of Philidor's offices in Pennslyvannia, including sales and managerial staff, employed by both Valeant and Philidor. Tanner's employment with Valeant was terminated in August 2015, and, immediately afterwards, he was hired by Philidor. In connection with Tanner's joining Philidor, Andrew Davenport sent a memo to Philidor employees noting the close ties between Valeant and Philidor by stating that "[Tanner] has been our client liaison with Valeant since the very beginning in January 2013 and has made an immeasurable contribution to Philidor's success." (Bloomberg, November 4, 2015, *Valeant Said to Have Planned Philidor Expansion for Products*).

80.     Likewise, on the same day Philidor was legally formed, Valeant hired Laizer Kornwasser, a former senior executive at Medco, as an executive vice president and company group chairman to oversee Valeant's relationship with Philidor. Kornwasser supervised Tanner

31

and reported directly to Valeant CEO Pearson. Immediately upon being hired, Kornwasser received nearly $5 million in equity awards. Both Kornwasser's senior position in Valeant's organizational structure and his outsized compensation demonstrate that Valeant viewed its relationship with Philidor as critically important to the Company's success. Tanner and Kornwasser were key employees who remained closely involved in the details of running the pharmacy, including expanding its business.

81.     On July 27, 2013, Philidor entered into a "Distribution Services Agreement" with Valeant to provide distribution services for all of Valeant's drugs. This agreement was amended just a week later on August 2, 2013, to assign Philidor the role of administering Valeant's "co-pay assistance programs" related to Valeant-branded pharmaceuticals. The amended agreement also provided that "patient savings cards" would be used to "offset all or part of their out of pocket costs with respect to [Valeant's] various branded pharmaceutical products." (Sec. Cmplt. ¶ 101.)

82.     Tanner was designated as the Valeant contact in the agreement, and Pearson and Schiller signed a form approving the agreement.

83.     In August 2015, Tanner left Valeant to formally join Philidor as Executive Vice President and a member of its management team. Andrew Davenport memorialized Tanner's prior role by sending a memo to employees describing Tanner as "our client liaison with Valeant since the very beginning in January 2013," going on to note that Tanner had "made an immeasurable contribution to Philidor's success." (Although Tanner became a Philidor employee, he retained his Valeant email account and computer. (Cr. Tr. 817-18.))

84.     During the Class Period, Valeant installed a cadre of its employees within Philidor (in addition to Tanner and Kornwasser) to supervise operations at the pharmacy and fraudulently increase the sale of Valeant drugs. For instance, Valeant placed a 30-person team inside Philidor

with instructions to show doctors how to direct patients to Valeant products. At different points in Philidor's evolution, Valeant employees were responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations.

85.   Brad Greenfield also joined Valeant from Medicis and worked closely with Philidor. Greenfield had been the Area Director for Dermatology sales at Medicis and was the Senior Director Marketing, Acne Division at Valeant's Scottsdale, Arizona office with responsibility for products such as Solodyn. Greenfield also saw Philidor as part of the Valeant organization. For example, Jeff Becker ("Becker") was the Operations Manager at Philidor starting in April 2015. On Becker's LinkedIn profile, Greenfield provided a recommendation stating that he had "experience working with Jeff over the past 6 months" and that Becker "joined *our organization,* making an immediate impact by connecting with multiple layers of *our* staff and helping *our* Claims team . . . ." (emphasis added.) In addition to being a Valeant employee, Greenfield was identified by Philidor in the Valeant-Philidor Option Agreement as Philidor's Senior Vice President, Operations. (GX 300-18 at 137.)

86.   To avoid detection as Valeant employees, and thereby conceal the fact that Valeant was using Philidor to steer patients to Valeant-branded drugs, Tanner and his former Medicis colleagues, Bijal Patel and Alison Pritchett, used pseudonyms such as "Peter Parker" (Patel) from Spiderman and "Brian Wilson" (Tanner) of the Beach Boys. These Valeant employees, secretly embedded in Philidor, even used email addresses that belonged to Philidor. Tanner used the Brian Wilson alias for his Philidor email address and Philidor business cards. (GX 100-19 at 1; GX 905 at 1.) For the same reason of avoiding detection, other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child). (Alison Pritchett

also used the email address "Shannon O'Hare." (Cr. Tr. 57.)) News outlets, including Bloomberg and the *Wall Street Journal*, which interviewed former Philidor employees, reported that the use of fake names by Valeant employees "was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products." Pearson later claimed that Valeant concealed the relationship for "competitive" reasons.

87.     Confidential patient information in prescriptions handled by Philidor was openly displayed to Tanner and other Valeant employees working in Philidor's main office, and Tanner adjudicated prescription claims, which is properly the role of a pharmacy and should not be done by a pharmaceutical-manufacturer employee like Tanner. (Cr. Tr. 928-29, 934, 1049.) Kornwasser testified at the criminal trial of Tanner and Andrew Davenport that this was a concern because "[o]nly people that need to know what information about individuals related to medications should have access to that information; otherwise, one is not supposed to see that information." (Cr. Tr. 934, 1056.) Under the HIPAA Privacy Rules, health-care providers, including pharmacies, must maintain the confidentiality of their patients' individually identifiable health information, referred to as "protected health information" ("PHI"). Pharmaceutical companies are not permitted to have access to PHI included in prescriptions for their drugs without the patients' permission, with limited exceptions. In particular, pharmacies may not disclose PHI to pharmaceutical companies for use in marketing the latter's drugs without the patients' permission. Thus, Valeant employees' access to PHI at Philidor was contrary to HIPAA. After Kornwasser raised concerns about this practice, Valeant and Philidor entered into the Business Associate Agreement purporting to give the embedded Valeant employees access to PHI as "business associates" (persons engaged in legal, actuarial, accounting, consulting, data aggregation, management, administrative, accreditation, or financial services for the pharmacy) under HIPAA.

88.    Kornwasser testified at the criminal trial of Andrew Davenport and Tanner that after Kornwasser visited Philidor's main office in November 2013 and spoke there with Tanner, the open display of PHI to Valeant employees  and "other issues that [he] had" based on his conversation with Tanner (Cr. Tr. 935) made him "very concerned": "I was concerned from an independence perspective, I was concerned from a compliance perspective . . . ." (Cr. Tr. 937.) He also testified that he had "concerns . . . related to the relationship" that were "questions in relation to independence, how the relationship started." (Cr. Tr. 1046-47.) Kornwasser reported these concerns to other senior Valeant executives, including Pearson and Schiller. (Cr. Tr. 938.)

89.    Valeant CEO Pearson, CFO Schiller, and other senior Valeant executives gave Tanner the highest performance rating for 2013 despite objections from Kornwasser. (Cr. Tr. 1010.) Tanner's 2014 performance evaluation in February 2015 again gave him the highest rating, identified his key strength as having successfully built a sustainable model in Philidor, and identified his biggest accomplishments as having helped to create a thriving business (Philidor) out of nothing and having facilitated Valeant's partnership with Philidor. (Cr. Tr. 44.) Pearson directly delivered Tanner's annual performance evaluations. (Cr. Tr. 1024.)

90.    Launching "Operation Green Light," an internal Valeant code name for Philidor, and active sales and marketing were weighted at 17% in the 2013 Valeant bonus plan and were rated as achieved 200%, accounting for 33% of the bonus pool for senior executives. This incentivized them to push for rapid expansion of Philidor and to prefer Philidor over alternative, independent pharmacies. Similarly, achieving at least one significant deal that created substantial shareholder value accounted for 20% of the 2014 bonus plan, and expanding Philidor and acquiring the option to acquire Philidor were the only such transaction Valeant achieved that year, again giving its senior executives a strong financial incentive to expand Philidor. (Cr. Tr. 13-15, 26, 33.)

91.     Patel and other Valeant employees embedded at Philidor communicated information to Valeant employees, including the number of prescriptions Philidor filled, the most popular drugs, and the physicians who prescribed the greatest amount of drugs. Senior Valeant executives, including Pearson, Schiller, and Kornwasser, received weekly emails called "executive dashboard reports" from Patel and other Valeant employees embedded at Philidor, reporting the weekly volume of prescriptions for each Valeant drug handled by Philidor. (Cr. Tr. 1031-32, 1052, 1105-06.) Philidor also provided monthly financial reports to Valeant; these reports included the amounts of payments to Philidor from insurers, data concerning claims processed and inventory, and prescription-level shipping volumes. Tanner wrote in an email to another Valeant officer in October 2014: "I provided [a] detailed list of claims processed each month . . . , and with this file provides [sic] detail related to the insurance collection amounts. . . . Outside of this, the other area is inventory and again this is reported to finance every month and is supported by the shipping volume . . . . [T]he data is very granular (i.e., provides prescription level data for everything shipped during each month)." Pearson, Schiller, Kornwasser, Tanner, and other senior Valeant executives held weekly Friday meetings or conference calls starting in the second half of 2013 to discuss Philidor's sales of Valeant products. (Cr. Tr. 112, 927-28, 1051.)

92.     Valeant's ties to Philidor went beyond personnel; Valeant also exercised financial control over Philidor. In late 2014, Pearson considered having Valeant acquire Philidor. (Cr. Tr. 114.) In October 2014, he had a dinner meeting with Andrew Davenport, Schiller, and Tanner to, as Tanner wrote in an internal Valeant email, "discuss our interest in potentially obtaining ownership to further the partnership." (GX 100-79 at 1.) Pearson decided, however, that instead of buying Philidor outright, Valeant should acquire an option to acquire Philidor at a later time in order to keep Valeant's control over Philidor secret. (Cr. Tr. 115.) On December 15, 2014, Valeant

36

entered into a purchase option agreement (the "Option Agreement") with Philidor under which it paid $100 million for the option to acquire Philidor for $0 for 10 years, plus various milestone payments based on Philidor's sales. The first milestone payment of $33 million was paid on January 15, 2015. The remaining milestone payments were tied to Philidor hitting sales targets. Valeant's little-known wholly owned subsidiary, KGA Fulfillment Services, Inc. ("KGA"), was used to obtain the option to acquire Philidor.

93.     Notably, the agreement provided that Philidor was to enter into a purchase agreement with Isolani, identified as "established for the purpose of acquiring R&O Pharmacy, Inc.," and Lucena, which was identified as "established for the purpose of acquiring Brighton Way, Inc. (d/b/a/ West Wilshire Pharmacy," as conditions to Valeant's acquisition of the option. (GX 300-18.) As discussed further in ¶¶ 127-36, the inclusion of the Isolani/R&O Pharmacy and Lucena/West Wilshire transactions as conditions to Valeant's acquisition of its Philidor option demonstrate Valeant's knowledge of and control over Philidor's establishment of a secret network of regional pharmacies.

94.     The Option Agreement also stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013. (GX 300-18.)

95.     Further demonstrating Valeant's control over Philidor, the Option Agreement barred Philidor from distributing more than $5.62 million to its owners or making any capital expenditure of more than $50,000 without Valeant's consent. (GX 300-18; Cr. Tr. 666-69.)

96.     The Option Agreement barred public disclosure of the option's existence before Valeant exercised the option, unless required by law or to enforce the option agreement. Thus, Valeant and Philidor agreed to and did keep Valeant's control over Philidor secret. (GX 300-18; Cr. Tr. 530, 1622-24.)

97.     In a written response to questions in 2016 from the U.S. Senate Committee on Aging about why Valeant acquired an option to acquire Philidor instead of buying Philidor outright, Philidor's counsel stated that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor." Thus, Philidor confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship. (Sec. Cmplt. ¶ 447.)

98.     Pearson personally made the decision to acquire the option to acquire Philidor, and he personally negotiated the Option Agreement with Andrew Davenport. (Cr. Tr. 114, 637.) Pearson also instructed a Valeant employee to revise the financial model for Philidor that was used to determine the price Valeant would pay for the option; an initial model assumed 0% growth in Philidor sales, but this was changed on Pearson's instructions to 90% growth in 2015, 50% growth in 2016, and further growth thereafter. As a result of these increased sales projections, Pearson decided to increase the total price Valeant paid for the option from $125 million to $133 million. (Cr. Tr. 707-08, 1606-07.)

99.     In causing Valeant to enter into the Option Agreement, Pearson rejected concerns raised by Kornwasser about Tanner's financial interest in Philidor. Kornwasser even refused to sign the Option Agreement on behalf of Valeant because he was concerned about Tanner's relationship with Philidor and Valeant, about information concerning the transaction that had not been given to him, and about "payor risks," i.e., the risk that TPPs and PBMs would not pay for Valeant drugs dispensed by Philidor if they learned the truth about the companies' relationship. Kornwasser discussed these concerns with Pearson in or around December 2014. (Cr. Tr. 995-97, 1178-81.)

100.    Before Valeant's $100 million payment to Philidor in December 2014 (followed by a $33 million milestone payment in January 2015), Valeant's senior management and members of the board of directors, including the entire Audit Committee, went on site visits to Philidor, during which time Valeant was provided further access and exposure to Philidor's business practices and operations. (Sec. Cmplt. ¶¶ 138, 414.)

101.    In exchange for the $133 million option payment, Valeant received contractual rights to control Philidor's operations. The Philidor Option Agreement permitted Valeant to form a joint steering committee with equal numbers of Philidor and Valeant designees to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones. Significantly, the Option Agreement documented Valeant's right to "make the final determination" regarding all matters with respect to Philidor's "Strategic Plan" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and [Philidor]'s internal policies and manuals" in the case of any tie of the joint steering committee members. The joint steering committee also had "the right to review, prior to their submission, all applications of [Philidor] for licenses and permits (including state pharmacy licenses) and all applications of [Philidor] to Third Party Payors and to comment on such applications and [Philidor] shall use all reasonable efforts to incorporate the comments of the [joint steering committee] on such applications." Valeant's designees on the committee had the right to veto the selection of any replacement for Philidor's CEO. The Option Agreement also gave Valeant the right to appoint Philidor's advisor to the CEO, corporate compliance officer, in-house counsel, and chief information-technology officer, all of whom reported to the joint steering

committee and could not be terminated without Valeant's prior written consent. (GX 300-18; Cr. Tr. 409, 411, 413-14, 660-64.)

