**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. THIRD-PARTY PAYOR LITIGATION | Civil Action No. 16-3087 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

  This matter comes before the Court on the Report and Recommendation (the "Report" or "R. & R.") of the Honorable Dennis M. Cavanaugh, U.S.D.J. (ret.) (the "Special Master"), recommending final approval of two class action settlements and for attorneys' fees, costs, and incentive awards. (ECF No. 204.) Named Plaintiffs AirConditioning and Refrigeration Industry Health and Welfare Trust Fund; Fire and Police Health Care Fund, San Antonio; Plumbers Local Union No. 1 Welfare Fund; Detectives Endowment Association of New York City; and New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund (collectively, "Named Plaintiffs") and Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") reached the first settlement valued at $23,000,000. (ECF No. 194-2.) Named Plaintiffs and Defendants Philidor Rx Services, LLC, Andrew Davenport ("Davenport"), and the Estate of Matthew S. Davenport (collectively, the "Philidor Defendants") reached the second (together with the Valeant settlement, the "Settlement Agreements") valued at $125,000. (ECF No. 195-2.) Named Plaintiffs also moved for fees, costs, and incentive awards, totaling $7,757,835.39 plus interest. (ECF No. 200.) Having considered the Special Master's Report and reviewed the parties' submissions, the Court decides this matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court adopts the Special Master's Report, grants final approval of the

Settlement Agreements, and grants Named Plaintiffs' requests for fees, costs, and incentive awards.

I.  **BACKGROUND**

This action arises out of the widely publicized controversy over Valeant's relationship with the Philidor Defendants. The core of the controversy is whether Valeant colluded with the Philidor Defendants to establish a network of "captive pharmacies"—which ultimately resulted in higher drug prices to consumers and other third parties. (Am. Compl. ¶ 1, ECF No. 143.) Named Plaintiffs are a group of five third-party payors that allegedly overpaid or incurred higher costs on Valeant-branded drugs because of Valeant and the Philidor Defendants' fraudulent scheme. Back in 2016, they sued the pair under the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act on behalf of themselves and other third-party payors. Now, after five years of vigorous litigation, the parties have settled.

A.  **The Litigation**

This litigation has been lengthy and robust. Named Plaintiffs filed their Consolidated Class Action Complaint in December 2016. (*See generally* Consol. Am. Compl., ECF No. 27.) Shortly thereafter, events transpired quickly. In this litigation, Valeant, the Philidor Defendants, and Davenport separately filed lengthy and well-sourced motions to dismiss. (*See* Valeant's Mot. to Dismiss, ECF No. 38; Philidor Defs.' Mot. to Dismiss, ECF No. 43; Davenport's Mot. to Dismiss, ECF No. 42.) Outside this litigation, the U.S. Attorney's Office for the Southern District of New York indicted Davenport and a Valeant executive. (Valeant Settlement ¶ I, ECF No. 194-2.) That indictment resulted in a stay of the proceedings pending the outcome of the consequent criminal trial. (*Id.* ¶ O.) Ultimately, the criminal trial returned a guilty verdict and $9.7 million in restitutionary damages. (*See id.* ¶¶ Q, S.) The Court then lifted the stay and—over initial opposition from the Philidor Defendants—granted Named Plaintiffs an opportunity to amend their complaint.

2

(*See* ECF No. 142.) The amended complaint invited a new round of motion-to-dismiss briefing. (*See* ECF Nos. 144, 145, 146.)

Before the Court adjudicated those motions, however, it appointed the Special Master to weigh in on all pre-trial proceedings. (Order Appointing Special Master, ECF No. 147.) Among other tasks, the Special Master recommended denying in-part and granting in-part the pendant motions to dismiss. (ECF No. 167.) In-depth discovery ensued. Written discovery encompassed exchanges of over four million pages of documents, aggressive e-mail and letter-writing campaigns, and service and objections to initial disclosures and interrogatories. (Valeant Settlement ¶ HH.) Testimonial discovery was even more exhaustive; the parties endured thirty-nine depositions, comprising Valeant's former board members, Chief Executive Officer, Chief Financial Officer, and others. (*Id.* ¶ II.)