102.    At the same time that Valeant and Philidor entered into the Option Agreement, Valeant Pharmaceuticals North America LLC, a subsidiary of Valeant, entered into a consulting agreement, dated December 18, 2014, with Andrew Davenport, Philidor's CEO, to "[p]rovide various advisory services to the CEO [i.e., Pearson] respecting, among other things, matters respecting pharmacies in the United States." (GX 300-19.) The consulting agreement provided that Davenport "shall report to Valeant and shall take instructions and directions only from J. Michael Pearson, Chief Executive Officer and President of Valeant (the 'Supervisor'), Supervisor's designee, or such other person as indicated by Valeant." *Id.* Davenport was eligible under the agreement to receive up to $9 million of Valeant equity awards and annual bonuses of up to $400,000. The agreement was for a term of five years, renewable in Valeant's sole discretion for up to five additional one-year terms, and could be terminated by Valeant at any time with or without cause and by Davenport only for a material breach by Valeant. (*Id.*; Cr. Tr. 414-17.)

103.    On December 15, 2014, Valeant and Philidor entered into a distribution and services agreement that superseded the original Master Service and Pharmacy Dispensing Agreement of January 11, 2013. The new agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify Philidor's compliance.

104.    Valeant's control over Philidor is also demonstrated by the fact that the total discounts Valeant gave Philidor on Valeant drugs under the Master Service and Pharmacy Dispensing Agreement were lower than the total discounts (typically a percentage discount from the WAC benchmark rate plus an additional "prompt-pay" discount) that Valeant gave its three major independent wholesale distributors, such that Valeant was able to earn higher profits on

sales to a pharmacy it controlled than on sales to independent wholesalers. (Cr. Tr. 1043-45 , 1597, 1648-49.) As Tanner wrote in an internal Valeant email in July 2013 about the Valeant-Philidor Distribution Services Agreement, "the net effective discount will be more favorable to us than what I believe existing wholesale arrangements will be given that I am not providing for a prompt pay discount—the fully inclusive rate will be 4% from WAC." Andrew Davenport has admitted that the discount Valeant gave Philidor was "more favorable to Valeant than any of its other major retail channels." *United States v. Tanner*, No. 18-3598(L), Brief and Special Appendix for Defendant-Appellant Gary Tanner, at 48 (2d Cir. filed Mar. 7, 2019) ("Tanner App. Br.") (adopted by *United States v. Tanner*, No. 18-3598(L), Brief and Special Appendix for Defendant-Appellant Andrew Davenport, at 4 (2d Cir. filed Mar. 7, 2019) ("Davenport App. Br.")).

105.    Defendants' post-Class Period admissions concerning Valeant's restated financial results demonstrate that Philidor was an instrumentality of Valeant during the Class Period. On October 26, 2015, in Valeant's Form 10-Q for the third quarter of 2015, Valeant announced that it had formed an ad hoc committee of Valeant's Board of Directors to review allegations about Valeant's improper and previously undisclosed relationship with Philidor. On February 22, 2016, Valeant announced that the ad hoc committee had identified approximately $58 million in revenues "in the second half of 2014 that should not have been recognized upon delivery of product to Philidor." Based on the ad hoc committee's investigation, on March 21, 2016, Valeant announced that it would restate its financial results for 2014 and the first three fiscal quarters of 2015 and that its internal controls over financial reporting suffered from "one or more" material weaknesses.

106.    Misconduct by Valeant's management was central to the ad hoc committee's findings concerning improper revenue recognition related to Philidor and the material weaknesses in the Company's internal controls. On March 21, 2016, Valeant admitted that the "tone at the top"

of the Company could have been a "contributing factor[] resulting in the Company's improper revenue recognition . . . ." Valeant specifically admitted that by "improper conduct," Valeant's Class Period CFO Howard Schiller and Corporate Controller Tanya Carro contributed to the misstatement of Valeant's Philidor-related revenues. In Valeant's belated 2015 Form 10-K, filed with the SEC on April 29, 2016, Valeant further admitted that the "tone at the top" was itself a material weakness in the Company's internal controls over financial reporting. In other words, Valeant would not have been able to improperly book revenue related to Philidor without improper conduct by Valeant's top management.

107.   Moreover, the nature of the misstatements themselves demonstrates that Philidor was an instrumentality of Valeant's during the Class Period. On March 21, Valeant stated that:

> In connection with the work of the Ad Hoc Committee, the Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement *were not executed in the normal course of business* and included actions taken by the Company *in contemplation of the option agreement*. As a result of these actions, revenue for certain transactions should have been recognized on a sell-through basis (i.e., record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement rather than incorrectly recognized on the sell-in basis utilized by the Company. *Additionally, related to these and certain earlier transactions, the Company also has concluded that collectability was not reasonably assured at the time the revenue was originally recognized*, and thus these transactions should have been recognized on a sell-through basis instead of a sell-in basis.

108.   Valeant's disclosure that it improperly booked revenue "in contemplation of the option agreement" demonstrates Valeant's de facto control over Philidor even before it obtained contractual control along with the option to formally acquire Philidor. Valeant was able to improperly book this revenue before the execution of the Philidor Option Agreement only because the Valeant Enterprise was on both sides of the deal—there was no way Philidor would not enter into the Option Agreement with Valeant. Valeant prematurely booked Philidor-related revenue before it was sure it could collect the revenue because it assumed that Philidor would be able to

sell its expensive branded drugs to patients through the Valeant Enterprise's captive network of pharmacies despite the availability of less-expensive generic alternatives.

**E.      Through Philidor, Defendants Expand Their Secret Network of Pharmacies**

109.    In or around early 2014, Valeant decided to use Philidor as the hub controlling a secret network of regional pharmacies with their own separate pharmacy licenses and identification numbers to distribute Valeant products. An internal email, dated January 17, 2014, to Pearson, Kornwasser, Tanner, and other senior Valeant executives summarized "the key points, takeaways and actions" from a meeting the day before about the "Derm[atology] Rx Portfolio." (GX 100-27.) Under the heading "OGL [Operation Green Light, i.e., Philidor]/Independent Pharmacies (Laizer [Kornwasser], Gary [Tanner])," the email noted: "Could a regional pharmacy system be set up." (*Id.*) Kornwasser suggested to Tanner in or about January 2014 that Philidor serve as the central hub of a regional pharmacy system by acquiring pharmacies aroumd the country, and Philidor proceeded to do so. (*See* Cr. Tr. 1075-76, 1079.) Kornwasser knew that the pharmacies acquired by Philidor had their own separate pharmacy licenses and pharmacy-identification numbers, but he considered them parts of a single entity along with Philidor. (Cr. Tr. 1077.)

110.    In addition to Kornwasser, Pearson was personally aware of Philidor's secret pharmacy network. For example, Andrew Davenport told Pearson in an email that "We continue to focus on pushing refills[,] completing the national footprint[,] and continuing our regional acquisition strategy." (Cr. Tr. 1165.)

111.    As a further example that Pearson personally monitored Philidor's expansion, on March 9, 2015, Ari Kellen, a Valeant Executive Vice President and Company Group Chairman, sent an email to Pearson: "Met with Deb [Jorn, a Valeant Executive Vice President and

Company Group Chairman who headed the dermatology division] . . . . Suggested we get all the DMs [District Managers] in for a day . . . . goal *to go over the practices in each district where Philidor is working well* and identify next [approximately] 10 practices where we should push harder to build it out. that [sic] will help fuel growth." (Ellipses in original, emphasis added.) Pearson responded, "Good stuff." Philidor managers were invited to meet with Valeant's board in July 2015. (Sec. Cmplt. ¶ 416.)

112.    The purpose of this secret pharmacy network was twofold: to increase Valeant's revenue by increasing the sales of its branded drugs, and to avoid having any single pharmacy in the network process so many prescriptions for Valeant products that TPPs like Plaintiffs and other members of the Class would notice the large number of prescriptions from one pharmacy and refuse to pay for excessive prescriptions—a ploy that Michael Hess, a lawyer for Philidor and Valeant, called playing "whack-a-mole" in an email to Andrew Davenport. Hess was a lawyer with expertise in pharmacy issues who represented Valeant on matters including its relationship with Philidor. He was introduced to Philidor by Kornwasser and Tanner in or about December 2013 to advise on payor issues, and Valeant waived conflicts of interest in or around April 2014 so Hess could advise Philidor on "Philidor's expansion and payor strategies," i.e., establishing its secret network of regional pharmacies. Hess advised Philidor to acquire pharmacies that had their own licenses so that Philidor could distribute Valeant's branded drugs through multiple pharmacies and avoid having any single pharmacy fill so many of the prescriptions that TPPs or the TPPs' PBMs would notice and refuse to pay for the excessive prescriptions. (Cr. Tr. 374, 376, 1093-98, 1101-02, 1122-25, 1128, 1146, 1156-57, 1161, 1163-64, 1168-69.)

113.    Andrew Davenport has admitted that Michael Hess gave the advice discussed in the preceding paragraph. In his appeal of his criminal conviction, Davenport "join[ed] in full"

Tanner's appellate brief under Fed. R. App. P. 28(i). Davenport App. Br., at 4. Tanner's brief, in

which Davenport joined, summarizes Hess's role:

> According to the government, Tanner's supervisor (Kornwasser) directed him to form partnerships with other specialty pharmacies out of concern that "Valeant depended too much on Philidor to distribute its drugs."
>
> ***
>
> To show that Tanner took Kornwasser's diversification directive seriously and actively worked to implement it, the defense attempted to call Michael Hess, Valeant's outside counsel.
>
> ***
>
> Hess's testimony would have addressed "payor risk" to Valeant, a risk that diversification was intended to mitigate. As Kornwasser explained the issue, he wanted Tanner to develop relationships with "more than one pharmacy" because having "all of [the alternative fulfillment] program's business going through one pharmacy," namely Philidor, created "a risk that . . . if [Philidor] had a problem with one of their payors, . . . that . . . would have an impact to [the alternative fulfillment] program." In other words, if Philidor submitted too many insurance claims, that could lead to companies terminating their relationship with it, leaving Valeant's sole distribution channel unable to be reimbursed the cost of Valeant's drugs.
>
> ***
>
> Hess (who had considerable familiarity with payor risk) would have testified that Tanner developed an *alternative* way to mitigate that risk, and did so with Valeant's approval: a "hub-and-spoke model" in which Philidor provided administrative support for a network of regional pharmacies, each of which could independently obtain reimbursements directly from insurance companies, using its own license number. (Kornwasser acknowledg[ed] that regional pharmacies "had separate [license] numbers"). Hess would have explained that as long as Valeant drugs were distributed through such a network, companies would not see Philidor growing too big and thus would not be inclined to end their relationship with it. Hess also would have testified that Philidor successfully implemented this model, with Tanner's help.
>
> Hess knew this history because he had advised Philidor and Tanner on the hub-and-spoke strategy—at Valeant's behest. Specifically, Hess would have testified that Kornwasser (with whom Hess had previously worked to reduce payor risk while at another specialty pharmacy) referred him to Philidor in order to implement that strategy. Valeant even granted Hess a conflict waiver to permit him to advise

45

Philidor on this issue. And senior executives at Valeant knew that Kornwasser and Tanner were pursuing the hub-and-spoke model.

Tanner App. Br., at 26-28.

114.    With the assistance of Valeant employees, Philidor acquired and oversaw a secret pharmacy network. The Canadian newspaper the *Globe and Mail* depicted an example of the relationships of this secret pharmacy network in the graphic below:



**Figure 2. Valeant's Shell Companies**

115.    Defendants created a host of shell companies through Philidor, which they used to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network. Defendants created a network of "phantom" pharmacies by causing

46

Philidor or its affiliates to file pharmacy applications with state regulators on behalf of various shell companies that Valeant and Philidor used to implement their scheme. These captive pharmacies include R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy.[3]

116.    Like Philidor itself, many of the shell companies Defendants used to build their covert pharmacy network had chess-related names. "Philidor" refers to eighteenth-century chess master François-André Philidor and his eponymous Philidor defense. Many of the numerous additional shell companies in Defendants' captive network, all registered in Delaware, likewise share chess-related names:

- BQ6 refers to chess master Bobby Fisher's opening moves against chess master Boris Spassky in 1972;

- Lucena Holdings LLC and Back Rank, LLC refer to endgame chess strategies;

- Isolani LLC refers to an isolated queen's pawn;

- Fifty Moves, LLC refers to the "Fifty Move Rule";

- ELO Pharmacy LLC refers to the ELO chess-ranking system;

- C-K Pharmacies LLC refers to the Caro-Kahn chess defense;

- Tarrasch Pharmacy Holdings, LLC refers to Siegbert Tarrasch, an acclaimed nineteenth-century chess master;

- NC3 Pharmacy LLC refers to the Dunst Opening (a strategy popularized by American chess player Ted A. Dunst); and

---

[3]    In connection with the US Senate Special Committee on Aging's April 27, 2016 hearing on Valeant and the Company's practice of increasing the price of its drugs, Philidor admitted that SafeRx Pharmacy, D&A Pharmacy, Presciption Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy were pharmacies through which Philidor dispensed Valeant drugs.

- Lasker Pharmacies, LLC refers to the nineteenth-century chess player Emmanuel Lasker.

117.     Defendants also created specific entities that helped secretly facilitate the flow of money between Philidor and Valeant. One of these entities was KGA, the wholly owned Valeant subsidiary that Valeant used to lend money to Philidor's co-owners and managers and which was the counterparty of record with Philidor in the $133 million Option Agreement. Valeant created KGA in November 2014 to hold Valeant's option to purchase Philidor. Like the names of many of the shell companies in Valeant's covert pharmacy network, KGA's name also refers to chess: KGA stands for "Kings Gambit Accepted," a common opening move. Thus, not only Philidor and numerous companies beneath Philidor in the Valeant Enterprise's corporate pyramid but also Valeant's subsidiary that it used to acquire contractual control over Philidor were named for chess strategies. This demonstrates that Valeant was actively, consciously involved in a conspiracy with Philidor to conceal the existence of their pharmacy network from TPPs and the TPPs' PBM agents. Indeed, KGA's name shows that Valeant was the "King" of the conspiracy.