### B.     The Settlement Negotiations

In 2021, the parties began settlement talks. (*Id.* ¶ JJ.) Named Plaintiffs and Valeant ultimately agreed to mediate their claims before Jed Melnick of JAMS, a "nationally recognized alternative dispute resolution firm." (*Id.* ¶ KK.) As one might expect, the mediation was litigious, involving swapped mediation statements and expert testimony. (*See id.*) The mediation, held in April 2021, was unsuccessful; but Named Plaintiffs and Valeant followed the mediation by engaging in months-long settlement discussions. (*Id.* ¶ LL.) In late June 2021, following a second mediation session, Named Plaintiffs and Valeant agreed to settle the case for $23,000,000 in exchange for a release of all claims. (*Id.* ¶¶ LL-NN.) Also in late June, Named Plaintiffs and the Philidor Defendants began settlement talks and ultimately agreed to settle their claims for $125,000. (Philidor Settlement ¶¶ KK-LL.)

### C.     The Settlement Agreements

The consequent Settlement Agreements were standard all-cash agreements. Valeant agreed to pay $23,000,000 and the Philidor Defendants agreed to pay $125,000 into a fund (the "Settlement Fund") in exchange for a release of all claims and no admissions of wrongdoing. (Valeant Settlement ¶ NN; Philidor Settlement ¶ LL.) The Settlement Agreements specify that class members could proportionally draw from the $23,125,000 Settlement Fund. (Valeant Settlement ¶ 21; Philidor Settlement ¶ 21.) They define class membership to include

> all health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, other Third-Party Payors, and any other health benefit provider in the United States of America or its territories, that paid or incurred costs for Valeant's branded drug products in connection with a claim submitted by Philidor, a claim submitted by any pharmacy in which Philidor had a direct or indirect ownership interest, or a claim by any pharmacy for which the amount sought for reimbursement was alleged to be inflated as a result of Defendants' allegedly fraudulent scheme, during the Class Period, and allegedly suffered damages thereby.

(Valeant Settlement ¶ 1(rr); Philidor Settlement ¶ 1(ss).) Notably, the Settlement Agreements expressly exclude "Pharmacy Benefit Managers" and "any persons or entities who submit a request for exclusion from the Settlement Class that is approved by the Court." (Valeant Settlement ¶ 1(rr); Philidor Settlement ¶ 1(ss).)

The Settlement Agreements also provide for a customary class notice procedure. They provide that Lead Counsel will hire a Claims Administrator to "coordinate notice of the Settlement administration of Claims for this Settlement." (Valeant Settlement ¶ 18; Philidor Settlement ¶ 18.) The Claims Administrator distributes a notice, called a Claims Form, to all members of the proposed class. (*See id.*) As is standard, the Claims Form provides detailed instructions for class members, including a description of the litigation, a summary of class members' rights and obligations, a questions-and-answers review of how class members receive funds from the

Settlement Fund, and instructions on how to opt-out or object to the settlements. (*See* Valeant Settlement, Ex. A-1 (Claims Form), ECF No. 194-2; Philidor Settlement, Ex. A-1 (Claims Form), ECF No. 195-2.)

By all counts, notice to the putative class members was a success. The Claims Administrator has expertise in third-party payor class-action litigation and used a "well-developed database" to locate third-party payors in the class. (Pls.' Unopposed Mot. for Prelim. Approval 19-20, ECF No. 194.) In total, the Claims Administrator dispatched over 41,000 Claim Forms. (R. & R. ¶ 10(b), ECF No. 204.) Further, no class member objected to the settlement terms, and only six class members opted out. (*Id.*)

The Settlement Agreements also provide for fees, costs, and incentive awards for Named Plaintiffs. Specifically, the Claims Form instructs that Lead Counsel may seek fees up to 30% of the Settlement Fund. (Claims Form 8.) It also instructs that Lead Counsel may seek costs up to $750,000. (*Id.*) Finally, it instructs that Named Plaintiffs may receive incentive awards up to $100,000. (*Id.*)