118.     What was not publicly disclosed, but has since been reported by the Southern Investigative Reporting Foundation (the "SIRF") in an article dated October 19, 2015, and entitled "The Kings Gambit: Valeant's Big Secret," is that KGA was "listed as the 'secured party' on UCC–1 liens placed in January and February 2015 against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in the debtor's personal property. In this case, Valeant/KGA lent money to Philidor's ownership group and accordingly, the ownership group's equity stakes in Philidor are potentially collateral."

119.     So firm was Valeant's insistence on using Philidor as its pharmacy network that when Valeant acquired Sprout Pharmaceuticals, Inc. ("Sprout") in August 2015, Valeant immediately cancelled Sprout's existing distribution agreement with Cardinal Health for Sprout's

48

marquee product, Addyi (also known as "Viagra for women"), a treatment option for hypoactive sexual desire disorder in pre-menopausal women, and then required that all sales of the product be made exclusively through Philidor.

120.    Andrew Davenport has admitted in his appeal of his criminal conviction that Valeant and Philidor worked closely together and did not have an arm's-length relationship:

> Valeant—at its senior-most executive levels—forged an unusually close relationship with Philidor and took a vested interest in its growth.

> Valeant advanced Philidor millions of dollars, closely monitored Philidor's performance, and installed its own employees, including . . . Gary Tanner, in Philidor's offices to help grow that company.

> \*\*\*

> Valeant was Philidor's first customer and remained its only customer for many months.

> \*\*\*

> From the very beginning, Valeant's CEO, Michael Pearson, and CFO, Howard Schiller, were personally involved in the Philidor project and shepherded Philidor's success. They each approved the Valeant-Philidor agreement, attended many meetings and calls about Philidor, and received weekly updates on the progress of Philidor's development and performance.

> Valeant also concluded that, in addition to the $2 million advance, Philidor "need[ed]" Valeant's "operational expertise and knowledge of the pharmaceutical manufacturing, retail pharmacy, and pharmacy benefits management businesses." Accordingly, Valeant assigned Tanner and three other Valeant employees to work in Philidor's offices "developing operational processes, validat[ing] and test[ing] information technology components, and building vital infrastructure functions."

> \*\*\*

> Nor was Philidor a true "third party" to Valeant. Driven by the prospect of significant revenues for itself, Valeant deliberately nurtured a relationship with Philidor that was less than arms-length: It advanced millions of dollars of seed capital to Philidor, flew Tanner across the country week-after-week to work in Philidor's offices and act in Philidor's best interests, and for all intents and purposes treated Tanner as Philidor's representative. Valeant's senior-most executives embraced and rewarded Tanner's hybrid role with glowing performance reviews and an enormous stock grant. . . . Valeant's CEO and other senior executives—not

> Tanner—dictated whether, when, and for how much Valeant would purchase the
> option to buy Philidor.

Davenport App. Br., at 2, 8-9, 30 (appellate record citations omitted).

121.    Davenport likewise admitted that "Valeant and Philidor were intimately
intertwined, and anything but arms-length counterparties." *United States v. Tanner*, No. 18-
3598(L), Reply Brief for Defendant-Appellant Andrew Davenport, at 4-5 (2d Cir. filed Apr. 22,
2019) ("Davenport App. Reply").

122.    Andrew Davenport has also admitted the role that Tanner played at Philidor,
including using the "Brian Wilson" alias for *all* of his Philidor work:

> Tanner used the "Brian Wilson" name for *all* of his Philidor work, but continued to
> interact with Valeant using his real name and his Valeant email account.
>
> ***
>
> The evidence indicates that, once Valeant installed Tanner at Philidor, Tanner
> became fully integrated into Philidor's operations as part of his effort to grow the
> company. For instance, Tanner adjudicated insurance claims for Philidor. He
> gathered patients' insurance information, determined whether the insurance
> company would cover patients' prescriptions, and determined the amount of any
> copays. This was indisputably "the role of a pharmacy," not something
> pharmaceutical manufacturers (or their employees) typically do. . . . Indeed,
> Davenport ordered business cards that identified Tanner as an Executive Vice
> President of Philidor. And Davenport listed Tanner on Philidor's internal
> organization chart as a member of its Executive Management Team and as a
> "Sponsor Liaison" (*i.e.,* an "[o]utside advisor to the Executive Team").

Davenport App. Br., at 11-12 (emphasis in original; citations to appellate record omitted).

123.    Again, Andrew Davenport admitted Tanner's role as Valeant's implant at Philidor
under an alias:

> Tanner had become so ingrained at Philidor—and . . . his work at Philidor was so
> valuable to the company—that he had effectively become "a Philidor
> employee." . . . Tanner's deep involvement with Philidor occurred *while* he was
> still employed at Valeant; in fact it began *because* Valeant had placed him at
> Philidor and directed him to help make Philidor a success. Indeed, . . . Davenport
> made Tanner business cards and listed him near the top of the company's internal

organizational chart. . . . [T]he identification of "Brian Wilson" on Philidor documents confirms that Tanner used that name for all of his Philidor work . . . .

Davenport App. Reply, at 6-7 (emphasis in original; citations to appellate record omitted).

### F. The Valeant Enterprise Causes Its Affilitiated Pharmacies to File False Applications with State Pharmacy Boards

124. To keep their captive pharmacy network a secret, Defendants caused the shell companies to make false and misleading statements in pharmacy applications, which were filed with state regulators and failed to disclose the companies' relationship with Valeant and Philidor.

125. For example, Philidor submitted an application to the California State Board of Pharmacy on or about August 15, 2013 that contained numerous false and misleading statements designed to hide Valeant's control over Philidor. The California State Board of Pharmacy found that Philidor and its CEO, Andrew Davenport, while under penalty of perjury, falsely represented in that application:

- that Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor;

- that Blaszczynski was an authorized signatory for Philidor's financial transactions;

- that there were no individuals or entities with a beneficial interest in Philidor;

- that there were no owners or shareholders of Philidor, when in fact there were sixteen;

- that there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- that there were no entities with 10% or more ownership interest in Philidor; and

- that Andrew Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

126.     On May 16, 2014, the California State Board of Pharmacy denied Philidor's application, finding that Philidor and Andrew Davenport knowingly made false statements concerning these topics, that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements, were "guilty of unprofessional conduct." The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy-license application in February 2016.

### 1.     Philidor Establishes Lucena to Acquire a Stake in West Wilshire Pharmacy

127.     Undeterred by the California State Board of Pharmacy's findings and determined to gain access to the California market, the largest insurance market in the United States, Defendants caused a Philidor-controlled shell company, Lucena Holdings LLC ("Lucena"), to acquire a stake in a California pharmacy, West Wilshire Pharmacy ("West Wilshire"), in an effort to circumvent the Board of Pharmacy's licensing denial. Philidor formed Lucena as a limited liability company in Delaware on or about July 31, 2014. Lucena's certificate of formation as a Delaware limited liability company identifies Defendant Matthew S. Davenport, Philidor's chief executive officer, as an "Authorized Person." Lucena's chief executive officer, Sherri Leon ("Leon"), identified herself through LinkedIn as Philidor's Director of Pharmacy Operations from August 2013 through 2015. (Her LinkedIn profile has since been removed.) Moreover, through Philidor, Valeant controlled Lucena, as Valeant's $133 million option agreement with Philidor provided that Philidor was to enter into a purchase agreement with Lucena (as well as Isolani) as a condition to the acquisition. (GX 300-18.)

128.     In August 2014, Philidor entered into a Prescription Drug Services Agreement with Brighton Way Pharmacy, Inc. doing business as West Wilshire Pharmacy. This agreement

(referenced in Valeant's Option Agreement to acquire Philidor (GX 300-18, p. 127)) gave Philidor the right to use West Wilshire Pharmacy for dispensing operations.

129.   In September 2014, Lucena acquired a 10 percent interest in Brighton Way Pharmacy, Inc. doing business as West Wilshire Pharmacy.

130.   In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor; and

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

131.   In other words, absent from the application was any disclosure that Leon was a Philidor employee; nor did Leon disclose Blaszczynski's ownership in Philidor. Although required to disclose this fact on the application, Leon concealed that she was associated with Philidor, which had been denied a Board license just months earlier. Yet attached to Lucena's application was its certification of formation under Delaware law, with Philidor's CEO signing as an "Authorized Person." (The Change of Permit Request Lucena also identified James R. Fleming ("Fleming") as a director but did not disclose that he was Philidor's controller. (Sec. Cmplt. ¶ 119.))

132.   In researching West Wilshire's relationship with Philidor, ProPublica discovered that West Wilshire shared Philidor's toll-free customer-assistance number, and West Wilshire's website was hosted on a network belonging to Philidor.

133.    Senior Valeant executives, including Kornwasser, were aware that Philidor acquired West Wilshire.

### 2.    Philidor Surreptitiously Forms Isolani to Acquire R&O

134.    In another attempt to overcome its inability to secure the necessary pharmacy license in California, Philidor formed Isolani LLC ("Isolani") as a limited liability company under Delaware law on October 28, 2014. Philidor then caused Isolani to acquire R&O, a licensed pharmacy in Camarillo, California. In court documents, Isolani admitted that it was a single-member LLC and that it was formed for the sole purpose of acquiring ownership of R&O. Its sole member was Eric Rice, who also served as Philidor's Senior Director of Call Operations.

135.    R&O unwittingly became a part of Valeant's secret pharmacy network when it entered into a series of agreements with Isolani in December 2014. After Philidor's purchase of R&O through Isolani, R&O began dispensing thousands of prescriptions, dwarfing the size of its business before its acquisition by Philidor. (Valeant made approximately 75 shipments of product to R&O between January and August 2015 and received millions of dollars in payment directly from R&O in return. (Sec. Cmplt. ¶ 417.)) These new prescriptions were extraordinarily expensive for simple dermatological conditions like acne or eczema and were all for drugs manufactured by Valeant. It was only when R&O began its own investigation into Philidor that it discovered the relationship between Philidor and Valeant. In connection with its purchase of R&O, Isolani concealed from California regulators its relationship with Philidor and Valeant.

136.    To date, Defendants have not disclosed the full scope of Valeant's secret pharmacy network and the identities of all the pharmacies and shell companies that constituted the Valeant Enterprise. However, elements of that network have become public. The chart below illustrates one segment of Valeant's retail-pharmacy network, the California associates in the Valeant

Enterprise that have been revealed to date, and the byzantine corporate structure Valeant and Philidor used to maintain the Valeant Enterprise's secrecy:



**Figure 3. Valeant's Network of Captive Pharmacies in California**
**Source:***Business Insider***, October 25, 2015.**

### 3.  Philidor Creates Back Rank to Acquire an Interest in Texas-Based Orbit Pharmacy

137.    As they did with California regulators, Defendants likewise misled Texas regulators in filings related to the purchase of a retail pharmacy. On April 23, 2015, Philidor created Back Rank, LLC, a Delaware limited liability company also named after a chess strategy. Back Rank's managing member was identified as Fleming, who was also Philidor's Controller and located at Philidor and BQ6's address. (Back Rank used "philidorrxservices.com" as its email address, Philidor's Hatboro, Pennsylvania address as its address, and Gretchen S. Wisehart ("Wisehart"), Philidor's general counsel, was Back Rank's general counsel. (Sec. Cmplt., p. 41 n.17.))

138.    Defendants caused Back Rank to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit Pharmacy"). On or about June 2015, Fleming filed an application with the

Texas Board of Pharmacy seeking to replace Segun Azeez Audu as the managing officer of Orbit Pharmacy. On or about September 15, 2015, Philidor caused Back Rank to file a form for a location change for Orbit Pharmacy. Fleming, Philidor's controller, was identified in the application to the Texas State Board of Pharmacy and also executed the form on Orbit Pharmacy's behalf. In the September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit Pharmacy to falsely represent that no state had ever denied a pharmacy-license application filed by any of "the pharmacy's owner[s] or partner[s]." Fleming also failed to disclose his and Back Rank's relationship with Philidor. Attached to the application was an assignment and assumption of lease, executed on Back Rank's behalf by its General Counsel, Wisehart. Wisehart's LinkedIn profile identified her as Executive Vice President and General Counsel of Philidor. Moreover, like West Wilshire Pharmacy, Orbit Pharmacy shared Philidor's toll-free customer-assistance number, and Orbit Pharmacy's website was hosted on a network belonging to Philidor. (Following the acquisition, Orbit used the Horsham, Pennsylvania address shared by BQ6 and Philidor as its address. (Sec. Cmplt. ¶ 120.)) In reality, as discussed above, California had denied Philidor's pharmacy-license application the previous year, and Orbit's false and misleading representation concealed its connection with Philidor and Valeant from Texas regulators.

139.    On or about June 10, 2015, in response to a violation warning from the Texas State Board of Pharmacy, Orbit belatedly disclosed the change in ownership. Orbit was also warned of a failure to maintain and document completion of training and for its lack of written policy and procedure manuals. On June 29, 2015, Rhoshona Carroll, the pharmacist-in-charge of Orbit, sent a response, noting that "Corporate headquarters is currently putting the last of the paperwork together." Ms. Carroll used a Philidor email address, which further reflects that Philidor controlled Orbit and the pharmacies used common policies. (Sec. Cmplt. ¶ 123.)

### G.     Defendants Use Their Secret Nationwide Network of Captive Pharmacies to Insulate Valeant's Branded Drugs from Generic Competition and Exponentially Inflate Drug Prices

140.    While Valeant's success was predicated on its ability to sell the drugs it acquired at prices inflated far beyond those at which they had been previously marketed and sold, this strategy would ordinarily have been impossible to execute because most of Valeant's drugs had cheaper generic equivalents. Ordinarily, pricing a brand-name alternative to a generic drug at a huge premium would have caused the brand-name product to lose market share to the point where the price increase would be unprofitable. Indeed, the primary purpose behind Defendants' secret network of pharmacies was to ensure that Valeant's branded drugs would be insulated from generic competition at retail outlets, where generic competition plays out as a result of the incentives to pharmacies and patients. Valeant's dermatological products were especially sensitive to generic competition.