### D. The Special Master's Recommendation

The Special Master approved the Settlement Agreements and the requests for fees, costs, and incentive awards. To start, the Special Master recommended certifying the class for settlement (the "Settlement Class") and adopted the parties' class definition. (R. & R. ¶ 7.) In so recommending, the Special Master concluded that the Settlement Class met all the factors required by Federal Rule of Civil Procedure 23(a) and 23(b).[1] (*Id.* ¶¶ 5-6.) The Special Master also concluded that the notice provisions were reasonable and further that the Settlement Agreements were fair, analyzing the factors required by the Third Circuit. (*Id.* ¶¶ 3, 10.) Finally, after thorough

---

[1] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

review of the parties' submissions regarding Lead Counsel's fees and costs, the Special Master recommended granting Named Plaintiffs' requests for fees, costs, and incentive awards. (*Id.* ¶¶ 16-18.)

## II.   STANDARD OF REVIEW

The Court reviews findings of fact and conclusions of law in the Special Master's reports and recommendations *de novo*. Fed. R. Civ. P. 53(f)(3)-(4); (Order Appointing Special Master ¶ 11.). The Court "may adopt or affirm, modify, wholly or partly reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1); (Order Appointing Special Master ¶ 10.)

## III.   LEGAL STANDARD

Under Rule 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). A district court may approve a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate." *Id.* The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

The Court must also certify the settlement class. While the exact process a district court should follow when presented with a settlement class is not prescribed by Rule 23, under Third Circuit law, the court must determine that the settlement class meets the requirements for class certification under Rule 23(a) and (b), as well as determine that the settlement is fair to that class under Rule 23(e). *In re NFL Players Concussion Inj. Litig.*, 775 F.3d 570, 581 (3d Cir. 2014).

## IV. DISCUSSION

With the standards set, the Court reviews *de novo* the Special Master's Report to determine whether to grant final approval to the Settlement Class and concludes that the Settlement Agreements are fair, reasonable, and adequate. The Court notes that the Special Master held a settlement hearing and made extensive factual findings and conclusions of law. It will therefore adopt those findings and conclusions where appropriate.

### A. The Court Certifies the Settlement Class.

The Special Master recommended certifying the Settlement Class. The Court agrees. To certify a class, plaintiffs must show that the proposed class meets three different sets of requirements. *First*, under Rule 23(a), plaintiffs must show that "the class is so numerous that joinder of all members is impracticable," that "there are questions of law or fact common to the class," that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). *Second*, under Rule 23(b) (and in this case, Rule 23(b)(3)), plaintiffs must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods." Fed. R. Civ. P. 23(b)(3). *Finally*, in the Third Circuit, plaintiffs must show that the class is ascertainable—that is, that the class is "defined with reference to objective criteria" and that "a reliable and administratively feasible mechanism" exists for "determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). The Court addresses each in turn.

1.  *Rule 23(a) Factors*

The Special Master found that Named Plaintiffs met their burden of showing the Rule 23(a) factors. (R. & R. ¶ 5.) The Court adopts those findings and adds further detail.

**Numerosity.** "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250-51 (3d Cir. 2016) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Here, the proposed class very likely exceeds forty, if not thousands. The proposed class accounts for several types of third-party payors, including "all health insurance companies, health maintenance organizations, [and] self-funded health and welfare benefit plans" that "paid or incurred costs" stemming from various claims related to the alleged fraudulent scheme. (Valeant Settlement ¶ 1(rr).) The class period covers almost three years of allegedly fraudulent conduct, during which numerous third-party payors likely incurred costs. (*See id.* ¶ 1(k).) The Court thus finds that Named Plaintiffs have met the numerosity prong.

**Commonality.** The commonality requirement is "not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). The Third Circuit counsels that the commonality inquiry focuses "on whether the defendant's conduct was common as to all of the class members." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc). Here, the proposed class suffered the same alleged harm—costs for third-party claims resulting from Valeant's alleged misrepresentations and omissions about its relationship with the Philidor Defendants. Indeed, common questions of fact easily include whether Valeant made false or misleading statements about its relationship and whether Valeant's conduct violated RICO. The Court thus finds that Named Plaintiffs have met the commonality prong.