141.    Through the Valeant Enterprise, Defendants were able to channel prescriptions for Valeant's branded drugs, including those ostensibly dispensed by smaller retail pharmacies in Defendants' captive network, through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure that Valeant's branded drugs—and not generics—were dispensed. Thirteen states, including Pennsylvania (where Philidor is headquartered), and Puerto Rico have laws requiring pharmacists to substitute generic equivalents for branded drugs, unless the prescribing doctor specified that the branded drug be dispensed.[4] Most other states have laws

---

[4]      These states, which include significant prescription-drug markets, are Florida, Kansas, Kentucky, Massachusetts, Minnesota, Mississippi, Nevada, New Jersey, New York, Pennsylvania, Rhode Island, Washington, and West Virginia. E.g., Fla. Statutes § 465.025, Kentucky Revised Statutes § 217.822, 105 Code of Mass. Regs. 722.090, Minn. Statutes § 151.21, Nev. Revised Statutes 639.2583, N.J. Statutes 24:6E-7, N.Y. Education Law § 6816-a, 35, Pa. Statutes § 960.3, R.I. Gen. Laws § 5-19.1-19, Revised Code Wa. 69.41.130, W. Va. Code § 30-5-12b.

permitting pharmacists to substitute generic equivalents for branded drugs, unless the prescribing doctor specified that the branded drug be dispensed. Additionally, contracts between pharmacies and TPPs or their PBM agents typically require the pharmacies to dispense a generic substitute for a branded drug where available, unless the prescribing doctor specified that the branded drug be dispensed. Defendants' refusal to substitute generic alternatives for Valeant's expensive branded drugs, despite the generics' widespread availability, violated these statutory and contractual mandates.

142.    In fact, contrary to these requirements and unknown to Plaintiffs and the members of the Class, Philidor's internal policy mandated that Valeant's branded drugs be dispensed, even when a prescription expressly called for a generic. For example, an adjudication specialist at Philidor from July 2015 through November 2015 said that she[5] was instructured by supervisors never to dispense generic drugs and, even when the prescription said a generic could be substituted, Philidor told employees to always put "brand" in Philidor's computer system. In fact, when she received a prescription for a generic drug and entered a generic drug into the system, her supervisor told her that doing so was wrong and to enter "brand" into the system instead.

143.    By manipulating PBMs and the processes used to obtain the most appropriate prescriptions at the lowest possible cost, including by minimizing generic substitution and thus substantially shielding Valeant's branded products from generic competition, Defendants were able to inflate the prices of Valeant's drugs far beyond the prices at which the drugs had previously been marketed and sold, both within Valeant's captive pharmacy network and by pharmacies outside Valeant's network. Documents obtained by the Congressional Committee on Oversight

---

[5]     When referring to former employees in this Complaint, any pronouns will be in the female gender, irrespective of whether the employees were male or female.

and Government Reform through its investigation into Valeant's misconduct revealed that Valeant *first* identified goals for revenue and *then* set drug prices to reach those goals.

144.    Defendants' scheme allowed Valeant to triple the price of Wellbutrin XL, an off-patent antidepressant that Defendants sold through Philidor and its captive pharmacy network, from less than $6,000 to $17,000 for a year's supply of the drug, compared to $360 for a year's supply of Wellbutrin XL's generic equivalent. Astonishingly, despite falling prescription rates for Wellbutrin XL and the availability of a generic alternative that costs 1/50 the price, Defendants' scheme allowed Valeant to double the revenue generated by Wellbutrin XL. These results could only be possible in a rigged market.

145.    Likewise, Defendants' scheme allowed Valeant to increase the price of its drugs—many of which have far cheaper generic bioequivalents—by extraordinary amounts. After acquiring the dermatology drug Noritate 1%, used to treat the common skin condition rosacea, from Sanofi in 2011, Valeant increased the price of the drug *212%* between the first quarter of 2014 and the third quarter of 2015. Significantly, a generic alternative for Noritate is available at a fraction of the price.

146.    From 2013 to 2015 alone, Valeant dramatically increased the prices of more than 50 other drugs. While the Company referred to this strategy of increasing drug prices as "optimization," in reality, these price increases were effectuated through Defendants' fraudulent scheme. The below chart illustrates the increases that Defendants implemented for certain of Valeant's drugs during the Class Period:

| Valeant Drug | From | Through | Years | Percent Increase |
|---|---|---|---|---|
| Cuprimine 250 MG capsules | Q1-13 | Q1-15 | 2.00 | 2,849% |
| Syprine 250 MG capsules | Q1-13 | Q3-15 | 2.50 | 1,424% |
| Glumetza 100 MG tablets | Q1-13 | Q3-15 | 2.50 | 1,018% |

| Valeant Drug | From | Through | Years | Percent Increase |
|---|---|---|---|---|
| Edecrin (per vial) | Q2-14 | Q4-15 | 1.50 | 878% |
| Carac cream | Q1-13 | Q3-15 | 2.50 | 557% |
| Mephyton (single tablet) | Q3-14 | Q4-15 | 1.25 | 527% |
| Wellbutrin XL 300 MG tablet | Q1-13 | Q3-15 | 2.50 | 381% |
| Tretinoin 0.1% cream | Q2-14 | Q3-15 | 1.25 | 328% |
| Vanos 0.1% cream | Q1-13 | Q3-15 | 2.50 | 279% |
| Targretin 60g 1 % gel | Q1-13 | Q3-15 | 2.50 | 250% |
| Aldara 5% cream | Q1-13 | Q3-15 | 2.50 | 223% |
| Xerese 5%-1% cream | Q1-13 | Q3-15 | 2.50 | 216% |
| Noritate 1% cream | Q1-14 | Q3-15 | 1.50 | 212% |
| Migranal nasal spray | Q1-13 | Q3-15 | 2.50 | 159% |
| Loprox 1% shampoo | Q1-13 | Q3-15 | 2.50 | 145% |
| Atralin 0.05% gel | Q1-13 | Q3-15 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4 MG/ML nasal spray | Q1-14 | Q3-15 | 2.50 | 90% |

147.    In addition to enabling Valeant to increase the prices of its branded drugs, Philidor's secret pharmacy network enabled Valeant to increase the volume of those drugs that it sold beyond what would have been possible if the truth about the relationships between Valeant, Philidor, and the secretly controlled pharmacies had been known to TPPs and their PBMs. Valeant set aggressive sales targets and shipped large volumes of drugs to Philidor at the end of financial quarters throughout the Class Period in order to meet the targets, which in at least one instance required Valeant to waive a contractual limit on Philidor's inventory size. Kornwasser said at the time to Pearson: "This is one where like, for example, like this buy, where Philidor's going to take 22 pallets, their inventory room doesn't have room for three pallets. And so it's one of those things where if it were ever to be exposed, it just doesn't feel—it just doesn't feel right." (Cr. Tr. 149-51, 162, 891.)

148.    Ordinarily, a high volume of claims for a single manufacturer's expensive branded drugs from a single pharmacy that was failing to substitute generic drugs for any of that

manufacturer's drugs—i.e., Philidor—would have triggered heightened scrutiny of the pharmacy's practices and denials of claims from PBMs. However, by concealing Valeant's relationship with Philidor, Philidor's relationships with its network of pharmacies, and the pharmacies' relationships with each other, Defendants were able to spread claims across ostensibly unrelated pharmacies. This caused Defendants' deceptive practices to go undetected by creating the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons and burying fraudulent claims among the large volume of the pharmacy network's claims.

149.    Accordingly, secrecy was essential to Defendants' scheme, and Defendants went to great lengths to ensure that Valeant's ownership of Philidor and its network of captive retail pharmacies remained concealed from the public, including from TPPs and PBMs. For example, neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed their relationship with Valeant to the TPPs or PBMs in their contract negotiations, audit reports, claims submissions, or other communications or transactions.

150.    Secrecy was so important to Defendants' scheme that former Philidor employees were forbidden to mention Philidor's relationship with Valeant to customers and were even reprimanded if they mentioned it. For example, a former Philidor call-center agent from August 2014 to October 2014 received a written warning by Brad Greenfield, Philidor's Director of Sales, who reported directly to Philidor's CEO, Andrew Davenport, when she mentioned Valeant in a recorded phone call. Greenfield told the call-center agent that she would be fired if she mentioned Valeant to a customer again. Similarly, a claims specialist and intake supervisor at Philidor from September 2014 to November 2015 explained that managers instructed Philidor employees like

her never to mention Valeant. The claims specialist and intake supervisor was reprimanded by a trainer when she mentioned Valeant to a patient.

151.    Similarly, Valeant never disclosed Philidor in any of its SEC filings during the Class Period before October 19, 2015. Likewise, Philidor never publicly discussed the nature of its relationship to Valeant before October 19, 2015.

152.    Maintaining the secrecy of the Valeant-Philidor relationship was so important to Defendants that in September 2015, two years after Philidor began operations and just after the R&O dispute arose, Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities.

### H.    Valeant's and Philidor's Misrepresentations to the Class

153.    In furtherance of their fraudulent scheme, Defendants made a host of false and misleading statements directly to TPPs, their PBM agents, and their members and beneficiaries in order to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales. Many aspects of Defendants' fraudulent scheme are catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs. Those manuals explained to employees that "*[w]e have a couple of different 'back door' approaches to receive payment from the insurance company*." (Bloomberg, October 28, 2015, *Valeant's Philidor Used 'Back Door' Tactics to Boost Payments*). As explained in further detail below, those "back door approaches" included altering prescription information, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass TPPs' denials of claims for Valeant drugs. Internal emails, including a July 19, 2015 email from Philidor's CEO, Andrew Davenport, reveal that Valeant and Philidor's senior management were well aware of these practices.

### 1.      The Valeant Enterprise's Alteration of Prescriptions

154.    Defendants instructed Philidor employees to change codes on prescriptions—i.e., *to deliberately alter the prescribing doctors' instructions stated in the prescriptions*—to require that the prescriptions be filled with Valeant's brand-name drugs, as opposed to less-expensive generic alternatives. While pharmacists who receive prescriptions for branded drugs will ordinarily dispense generic substitutes if available (in fact, pharmacists are required to do so by law in thirteen states and Puerto Rico and often by contract throughout the country), doctors can indicate that the prescriptions be "dispensed as written" or "DAW" and order that no substitutions be made. When TPPs denied reimbursement claims for Valeant's branded drugs, Philidor employees circumvented those denials by resubmitting altered claims that falsely represented that the prescribing doctors had ordered the the prescriptions be DAW. Moreover, Philidor employees falsely resubmitted these claims as new claims, misrepresenting and concealing the fact that these claims had previously been denied.

155.    As reported by Bloomberg on October 29, 2015, former Philidor employees have confirmed that pharmacies in Valeant's network, acting on written instructions in claims-handling manuals issued by Defendants, routinely altered doctors' prescriptions to ensure that more patients received Valeant products rather than less-costly generics. These employees explained that this fraud was frequently implemented with respect to certain key Valeant dermatologic products that encountered repeated denials from TPPs, such as Retin-A Micro and Vanos. Bloomberg has reported that an "undated Philidor document . . . provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological cream and gels, including Retin-A Micro and Vanos is rejected. Similar instructions for changing the DAW indication are supplied for patients who are paying in cash." Bloomberg also reported that ex-employees of Philidor confirmed that

prescriptions were altered as the claims-handling manual instructed and said the intent was to fill more prescriptions with Valeant products than generics.

156.    In deliberately altering prescribing doctors' instructions with respect to prescriptions, Philidor employees engaged in at least two types of fraud. When TPPs denied claims for these prescriptions, Philidor employees circumvented those denials by resubmitting the claims with altered prescription codes that falsely represented that the prescribing doctors had ordered that only Valeant drugs be dispensed and that no generic substitutions were permitted. Moreover, in resubmitting these denied claims, Philidor employees falsely resubmitted these claims as new claims, misrepresenting and concealing the fact that these claims had previously been denied.

## 2.    The Valeant Enterprise's Use of False Pharmacy-Identification Numbers

157.    Defendants also used false pharmacy-identification information to bill TPPs for prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursement. Specifically, Defendants' claims-handling manual instructed Philidor employees to submit claims to TPPs or their PBM agents using Philidor's NPI. If a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging to a different pharmacy in Defendants' captive network—in other words, to misrepresent that a pharmacy had dispensed a prescription it did not in fact dispense, and, in some cases, did not even stock.

158.    Former Philidor employees indicated that they were provided with maps and detailed instructions that set out the particular false NPI information that should be submitted in the event of a denial relating to a particular dispensing pharmacy. For instance, Defendants' claims-handling manual instructed employees who received certain denials from TPPs to "submit the NPI for our partner in California, West Wilshire Pharmacy. . . . There is a good chance they are contracted." If a claim using West Wilshire's NPI was denied, the next step was to "add the

Cambria Central Fill insurance and run that as the primary"—referring to one of Philidor's secret retail pharmacies based out of Philadelphia, Pennsylvania. "They should then get a paid claim and then Cambria . . . will reimburse us." (Bloomberg, October 29, 2015, *Philidor Said to Modify Prescriptions to Boost Valeant Sales*). In other words, Philidor employees were "instructed . . . to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim—to essentially shop around for one that would be accepted."

159.    Likewise, Defendants routinely caused pharmacies in the Valeant network, including Isolani (described above), to use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network discussed further below, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O did not even stock. Philidor used its network of pharmacies and their NPIs to fill prescriptions and obtain reimbursements in states where Philidor was not licensed, including California. Philidor also shipped Valeant drugs to states where neither Philidor nor the pharmacy associated with the NPI were licensed. In a July 19, 2015 email to R&O, Defendant and Philidor CEO Andrew Davenport himself acknowledged that he was aware this practice was ongoing.

160.    The purpose of this conduct was to fraudulently secure payment of claims that were properly denied by TPPs or PBMs, as described by both the *Wall Street Journal* and Bloomberg. Moreover, in an interview with SIRF, Taylor Geohagen, a former Philidor claims adjudicator during the Class Period, confirmed that this fraudulent practice was routinely implemented: "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch." (Southern Investigative Reporting Foundation, October 25, 2015, *The Pawn Isolated: Valeant, Philidor and the Annals of Fraud*).

65

161.    Similarly, the claims specialist and intake supervisor at Philidor from September 2014 to November 2015 described how this practice worked in the Advanced Care Specialist Department, which she joined in October 2015. According to this claims specialist and intake supervisor, when Philidor was unable to get a claim paid through a certain pharmacy, Philidor would then attempt to process the claim through a different pharmacy that Philidor had a "partnership" with, such as West Wilshire or Orbit. She said that the location of the patient did not determine which pharmacy was used.