**Typicality.** "Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based

differs from that upon which the claims of other class members will perforce be based.'" *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994) (alteration in original) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)). Like commonality, typicality is not hard to prove. *See id.* at 58 ("[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."). Here, no question exists that all Plaintiffs proceed under the same legal theory—third-party payors purchased or incurred costs for Valeant-branded drugs arising from Valeant's allegedly fraudulent conduct. The Court thus finds that Named Plaintiffs have met the typicality prong.

**Adequacy of Representation.** District courts ask two questions in assessing the adequacy of representation: whether class counsel is qualified to represent the class and whether named plaintiffs have conflicts of interest with the class members. *See In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). As to the first question, the Court finds that Lead Counsel has extensive experience and expertise in litigating complex class actions. *See Chao Sun v. Han*, No. 15-703, 2015 WL 2364937, at *5 (D.N.J. May 14, 2015) (noting that Carella Byrne has "extensive experience and substantial expertise in securities litigation"); *In re CenturyLink Sales Practices & Sec. Litig.*, 337 F.R.D. 193, 205 (D. Minn. 2020) (noting that Bernstein Litowitz is "highly qualified and ha[s] extensive experience in securities class action litigation"). As to the second question, the Court finds that the interests of Named Plaintiffs align with the class members—that is, both seek recovery of monies incurred by Valeant and the Philidor Defendants' allegedly fraudulent scheme. To be sure, no party has brought any conflict of interest to the Court's attention, and the Named Plaintiffs have vigorously disputed this case to date. The Court thus finds that Named Plaintiffs have met the adequacy-of-representation prong.

2.  *Rule 23(b)(3) Factors*

The Special Master found that Plaintiffs met their burden of showing the Rule 23(b)(3) factors. (R. & R. ¶ 6(a)-(b).) The Court adopts those findings and adds further detail.

**Predominance.** "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods, Inc.*, 521 U.S. at 623 (citation omitted). In assessing predominance, the Court draws from Third Circuit cases that have found predominance easier to meet for antitrust and fraud cases, especially in the conspiracy context. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) ("[P]redominance is a test readily met in certain cases alleging consumer . . . fraud or violations of the antitrust laws." (second alteration in original) (quoting *Amchem Prods. Inc.*, 521 U.S. at 625)); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) ("Key questions will not revolve around whether [a]ppellees knew that the prices paid were higher than they should have been or whether [a]ppellees knew of the alleged conspiracy among [a]ppellants. Instead, the critical inquiry will be whether 'defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class.'" (quoting *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999)). *Warfarin* is illustrative. There, the plaintiffs alleged that the defendant company "engaged in a broad-based campaign" that violated several "consumer fraud and antitrust laws," which deceived, among others, third-party payors. *In re Warfarin*, 391 F.3d at 528. So too here: Named Plaintiffs allege that Valeant and the Philidor Defendants conspired to conceal their relationship to the detriment of third-party payors and in violation of RICO. The allegedly misleading statements and the complexity of Valeant and the Philidor Defendants' relationship thus naturally raises common questions—and common evidence—of liability that will predominate over individualized class member issues. *See id.* The Court thus finds that Named Plaintiffs have met the predominance requirement.

**Superiority.** The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Id.* at 533-34 (quoting *In re Prudential*, 148 F.3d at 316). Here, the Court finds class action a superior mechanism for resolution. The class comprises likely thousands of third-party payors that are spread across the United States. As the years of litigating this case have shown, individualized litigation would be complex and expensive. In addition, outside the cases consolidated into this action, the Court is unaware of any individual litigation that has been filed, revealing just how onerous individual resolution of the class claims are. The Court thus finds that Named Plaintiffs have met the superiority requirement.