162.    To conceal Defendants' use of false pharmacy-identification numbers, Philidor and Valeant also submitted false and misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which Philidor and Valeant were secretly associated, falsely representing that the pharmacies had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies.

163.    Relatedly, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies. For instance, as evidenced by a July 14, 2015 email from Russell Reitz of R&O to Eric Rice, Senior Director at Philidor, Defendants' agents' audit statements on behalf of R&O falsely claimed that R&O had dispensed prescriptions for Valeant drugs that were actually filled by Philidor. Specifically, Reitz told Rice that Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed *before* the exection of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's NCPDP (National Council for Prescription Drug Programs) number without his knowledge or consent. (Emphasis in original.) Again, in some cases, these prescriptions were for drugs that R&O did not even stock.

164.     In response to a complaint to Philidor that some prescriptions using R&O's NPI were being filled by Philidor using R&O's NPI number or outside California, Andrew Davenport falsely told Reitz that Philidor had stopped using R&O's NPI number and "[w]hile we remain comfortable with the practice, we halted activity pending coming to some alignment with you." (Sec. Cmplt. ¶ 117.)

### 3.     The Valeant Enterprise's Automatic-Refill Program

165.     Another "back door" fraudulent billing practice implemented by Defendants was submitting unnecessary or unwanted prescription renewals for reimbursement, falsely representing to TPPs and their PBM agents that patients had requested renewals of their prescriptions when in fact no renewal requests had been made. As Philidor customers have explained and as *New York* magazine reported in a January 13, 2016 article, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, even though the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills. The *New York* magazine article likewise reported that Philidor "enlist[ed] patients in an unadvertised 'auto-refill' subscription program that automatically delivered more toenail-fungus remover [Jublia] and charged them ongoing co-pays to do it," and that "[g]etting unsubscribed from this program was, according to patient complaints, almost impossible."

166.     Valeant launched Jublia in the second quarter of 2014, and Valeant's efforts to route Jublia prescriptions through Philidor caused rapid growth in Jublia sales, which increased 333% to $12 million in the third quarter of 2014, 308% to $54 million in the fourth quarter of 2014, 17% to $62 million in the first quarter of 2015, 65% to $102 million in the second quarter of 2015, and 4% to $106 million in the third quarter of 2015. By that time, 44% of Jublia sales, totaling $46.6 million in revenue, were sold through Philidor. Valeant's reported revenue for Jublia declined 36%

in the fourth quarter of 2015 when Valeant was forced to close Philidor on October 30, 2015, and dropped another 44% in the first quarter of 2016. Similarly, Solodyn revenues declined 60% from $66 million in the third quarter of 2015 to $26 million in the fourth quarter of 2015. Valeant's total dermatology revenues declined 30% from the third to the fourth quarter of 2015. (Sec. Cmplt. ¶¶ 362–63, 371.)

167.    Defendants' implementation of automatic refills of Valeant's dermatological products was particularly injurious to TPPs because the conditions these products are designed to treat are not chronic and can be remediated by a limited course of treatment, limiting the need for renewals absent Defendants' fraudulent scheme. Notably, Philidor's practice of waiving patient copays in connection with this scheme (described in detail below) allowed the scheme to go undetected, as patients were not incentivized to complain about unnecessary refills for which they were not charged copays. These unnecessary refills harmed the Class because the cost of these drugs was imposed on TPPs through the payment of additional claims for unnecessary drugs that had not actually been ordered by either a physician or a patient.

168.    Philidor employees have confirmed this practice. As a Philidor employee explained in an online forum, Philidor "auto ship[ped] [Valeant drugs] without proper approval, most people do not need these refills. The reason they ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550–$1220 from the insurance companies." Likewise, after the end of the Class Period, a Philidor employee explained in an online forum that this scheme was jointly developed by Brad Greenfield, Director of Sales and Marketing for Valeant, and Philidor executive Fabian Forrester-Charles:

> They took the list of customers who had been approved by [insurance] and had refills available. ***Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs. They would do this on the 30th day of the rx.*** Previously they had a Co pay so would

have to wait to get approval to charge the 35.00 Co pay, making the Co pay . . . 0 allowed them to ship refills whether u wanted them or not. Not a bad money making idea except *most people did not really need refills of Solodyn so soon* . . . Of course these refills were out the door ASAP *sometimes within an hour of the call and the [insurance] money would come in*.

What patients don't get is *your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed. I would bet a lot of solodyn and Jublia bottles are just lying around still in the shipping package.*

*If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor*. Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$ and a ton of it! Think about it.

(emphasis added and all typographical errors in original) (Cafepharma, Philidor employee post dated October 27, 2015).

### 4.     The Valeant Enterprise's Waiver of Co-Pays

169.    When submitting claims to TPPs, Defendants also misrepresented to TPPs the dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants' practice of routinely waiving patient co-pays.

170.    As a general matter, the collection of co-pays from insureds discourages insureds from "overutilization," or wasteful consumption of pharmacy benefits beyond those medically necessary, and thereby incentivizes insureds to select generics when available and to refill medications only when needed. Conversely, waiving co-pays has the opposite effect and discourages patients from actively avoiding low-value or medically unnecessary medicines.

171.    Notably, even if these co-pay waivers at first seem to protect consumers, that protection is in fact short-lived. As the *New York Times* reported, "even if patients are often shielded, the costs are paid by insurers, hospitals and taxpayers and lead to higher premiums and co-payments for everyone." Co-pay waivers can significantly distort an insured's economic incentives when choosing between a branded drug and its generic alternative and when refilling a prescription. As a result, PBM contracts with pharmacies mandate that pharmacies make every

69

attempt to collect co-payments and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.

172.    For this reason, co-pay waivers are generally discouraged, or outright prohibited, by TPPs. For example Optum Rx's 2015 Provider Manual "strictly prohibited" pharmacies from waiving patient cost-sharing amounts (i.e., co-pays). Similarly, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association, a national association that represents PBMs, explained to Congress at a hearing on February 4, 2016 concerning Valeant's price-gauging tactics that PBMs "encourag[e] the use of generics and more affordable brand medications." He noted that PBMs restrain drug costs by "using differential copays and other tools to encourage patients to choose more affordable options." Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce "resistance to higher prices." He testified that by providing co-pay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced "the employer's unions and others to pay hundreds of thousands more for the most expensive brands on the formulary." Merritt noted that "such practices are considered illegal kickbacks in federal programs."

173.    Here, Defendants routinely waived co-pays for patients prescribed Valeant branded drugs, but when submitting claims for the prescriptions, Defendants falsely represented to TPPs that the patients had been charged the full prices of the drugs. For example, Philidor's training manual instructed employees that Philidor had set up "numerous house insurances that will bring [patient] copay[s] down."

174.    Valeant increased patient assistance programs ("PAPs") so, unbeknownst to payors, patients paid little or nothing for Valeant medications which had experienced dramatic price hikes. Valeant increased its PAPs in order to waive or substantially reduce patient copays

without full disclosure to payors that while they were paying more, patients were paying less. Valeant's total spending on PAPs increased by over 1,100% from 2012 to 2015, from $53 million to $600 million, with expectations for PAPs spending to reach over $1 billion in 2016. In comparison, the Company's revenues increased by only 300% in the same time period, from $3.5 billion in 2012 to $10.4 billion in 2015. (Sec. Cmplt. ¶ 77.)

175.     While PAPs are intended to ensure that financially needy persons are not deprived of, in some cases, lifesaving medications, Valeant manipulated its patient assistance into another deceptive tactic to conceal its price gouging from the private payors it was fleecing. While Valeant's increased financial assistance appeared to be increased support for patients needing financial aid, Valeant waived or reduced patient obligations for high-priced Valeant drugs to reduce patient complaints, patient refusal to accept unnecessary refills or enrollment in automatic refill programs, and negative publicity. (Sec. Cmplt. ¶ 78.)

176.     For example, an internal Valeant analysis reflected this strategy when it outlined the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser. The analysis stated: "Take initial 25% price increase to drive patients into the restricted distribution model," and noted that "[h]igh deductible copay requires increased foundation support." The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine." (Sec. Cmplt. ¶ 82.)

177.     Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program." The presentation stated that "[t]he program will be funded through planned price increases [i.e., funded by higher prices to payors rather than by Valeant]." The analysis directed adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance

program or free goods as last resort." The presentation noted that Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns." (Sec. Cmplt. ¶ 83.)

178.    The presentation also identified the risks of these tactics, including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's, payors, and/or government agencies" and "Managed Care plan actions against products could limit/restrict re-imbursement." To address the risks, the presentation included a "PR Mitigation" plan to "Privately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase." (Sec. Cmplt. ¶ 84.)

179.    The presentation included a June 4, 2013 "PR Draft Communications Plan: Orphan Drug Rate Increases," which noted that orphan drugs "often command a substantial premium in the market—to offer pharmaceutical companies a greater return on investment." It explained that"[w]hile the high cost of orphan drugs has been largely tolerated by the medical community because the overall impact of these pharmaceuticals on health budgets has been relatively small, there has recently been a renewed focus on the cost of these drugs." The presentation warned that the "press has also picked up on these trends" and Valeant's planned price increases on drugs to treat Wilson's disease "needs to be managed carefully." (Sec. Cmplt. ¶ 85.)

180.    As part of the PAP and PR strategy, the presentation also encouraged false and misleading responses to inquiries about price increases. Notably, a draft Q&A directed that the response to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was: "No. These rate increases are essential to ensure

that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable." In truth, Valeant's costs of producing these drugs had not increased and the price increases, which resulted in gross margins exceeding 90%, were not required to keep Valeant commercially viable. Kornwasser essentially conceded the fact that Valeant was using price increases to chase outsized profit margins when he wrote a May 2014 email stating, "These patients are too valuable to lose." (Sec. Cmplt. ¶ 86.)

181.    Valeant employed its PR strategy on Berna Heyman, a patient who testified at the April 27, 2016 Senate Committee hearing as to her experience with Valeant and Wilson's disease. On November 1, 2013, Ms. Heyman wrote to Pearson that she was "outraged . . . by the unbelievably steep increases in prices charged for Syprine." She wrote "to ask for an explanation of how the drug costs could have increased so dramatically." (Sec. Cmplt. ¶ 87.)

182.    On December 9, 2013, Valeant's customer service department responded (following the PR strategy) that "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute novel medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable." This was dishonest and misleading because despite Valeant's massive price increase for Syprine, Valeant was not reinvesting in R&D to find better treatments for Wilson's disease. (Sec. Cmplt. ¶ 88.)

183.    Thereafter, Valeant continued raising prices, and Ms. Heyman's copay increased to over $10,000 per year with her insurance company paying $26,000 per year. Ms. Heyman could not afford the copay and was forced to use an alternative and, in her view, less desirable treatment. However, once Ms. Heyman took her complaints to the media, Valeant responded by offering her

financial assistance, sending her flowers, and offering free medication for life, while continuing to charge the exorbitant prices to other patients. (Sec. Cmplt. ¶ 89.)

184.   Pearson monitored such complaints. For example, in January 2015, Drew Katz ("Katz") wrote an email to William Ackman, the head of Pershing Square Capital Management, one of Valeant's largest shareholders, complaining that "Valeant charges approximately $300,000 / yr for the average does [sic] needed for a patient with WD [Wilson's disease] (200X higher than Merck charged when it owned the drug. Merck did not raise its rates for … 20 years." Katz noted that "[w]e hear that healthcare providers are now beginning to deny coverage due to the cost of the drug. And those without coverage are in real trouble." Ackman forwarded the email to Pearson, warning that "Drew is a very politically connected and influential person." (Sec. Cmplt. ¶ 90.)

185.   Moreover, in an article dated February 2016, *The Pharmacist Activist* reported on an incident in which Philidor waived a patient's co-pays without disclosure of this practice to TPPs:

> The patient was prescribed Luzu for athlete's foot but was surprised that the prescriber suggested that he obtain the prescription from a mail-order pharmacy (Philidor) that would cover the co-pay for the first prescription. The prescription was delivered and several weeks later the patient received a call from Philidor offering to waive his co-pay for all his remaining refills. The patient observed that he probably would not have needed or ordered the refills if he would have been charged a co-pay. He now has "a few years' supply of athlete's foot cream" and is also suspicious of what incentives the prescriber may have received, as well as the relationship between Valeant and Philidor.

186.   Similarly, an October 25, 2015 article in the *Wall Street Journal* explained that doctors reportedly said that Valeant sales representatives furnished brochures and coupons offering to help pay for co-pays and directing patients to call a number for Philidor:

> [D]octors would send prescriptions for Valeant drugs electronically to Philidor.

> Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to three former employees . . . .
>
> * * *
>
> If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said . . . .

187.    Philidor employed these co-pay practices in order to increase sales by removing incentives for patients to use much cheaper generics, concealing this practice from TPPs and harming them in the process.

### 5.    The Valeant Enterprise's Misrepresentations Directing Patients to Philidor

188.    Defendants also made misrepresentations directly to patients to boost Valeant's drug sales. Specifically, Defendants disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost only if they submitted their prescriptions directly to Philidor. By encouraging patients to submit claims directly to Philidor, Defendants ensured that prescriptions for Valeant drugs would not wind up being filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but would instead end up at Philidor, where Valeant's branded drug would be dispensed. To induce patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed. For example, in a consumer complaint filed with the Better Business Bureau on March 5, 2015, a patient wrote about Philidor:

> **Complaint:** Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******. ***They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you".*** Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for

this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the ****** unopened in order to have this taken off my Claims. (emphasis added and all typographical errors in original) (Better Business Bureau, customer complaint dated March 5, 2015).

189.    In fact, TPPs were billed for these drugs. As one patient reported in an online forum:

> My dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. ***The trial coupon offers a '$0 co-pay for 12 months' of this medicine . . . . Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account***. (emphasis added and all typographical errors in original) (Pissed Consumer, customer complaint dated January 2, 2015).