3. *Ascertainability*

As stated before, Named Plaintiffs must show that the class they seek to certify is ascertainable. *Byrd*, 784 F.3d at 163. The Special Master found that the class was ascertainable (R. & R. ¶ 6(c)), and the Court agrees. For one, the class definition identifies which third-party payors are part of the class, expressly excluding pharmacy-benefit managers. (Valeant Settlement ¶ 1(rr).) It further restricts the class to third-party payors who purchased or incurred costs for Valeant-branded drugs, thereby excluding any claims for generic drugs. In addition, the Court finds that a "reliable and administratively feasible mechanism" for finding putative class members exists. *Byrd*, 784 F.3d at 163. Named Plaintiffs note that a "well-developed database" of third-party payors exists, and that the Claims Administrator used this database in previous third-party payor litigation. (Pls.' Unopposed Mot. for Prelim. Approval 19.) The Court is thus satisfied that Named Plaintiffs have met the ascertainability prong.

**B.    The Notice to Class Members Was Reasonable.**

The Special Master twice approved of the notice procedure contemplated by the Settlement Agreements. (*See* Order Granting Prelim. Settlement Approval ¶ 8, ECF No. 197; R. & R. ¶ 3.)

On its own review, the Court has no reason to disturb that conclusion. The parties used an experienced Claims Administrator to give notice to class members through a well-developed database of third-party payors. (Pls.' Unopposed Mot. for Prelim. Approval 19.) The Claims Administrator had experience doing so in other third-party payor litigation. (*Id.*) In addition, the Claims Form was detailed and "provided all of the required information concerning the class members' right[s] and obligations." *In re Prudential*, 148 F.3d at 328; (Valeant Settlement, Exs. A-1 & A-2, ECF No. 194-2.) The Court thus concludes that notice to the class members was reasonable.

    **C.**    **The Settlement Agreements Are Fair.**

The Court must finally assess whether the Settlement Agreements are fair. Where, as here, the parties both seek certification and settlement approval, "courts [must] be even more scrupulous than usual" when examining fairness. *In re Prudential*, 148 F.3d at 317. But courts may also initially presume fairness where, as here, "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001); *see also In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016) (affirming presumption of fairness). After applying the presumption, the Court must consider Rule 23(e), which provides four fairness factors: (1) whether "the class representatives and class counsel have adequately represented the class"; (2) whether "the proposal was negotiated at arm's length"; (3) whether "the relief provided for the class is adequate"; and (4) whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). The Third Circuit has largely codified these factors into a set of its own, illustrated by the factors set forth in *Girsh* and *Prudential*. *See Girsh*, 521 F.2d at 157; *In re Prudential*, 148 F.3d at 323.

Here, the Court begins by noting that it presumes the Settlement Agreements to be fair. The Special Master found, and the Court has no reason to dispute, that the parties negotiated at arms' length (R. & R. ¶¶ 4, 9), the parties engaged in extensive discovery for years (*id.* ¶ 10(c)), and no class members objected (*id.* ¶ 10(b)). In addition, the Court finds that the Settlement Agreements are like those in similar litigations, especially considering their all-cash nature, use of an experienced Claims Administrator, and customary detailed Claims Form. (*See* Valeant Settlement ¶ 18. *See generally* Claims Form.) The Special Master's findings further buttress the fairness of the Settlement Agreements. The Special Master examined and analyzed each of the relevant *Girsh* and *Prudential* factors. (*See* R. & R. ¶¶ 10-11.) The Court has thoroughly reviewed the Special Master's factor-by-factor analysis and adopts in full his recommendations. The Court thus concludes that the Settlement Agreements are fair.

**D. The Court Approves Plaintiffs' Requests for Fees, Costs, and Incentive Awards.**

The Court next considers the Special Master's recommendation that the Court grant fees and costs to Lead Counsel and incentive awards to Named Plaintiffs. The Court concludes that both awards are appropriate.

1. *Fees and Costs*

The Special Master recommended awarding Lead Counsel fees equal to 30% of the Settlement Funds. (*Id.* ¶ 16.) The Court agrees and adds further detail to the Special Master's findings.

Starting with fees, courts assess fee awards under two approaches: the percentage-of-recovery approach and the lodestar approach. The former awards fees based on a specified percentage of a fund, while the latter multiples the number of hours billed by reasonable billing rates. As a starting point, the Third Circuit "generally favor[s]" the percentage-of-recovery

approach in settlement fund cases. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 330 (3d Cir. 2011) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005)). It instructs courts to next "cross-check the reasonableness of the percentage-of-recovery fee award" through the lodestar approach. *See id.* (quoting *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006)). In addition, the Third Circuit mandates that district courts consider the following, called the *Gunter-Prudential* factors:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); *In re Prudential*, 148 F.3d at 336-40).