190.    To protect their fraudulent enterprise, Defendants made it as difficult as possible for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills. Indeed, despite its massive investment in its sales force, Philidor invested very little in creating a call center to handle customer complaints and problems. (Pissed Consumer, customer complaints dated February 19, 2015 and February 22, 2015). Customers and patients would routinely report that they were directed to sales staff when they tried to report these problems.

### 6.    The Valeant Enterprise's Manipulation to Achieve the Highest "Customary" Price and Volume an Insurer Would Accept

191.    Philidor instructed employees to manipulate the "usual and customary price" of prescription drugs when adjudicating claims in an attempt to secure insurance payment for high-priced Valeant drugs, which was accomplished by repeatedly lowering the purported usual and

customary price until the insurer's system accepted the claim. Rather than accept payment at that price, Philidor employees were trained to raise the price again in order to pinpoint a plan's maximum allowable price.

192.    For example, an internal Philidor PowerPoint titled "Program DrugCost Exceeds Maximum Error," which was used to train Philidor employees, instructed employees to request that the insurance company representative provide the maximum reimbursement amount and if the representative did not do so to manipulate the process by "drop[ping] down by $500 until paid and then increase by $100 to get as close as possible to the max amount allowed by the insurance company." In addition, Valeant employees Patel and Tanner were copied on a November 2014 email that included an attachment explaining how Philidor employees could bill the highest amount an insurance company was willing to pay by resubmitting rejected claims at different price points. (Sec. Cmplt. ¶ 125.)

193.    Defendants also misrepresented the quantities of drugs to secure approval. If a claim for reimbursement was rejected by an insurer, Philidor employees would resubmit the claim with a lower quantity of drugs so the price would be lower to secure insurance approval. The employee would then compensate for the lower quantity by increasing the number of prescription refills to secure the maximum reimbursement.

194.    Had Valeant not concealed its relationship with Philidor, and had Philidor not spread its prescriptions and reimbursement claims across its broad network of captive pharmacies, TPPs or their PBMs would have noticed both that Philidor submitted an unusually high volume of claims for Valeant's branded drugs and that these drugs had high prices, which would have resulted in additional audits or claim rejections.

I.      **Defendants' Violation of PBM Contracts**

195.    Defendants' deceptive practices described above violated PBMs' agreements that govern participation in the pharmacy networks. For example, Express Scripts' 2014 Network Provider Manual provides for termination if the participating pharmacy failed to inform the PBM of any change in the pharmacy's ownership or control, failed to notify the PBM of any changes or additions to the pharmacy's locations, failed to maintain appropriate licensing, or submitted any fraudulent information in support of a prescription drug claim. Similarly, OptumRx's 2014 Pharmacy Manual provided a partial list of violations that could result in "immediate termination from the [PBM] Network," including using "dummy" NPIs to obtain a paid response and billing for a brand with DAW when the prescriber had not so specified. OptumRx's 2015 Provider Manual stated that "[a]lteration of the U&C [usual and customary] price to attempt to increase Claim payment without a true change to the cash price being offered to the general public will be considered non-compliance and a violation of the agreement." It also prohibited pharmacies from entering quantities other than those reflected in the prescription and entering into a captive pharmacy relationship with a manufacturer without PBM consent. (Sec. Cmplt. ¶ 127.)

196.    The practices employed by Valeant and Philidor to conceal their relationship and falsify claims information violated such provisions. In fact, in September 2014, OptumRx (then one of Philidor's largest revenue sources) sent a cease and desist letter to Philidor citing a breach of contract and began rejecting claims. Thereafter, according to former employees interviewed by *Reuters,* Philidor devoted special training sessions on how to bill OptumRx by deceptively using alternate pharmacies' NPI numbers. Eventually, OptumRx traced some of these orders back to Philidor and in 2015 issued cease and desist letters to West Wilshire and R&O also barred them from doing business with OptumRx. (Sec. Cmplt. ¶ 128.)

### J.   Defendants Reaped Hundreds of Millions of Dollars in Ill-Gotten Profits

197.   Through their fraudulent scheme, Defendants obtained hundreds of millions of dollars in ill-gotten profits at the expense of the Class, whose members paid inflated prices for Valeant drugs that in many cases should never have been dispensed. In 2015 alone, Valeant channeled nearly $500 million worth of its drugs through Philidor, its central pharmacy hub.

198.   *First*, as explained above, the Class paid for expensive Valeant drugs when cheaper generic equivalents could and should have been dispensed. The Class suffered harm because it paid the dramatic difference between the cost of the generic drugs that should have been dispensed and the expensive Valeant drugs. For instance, as discussed above, as a consequence of Defendants' fraud, members of the Class paid up to $17,000 for a year's supply of Valeant's Wellbutrin XL, when they should have paid only $360 for a year's supply of the drug's generic equivalent. Similarly, while the price for a 90-tablet course of treatment with Valeant's branded Lodosyn 25mg cost as much as $2,609.14, the same course of treatment with this drug's generic equivalent cost approximately $292.45.

199.   *Second*, as explained above, the Class paid for Valeant drugs when, in fact, no drugs should have been dispensed or claims were properly denied. The Class suffered this harm in connection with, for instance, Defendants' scheme to fraudulently alter prescriptions, submit claims for unrequested refills, and use false pharmacy-identification numbers to circumvent denials of claims. Defendants were improperly enriched because they received payments from the Class for drugs that should never have been dispensed.

200.   *Third*, as explained above, because of Defendants' failure to disclose their routine waiver of patient co-pays when submitting claims to Class members or their PBM agents, Valeant was able to sell medically unnecessary and low-value drugs, and to sell the drugs at artificially

inflated prices, by removing a critical mechanism used to limit the use of medically unnecessary, low-value drugs. The undisclosed waiver of co-pays led patients to obtain higher-priced Valeant branded drugs rather than lower-priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the members of the Class. Had Defendants charged co-pays, patients would have had the intended economic incentive to choose lower-cost generic drugs and to avoid unnecessary prescriptions, thereby reducing unneeded costs that were ultimately borne by the Class. Further, had Defendants properly disclosed that Defendants routinely waived patient co-pays, PBMs and TPPs would not have paid the prices they did for Valeant's relevant branded drugs or paid for the drugs at all.

201.    *Fourth*, as explained above, the Class paid highly inflated prices for Valeant's branded drugs. This happened on claims for reimbursement submitted both by pharmacies within Valeant's captive network and, based on Valeant's being able to maintain artificially inflated prices that served as inputs into the pricing formulas that determined TPP payments, by pharmacies outside Valeant's network as well. But for Defendants' fraudulent scheme, the prices Defendants charged for Valeant's branded drugs would have been influenced by competitive market forces and, driven by the presence of numerous low-cost generic drugs in the marketplace, would have been substantially lower. The Class was damaged because it reimbursed claims at inflated prices created by Defendants' fraud, rather than the prices a market free from manipulation would have set.

202.    *Fifth*, as explained above, the Class paid highly inflated prices for Valeant's branded drugs as a result of Defendants' misrepresentations assuring patients that their TPPs would not be billed, when in fact the TPPs were billed. The Class was damaged because it reimbursed

claims for Valeant drugs that patients accepted in reliance on Defendants' promises that their TPPs would not be billed.

### K.     Defendants' Fraud Is Finally Revealed

203.    As alleged above, in an effort to overcome the California State Board of Pharmacy's licensure denial, Philidor created a shell company called Isolani to acquire R&O, a licensed pharmacy in Camarillo, California. R&O and Russel Reitz, its owner and Pharmacist in Charge, unwittingly became entangled in the Valeant Enterprise when they entered into a series of agreements with Isolani, including a Purchase and Sale Agreement, on or about December 1, 2014.

204.    On December 1, 2014, Reitz, a Southern California pharmacist, sold his business, R&O Pharmacy, a specialized dispensary for gastroenterology patients, to Philidor. In connection with the sale, Reitz learned that Philidor had not yet received a license from the California State Board of Pharmacy.

205.    Not long after the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service; these numbers dwarfed the customary size of R&O's business. Philidor would send R&O bulk orders of Valeant's branded pharmaceuticals, and Reitz would dispense these to patients directly or by mail. Payment later arrived at the pharmacy in the form of paper checks from health insurers; each check covered hundreds of patients and was typically made out for over one million dollars.

206.    Philidor's prescriptions channeled through R&O were not only unusually numerous but also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Consistent with Defendants' scheme, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel for eczema, and Jublia for toenail fungus.

81

207.    In March 2015, Reitz received an audit from one of his PBMs. The audit showed that, in addition to the business Reitz oversaw personally, R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard. Many were for medications that R&O did not carry. Some prescriptions were even backdated to before Reitz had sold R&O to Philidor. These practices continued throughout the summer of 2015.

208.    Indeed, by the summer of 2015, Reitz began to suspect that he may have been the victim of a fraud after, as reported in the *Los Angeles Times* on October 31, 2015, his "modest prescription-filling business" that he had agreed to sell for just $350,000 was flooded with "a ***torrent of insurers' money . . . on pace equal to $230 million a year, according to invoices***."

209.    As a result of these suspicious practices, R&O began investigating Philidor in the summer of 2015. Its investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy, which denied the application. Specifically, in a filing before the Board of Pharmacy, Department of Consumer Affairs, dated December 18, 2014, the California State Board of Pharmacy denied Philidor's application for a pharmaceutical license because Philidor made "false statements of fact" in its application. Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz finally realized that the purpose of the R&O purchase was to use R&O as a channel through which Philidor would surreptitiously conduct its own business in California and circumvent the licensing board's denial.

210.    When R&O was audited by an insurance company, Reitz refused to sign the audit, but then learned later that it was signed by Rice (the sole member of Isolani who also worked at Philidor). (Sec. Cmplt. ¶ 129.)

211.    On July 14, 2015, Reitz wrote an email to Rice to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O. Reitz demanded that they stop the practices immediately. Reitz added that the agreement required Philidor/Isolani to apply for a permit and that "this process does not take 7 months" and asked for all documents relating to the application and noted he had already asked for this information from Dean Griffin. (Sec. Cmplt. ¶ 130.)

212.    On July 19, 2015, Andrew Davenport wrote an email to Reitz sating that Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you." The next day, Reitz wrote back asking why "Philidor is responding to my concerns instead of Eric Rice" who executed the agreement on behalf of Isolani. Reitz further stated that he learned that Rice signed off on the "Argus-Humana audit, the same audit I refused to sign," and "Eric Rice is not the PIC [pharmacist-in-charge] (I am) and has never stepped through R&O's doors. I am not sure how he could verify the accuracy of anything pertaining to that audit." (Sec. Cmplt. ¶ 131.)

213.    On July 21, 2015, Rice and several Philidor executives, including Andrew Davenport, Fleming, and Wisehart, flew to California to meet Reitz at R&O. The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting that they "appear[ed] to be engaging in a widespread fraud." (Sec. Cmplt. ¶ 132.)

214.    On August 18, 2015, Fleming sent an email to Reitz suggesting responses to an audit. One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania (where Philidor was located). (Sec. Cmplt. ¶ 133.)

215.    On August 31, 2015, counsel for R&O sent a notice of termination to Duane Morris LLP, counsel for Isolani. R&O's counsel wrote that "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud." R&O's counsel added that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks . . . ." R&O's counsel continued by noting that Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts" and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O." Counsel added that "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor." Counsel also asserted that "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors." (Sec. Cmplt. ¶ 134.)

216.    Valeant's General Counsel, Robert Chai-Onn, wrote a letter to Reitz stating that as of August 31, 2015, R&O owed Valeant $69,861,343.08. Chai-Onn added that "Valeant is contacting you so that you may take the requisite steps to ensure immediate payment and avoid further damage to Valeant and other parties" and threatened to take "any and all actions to ensure" payment, including seeking damages and attorney's fees. (Sec. Cmplt. ¶ 135.)

217.    On September 6, 2015, Heather Guerena, an attorney at Duane Morris LLP, counsel to Isolani, sent an email to counsel for R&O informing him that they were seeking a protective order against Reitz and for an accounting. Counsel for R&O responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential / actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials." (Sec. Cmplt. ¶ 136.)

218.    R&O stated it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties" or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others." Valeant eventually reached a confidential settlement with R&O. (Sec. Cmplt. ¶ 137.)

219.    This correspondence made clear that Valeant was not simply a drug manufacturer supplying Philidor, but rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained. Ultimately, Reitz filed suit against Valeant and disclosed the facts described above in the suit. These disclosures set off a chain of events revealing the truth about Defendants' fraud and the Valeant Enterprise.

220.    On October 19, 2015, the SIRF published a detailed account of Philidor and Valeant's dealings with Reitz and R&O. This was the first public report that Valeant was Philidor's only client, and it provided extensive detail on Valeant's financial connection to Philidor, a connection that had never before been publicly disclosed.

221.    That same day, Valeant CEO Pearson and CFO Robert L. Rosiello held a conference call to discuss the Company's third-quarter 2015 earnings results. On the conference

call, Valeant, for the first time, publicly discussed Philidor. During the conference call, Pearson

stated:

> Turning to: How does Valeant work with specialty pharmacies, especially Philidor.
> The topic of specialty pharmacies has not been a focus of ours in past calls because
> **we believe this was a competitive advantage that we did not disclose to our**
> **competitors** . . . . Similar to many pharmaceuticals companies in the US, an
> increasing percentage of our revenue is coming from products dispensed through
> multiple specialty pharmacies.
>
> ***
>
> Philidor, one of our specialty pharmacy partners, provides prescription services to
> patients across the country, and provides administrative services for our co-pay
> cards and is a dispensary that fills prescriptions. We have a contractual relationship
> with Philidor and late last year we purchased an option to acquire Philidor if we so
> choose. Given accounting rules, we consolidate Philidor's financials. Inventory
> held at Philidor remains on Valeant's books and is not included in the specialty
> pharmacy channel inventory.

222.    Also on October 19, 2015, the *New York Times* published an article detailing

Valeant's use of specialty pharmacies to increase pricing of its drugs:

> Use of specialty pharmacies seems to have become a new way of trying to keep the
> health system paying for high-priced drugs. Valeant Pharmaceuticals International,
> which has attracted government and media scrutiny for its huge price increases,
> does much the same thing for its dermatology products with a specialty pharmacy
> called Philidor Rx Services.