Here, starting with the percentage-of-recovery approach, the Court finds Lead Counsel's fees reasonable. Lead Counsel requests fees equal to 30% of the Settlement Fund, which falls comfortably within the customary recovery range. *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 122 (D.N.J. 2012) ("Courts within the Third Circuit often award 25% to 33% of recovery." (citations omitted)). To be sure, Lead Counsel references several cases where courts found similar awards reasonable. (*See* Pls.' Fees Br. 6-7, ECF No. 200-1 (collecting cases) (citing, among others, *Castro v. Sanofi Pasteur Inc.*, No. 11-7178, 2017 WL 4776626, at *10 (D.N.J. Oct. 23, 2017); *Demaria v. Horizon Healthcare Servs., Inc.*, No. 11-7298, 2016 WL 6089713, at *4 (D.N.J. Oct. 18, 2016); *In re N.J. Tax Sales Certifs. Antitrust Litig.*, No. 12-1893, 2016 WL 5844319, at *10 (D.N.J. Oct. 3, 2016)).) The lodestar cross-check confirms the reasonability of

Lead Counsel's fees. Whereas 30% of the Settlement Fund is just under $7 million, Lead Counsel's lodestar clocks in at over $9.4 million. (Harrod & Cecchi Joint Decl., Ex. 7 (Lodestar Summary), ECF No. 201-7.) Unlike many others, Lead Counsel's lodestar results in a *negative* multiplier, thereby furnishing strong evidence that the requested fees are reasonable. *See Castro*, 2017 WL 4776626, at *9 ("Because the lodestar cross-check results in a negative multiplier, it provides strong evidence that the requested fee is reasonable."); *Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. 08-235, 2019 WL 4877563, at *8 (D.N.J. Oct. 3, 2019) ("The negative multiplier of 0.36 is much lower than lodestar multipliers of between one and four that have been found to be reasonable in this Circuit.").

Turning to the *Gunter-Prudential* factors, like the Special Master, the Court finds that the first nine factors support the requested fees and that the tenth factor is neutral:

1. A sizeable number of class members will benefit from the $23,125,000 Settlement Fund, illustrated by the more than 41,000 notices mailed by the Claims Administrator. *See In re Par Pharm. Sec. Litig.*, No. 06-3226, 2013 WL 3930091, at *9 (D.N.J. July 29, 2013) (looking to number of notices distributed to determine number of persons benefited).

2. As of November 11, 2021 (the objection deadline), the Court received no objections. *See id.* ("The lack of any objections or exclusions strongly supports approval of the Settlement.")

3. The parties' attorneys are skilled class-action counsel that efficiently litigated this matter, as shown by the $23,125,000 recovery to the class in the face of staunch opposition. *See In re Wellbutrin SR Antitrust Litig.*, No. 04-5525, 2011 WL 13392296, at *5 (E.D. Pa. Nov. 21, 2011) ("This experience and the results obtained for the class reflect Class Counsel's skill and efficiency." (citation omitted)).

4. This five-year litigation has been vigorously contested, involving millions of documents, dozens of depositions, and multiple mediations. *See In re Cendant PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001) (noting that hallmarks of complexity and duration are "complex and/or novel legal issues, extensive

discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel").

5. Lead Counsel undertook this litigation on a contingency-fee basis and faced defense counsel that argued that no damages existed. *See In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-1432, 2012 WL 1964451, at *7 (D.N.J. May 31, 2012) ("Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." (citations omitted)); *McGee v. Cont'l Tire N. Am., Inc.*, No. 06-6234, 2009 WL 539893, at *15 (D.N.J. May 4, 2009) ("Class Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award.").

6. Lead Counsel spent over 16,000 hours litigating this case. *See Plymouth Cnty. Contributory Ret. Sys. v. Hassan*, No. 08-1022, 2012 WL 664827, at *5 (D.N.J. Feb. 28, 2012) (finding in favor of fee award where counsel "expended over 10,000 hours in the pursuit of th[e] litigation").