223.    Two days later, on October 21, 2015, a report by Citron Research revealed more

information about Philidor and its network of "phantom captive pharmacies" and Valeant's tactics

to create fraudulent payor audits. The Citron report explained that Philidor was owned by Valeant

and that Valeant used Philidor to establish "an entire network of phantom captive pharmacies."

Additionally, the Citron report accused the Company of committing accounting fraud, referring to

Valeant as the "pharmaceutical Enron."

224.    Then, on October 26, 2015, the *Wall Street Journal* reported that Valeant

employees were frequently involved in operations at Philidor. As referenced above, the *Wall Street*

*Journal* also reported that Valeant employees working at Philidor used aliases, including the names of comic-book characters like Peter Parker, to hide their identity as Valeant employees.

225.    On that same day, Valeant announced that it had set up a special committee to review its relationship with Philidor.

226.    On October 30, 2015, Valeant announced that it was "severing all ties with Philidor" and that Philidor would be shut down immediately.

227.    In fact, Valeant had no choice but to cut ties with Philidor because TPPs and PBMs were already severing their relationships with the pharmacy. Only one day before, on October 29, 2015, some of the biggest PBMs and customers of Philidor announced that they were severing business relationships with Philidor after finding noncompliance with provider agreements. Specifically, CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx—the three largest PBMs in the United States, which together handled three-quarters of the total estimated 5 billion US prescriptions in 2014 and represent many members of the TPP Class—all announced that they were ending their relationships with Philidor and would stop paying for drugs dispensed by Philidor. CVS Health Corp. explained:

> CVS/caremark maintains a broad national network of 68,000 pharmacies. In accordance with CVS/caremark's standard auditing protocols, over the last several weeks we have been monitoring and reviewing the results of recent audits of Philidor's practices. ***Based on the findings from those activities, we have terminated Philidor for noncompliance with the terms of its provider agreement.***

228.    Express Scripts and United Healthcare made similar statements about Philidor's noncompliance with the PBMs' provider agreements.

229.    Philidor had not disclosed to Express Scripts in its contract with Express Scripts or otherwise that Philidor was a mail-order pharmacy. Express Scripts normally did business only with retail pharmacies and would not have done business with Philidor had it known that Philidor was a mail-order pharmacy. Senior Valeant executives including Kornwasser were aware of the

Philidor-Express Scripts contract and its failure to disclose the true nature of Philidor's business at least as early as November 2014. (Cr. Tr. 990-93.)

230.    On November 25, 2015, Philidor notified the Pennsylvania Bureau of Workforce Development that it was closing its facilities and laying off its workers. Philidor's notice identified Valeant as its only client. (Sec. Cmplt., p. 22 n.9.)

**L.    Valeant Becomes the Target of Multiple Government Investigations**

231.    As Defendants were coming under greater scrutiny from the press and public, Valeant became the target of multiple government investigations. On October 14, 2015, Valeant received subpoenas from the US Attorney's Offices for Massachusetts and the Southern District of New York concerning Valeant's relationship with Philidor, its drug-price increases, and its accounting treatment of sales by specialty pharmacies.

232.    In November 2015, Valeant received subpoenas for documents from the SEC concerning Valeant's relationship with Philidor and its accounting practices and policies.

233.     Congress also began investigating Defendants' price increases for Valeant drugs and Valeant's relationship to Philidor. Both the House Committee on Oversight and Government Reform and the Senate Special Committee on Aging issued document requests and conducted interviews with Valeant employees. Bloomberg News reported that US Representative Elijah Cummings wrote to Pearson requesting that Pearson make Bijal Patel and other Valeant employees available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations."

234.    On February 2, 2016, the House Committee issued a memorandum reporting interim findings from its investigation, stating that it found, among other things, that while Pearson purchased drugs "in order to dramatically increase their prices and drive up his company's revenues and profits," Valeant engineered a public-relations strategy to "divert attention away

from its price increases" and to mitigate the "Critical Risks" of addressing "concerns from patients, *insurance companies or managed care providers* to prevent public displays of negative sentiment."

235.     On February 22, 2016, as a result of the Company's investigation of its relationship with Philidor previously announced in October 2015, Valeant announced that it would restate its financial results for 2014 and 2015 to correct the accounting for its sales to Philidor.

236.     On February 29, 2016, Valeant announced that it was under investigation by the SEC for its relationship with Philidor.

237.     On March 21, 2016, Valeant announced that its Board of Directors had initiated a search to identify a new CEO to replace Pearson. After Pearson was removed from his post at Valeant, he was subpoenaed by Congress to testify about Valeant's practices.

238.     Also in March 2016, Valeant received an investigative demand from the State of North Carolina Department of Justice, requesting documents relating to Nitropress, Isuprel, and Cuprimine, including information concerning Valeant's production, marketing, distribution, sale and pricing of, and patient-assistance programs covering, these products, as well as the Company's pricing decisions for some of its other products.

239.     On April 20, 2016, Valeant received a document subpoena from the New Jersey State Bureau of Securities. The materials requested included documents concerning the Company's former relationship with Philidor and its accounting treatment of sales to Philidor.

240.     On April 25, 2016, Valeant announced that Joseph Papa would replace Pearson as the Company's CEO.

241.    On April 27, 2016, Defendant Pearson testified before the Senate Special Committee on Aging that Valeant's strategy of dramatically raising the prices of its drugs was "too aggressive" and "was a mistake" that he "regret[ted] pursuing."

242.    On September 16, 2016, Valeant received an investigative subpoena from the California Department of Insurance, requesting documents concerning Valeant's relationship with Philidor and certain California-based pharmacies, the marketing and distribution of Valeant's products in California, and the billing of insurers for its products being used by California residents.

243.    Counsel for Tanner stated at his criminal trial in May 2018 that Pearson and Schiller were unavailable to testify because they indicated that they would invoke their Fifth Amendment right not to testify. (Cr. Tr. 28.)

244.    The Defendants in the criminal trial moved for compelled immunization of Alison Pritchett, one of the Valeant employees who was embedded at Philidor and used an alias email account there, and who was otherwise unavailable to testify because of two ongoing criminal investigations. The court denied the motion, finding that the two ongoing criminal investigations were good-faith investigations. (Cr. Tr. 53-60, 67.) In addition to Pritchett, Patel and Griffin, the other two Valeant employees who were embedded at Philidor along with Tanner, also invoked the Fifth Amendment. Tanner App. Br., at 35.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN FURTHERANCE OF THEIR SCHEME TO BOOST VALEANT'S SALES

### A.    Defendants' Misrepresentations to Third-Party Payors

245.    Defendants submitted false claims information to TPPs or their agents, including their PBMs, to fraudulently maximize the reimbursements paid by those TPPs and boost Valeant's drug sales and revenues.

246.    The claims that Defendants submitted to the Class were materially false and misleading because the claims (1) misrepresented either the dispensing pharmacy or the pharmacy to which the patient/insured had submitted his or her prescription; (2) misrepresented whether the claim had been previously submitted and denied; (3) misrepresented the cost of the drugs by concealing the waiver of co-pays; (4) misrepresented that the prescription was designated to be "DAW"; (5) implicitly misrepresented that the claim was for a medication prescribed by a physician; (6) implicitly misrepresented that the claim was for a medication requested by a patient/insured; or (7) implicitly misrepresented that the pharmacy was licensed to conduct business in the state in which the drugs were dispensed.

247.    As discussed above in detail, these claims were false and misleading as a result of the deceptive tactics Defendants employed to fraudulently increase the sales of Valeant products over generics and to enable the charging of higher prices for those Valeant drugs. Specifically:

- Defendants renewed prescriptions without a patient's request or consent.

- Defendants used false pharmacy-identification information for prescriptions that had previously been denied in order to fraudulently bypass the TPPs' denials of claims for reimbursement.

- Defendants caused pharmacies in the Valeant network, including Isolani, to use R&O's identification information, including its NCPDP and NPI numbers, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O did not even stock.

- Defendants submitted false and misleading payer audits to TPPs or their agents on behalf of retail pharmacies with which Defendants secretly associated, falsely representing that the pharmacies had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies. In addition, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies.

- Defendants routinely waived co-pays for patients prescribed Valeant drugs, often when soliciting patients to order unnecessary refills of their

91

prescriptions. When submitting claims to TPPs for these prescriptions, however, Defendants concealed the waiver.

- Defendants modified prescriptions to require that the prescriptions be filled with Valeant's brand-name drugs, as opposed to less-expensive generic alternatives.

248. Finally, Defendants deceived TPPs and PBMs with respect to the identity and ownership of the pharmacies with which the TPPs and PBMs were contracting to provide prescription services to their members and insureds. While the TPPs and PBMs believed that they were contracting with independent retail pharmacies, Defendants failed to disclose that Defendants were using the retail pharmacies to insulate Valeant's products from generic competition and to funnel prescriptions through Philidor, where those prescriptions and claims relating to the prescriptions would be manipulated by means of the fraudulent practices described above. By concealing the association and relationship among the pharmacies in the Valeant Enterprise, Defendants also concealed that certain of those pharmacies—including Philidor—did not have pharmacy licenses in states in which members of the Class and their beneficiaries were located.

**B.    Defendants' Misrepresentations to Patients and Physicians**

249. Defendants constructed and deployed a dishonest sales campaign, specifically instructing the Valeant and Philidor sales force to make a number of false and misleading statements to both patients and physicians in order to boost Valeant's drug sales and thereby impose added costs on TPPs. While these statements were made to the members, beneficiaries, and insureds (and their physicians) covered by the TPPs rather than to the TPPs directly, the purpose of these misrepresentations was to fraudulently cause Class members to pay more for Valeant drugs than the Class members would have paid but for Defendants' misconduct.

250. Defendants fraudulently induced doctors to prescribe, and patients to request, Valeant's branded pharmaceutical products—rather than less-expensive generic drugs—by

disseminating statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost or reduced cost. In both cases, patients were falsely assured that their TPPs would not be billed. In fact, TPPs were billed for these drugs, and patients were subsequently billed for amounts not covered by their TPPs.

### C.    Defendants' Misrepresentations to State Regulators

251.    Defendants made numerous false statements to a host of different constituencies in an effort to conceal the true ownership and identity of a vast network of Valeant-affiliated pharmacies, which Defendants used to insulate Valeant's branded products from generic competition. Although these statements were not made directly to TPPs, they were made to conceal the fraudulent conduct of the Valeant Enterprise, and thereby caused the Class to pay inflated prices for Valeant drugs.

252.    Defendants' fraudulent scheme depended entirely on its secrecy—if *anyone* outside the Valeant Enterprise discovered the true ownership and structure of Valeant's network of captive pharmacies, the scheme would collapse, as it ultimately did. To keep the scheme secret, Defendants made numerous false and misleading statements to regulators to conceal Defendants' illicit pharmacy network.

253.    Defendants caused Philidor or its affiliates to file pharmacy applications with state regulators on behalf of various shell companies controlled by Defendants. In these applications, the companies falsely denied and failed to disclose their relationships with Philidor and Valeant and made other false statements designed to conceal the true ownership of Valeant's network of captive retail pharmacies.

254.    For example, after California state regulators denied Philidor's application for a pharmacy license, Defendants caused a Valeant/Philidor-controlled shell company, Lucena Holdings, to acquire a stake in a California pharmacy called West Wilshire Pharmacy in an effort

to circumvent the state's licensing denial. In a "Change of Permit Request" filed with the California State Board of Pharmacy, Defendants caused Lucena to falsely represent:

- that Lucena did not have a parent company;

- that the only entity or individual with an interest in Lucena was Gregory Blaszczynski, who, unknown to state regulators, was an employee of BQ6, an instrumentality of Valeant and Philidor; and

- that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied." In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year. Accordingly, Lucena's deceptive and misleading representation concealed its connection with Philidor and Valeant from state regulators.

255.    Likewise, Defendants caused Back Rank, LLC, a Philidor shell company, to take ownership of Houston-based Orbit Pharmacy, Inc. In a September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent that no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]." In fact, California had denied Philidor's pharmacy application the previous year, expressly finding that Philidor and its CEO, Andrew Davenport, had commited acts involving "dishonesty, fraud, or deceit, with the intent to substantially" benefit Philidor and Davenport, and that under penalty of perjury, Philidor and Davenport had made "false statements of fact" concealing Philidor's relationship to Valeant. Accordingly, Orbit Pharmacy's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

## VI.    CAUSATION AND INJURY TO THE CLASS

256.    Defendants made false and misleading statements to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to increase sales and claims to TPPs, and to insulate Valeant's branded drugs from generic competition and thus facilitate Valeant's drug-price increases. Unaware of Defendants' scheme, Plaintiffs and the Class paid highly inflated

prices for Valeant's expensive branded drugs, in many cases notwithstanding the availability of far-cheaper generic drugs that could and should have been dispensed instead. Also, Defendants made false and misleading statements to Plaintiffs and the Class to fraudulently secure or maximize reimbursement for prescriptions written and filled for Valeant's expensive branded drugs. When submitting claims to Plaintiffs and the Class, Defendants (among other fraudulent practices described above) falsified prescriptions, made claims for refills that were never requested by patients, and misrepresented the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the fact that either no drugs or cheaper generic alternative drugs should have been dispensed. Additionally, Defendants made false and misleading statements to patients and prescribing physicians that artificially increased the number of prescriptions for branded Valeant drugs written and filled during the Class Period. Unaware of Defendants' scheme, Plaintiffs and the Class paid for these prescriptions, despite the availability of cheaper generic alternative drugs that could and should have been dispensed instead. During the Class Period, Defendants amassed billions of dollars in ill-gotten gains through their scheme to fraudulently boost Valeant's drug sales and line Defendants' pockets. The manner in which each of the various components of Defendants' fraudulent enterprise artificially increased Valeant's drug prices and sales and injured Plaintiffs and the Class is described below:

- **Defendants altered prescriptions to provide that they be filled with brand-name Valeant drugs, rather than cheaper generic alternatives,** as described in ¶¶ 141-42 and 154-56 above. But for Defendants' false and misleading statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since

Defendants used this fraudulent practice to create artificial demand for, and support the inflated prices of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class's injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false claims for reimbursement for prescription renewals**, as described in ¶¶ 165-68 above. But for Defendants' conduct, Plaintiffs and the Class would not have paid for these prescriptions, but either would have paid for cheaper generic alternatives or would not have paid for any prescription at all. Also, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated prices of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class's injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants used false pharmacy-identification information, including NCPDP and NPI numbers, to bill TPPs, including Plaintiffs and the Class, for prescriptions**, as described in ¶¶ 157-61 and 164 above. Had Defendants not used false pharmacy-identification information to bypass Plaintiffs' and the Class's and their PBMs' rejection of Defendants' claims for reimbursement for Valeant's branded drugs, lower-cost generic drugs would have been dispensed

instead. Accordingly, but for Defendants' conduct, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Moreover, since Defendants used this fraudulent practice to create artificial demand for, and support the inflated prices of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class's injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and misleading payer audits to TPPs**, as described in ¶¶ 162-63 and 212-15 above. But for Defendants' false and misleading audit statements, Plaintiffs and the Class would not have paid for Valeant's expensive brand-name drugs, but for cheaper generic alternatives. Since Defendants used this fraudulent practice to create artificial demand for, and support the inflated prices of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum, paid less for Valeant's branded drugs. Plaintiffs' and the Class's injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants submitted false and inflated claims to TPPs (or their PBM agents)**, as described in ¶¶ 169-87 above. Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs (or their agents) for these prescriptions, falsely represented that the patients had

been charged the full prices of the drugs. But for Defendants' false and misleading statements inflating the prices charged to the patients for Valeant drugs, Plaintiffs and the Class would have, at a minimum, paid claims based on the discounted prices *actually* charged. Plaintiffs' and the Class's injury was a reasonably foreseeable consequence of Defendants' fraudulent scheme.

- **Defendants made false and misleading statements to conceal Valeant's relationship with its network of captive pharmacies**, as described in ¶¶ 86, 96-97, 112-18, and 124-39 above. But for Defendants' misstatements, Defendants' practice of failing to substitute generic drugs for Valeant drugs, which contravened state law and contracts between the pharmacies andTPPs or the TPPs' PBMs, would have triggered denials of claims from TPPs and scrutiny of the pharmacies' practices. By concealing both Valeant's relationship with its network of pharmacies and the pharmacies' relationships to each other, Defendants were able to create the false impression that independent pharmacies had dispensed the prescriptions and to spread false claims across ostensibly unrelated pharmacies. But for Defendants' conduct, Plaintiffs and the Class would not have paid for these prescriptions, but either would have paid for cheaper generic alternatives or would not have paid for any prescription at all. Since Defendants used this fraudulent practice to create artificial demand for, and support the inflated prices of, Valeant drugs, but for Defendants' false and misleading statements, Plaintiffs and the Class would have, at a minimum,

98

paid less for Valeant's branded drugs. Plaintiffs' and the Class's injury was a

reasonably foreseeable consequence of Defendants' fraudulent scheme.


**VII.   CLASS-ACTION ALLEGATIONS**

257.   Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3)

on behalf of a class consisting of:

> All health insurance companies, health maintenance organizations, self-funded
> health and welfare benefit plans, third party payors, and any other health benefit
> provider in the United States of America or its territories, that paid or incurred costs
> for Valeant's branded drug products in connection with a claim submitted by
> Philidor, a claim submitted by any pharmacy in which Philidor had a direct or
> indirect ownership interest, or a claim by any pharmacy for which the amount
> sought for reimbursement was inflated as a result of Defendants' fraudulent
> scheme, between January 2, 2013 and November 9, 2015, and suffered damages
> thereby. Excluded from the Class are PBMs, Defendants, Defendants' successors
> or assigns, and any entity in which Defendants have or had a controlling interest.

258.   The members of the Class are so numerous that joinder of all members is

impracticable. The Class consists of all TPPs in the United States that were wrongfully induced to

pay claims for Valeant's branded drugs as a consequence of Defendants' fraudulent scheme,

including TPPs that paid for Valeant drugs purchased through Defendants' captive pharmacy

network or from pharmacies outside Valeant's network, and that suffered damages as a

consequence of Defendants' fraudulent scheme during the Class Period. While the exact number

of Class members is unknown to Plaintiffs at this time and can be ascertained only through

appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed

Class. Class members may be identified from records maintained by Defendants and PBMs and

may be notified of this class action using a form of notice similar to that customarily used in class

actions.

259.    Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of in this action.

260.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and in RICO and pharmaceutical-related litigation.

261.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a)      whether Defendants' acts and omissions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

b)      whether Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

c)      whether Defendants made false or misleading statements that concealed Valeant's relationship with a network of pharmacies;

d)      whether, when submitting claims to Plaintiffs and the Class, Defendants changed codes on prescriptions to require that the prescriptions be filled with Valeant's brand-name drugs, as opposed to less-expensive generic alternatives;

e)      whether Defendants submitted prescription renewals for reimbursement, falsely representing that the particular patients had requested renewals of their prescriptions;

f)      whether Defendants used false pharmacy-identification information to allow their affiliated pharmacies to dispense Valeant's branded drugs;

g)       whether Defendants submitted false and misleading payer audits to TPPs on behalf of retail pharmacies with which they secretly associated;

h)       whether Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims to TPPs for the prescriptions, falsely represented that the patients had been charged the full prices of the drugs;

i)       whether Defendants disseminated false statements (including in brochures and coupons) to doctors and patients falsely promising patients that their TPPs would not be billed for Valeant drugs they received at no cost;

j)       whether Defendants made misrepresentations to regulators to conceal the existence of the Valeant Enterprise and the relationship Valeant had with a secret network of pharmacies;

k)       whether Defendants Valeant, Andrew Davenport, and Matthew S. Davenport supervised and participated in the wrongdoing by Philidor and its affiliated pharmacies alleged in this Complaint;

l)       whether Defendants' acts and omissions described in this Complaint constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1962;

m)       whether Defendants administered an "enterprise," within the meaning of 18 U.S.C. § 1962;

n)       whether Defendants' acts or omissions described in this Complaint affected interstate commerce; and

o)       whether Defendants' acts or omissions described in this Complaint directly and proximately caused injury to Plaintiffs and the Class.

262.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small, so that the burden and expense of individual litigation makes it impossible for those members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF

<u>COUNT I</u>

**FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)—RACKETEERING (Against All Defendants)**

263.    Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

264.    This Count is asserted on behalf of all members of the Class against all Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

265.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise (the "Valeant Enterprise") through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

266.    The Valeant Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, and Matthew S. Davenport and their employees and agents, including Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP, R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy, and other as-yet-unknown pharmacies, agents, and instrumentalities engaged, owned, or controlled by Defendants to advance

the fraudulent scheme described in this Complaint. All entities constituting the Valeant Enterprise are "persons" within the meaning of 18 U.S.C. § 1961(3), are "persons" distinct from the Valeant Enterprise, and acted to enable Defendants to fraudulently inflate the number and cost of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period. The Valeant Enterprise functioned as an ongoing organization and continuing unit and was created and used to effectuate a pattern of racketeering activity. The development and execution of Defendants' activities in furtherance of the Valeant Enterprise would exceed the capabilities of each member of the Enterprise acting singly or without the aid of any other member.

267.    Defendants, in concert with other participants in the Valeant Enterprise, created and maintained systemic links for a common purpose: to inflate the number and costs of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period. This scheme yielded substantial financial benefits for the participants in the Valeant Enterprise far in excess of those the participants would have received had they refrained from making the false and misleading statements to TPPs, regulators, doctors, and patients detailed in ¶¶ 86, 96-97, 112-18, 124-39, 141-42, and 154-87 above. Defendants exercised control over the activities of the Valeant Enterprise in disseminating those false and misleading statements, and participants in the Valeant Enterprise were aware that Defendants exercised that control. Furthermore, each component of the Enterprise benefitted from the existence of all other components.

268.    The Valeant Enterprise engaged in and affected interstate commerce because, among other things, it made and disseminated false and misleading statements to thousands of individuals and entities, including TPPs, patients, doctors, and regulators, throughout the United States. Valeant and the pharmacies constituting the Valeant Enterprise dispensed pharmaceuticals

103

throughout the United States to thousands of patients, and submitted claims for reimbursement complained of in this Complaint to TPPs throughout the United States.

269.    Defendants conducted and participated in the affairs of the Valeant Enterprise through patterns of racketeering activity, including acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (use of interstate facilities to conduct unlawful activity). These violations include the dissemination of the misrepresentations described in this Complaint through the mails and wires, and the shipment of drugs through the mails in furtherance of the fraudulent scheme described in this Complaint.

270.    Defendants' fraudulent scheme to inflate the price of Valeant's branded drugs and the number of prescriptions for those drugs written, filled, and reimbursed during the Class Period consisted of, among other things, (1) making false and misleading statements to the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs; (2) making false and misleading statements to regulators to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to implement the fraudulent scheme described in this Complaint; and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

271.    Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications, including but not limited to (1) communications with, and among, the Enterprise participants in furtherance of their fraudulent scheme; (2) communications promulgating the false and misleading statements described above to TPPs, patients, doctors, and regulators throughout the United States; (3) receipt of proceeds generated by Defendants' fraudulent scheme, including payments made by TPPs for Valeant drugs; (4) shipment of Valeant

drugs by Valeant and Philidor to the pharmacies that constituted the Valeant Enterprise; and (5) shipment of drugs by members of the Valeant Enterprise to patients, insureds, members, and beneficiaries whose drug costs were covered by members of the Class.

272.    The foregoing racketeering activities constitute a common course of conduct intended to deceive and harm Plaintiffs and the Class. Each of these instances of racketeering activity was related, had the same or similar purposes, involved the same or similar participants, had the same or similar means of commission, and had the same or similar results affecting the same or similar victims, including Plaintiffs and the Class.

273.    Plaintiffs and the Class have been injured in their business or property by reason of these violations, in that Plaintiffs and the Class paid millions of dollars for Valeant drugs that they would not have paid had Defendants not engaged in the pattern of racketeering activity described in this Complaint. Defendants' racketeering activities were part of their ongoing business and, during the Class Period, constituted a continuing threat to property belonging to Plaintiffs and the Class.

274.    The injuries to Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity.

### COUNT II

### FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)—RACKETEERING CONSPIRACY
#### (Against All Defendants)

275.    Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

276.    This Count is asserted on behalf of all members of the Class against all Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), the violation arising from their conspiracy to violate 18 U.S.C. § 1962(c).

277.     Defendants Valeant Pharmaceuticals International, Inc., Philidor Rx Services, LLC, Andrew Davenport, and Matthew S. Davenport and their employees and agents, including, Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, End Game, LLP, R&O Pharmacy, West Wilshire Pharmacy, Orbit Pharmacy, Cambria Pharmacy, Safe Rx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy, and other as-yet-unknown pharmacies, agents, and instrumentalities engaged, owned, or controlled by Defendants, engaged by Defendants to inflate Valeant's drug sales, knowingly agreed, combined, and conspired to conduct or participate, directly or indirectly, in the conduct of the Valeant Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (use of interstate facilities to conduct unlawful activity), including (1) making false and misleading statements to state regulators to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's branded drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs); and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

278.     Defendants knew and agreed to act in furtherance of the Valeant Enterprise's common purpose: to inflate the cost and the number of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period by issuing a variety of false and misleading

statements to numerous different constituencies in order to obtain money and benefits for participants in, and associates of, the Valeant Enterprise at the expense of Plaintiffs and the Class.

279.    Defendants committed, or caused the commission of, numerous overt acts in furtherance of the conspiracy and to effect the conspiracy's objects, including (1) making false and misleading statements to state regulators to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's drugs from generic competition; (2) making false and misleading statements to Plaintiffs and the Class to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including falsifying prescriptions, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs); (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives; (4) constructing the shell companies, including Lucena Holdings, LLC, KGA Fulfillment Services, Inc., BQ6 Media Group, Isolani LLC, Back Rank, LLC, and End Game, LLP, through which Valeant acquired interests in, and associated with, a network of retail pharmacies in order to execute Defendants' fraudulent scheme to boost Valeant's drug sales; and (5) promulgating employee manuals and handbooks instructing Philidor employees to, among other things, falsify prescriptions, make claims for refills that were never requested by patients, and misrepresent the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgement against Defendants jointly and severally, as follows:

1.    Declaring the action to be a proper class action under Fed. R. Civ. P. 23;

2.   Awarding Plaintiffs and the Class compensatory and treble damages, in an amount to be proven at trial, including interest;

3.   Awarding Plaintiffs and the Class their reasonable costs and expenses, including attorneys' fees; and

4.   Awarding such other relief as the Court deems just and proper.

## X.   JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: July 30, 2019

CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.

/s/ James E. Cecchi
James E. Cecchi
Tel: (973) 994-1700
Fax: (973) 994-1744
JCecchi@carellabyrne.com
5 Becker Farm Road
Roseland, NJ 07068

*Lead Counsel, Interim Class Counsel, and
Local Counsel for Plaintiffs AirConditioning
and Refrigeration Industry Health and
Welfare Trust Fund, Fire and Police Health
Care Fund, San Antonio, and Plumbers
Local Union No. 1 Welfare Fund*

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

Hannah Ross (*pro hace vice*)
James A. Harrod *(pro hac vice)*
Jai Chandrasekhar *(pro hac vice)*
James M. Fee *(pro hac vice)*
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
hannah@blbglaw.com
jim.harrod@blbglaw.com
jai@blbglaw.com
james.fee@blbglaw.com

*Lead Counsel, Interim Class Counsel, and
Counsel for Plaintiffs AirConditioning and
Refrigeration Industry Health and Welfare
Trust Fund, Fire and Police Health Care
Fund, San Antonio, and Plumbers Local
Union No. 1 Welfare Fund*

**BARRACK, RODOS & BACINE**
Robert A. Hoffman
Julie B. Palley
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 297-1484
      - and -
Jeffrey W. Golan
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

*Counsel for Plaintiff the Detectives
Endowment Association of New York City*

**COHEN MILSTEIN SELLERS & TOLL
  PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
      - and -
Christopher Lometti
Joel P. Laitman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797

*Counsel for Plaintiff New York Hotel Trades
Council & Hotel Association of New York
City, Inc. Health Benefits Fund*