7. 30% of a fund is a typical fee award. *See In re Ins. Brokerage Antitrust Litig.*, 288 F.R.D. at 122 ("Courts within the Third Circuit often award 25% to 33% of recovery.").

8. Although the DOJ and the SEC investigated and prosecuted Defendants, Lead Counsel brought RICO claims that were distinct from those government inquiries and did not benefit from any prior admissions of wrongdoing. *See In re Rite Aid Corp.*, 396 F.3d at 304-05 (affirming district court that weighed eighth factor in favor of fees where "government's investigations never resulted in criminal or civil charges" and "may have hardened [the defendant's] bargaining position").

9. 30% of a fund is at the bottom of the range of customary private contingency fees. *See Whiteley v. Zynerba Pharms., Inc.*, No. 19-4959, 2021 WL 4206696, at *13 (E.D. Pa. Sept. 16, 2021) ("In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent and forty percent of the recovery." (citations omitted)).

10. As conceded by Lead Counsel, the Settlement Agreements do not contain innovative terms because "an all-cash recovery is the best remedy for the injury suffered by the Settlement Class." (Pls.' Fees Br. 17 n.8; *see also In re Merck & Co. Vytorin ERISA Litig.*, No. 08-285, 2010 WL 547613, at *12 (D.N.J. Feb. 9, 2010) (concluding that tenth factor "neither weigh[ed] in favor

nor detract[ed] from a decision to award attorneys' fees" where class counsel identified no innovative terms).)

Putting them all together, the Court finds that the *Gunter-Prudential* factors weigh strongly in favor of awarding Lead Counsel's requested fees.

Regarding costs, the Court finds Lead Counsel's request proper. "Expenses are recover[able] if they are adequately documented and reasonable in nature." *Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *23 (D.N.J. Oct. 13, 2010) (citing, among others, *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995)). Lead Counsel requests $720,335.39 in costs, representing that those costs include "document management costs, expert fees, on-line research, court reporting and transcripts, photocopying, and postage expenses." (Pls.' Fees Br. 18.) The single largest line item was expenses to the Special Master, which this Court ordered. (*See* Order Appointing Special Master ¶¶ 21, 23.) The Court has carefully reviewed Lead Counsel's expense reports and concludes that their costs are adequately documented and reasonable. *See Hall*, 2010 WL 4053547, at *23 ("Courts have generally approved expenses arising from photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants." (citation omitted)). In addition, the Claims Form notified class members that litigation expenses would not exceed $750,000—thereby putting the class on notice of these costs. Nor did any class member object to that figure. *See In re Schering-Plough Corp.*, 2012 WL 1964451, at *8 (awarding expenses where class counsel notified class members of expenses, and no class members objected).

### 2.  *Incentive Awards*

Finally, the Special Master recommended awarding $20,000 in incentive awards to each of the five Named Plaintiffs. The Court agrees. In this district, courts "have not hesitated to assure that those undertaking class litigation are not penalized for placing a class's interest above their own." *Cullen v. Whitman Med. Co.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (listing cases). That's

especially so where named plaintiffs "significantly contribute[] to the litigation." *In re Merck & Co. Vytorin ERISA Litig.*, No. 08-1974, 2012 WL 13186948, at *7 (D.N.J. Oct. 1, 2012). Here, over five years, Named Plaintiffs provided Lead Counsel with detailed information, authorized searches of corporate data, provided countless documents, and ensured that the action moved toward resolution. (*See* Harrod & Cecchi Joint Decl., Exs. 1-5 (Named Plaintiffs Decls.), ECF No. 201-1 to -5.) Nor is an individual incentive award of $20,000 unreasonable or out of the ordinary. (*See* Pls.' Fees Br. 20-21 (collecting cases).)

## V. CONCLUSION

The Court adopts the Special Master's Report and approves the Settlement Agreements. It further grants Named Plaintiffs' requests for attorneys' fees, costs, and incentive awards. An order consistent with this Memorandum Opinion will follow.

*/s/ Michael A. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE